## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION (at Covington)

| | | |
|---|---|---|
| **Hon. JOHN SCHICKEL,** | **:** | **Case No. _____** |
| **in his Personal and Official Capacities,** | | |
| **2147 Natchez Trace** | **:** | |
| **Union, KY 41091** | | |
| | **:** | |
| **AND** | | |
| | **:** | |
| **DAVID WATSON** | | |
| **4475 Oak Level Road** | **:** | |
| **Benton, Kentucky 42025** | | |
| | **:** | |
| **AND** | | |
| | **:** | |
| **KEN MOELLMAN, JR.** | | |
| **475 Hickory Grove Road** | **:** | |
| **Foster, KY 41043** | | |
| | **:** | |
| **PLAINTIFFS** | | |
| **v.** | **:** | |
| **Hon. CRAIG C. DILGER,** | **:** | |
| **in his official capacity** | | |
| **as Chair and Member, Kentucky** | **:** | |
| **Registry of Election Finance,** | | |
| **140 Walnut Street** | **:** | |
| **Frankfort, Kentucky** | | |
| | **:** | |
| **and** | | |
| | **:** | |
| **Hon. TERRY NAYDAN,** | | |
| **in her official capacity** | **:** | |
| **as Vice-Chair and Member,** | | |
| **Kentucky Registry of Election Finance,** | **:** | |
| **140 Walnut Street** | | |
| **Frankfort, Kentucky** | **:** | |
| | | |
| **and** | **:** | |
| | | |
| **Hon. ROSEMARY CENTER,** | **:** | |
| **in her official capacity** | | |
| **as Member,** | **:** | |
| **Kentucky Registry of Election Finance,** | | |

**140 Walnut Street**
**Frankfort, Kentucky**

                                      :

**and**

                                        :

**Hon. REID HAIRE**
     **in his official capacity**     :
     **as Member,**
     **Kentucky Registry of Election Finance,**  :
     **140 Walnut Street**
     **Frankfort, Kentucky**     :
**and**

                                          :

**Hon. ROBERT MATTINGLY**
     **in his official capacity**     :
     **as Member,**
     **Kentucky Registry of Election Finance,**  :
     **140 Walnut Street**
     **Frankfort, Kentucky**     :

**and**                                        :

**Hon. CHASTITY ROSS**     :
     **in her official capacity**
     **as Member,**     :
     **Kentucky Registry of Election Finance,**
     **140 Walnut Street**     :
     **Frankfort, Kentucky**

                                        :
**and**

                                        :

**Hon. THOMAS STEVENS**
     **in his official capacity**     :
     **as Member,**
     **Kentucky Registry of Election Finance,**  :
     **140 Walnut Street**
     **Frankfort, Kentucky**     :

**and**                                        :

**Hon. JOHN STEFFEN,**     :
     **in his official capacity**
     **as Executive Director**     :
     **Kentucky Registry of Election Finance,**
     **140 Walnut Street**     :
     **Frankfort, Kentucky**

              :

**and**              :

**Hon. GEORGE C. TROUTMAN,**
   **in his official capacity**    :
   **as Chairman and Member**
   **Kentucky Legislative Ethics Comm'n.** :
   **22 Mill Creek Park**
   **Frankfort, Kentucky 40601**   :

**and**              :

**Hon. ELMER GEORGE**     :
   **in his official capacity as Member**
   **Kentucky Legislative Ethics Comm'n.** :
   **22 Mill Creek Park**
   **Frankfort, Kentucky 40601**   :

**and**              :

**Hon. DEBORAH JO DURR**    :
   **in her official capacity as Member**
   **Kentucky Legislative Ethics Comm'n.** :
   **22 Mill Creek Park**
   **Frankfort, Kentucky 40601**   :

**and**              :

**Hon. NORMA SCOTT**      :
   **in her official capacity as Member**
   **Kentucky Legislative Ethics Comm'n.** :
   **22 Mill Creek Park**
   **Frankfort, Kentucky 40601**   :

**And**              :

**Hon. CHARLES R. BORDERS**   :
   **in his official capacity as Member**
   **Kentucky Legislative Ethics Comm'n.** :
   **22 Mill Creek Park**
   **Frankfort, Kentucky 40601**   :

**And**              :

**Hon. BOB FULKERSON**     :
   **in his official capacity as Member**

       **Kentucky Legislative Ethics Comm'n.**     :
       **22 Mill Creek Park**
       **Frankfort, Kentucky 40601**     :

**And**     :

**Hon. PAT FREIBART**     :
       **in her official capacity as Member**
       **Kentucky Legislative Ethics Comm'n.**     :
       **22 Mill Creek Park**
       **Frankfort, Kentucky 40601**     :

**And**     :

**Hon. HENRY STEPHENS**     :
       **in his official capacity as Member**
       **Kentucky Legislative Ethics Comm'n.**     :
       **22 Mill Creek Park**
       **Frankfort, Kentucky 40601**     :

**And**     :

**Hon. PAUL D. GUDGEL**     :
       **in her official capacity as Member**
       **Kentucky Legislative Ethics Comm'n.**     :
       **22 Mill Creek Park**
       **Frankfort, Kentucky 40601**     :

**And**     :

**Hon. ANTHONY M. WILHOIT**     :
       **in his official capacity as**
       **Executive Director**     :
       **Kentucky Legislative Ethics Comm'n.**
       **22 Mill Creek Park**     :
       **Frankfort, Kentucky 40601**
                           :

       **DEFENDANTS**

                           :

**And**     :

       **Jack Conway, KY Attorney General**
       **Office of the Attorney General**
       **700 Capitol Avenue, Suite 118**     :
       **Frankfort, Kentucky 40601-3449**     :
       *For Notice Purposes Only*

<u>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF,**</u>
<u>**COSTS, AND ATTORNEY FEES FOR CONSTITUTIONAL VIOLATIONS**</u>

Plaintiffs Kentucky State Senator John Schickel, ("Senator Schickel"), Mr. David Watson ("Mr. Watson"), and Mr. Ken Moellman, Jr. ("Mr. Moellman"), by and through counsel, for their *Verified Complaint for Declaratory and Injunctive Relief, Costs, and Attorney Fees for Constitutional Violations* (the "Complaint"), state and allege as follows:

## <u>INTRODUCTION</u>

1.   This is an action involving the continued and threatened deprivation of the First Amendment and Fourteenth Amendment rights of Senator Schickel, Mr. Watson, Mr. Moellman, and millions of other Kentuckians by the official capacity Defendants named herein.  Senator Schickel, a retired law enforcement officer, who has a long and distinguished history of protecting Kentuckians, seeks to continue fulfilling his oath of office, upholding and protecting the U.S. Constitution, and vindicating the First Amendment rights of himself and millions of other Kentuckians.  Mr. Watson, an Army veteran, and candidate for the Kentucky House or Representatives, likewise seeks to vindicate the constitutional rights of millions of Kentuckians.  Specifically this action challenges certain campaign finance legislation contained in K.R.S. § 121.150, and specifically certain campaign contribution limitations as well as campaign contribution prohibitions contained within those sections. This suit likewise challenges certain provisions in K.R.S. § 6.767 through K.R.S. § 6.811, as being incompatible with the First and Fourteenth Amendments.  This suit seeks injunctive and declaratory relief under 42 U.S.C. § 1983, and attorney fees under 42 U.S.C. § 1988.

## <u>PARTIES</u>

2.  At all relevant times herein, Senator Schickel was a resident of Boone County, Kentucky, was and is the incumbent State Senator for the 11th Senatorial District in Kentucky, was a

5

candidate for the office of State Senator for the 11th Senatorial District in 2012, and is a candidate for the office of State Senator for the 11th Senatorial District in 2016. In connection with his candidacy for office, for which he will stand for election in the 2016 primary and general election, Senator Schickel has and continues to engage in fundraising and other campaign activities, and desires to engage in campaign activities that are currently prohibited by the statutes challenged herein.

3. At all relevant times herein, Mr. Watson was a resident of Marshall County, Kentucky, and is currently and will be a candidate for the 6th House District in Kentucky in 2016. In connection with his candidacy for office, for which he will stand for election in the 2016 primary and general election, Mr. Watson has and continues to engage in fundraising and other campaign activities, and desires to engage in campaign activities that are currently prohibited by the statutes challenged herein.

4. At all relevant times herein, Mr. Moellman was a resident of Pendleton County, Kentucky, and, in 2011, was a statewide candidate for the office of Kentucky State Treasurer. Mr. Moellman will be a candidate for the office of Pendleton County Judge/Executive in the 2018 elections, and in connection with that office, will begin fundraising activities in the near future. Mr. Moellman desires to engage in campaign and other activities that are currently prohibited by the statutes challenged herein.

5. Defendants Hon. Craig Dilger, Hon. Terry Naydan, Hon. Rosemary Center, Hon. Reid Haire, Hon. Robert Mattingly, Hon. Chastity Ross, and Hon. Thomas Stevens are the duly installed and serving members of the Kentucky Registry of Election Finance (collectively "KREF"), who are all sued in their official capacities as such. Defendant John Steffen is the Executive Director of the KREF and is sued in his official capacity as such. The members of KREF,

KREF itself, and Mr. Steffen are responsible, pursuant to K.R.S. 121.110, 121.120, and 121.140, for the enforcement of K.R.S. Chapter 121, including, without limitation, the ability to bring administrative or civil enforcement actions, as well as the ability to refer enforcement matters for criminal prosecution.  KREF also, pursuant to K.R.S. 121.140, receives sworn complaints from the public relating to potential violations of K.R.S. Chapter 121.

6. Defendants Hon. George Troutman, Hon. Elmer George, Hon. Deborah Jo Durr, Hon. Norma Scott, Hon. Charles R. Borders, Hon. Bob Fulkerson, Hon. Pat Freibart, Hon. Henry Stephens, and Hon. Paul Gudgel are the duly installed and serving members of the Kentucky Legislative Ethics Commission (collectively "KLEC"), who are all sued in their official capacities as such.  Defendant Anthony Wilhoit is the Executive Director of the KLEC and is sued in his official capacity as such.  The KLEC and Mr. Wilhoit are responsible, pursuant to K.R.S. 6.651 and 6.666, for the enforcement of K.R.S. 6.601 through 6.849, known as the Kentucky Code of Legislative Ethics ("Ethics Code"), including, without limitation, the ability to bring administrative or civil enforcement actions, as well as the ability to refer enforcement matters for criminal prosecution.  KLEC also, pursuant to K.R.S. 6.686, receives sworn complaints from the public relating to potential violations of the Ethics Code.

7. The Kentucky Attorney General is not served as a Defendant, but is provided notice under the provisions of K.R.S. 418.075.

<u>**JURISDICTION AND VENUE**</u>

8. Subject matter jurisdiction over the claims and causes of action asserted by Senator Schickel in this action is conferred on this Court pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, 28 U.S.C. §1331, 28 U.S.C. § 1343, 28 U.S.C. §§ 2201 and 2202, and other applicable law.

9.  This Court has personal jurisdiction over each defendant because each of them is domiciled within the Commonwealth of Kentucky.

10. Venue in this District and division is proper, pursuant to 28 U.S.C. §1391 and other applicable law, because all of the deprivations of Senator Schickel's and Mr. Moellman's Constitutional Rights occurred in Boone County, Kentucky and Pendleton County, Kentucky, respectively, and future deprivations of their Constitutional Rights are threatened and likely to occur in this District.  The named Defendants live in separate divisions within the Eastern District of Kentucky, and some live in the Western District of Kentucky.  A substantial portion of the events and deprivations at issue occurred in the Northern Division of the Eastern District of Kentucky.  While deprivations of Mr. Watson's constitutional rights occurred in Marshall County, Kentucky, which is outside this district, the questions of fact and law are identical to the claims brought by Senator Schickel and Mr. Moellman.

## FACTS COMMON TO ALL CLAIMS

11. Senator Schickel was a candidate for the office of State Senator for the 11th Senatorial District in 2012, and is a candidate for the office of State Senator for the 11th Senatorial District in 2016.  In connection with his candidacy for office, for which he will stand for election in the 2016 primary and general election, Senator Schickel has and continues to engage in fundraising and other campaign activities, and desires to engage in campaign activities that are currently prohibited by the statutes challenged herein.

12. Mr. Watson is and will be a candidate for the office of State Representative for the 6th House District in 2016.  In connection with his candidacy for office, for which he will stand for election in the 2016 general election, Mr. Watson has and continues to engage in fundraising

and other campaign activities, and desires to engage in campaign activities that are currently prohibited by the statutes challenged herein.

13. At all relevant times herein, Mr. Moellman was a resident of Pendleton County, Kentucky, and, in 2011, was a statewide candidate for the office of Kentucky State Treasurer.  Mr. Moellman will be a candidate for the office of Pendleton County Judge/Executive in the 2018 elections, and in connection with that office, will begin fundraising activities in the near future.  Mr. Moellman desires to engage in campaign and other activities that are currently prohibited by the statutes challenged herein.

14. The 11th Senatorial District covers Boone County, Kentucky which according to 2010 Census data, had a population of 118,811, comprising 43,216 households.

15. The 6th House District covers Lyon and Marshall County, Kentucky, and part of McCracken County, and, according to 2010 Census data, had a population of 41,978, comprising approximately 20,000 households.

16. Pendleton County, Kentucky, has a population of 14,877, comprising 6,339 households according to the 2010 Census.

17. Senator Schickel has engaged and continues to engage in significant fundraising activities in connection with his campaigns for State Senate.  For instance, in 2012, Senator Schickel raised $92,968.88 for his Republican Primary Campaign, and Senator Schickel raised, and spent $70,067.25 for his General Election Campaign.  Thus far, for the 2016 election, by and through his 2014 annual KREF report, Senator Schickel has raised $97,719.49 and spent $8,763.38, from approximately 150 separate donors.  Senator Schickel has raised as many funds as he can, consistent with the limitations of the law.

9

18. Senator Schickel expects to need to raise approximately $250,000 to $350,000 for his primary and general election campaigns in 2016.  He cannot do so lawfully under current Kentucky law.

19. Mr. Watson will engage in significant fundraising activities in connection with his campaigns for the Kentucky House of Representatives.  He expects to need to raise at least $150,000 to be competitive in the General Election in 2016.  To win the election, Mr. Watson intends to inform the voters of the 6th Kentucky House District of the incumbent, Will Coursey's record of sexually harassing female staffers in the Kentucky General Assembly, causing a lawsuit to be filed against Coursey and the Kentucky Legislative Research Commission.[1]  He cannot lawfully raise enough funds under current Kentucky law to so inform the voters.

20. Mr. Moellman needs to raise approximately $75,000 for his general election campaign in 2018.  He cannot lawfully do so under current Kentucky law.

21. Senator Schickel, Mr. Watson, and Mr. Moellman have many donors and potential donors who are longstanding friends and acquaintances, and many of these donors contribute to Kentucky's campaign limit donation of $1,000 per election, per person.  If permitted by Kentucky law, these donors would donate more than the $1,000 limit.

22. A single mailer, for instance, in a primary cycle for the 11th Senatorial District costs approximately $10,000 to run; while a single mailer in a general election cycle for the 11th Senatorial District costs approximately $20,000 to run.  Typically, Senator Schickel will run at least two mailers in a primary cycle, and at least two mailers in a general election campaign.  More could be necessary on the competitiveness of the race.  The costs for these

---

[1] http://www.courier-journal.com/story/news/politics/2015/06/23/taxpayers-hook-arnold-settlement/29185533/

mailers, and other costs associated with running a campaign, goes up every year, exceeding or at least matching the price of inflation.

23. A single mailer, for instance, in a general election cycle for the 6th House District costs approximately $12,000 to run.  Mr. Watson expects to need to run at least two mailers in the general election campaign.  More could be necessary based on the competitiveness of the race.  The costs for these mailers, and other costs associated with running a campaign, goes up every year, exceeding or at least matching the price of inflation.

24. A single mailer, for instance, in a general election cycle for the Pendleton County Judge/Executive Race costs approximately $10,000 to run.  Mr. Moellman expects to need to run at least two mailers in the general election campaign.  More could be necessary on the competitiveness of the race.  The costs for these mailers, and other costs associated with running a campaign, goes up every year, exceeding or at least matching the price of inflation.

25. Typically, Political Action Committees ("PACs"), including non-profit groups that advocate for the election or defeat of particular candidates or send mail pieces about one candidate or the other (or both), either registered with KREF, or, more often than not, so called federal "dark money" Super PACs, which are not subject to disclosure and reporting requirements, have been participating in primary and general elections for Kentucky State Senate or Judge/Executive races, sending between one and three mailers per PAC per election.  For the 11th Senatorial District or 6th House District, this results in spending of hundreds of thousands of dollars in PAC (and Super PAC) money.

26. PACs also operate and are active in Judge/Executive races, and tens of thousands of dollars are expected to be spent in the 2018 Pendleton County Judge/Executive race.

27. Each dollar that Senator Schickel, Mr. Watson, or Mr. Moellman raises, however, is subject to both disclosure requirements, and limitations under K.R.S. Chapter 121.

28. Each PAC mailer that is adverse to Senator Schickel, Mr. Watson or Mr. Moellman requires each of them to spend corresponding dollars to address issues raised.  Where the issues are misleading, and require clarification, more than one mailer or other form of voter messaging may be necessary.  Thus, each dollar spent by a PAC requires between one to three dollars of money to be spent by a candidate to effectively communicate with voters.


The Challenged Provisions

29. K.R.S. 121.150(6) limits, in any election, campaign contributions to $1,000, from any person, permanent committee, or contributing organization; K.R.S. 121.150(13) limits loans to a person's own campaign to $10,000; K.R.S. 121.150(23)(a) limits a candidate's ability to accept more than 50% of fundraising from a permanent committee or $10,000, whichever is greater.  If permitted, Senator Schickel, Mr. Watson, and Mr. Moellman would accept donations of more than $1,000 in an election; would loan themselves more than $10,000 to conduct their elections; and would generate more than 50% of his fundraising, and more than $10,000 from permanent committees.  They do not do so out of a legitimate fear and threat of criminal and civil enforcement of K.R.S. 121.150, and the other sections contained herein, by the Kentucky Registry of Election Finance, the official capacity Defendants herein.  Under K.R.S. 121.990 violations constitute Class D felonies.

30. In addition to the foregoing, Mr. Watson intends to run as a Libertarian Candidate.  K.R.S. 121.150(11) provides for four special "Super PACs" – called "caucus campaign committees," these committees are established in K.R.S. 121.015(3)(b), which states:

(b) "Caucus campaign committee," which means members of one (1) of the following caucus groups who receive contributions and make expenditures to support or oppose one (1) or more specific candidates or slates of candidates for nomination or election, or a committee: 1. House Democratic caucus campaign committee; 2. House Republican caucus campaign committee; 3. Senate Democratic caucus campaign committee; and 4. Senate Republican caucus campaign committee;

31. K.R.S. 121.150(11) provides for a $2,500 ***per year*** donation limit to the caucus campaign committee for the House Democrats, House Republicans, Senate Democrats, and Senate Republicans, and Kentucky law, and specifically K.R.S. 121.180(2)(b) envisions a donor giving to the committee and "earmarking" the donation to assist particular candidates. Unlike donations to political parties, which K.R.S. 121.150(11) caps at $2,500 per year, but provides that donations in excess of $1,000 be "deposited in a separate account which the state executive committee maintains for the exclusive purpose of paying administrative costs incurred by the political party," there is no such limitation on such donations to "caucus campaign committees." This allows the caucus campaign committees to funnel funds, at two and a half times the "normal" candidate donation limit, to particular races and candidates, engaging in viewpoint discrimination to protect Republican and Democratic party candidates.

32. In the case of Mr. Watson, the special, viewpoint based, limitations for caucus campaign committees significantly and negatively affect his ability to campaign, since he is limited to $1,000 per donor limitations.

33. The contribution limits, in 1990, were set at $4,000 per candidate, per election. In 1992, these contribution limits were lowered to $500 per candidate, per election. Finally, in 1994, and since that point in time, the limit has remained $1,000 per candidate, per election.

34. The same $1,000 per candidate, per election, limit applies to a Mayor of a small city of 100 people, as to a State Senator covering a district of 118,811 people.

35. The $1,000 limit does not rise based on inflation or consumer price index.  Applying the

Consumer Price Index to the $1,000 from 1994, that would equate to $1,583.82 today.  Put

another way, the $1,000 limit today would equate to $631.39 in 1994 dollars.  More

fundamentally, using 1976 dollars, the $1,000 limit today, adjusted for inflation would be

$242.41 in 1976 dollars.  Similarly, $1,000 in 1976 would equate to $4,125.17 today.

Similarly, the $1,000 limit today, equates to $683.79 in 1997 dollars.[2]

36. At the federal level, campaign contributions are adjusted for inflation, and are currently

$2,700 per candidate, per election.  52 USC 30016(a) and (c).

37. Elections are and continue to be more and more costly, largely because of so called Super

PACs; *See, also, McCutcheon v. FEC*, 134 S. Ct. 1434 (2014) (describing Super PACs).

These Super PACs have and continue to participate in Kentucky legislative races.  Over

$3,000,000 in Super PAC monies were spent in the 2014 general election cycle in Kentucky

state races and these Super PACs further participate in primary elections, spending

significant sums.  *See, also* "Super PACs will spend millions in fight for Ky House,"

Louisville Court Journal, Tom Loftus, 10/31/2014 (attached as Exhibit A).

38. In a contested state house or state senate race, a Super PAC can be expected to fund at least

$100,000; and in particularly contested races, $200,000, or more could be spent.

39. As opposed to campaign disclosures in 1976, today, Kentucky's Registry of Election Finance

accepts campaign finance reports from candidates in the weeks and months preceding an

election, and makes these figures available to the public on its website and searchable

database at http://www.kref.state.ky.us/krefsearch/ (last visited 4/10/15), making meaningful

campaign donor information, including date, amount, and identity of the door, available to

---

[2] Source: http://data.bls.gov/cgi-bin/cpicalc.pl  (last visited April 10, 2015)

voters.  This in turn makes it far easier to ferret out any quid-pro-quo donations, and has a significant effect in preventing such quid-pro-quo corruption.

40. In fact, the Kentucky Registry of Election Finance admits, on its website, that its role is to "assure the integrity of the Commonwealth's electoral process by making certain there is full public access to campaign financial data and financial disclosure reports, and by administering Kentucky's campaign finance laws." *See* http://kref.ky.gov/Pages/default.aspx#slide1 (last visited 4/10/2015).  It further "ensures that information reports pertinent to election campaign financing are filed on a timely basis and reviews this information for completeness, accuracy, and compliance with campaign finance laws." *Id.*

41. K.R.S. 6.767(1)[3] prohibits the receipt of a campaign contribution from a legislative agent (i.e. a lobbyist), in any amount, at any time to any legislator or candidate for legislator – this limitation applies not only to donations for legislative races, but also donations for any other race the legislator desires to run (i.e. for Governor, Lt. Governor, or Attorney General).; K.R.S. 6.767(2) prohibits the receipt of a campaign contribution from an employer of a legislative agent (i.e. a lobbyist), at any time that the legislature is in session.  K.R.S. 6.811(6) and (7) contains reciprocal prohibitions on the legislative agents and their employers from making these same contributions.  There are criminal, civil and other penalties for violations.

42. K.R.S. 6.811(4) and K.R.S. 6.751(2) prohibits the gifting of "anything of value" to a legislator, from a legislative agent or its employer, at any time, regardless of the circumstances, for any reason.  This includes a 2014 amendment that excluded a *de minimis*

---

[3] To be clear, only Senator Schickel and not Mr. Moellman, are challenging the legislative ethics provisions in K.R.S. Chapter 6.

exception for entertainment, or a cup of coffee, from the definition of "anything of value" under K.R.S. 6.611.  Under the new definition, members of the public can invite legislators to holiday parties, including events for political parties, and allow the legislators to receive snacks and other *de minimis* items, but if the same event is organized by a lobbyist or employer of a lobbyist, the legislator cannot attend.  This infringes on the legislator's, lobbyist's, and employer of lobbyist's right to freedom of association, and freedom of speech.

43. Senator Schickel, a retired law enforcement officer, is prohibited from taking donations from, but otherwise would accept donations, from employers of lobbyists at all times but for the aforementioned prohibitions set forth above, including, the Kentucky State Lodge Fraternal Order of Police, Inc., the Bluegrass Fraternal Order of Police Lodge #4, the Kentucky Fire Fighters Association, and the National Rifle Association of America.

44. In terms of lobbyist donations, Senator Schickel would accept, if not prohibited, donations from certain registered lobbyists, including those lobbying on behalf of the organizations set forth in the preceding paragraph.

45. Furthermore, Senator Schickel would attend holiday parties, hosted by longstanding friends, who are lobbyists or employ lobbyists, if he were not prevented from doing so under K.R.S. 6.811(4) and K.R.S. 6.751(2).  In order to simply conform to social norms, he would also accept a cup of coffee, or soda or other *de minimis* items, from such lobbyists, in the Capitol's cafeteria, in discussing issues with the lobbyists, just as he would do so from a constituent.

46. Mr. Watson, an army veteran, father, and husband, who is an advocate for freedom and ethics in government, is prohibited from taking donations from, but otherwise would accept

donations, from employers of lobbyists at all times but for the aforementioned prohibitions

set forth above, including, the Kentucky Association of Sexual Assault Programs, Inc., which

advocates on behalf of rape crisis centers, and the National Rifle Association of America.

47. In terms of lobbyist donations, Mr. Watson would accept, if not prohibited, donations from

certain registered lobbyists, including those lobbying on behalf of the organizations set forth

in the preceding paragraph.

48. Furthermore, Mr. Watson would attend holiday parties, hosted by longstanding friends, who

are lobbyists or employ lobbyists, if he were not prevented from doing so under K.R.S.

6.811(4) and K.R.S. 6.751(2).

49. Unless enjoined, all Defendants will continue to enforce the challenged provisions herein, in

a manner that contravenes Senator Schickel's, Mr. Watson's, and Mr. Moellman's First and

Fourteenth Amendment rights.

50. The actions set forth herein have and continue to deprive Senator Schickel, Mr. Watson, and

Mr. Moellman of their First Amendment rights.

### Case Law, or a Good Faith Argument for Extension or Reversal of It, Supports the Challenges Herein

51. Plaintiffs, Senator Schickel, Mr. Watson, and Mr. Moellman, hereby reincorporates the

preceding paragraphs of their Complaint as if fully set forth herein.

### KRS 121.150(6)'s $1,000 limit and K.R.S. 121.150(11)'s $2,500 limit for "caucus campaign committees"[4]

52. K.R.S. 121.150(6) provides that "No candidate, slate of candidates, campaign committee,

political issues committee, nor anyone acting on their behalf, shall accept a contribution of

more than one thousand dollars ($1,000) from any person, permanent committee, or

---

[4] To be clear, the challenge to K.R.S. 121.150(11) regarding "caucus campaign committees" is raised by Mr. Watson, and not Senator Schickel.

contributing organization in any one (1) election.  No person, permanent committee, or contributing organization shall contribute more than one thousand dollars ($1,000) to any one (1) candidate, campaign committee, political issues committee, nor anyone acting on their behalf, in any one (1) election."

53. The $1,000 limitations contained within K.R.S. 121.150(6), which are not indexed for inflation, violate Senator Schickel's, Mr. Watson's, and Mr. Moellman's First Amendment Rights under case law found in *Buckley v. Valeo*, 424 U.S. 1 (1976) and *Randall v. Sorrell*, 548 U.S. 230 (2006).  Specifically, the $1,000 limit today equate to $242.41 in 1976 dollars (as is relevant to *Buckey*), and $683.79 in 1997 dollars (as is relevant to *Randall*). Furthermore, the $1,000 limit, which is not and has not been increased for inflation, makes it difficult if not impossible to amass the resources necessary for effective campaign advocacy, particularly in light of: (1) the incremental effects of inflation; (2) the participation of PACs and Super PACs in the race, which can and do raise more than the candidates themselves; (3) increasing campaign costs, which, unlike the donation limits, are adjusted for inflation.  For non-incumbents, the $1,000 limit magnifies the advantages of incumbency to the point where they can, absent PAC or Super PAC participation, places a non-incumbent at a significant disadvantage.

54. K.R.S. 121.150(11) provides: "No person shall contribute more than two thousand five hundred dollars ($2,500) to the state executive committee of a political party and its subdivisions and affiliates in any one (1) year. No person shall contribute more than two thousand five hundred dollars ($2,500) to a caucus campaign committee in any one (1) year. Contributions a person makes to any executive committee other than the state executive committee in excess of one thousand dollars ($1,000) in any one (1) year shall be deposited

18

in a separate account which the state executive committee maintains for the exclusive

purpose of paying administrative costs incurred by the political party."

55. The $1,000 limitation is particularly egregious in light of the $2,500 limitation for caucus

campaign committees for the Kentucky House and Kentucky Senate Democrat and Republic

caucuses.  These viewpoint based, legislatively hard coded "super PACs," permitted the

ability to fundraise and spend more on political races than political parties themselves, are

permitted to raise two and half times the amount that an individual candidate is, placing

persons such as Mr. Watson at a significant disadvantage.

56. Furthermore, notwithstanding the Sixth Circuit's decision in *Kentucky Right to Life v. Terry*,

108 F.3d 637 (1997), almost 20 years have passed (with corresponding inflation) without

revisions to the limits upheld in that case, as well as a significant sea change in election

finance with the advent of significant Super PAC participation, online transmission of

campaign contribution information, and other considerations outlined herein.

57. Under these facts and circumstances, the $1,000 limit is no longer "closely drawn" towards

preventing quid-pro-quo corruption, particularly where, as is the case here, there is full,

timely, and convent disclosure of donors to the public, and where the limits creates the issues

set forth in the preceding paragraphs.

58. Moreover, it is appropriate to overrule and revisit *Buckley v. Valeo*, 424 U.S. 1 (1976), and

its application of anything other than strict scrutiny on contribution limits, given today's

political atmosphere of Super PACs and the levels of their participation, and the fact that,

unlike Super PACs, contributions to candidates are subject to disclosure, where, "with

modern technology, disclosure now offers a particularly effective means of arming the voting

public with information" and limits "may in fact encourage the movement of money away

from entities subject to disclosure." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1460 (2014).  The $1,000 limit at issue is not narrowly tailored to meet a compelling government interest, as required by strict scrutiny.

59. Furthermore, the creation of the "caucus campaign committees," under Kentucky law, coupled with their privileged status under Kentucky law with heightened donation limits under K.R.S. 121.150(11), is a facially based viewpoint discrimination, and therefore unconstitutional.

### K.R.S. 121.150(13) limit on campaign loans by the candidate

60. K.R.S. 121.150(13) provides "No candidates running as a slate for the offices of Governor and Lieutenant Governor shall make combined total personal loans to their committee in excess of fifty thousand dollars ($50,000) in any one (1) election. No candidate for any other statewide elected state office shall lend to his committee any amount in excess of twenty-five thousand dollars ($25,000) in any one (1) election. In campaigning for all other offices, no candidate shall lend to his committee more than ten thousand dollars ($10,000) in any one (1) election."

61. This law was last enacted and updated in 2011.

62. If not prevented by law, Senator Schickel, Mr. Watson, and Mr. Moellman would loan their respective campaigns over $10,000.

63. The law is not narrowly tailored to meet a compelling government interest.  In the alternative, the law is not "closely drawn" towards preventing quid-pro-quo corruption.

64. The $10,000 limit loan imposed on Senator Schickel, Mr. Watson, and Mr. Moellman is tantamount to an expenditure limitation, and it is not narrowly tailored to meet a compelling governmental interest.  In *Anderson v. Spear*, 356 F.3d 651, 672-674 (6th Cir. 2004), the

Sixth Circuit struck the $50,000 governor's limitation on loans, yet Kentucky re-enacted the statute with that ban in place.  The $10,000 loan is contrary to *Anderson*, the First Amendment, and unconstitutional.

### KRS 121.150(23)(a) limitation on fundraising from permanent committees

65. K.R.S. 121.150(23)(a) limits a candidate's ability to accept more than 50% of fundraising from a permanent committee or $10,000, whichever is greater.

66. If not prevented by law, both Senator Schickel, Mr. Watson, and Mr. Moellman would accept, and permanent committees would donate, over 50% of their fundraising and over $10,000.

67. These provisions are not narrowly tailored to meet a compelling governmental interest. These provisions are akin to the aggregate limits struck down in *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014).

68. In the alternative, these restrictions are not "closely drawn" towards preventing quid-pro-quo corruption and are akin to the aggregate limits struck down in *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014).

### K.R.S. 6.767(1),(2), K.R.S. 6.751(2), and K.R.S. 6.811 (4), (5), (6) and (7) – Lobbyists and Employers of Lobbyists

69. K.R.S. 6.611(2) provides, in relevant part, that "anything of value" includes: "A gift, ... or an interest in a gift..." but does not include: "[c]ompensation, food, beverages, entertainment, transportation, lodging, or other goods or services extended to a legislator by the legislator's private employer or by a person other than a legislative agent or employer."

70. K.R.S. 6.767 provides, in relevant part: "**(1)** A member of the General Assembly, candidate for the General Assembly, or his or her campaign committee shall not accept a campaign contribution from a legislative agent. Violation of this provision is ethical misconduct. **(2)** A member of the General Assembly, candidate for the General Assembly, or his or her campaign committee shall not, during a regular session of the General Assembly, accept a campaign contribution from an employer of a legislative agent, or from a permanent committee as defined in KRS 121.015. This subsection shall not apply to candidates for the General Assembly in a special election held during a regular session of the General Assembly. Violation of this provision is ethical misconduct."

71. K.R.S. 6.751(2) provides, in relevant part: "A legislator or his spouse shall not solicit, accept, or agree to accept anything of value from a legislative agent or an employer. Violation of this subsection is a Class B misdemeanor."

72. K.R.S. 6.811 provides, in relevant part: "**(4)** A legislative agent or employer shall not knowingly offer, give, or agree to give anything of value to a legislator, a candidate, or the spouse or child of a legislator or candidate; **(5)** A legislative agent shall not serve as a campaign treasurer, and shall not directly solicit, control, or deliver a campaign contribution, for a candidate or legislator. **(6)** A legislative agent shall not make a campaign contribution to a legislator, a candidate, or his or her campaign committee. **(7)** During a regular session of the General Assembly, an employer of a legislative agent shall not make a campaign contribution to a legislator, candidate, campaign committee for a legislator or candidate, or caucus campaign committee. This subsection shall not apply to candidates for the General Assembly in a special election held during a regular session of the General Assembly."

73. There are, and were, no examples of legislative agent, i.e. lobbyist, donations to a legislator or candidate's campaign that created a scandal, or any unethical quid-pro-quo arrangements.

74. There are, and were, no examples of an employer of a legislative agent, i.e. lobbyist, donations to a legislator or candidate's campaign that created a scandal, or any unethical quit-pro-quo arrangements.

75. There are, and were, no examples of a legislative agent, i.e. lobbyist, *de minimis* gifts to a legislator or candidate that created a scandal, or any unethical quid-pro-quo arrangements; nor are there, or were there, any examples of any *de minimis* gift from employer of a legislative agent, i.e. lobbyist, donations to a legislator or candidate that created a scandal, or any unethical quid-pro-quo arrangements.

76. Any such donations or gifts, individually or in the aggregate, would, if over $100, be required to be reported to KREF.

77. Under the authority set forth in *Green Party of Conn. v. Garfield*, 616 F.3d 189 (2d Cir. 2010); *Lavin v. Brunner*, 2010 U.S. Dist. LEXIS 114210 (S.D. Ohio 2010), and *Barker v. Wisconsin Ethics Bd.*, 841 F. Supp. 255 (1993), K.R.S. 6.767(1),(2), K.R.S. 6.751(2), and K.R.S. 6.811 (4), (5), (6) and (7) are unconstitutional.  Specifically, they are not "closely drawn" towards preventing *quid pro quo* corruption.  To the extent the U.S. Supreme Court is willing to overrule *Buckley*, such provisions are not narrowly tailored to meet a compelling state interest.

## COUNT I – VIOLATIONS OF FIRST AND FOURTEENTH AMENDMENTS

78. Senator Schickel, Mr. Watson, and Mr. Moellman hereby reincorporate the preceding paragraphs of their Complaint as if fully set forth herein.

79. Senator Schickel, Mr. Watson, and Mr. Moellman are citizens of the United States of America.

80. Senator Schickel, Mr. Watson, and Mr. Moellman have clearly established rights and protections under the United States Constitution and its statutes to Freedom of Speech, Association, and Expression and other First Amendment guarantees.  The Fourteenth Amendment likewise has guarantees of equal protection and liberty.

81. Defendants, using their respective offices and acting under color of state law, violated and are violating Senator Schickel's, Mr. Watson's, and Mr. Moellman's First Amendment and Fourteenth Amendment Rights, which have deprived, are depriving, and will deprive him of his rights to Free Speech, Expression, and Association guaranteed to them under the First Amendment of the U.S. Constitution, and their rights to Equal Protection, under the Fourteenth Amendment, which rights are clearly established. Defendants thereby subjected themselves under 42 U.S.C. § 1983, to prospective injunctive relief and declaratory relief under 28 U.S.C. §§ 2201, *et seq*.

82. The First Amendment of the U.S. Constitution provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech..."  The First Amendment has been incorporated under the Fourteenth Amendment to apply to the states, including the Commonwealth of Kentucky, under *Gitlow v. New York*, 268 U.S. 652 (1925).

83. Defendants abused the authority of their respective offices and, while acting under color of law and with knowledge of Senator Schickel's, Mr. Watson's, and Mr. Moellman's established rights, used their offices to violate their First and Fourteenth Amendment rights.

84. Senator Schickel, Mr. Watson, and Mr. Moellman seek declaratory relief, and prospective injunctive relief under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202, declaring K.R.S.

121.150(6), K.R.S. 121.150(11),[5] K.R.S. 121.150(13), K.R.S. 6.611(2), K.R.S. 6.751(2),

K.R.S. 6.767(1) and (2), and K.R.S. 6.811(4) (5), (6) and (7) unconstitutional, facially, or as-

applied to the activities set forth herein that Senator Schickel and Mr. Moellman seek to

engage in.  Senator Schickel, Mr. Watson, and Mr. Moellman likewise seeks a permanent

injunction enjoining the enforcement of these provisions, facially, or as applied to all of the

foregoing scenarios.  Senator Schickel, Mr. Watson, and Mr. Moellman further seeks their

costs and reasonable attorney fees under 42 U.S.C. § 1988.

85. In addition to the foregoing, the impermissible applications of the challenged provisions at

issue are substantial when compared against any legitimate sweep.

86.  The challenged provisions are void for vagueness because they do not, for instance,

delineate the nature and scope of under what circumstances it applies, making compliance

with the sections impossible.  The challenged provisions are also overbroad.

87. The challenged provisions fail to establish standards that are sufficient to guard against the

arbitrary deprivation of liberty interests.

88. A substantial number of instances exist in which the challenged provisions cannot be applied

constitutionally.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs demand judgment against Defendants as prayed for, including:

A.  That this Court issue a declaration that K.R.S. 121.150(6), K.R.S. 121.150(11), K.R.S.

121.150(13), 121.150(23)(a), K.R.S. 6.611(2), K.R.S. 6.757(2), K.R.S. 6.767(1) and (2),

and K.R.S. 6.811 (4), (5), (6) and (7), are unconstitutional, facially, or as-applied to the

---

[5] The challenge to K.R.S. 121.150(11) is raised solely by Mr. Watson.

activities set forth herein that Senator Schickel, Mr. Watson, and Mr. Moellman seek to engage in;

B. That this Court enter a temporary restraining order and/or an preliminary injunction to enjoin enforcement of K.R.S. 121.150(6), K.R.S. 121.150(11), K.R.S. 121.150(13), 121.150(23)(a), K.R.S. 6.767(1) and (2), and K.R.S. 6.811(5), (6) and (7), on a facial or as-applied basis, pending a trial on the merits;

C. That this Court award permanent injunctive relief, prohibiting the further enforcement of K.R.S. 121.150(6), K.R.S. 121.150(11), K.R.S. 121.150(13), 121.150(23)(a), K.R.S. 6.767(1) and (2), and K.R.S. 6.811(5), (6) and (7), generally, or, in the alternative, prohibiting enforcement of these sections as applied to the conduct Senator Schickel, Mr. Watson, and Mr. Moellman seek to engage in;

D. That Senator Schickel, Mr. Watson, and Mr. Moellman be awarded his costs in this action, including reasonable attorney fees under 42 U.S.C. § 1988; and

E. Such other relief as this Court shall deem just and proper.

Respectfully submitted,


/s/ Christopher Wiest
Christopher Wiest (KBA 90725)
Paul J. Darpel (KBA 84989)
Robert A. Winter, Jr. (KBA 78230)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
859/486-6850 (v)
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

and

/s/ Jack Gatlin
Jack S. Gatlin (KBA 88899)
Thomas B. Bruns (KBA 84985)
FREUND, FREEZE & ARNOLD
Chamber Office Park
2400 Chamber Center Drive, Ste 200
Ft. Mitchell, KY 41017
Phone: (859) 292-2088
Fax: (859) 261-7602
jgatlin@ffalaw.com

**Attorneys for Plaintiff**