UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

NORTHERN DIVISION (AT COVINGTON)

CASE NUMBER: 2:15-cv-00155-WOB-JGW

JUDGE WILLIAM O. BERTELSMAN


JOHN SCHICKEL, ET AL.                PLAINTIFFS

     vs.

CRAIG DILGER, ET AL.                 DEFENDANTS


        * * * * * * * *

DEPONENT:            H. JOHN SCHAAF

DATE:               MAY 9, 2016

        * * * * * * * *


Lois A. Roell,

Registered Merit Reporter


Barlow
Raising the Bar
Reporting & Video Services, LLC
620 Washington Street
Covington, Kentucky  41011
(859) 261-8440

Page 2

INDEX

|  |  | Page |
|---|---|---|
| 3 | Cross-Examination By Mr. Wiest | 6 |
| 4 | Examination By Mr. James | 291 |
| 5 | Further Cross-Examination By Mr. Wiest | 310 |

EXHIBITS

| | | |
|---|---|---|
| 7 | Exhibit 1 Notice of Deposition | 8 |
| 8 | Exhibit 2 Kentucky Legislative Ethics Commission | 9 |
| 9 | Exhibit 3 KRS 6.601 | 12 |
| 10 | Exhibit 4 KRS 6.651 | 12 |
| 11 | Exhibit 5 KLEC Members | 13 |
| 12 | Exhibit 6 KLEC Contact Us | 15 |
| 13 | Exhibit 7 KLEC Staff Members | 16 |
| 14 | Exhibit 8 KRS 6.666 | 16 |
| 15 | Exhibit 9 KRS 6.686 | 16 |
| 16 | Exhibit 10 KLEC Complaints and Investigations | 16 |
| 17 | Exhibit 11 KLEC Complaint Form | 16 |
| 18 | Exhibit 12 KRS 6.691 | 23 |
| 19 | Exhibit 13 KLEC Annual Report, 2012-2013 | 27 |
| 20 | Exhibit 14 KLEC Annual Report, 2013-2014 | 27 |
| 21 | Exhibit 15 KLEC Annual Report, 2014-2015 | 27 |
| 22 | Exhibit 16 KRS 6.761 | 39 |
| 23 | Exhibit 17 KRS 6.751 | 39 |
| 24 | Exhibit 18 KRS 6.611 | 39 |

Page 4

| 1 | Exhibit 42 Statement of Financial Disclosure | 235 |
| 2 | Exhibit 43 KLEC Responses to Discovery Request | 243 |
| 3 | Exhibit 44 Interim Joint Committee on State Government Meeting Minutes, 9/28/11 | 270 |
| 4 | Exhibit 45 Interim Joint Committee on State Government Meeting Minutes, 10/24/12 | 270 |
| 6 | Exhibit 46 KRS 6.801 | 270 |
| 7 | Exhibit 47 KRS 6.807 | 270 |
| 8 | Exhibit 48 Legislative Agent's Updated Registration Statement | 270 |
| 9 | Exhibit 49 Employers' Updated Registration Statement | 270 |
| 11 | Exhibit 50 KRS 6.811 | 272 |
| 12 | Exhibit 51 KRS 6.821 | 272 |
| 13 | Exhibit 52 KRS 6.824 | 272 |
| 14 | Exhibit 53 Operation BOPTROT | 272 |
| 15 | Exhibit 54 Lies, bribes and videotape | 272 |
| 16 | Exhibit 55 KLEC Current Issues Seminar | 272 |
| 17 | Exhibit 56 Bribery charge sends shock through Dems, article by Joseph Gerth | 272 |
| 18 | Exhibit 57 Plea Agreement | 272 |
| 19 | Exhibit 58 Statehouse sex scandals carry public costs, consequences | 272 |
| 21 | Exhibit 59 Ethics Reporter, February 2013 | 297 |
| 22 | Exhibit 60 Ethics Commission calls for groups | 301 |
| 23 | Exhibit 61 Ethics in State Government | 303 |
| 24 | Exhibit 62 Kentuckians Amazed That $400 Can Buy a Lawmaker | 304 |

Page 3

| 1 | Exhibit 19 KRS 6.747 | 39 |
| 2 | Exhibit 20 The Ethics Reporter, February 2009 | 63 |
| 3 | Exhibit 21 The Ethics Reporter, March 2009 | 74 |
| 4 | Exhibit 22 Ethics complaints rarely end in discipline, October 18, 2009 | 87 |
| 5 | Exhibit 23 The Ethics Reporter, November 2009 | 87 |
| 6 | Exhibit 24 The Ethics Reporter, 2010 | 106 |
| 7 | Exhibit 25 Ethics Reporter, 2011 | 122 |
| 8 | Exhibit 26 Ethics Reporter, 2012 | 122 |
| 9 | Exhibit 27 Article in Op-Ed, 10/1/12 | 122 |
| 10 | Exhibit 28 Ethics Reporter, 2013 | 122 |
| 11 | Exhibit 29 Ethics Reporter, 2014 | 122 |
| 12 | Exhibit 30 Ethics Reporter, 2015 | 122 |
| 13 | Exhibit 31 Ethics Reporter, February 2016 | 122 |
| 14 | Exhibit 32 Ethics Reporter, March 2016 | 122 |
| 15 | Exhibit 33 Ethics Reporter, April 2016 | 122 |
| 16 | Exhibit 34 Recommended Changes to the Kentucky Code of Legislative Ethics, 7/1/07 | 205 |
| 17 | Exhibit 35 Recommended Changes to the Kentucky Code of Legislative Ethics, 7/1/13 | 205 |
| 19 | Exhibit 36 Kentucky 2014 House Bill 28 | 210 |
| 20 | Exhibit 37 Statement of Candidacy | 214 |
| 21 | Exhibit 38 Appointment of Campaign Treasurer and Request for Reporting Exemption | 214 |
| 22 | Exhibit 39 KRS 6.731 | 235 |
| 23 | Exhibit 40 KRS 6.767 | 235 |
| 24 | Exhibit 41 KRS 6.781 | 235 |

Page 5

1   The deposition of H. JOHN SCHAAF, taken for the
2   purpose of discovery and/or use as evidence in the
3   within action, pursuant to notice, heretofore taken
4   at the office of the Kentucky Registry of Election
5   Finance, 140 Walnut Street, Frankfort, Kentucky, on
6   May 9, 2016, at 9:00 a.m., upon oral examination,
7   and to be used in accordance with the Federal Rules
8   of Civil Procedure.
9           * * * * * * * *
10              APPEARANCES
11  REPRESENTING THE PLAINTIFFS:
12  Christopher Wiest, Esq.
    25 Town Center Boulevard, Suite 104
13  Crestview Hills, Kentucky  41017
    (859)486-6850
14
    REPRESENTING THE DEFENDANTS:
15
    Matt James, Esq.
16  Office of the Attorney General
    The Capitol Building
17  700 Capital Avenue, Suite 118
    Frankfort, Kentucky  40601
18  (502)696-5300
19  Kara L. Daniel, Esq.
    Kentucky Legislative Ethics Commission
20  22 Mill Creek Park
    Frankfort, Kentucky  40601
21  (502)573-2863
22  Emily Dennis, Esq.
    Kentucky Registry of Election Finance
23  140 Walnut Street
    Frankfort, Kentucky  40601
24
    ALSO PRESENT:  Katie Flora, Paralegal
25              John Steffen

51d14619-9481-44e8-adb5-d49d86433c88

Page 6

1     H. JOHN SCHAAF
2  called on behalf of the Plaintiffs, after having
3  been first duly sworn, was examined and deposed as
4  follows:
5          CROSS-EXAMINATION
6  BY MR. WIEST:
7      Q   Good morning, Mr. Schaaf.  My name is
8  Chris Wiest, and I am one of the counsel for the
9  plaintiffs in this matter.  Before we begin, I'm
10 going to be asking you some questions.  If you don't
11 understand them or you need me to repeat them, just
12 say so.  Okay?
13     A   So.
14     Q   That's the other thing, if you can
15 verbalize your answers, yes and no, so the court
16 reporter can take it down.
17     A   Yes.
18     Q   And the last thing is if you can let me
19 finish my question and I promise to let you finish
20 your answer, okay?
21     A   Okay.
22     Q   If you need a break, let us know and
23 we'll take one.  The only caveat to that is if
24 there's a question pending, I'd ask that you answer
25 it before we go on break, okay?

Page 7

1      A   No problem.
2      Q   Sir, have you ever been deposed before?
3      A   No, I don't think so.
4      Q   And I understand you're an attorney.
5  Have you ever taken a deposition before?
6      A   Oh, yes.
7      Q   So you understand the rules of the road.
8  Can you give us your background in terms of your
9  name.
10     A   My name is John Schaaf, and my background
11 is I am an attorney, the Executive Director of the
12 Kentucky Legislative Ethics Commission.  I graduated
13 from the University of Louisville School of Law in
14 1985, practiced law in Louisville for several years.
15 Went to work for the Kentucky General Assembly in
16 1988, worked there as their legal counsel and, until
17 I came to the Ethics Commission as their legal
18 counsel in 2004.
19     Q   As the Executive Director of the
20 Legislative Ethics Commission, what is your duties?
21     A   Well, we have a nine-member commission
22 which meets monthly, and between meetings we on the
23 staff carry out the responsibilities of advising
24 legislators, lobbyists, people who employ lobbyists,
25 and the general public about the Code of Legislative

Page 8

1  Ethics.  We answer a great many questions regarding
2  the code, how it applies in specific situations.  So
3  I guess that -- as far as administration of the
4  office, I oversee the full-time staff of three
5  people besides myself, and we have a part-time
6  enforcement counsel who works on an as-needed basis
7  when a complaint is filed.
8      Q   Other than speaking with legal counsel, I
9  don't want to get into any attorney-client issues,
10 what did you do or who did you speak to to prepare
11 to testify today?
12     A   Other than legal counsel, no one.
13         (Exhibit 1 was marked for
14          identification.)
15     Q   Sir, I'm going to hand you what's been
16 marked as Exhibit 1, which is the Notice of
17 Deposition in this matter, and I know that it's been
18 renoticed, the dates have been changed a couple
19 times.  Have you seen this before?
20     A   Yes.
21     Q   You understand that you're here to
22 testify today as what's known as a 30(b)(6) witness,
23 right?
24     A   Yes.
25     Q   And you understand that your answers are,

Page 9

1  you're not just John Schaaf today, you're also
2  speaking on behalf of the Legislative Ethics
3  Commission on the topics that have been designated
4  in the notice, right?
5      A   Yes.
6      Q   If you can look, sir, at the Exhibit A,
7  which is the third page in this notice.  Are you
8  prepared to testify on these topics today?
9      A   I will give you the fullest answers that
10 I am qualified to give you on these topics, yes.
11     Q   If there's a topic or a question that you
12 think somebody else may be more qualified or may be
13 able to give us a better answer on, I'd ask that you
14 let us know that when we get to a particular
15 question today.
16     A   Certainly.
17         (Exhibit 2 was marked for
18          identification.)
19     Q   I'm going to go ahead and hand you, sir,
20 what has been marked as Exhibit 2, which is our
21 second exhibit today.  Do you recognize this?  It's
22 a printout.
23     A   Uh-huh.  It looks like it came from our
24 website, but I can't be sure, it's in a different
25 format.

51d14619-9481-44e8-adb5-d49d86433c88

Page 10

1    Q    Is your website up there in the top right
2   corner, klec.ky.gov?
3    A    Yes.
4    Q    How about the content, does the content
5   look like it came from your website?
6    A    Yes.
7    Q    Do you agree with the statements that are
8   made in this website page which is about KLEC and,
9   by the way, today I'm going to call KLEC, I'm going
10  to call it KLEC, but we all understand that it's the
11  abbreviation for the Kentucky Legislative Ethics
12  Commission, okay, right, you agree with me about the
13  abbreviation today?
14   A    Yes.
15   Q    Do you agree that it was established by
16  an extraordinary session of the General Assembly
17  which enacted the Code of Legislative Ethics in
18  1993?
19   A    Yes.
20   Q    Do you agree that it is an independent
21  authority within the legislative department of state
22  government?
23   A    Yes.
24   Q    And do you agree that it is charged with
25  the enforcement of the code and is composed of nine

Page 11

1   citizen members?
2    A    Yes.  It only has seven at this moment,
3   but generally there are nine seats on the
4   commission.
5    Q    It's authorized to have nine seats,
6   there's a couple vacancies is what you're telling
7   me, right?
8    A    Correct.
9    Q    You agree that the code regulates conduct
10  by legislators, lobbyists, and the employers of
11  lobbyists, right?
12   A    Yes.
13   Q    There's a jurisdiction statement and it
14  talks about what KLEC has jurisdiction over, and it
15  includes, I think you just told me this, legislative
16  agents or lobbyists, right?
17   A    Yes.
18   Q    And, sir, today I'm going to use those
19  terms interchangeably.
20   A    That's fine.
21   Q    Because I think the statute calls them
22  legislative agents, but we all know that they're in
23  fact lobbyists?
24   A    That's correct.
25   Q    Employers, I think those are, it's not

Page 12

1   any employer, it's an employer of a legislative
2   agent or a lobbyist, right?
3    A    That's correct.
4    Q    And then members of the General Assembly,
5   right?
6    A    Correct.
7    Q    In fact, it's not just members, it's also
8   candidates for office?
9    A    Yes, in certain circumstances.
10   Q    And we'll talk about that today.  All
11  right.  I think that will cover that.
12           (Exhibits 3 and 4 were marked
13            for identification.)
14   Q    I want to just take a look at what I've
15  marked as Exhibit 3.  I'm going to hand you, sir,
16  what I'm marking as Exhibit 3 and Exhibit 4, and I
17  think we just went over this.  It's a couple
18  provisions of the Kentucky Revised Statutes.  I'm
19  sure you've seen these before.  The first one is the
20  short title that talks about the sections of the
21  Kentucky Revised Code that may be cited as the
22  Kentucky Code of Legislative Ethics, right?
23   A    That's the first one on the page I'm
24  looking at.
25   Q    Yes, sir, that's the first one on

Page 13

1   Exhibit 3, right?
2    A    Yeah.
3    Q    And when we look at Exhibit 4, which is
4   KRS 6.651, that talks about I think what you just
5   told me, which is that we've got nine members, who
6   the appointing authority is, and some qualifications
7   for membership.  Do you see that?
8    A    Yes.
9    Q    It also talks about the term of office,
10  right, and the ability to -- and who is able to
11  remove members of Legislative Ethics Commission,
12  right; do you see that?
13   A    (Nodding head.)
14   Q    And does that match your understanding of
15  what I'm going to call the composition and
16  establishment of the KLEC?
17   A    Yes.
18           (Exhibit 5 was marked for
19            identification.)
20   Q    I'm going to hand you, sir, what I've
21  marked as Exhibit 5.  Does Exhibit 5 contain, and
22  this is another website from KLEC, is it not,
23  another printout from a website?
24   A    It appears to be, yes.
25   Q    Does this match your understanding of the

51d14619-9481-44e8-adb5-d49d86433c88

Page 14

1  current members of the KLEC?
2      A   No, it does not.
3      Q   Who is no longer a member that's on this
4  particular website page?
5      A   On page 2, Charles Borders is no longer a
6  member, Henry L. Stephens is no longer a member, and
7  on page 3, Judge Paul Gudgel is no longer a member.
8      Q   And are those vacancies, are all three of
9  those seats vacancies?
10     A   No.  Judge Tom Jensen has been appointed
11  to replace Charles Borders.
12     Q   Where does Judge Jensen, where is he
13  from?
14     A   London.
15     Q   All right.  And then I take it
16  Mr. Stephens' and Judge Gudgel's seats are vacant
17  still?
18     A   Still.  Their terms expired on
19  April 30th.
20     Q   Looking at the list of members, sir, I
21  see -- by the way, are you aware of what counties
22  comprise the Eastern District of Kentucky?
23     A   No.
24     Q   I just want to confirm a couple folks on
25  this list.  Deborah Durr is from Richwood, Kentucky;

Page 15

1  is that your understanding?
2      A   That's correct.
3      Q   Pat Freibert is from Lexington, Kentucky,
4  right?
5      A   That's correct.
6      Q   And I believe you said that Judge Jensen
7  was from London, Kentucky, right?
8      A   That's correct.
9              (Exhibit 6 was marked for
10             identification.)
11     Q   I'm going to hand you, sir, what I'm
12  marking as Exhibit 6, which is a contact us address,
13  and it looks like the Legislative Ethics Commission,
14  its address is 22 Mill Creek Park in Frankfort,
15  Kentucky?
16     A   That's correct.
17     Q   Is that where the meetings are held?
18     A   No.  Generally the meetings are held at
19  the Capitol annex, which is adjacent to the state
20  capitol in Frankfort.
21     Q   Okay.  And so that's also in Frankfort,
22  Kentucky?
23     A   Yes.
24     Q   Are you aware that Frankfort, Kentucky is
25  within the Eastern District of Kentucky?

Page 16

1      A   Yes, I am.
2              (Exhibit 7 was marked for
3              identification.)
4      Q   I'm going to hand you, sir, what I'm
5  marking as Exhibit 7, which is a list of Commission
6  staff.  It looks like a very nice picture of you and
7  some other folks, including Ms. Daniel, who is here
8  today.  The staff all meets and is headquartered out
9  of the 22 Mill Creek Park address, correct?
10     A   That is correct.
11         MR. WIEST:  If it's okay, I'm just going
12  to kind of hand you the folder and you can pass
13  them around.
14             (Exhibits 8, 9, 10 and 11 were
15             marked for identification.)
16     Q   Sir, handing you what I've marked as
17  Exhibits 8, 9, 10, and 11.  We're going to go
18  through them in order.  Hopefully the powers of
19  commission is on top, right?
20     A   Yes.
21     Q   So I want to look at the powers of the
22  commission, and that comes in KRS 6.666; do you see
23  that?
24     A   Yes.
25     Q   You agree with me that the commission has

Page 17

1  jurisdiction to enforce civil penalties, right?
2      A   Yes.
3      Q   And it has the power to administer oaths,
4  right?
5      A   Yes.
6      Q   And issue subpoenas?
7      A   Yes.
8      Q   And to compel the attendance of witnesses
9  and the production of papers, books, accounts, and
10  documents and testimony, right?
11     A   Yes.
12     Q   And you're aware that that can be
13  enforced in the Franklin Circuit Court, correct?
14     A   Correct.
15     Q   I think you talked to me before about
16  advisory opinions.  Is that something else that you
17  guys do that's within the statute?
18     A   Yes.
19     Q   And you have the power or you shall
20  provide forms for reports, statements, notices, and
21  other documents, right?
22     A   Yes.
23     Q   And if something is not appropriately
24  filed, then you're supposed to give notice to the
25  filer to fix it, right?

51d14619-9481-44e8-adb5-d49d86433c88

Page 18

1      A    Correct.
2      Q    You also have to compile and maintain a
3   list of legislative agents, and I'm going to call
4   them employers, but when I say that, I mean the
5   employers of legislative agents, okay?
6      A    The employers and the legislative agents,
7   yes.
8      Q    Right.  And you're also supposed to
9   provide an annual report to the General Assembly,
10  correct?
11     A    Yes.
12     Q    I want to talk to you, sir, about the
13  complaint procedure, and I know that that is
14  contained in KRS 6.686.  You have the jurisdiction
15  to investigate and proceed as to violations of the
16  code, right?
17     A    That's correct.
18     Q    And there's a requirement that if
19  somebody files a complaint, that it be a written
20  statement alleging a violation and stating the
21  facts, right?
22     A    And signed by the complainant.
23     Q    Correct.
24     A    Under oath.
25     Q    Under oath.  And you don't have

Page 19

1   jurisdiction in the absence of a complaint, but if
2   you've got a complaint, you can proceed with it,
3   right?
4      A    Yes.
5      Q    And, of course, a member of the
6   commission is also authorized to file the complaint,
7   correct?
8      A    Yes.
9      Q    Would it be fair to say that members of
10  the public are authorized to file complaints?
11     A    Anyone can file a complaint.
12     Q    And once somebody files a complaint,
13  then, I'm going to call them the respondent, I don't
14  know what you all call them, maybe the defendant,
15  but whomever is the subject of the complaint has an
16  opportunity to file an answer, right?
17     A    Correct.
18     Q    And I take it that then you can make a
19  preliminary -- actually the statute says you can
20  then make a preliminary inquiry into the violation
21  and see does it charge an offense, for instance,
22  right?
23     A    That's right.
24     Q    And it gives you permission to turn over
25  to the Attorney General, the United States Attorney,

Page 20

1   the Commonwealth's attorney, or the county attorney
2   evidence that can be used in criminal proceedings,
3   right?
4      A    That's correct.
5      Q    Have you guys ever done that?
6      A    No.
7      Q    Have you ever participated in any
8   investigations that have been investigated by the
9   Attorney General, US Attorney, Commonwealth's
10  attorney, or county attorney?
11     A    I haven't, no.
12     Q    And when I say you all, I mean the
13  Legislative Ethics Commission.
14     A    The former Executive Director, Judge
15  Anthony Wilhoit, may have spoken with the Attorney
16  General on occasion about investigations they were
17  doing, but I don't recall specifically if he did.
18     Q    Okay.  And at some point if you think
19  that there's a violation and you think there's
20  probable cause for a violation, the statute directs
21  you to either, if you think it's not serious or the
22  harm is not serious, you can just do, I'm going to
23  call it, I think it's a private reprimand, and you
24  just give a copy to the presiding officer of the
25  Kentucky House or the Kentucky Senate, right?

Page 21

1          MR. JAMES:  Can you break that question
2   up.
3      Q    Sure, I'll break it up.  So if you
4   determine that due to mitigating circumstances,
5   there's not significant economic advantage or gain,
6   or there's not a significant impact on the public
7   confidence in government, you can confidentially
8   reprimand in writing the alleged violator, correct?
9      A    Well, the enforcement counsel does the
10  investigation, and he is not part of our full-time
11  staff.  The investigation is a separate process, and
12  we're not involved in that.  The enforcement counsel
13  presents the evidence to the commission at the
14  preliminary inquiry hearing, and the commission
15  decides whether there's probable cause to believe
16  that a violation of the ethics code has occurred.
17  And then that range of options kicks in.
18     Q    Right.  So they could just do a
19  confidential reprimand and give a notice to the
20  presiding officer of the House or the Senate?
21     A    Yes.
22     Q    Or, the option B, literally option B, is
23  that they can initiate an adjudicatory proceeding,
24  right?
25     A    That's correct.

51d14619-9481-44e8-adb5-d49d86433c88

Page 22

1    Q    And that looks like a full-blown, I'm
2  going to call it a full-blown lawsuit, correct?
3         MR. JAMES: Objection, characterization.
4    A    It's a full-blown adjudicatory proceeding
5  as provided by the statute, in which the enforcement
6  counsel presents the case and the respondent has the
7  opportunity to present a defense.
8    Q    Okay. In looking at Exhibit 10, and this
9  is again from your website, you've got an entire
10 section on complaints and investigations, right?
11   A    Yes.
12   Q    And that website is available to the
13 public, correct?
14   A    Yes.
15   Q    And I think it just walks us through the
16 process that we just went through, correct?
17   A    Yes.
18   Q    I want you to look at Exhibit 11. Do you
19 recognize it?
20   A    Yes.
21   Q    What is it?
22   A    It's the form that we make available on
23 the Ethics Commission's website for a person to make
24 a complaint. If a person is interested in filing a
25 complaint, they can use this form, but that's not

Page 23

1  required.
2    Q    Sure. And the reason that you do that is
3  that if they follow this form and they get it
4  notarized, then they meet the statutory
5  prerequisites, assuming the alleged facts constitute
6  a violation; would you agree with that?
7    A    Yes.
8    Q    And the reason it's available on your
9  public website is so that the public, if they want
10 to, can make a complaint?
11   A    That's correct.
12        (Exhibit 12 was marked for
13        identification.)
14   Q    Sir, I'm going to hand you what I've
15 marked as Exhibit 12, and it is a copy of KRS 6.691.
16 Are you familiar with this?
17   A    Yes.
18   Q    And this outlines the adjudicatory
19 proceedings procedure, correct?
20   A    Correct.
21   Q    Have you, and by you, I mean the
22 Legislative Ethics Commission, ever had any
23 adjudicatory proceedings?
24   A    Yes.
25   Q    And is this the procedure that is

Page 24

1  followed for these adjudicatory proceedings?
2    A    Yes.
3    Q    And all parties, and the parties to a
4  proceeding, is the complainant a party to the
5  proceeding?
6    A    Yes. The complainant participates.
7  Really the case is presented by the enforcement
8  counsel though.
9    Q    So when we look, for instance, at the
10 parties shall have the right to call and examine
11 witnesses, that's the enforcement counsel on the one
12 hand and I'm going to call it the respondent's
13 counsel on the other?
14   A    Correct.
15   Q    And they can introduce exhibits and
16 cross-examine witnesses?
17   A    That's correct.
18   Q    And they've got the right to be
19 represented by counsel, correct?
20   A    That's correct.
21   Q    All right. And the penalties that are a
22 possibility are listed in paragraph 5, right?
23   A    Yes.
24   Q    And so what are the options that can come
25 out of this adjudicatory hearing?

Page 25

1    A    Well, as listed in subsections 5 (a)
2  through (f), the commission can take a variety of
3  options. They can issue an order requiring the
4  violator to cease and desist the violation,
5  subsection (a); subsection (b), they can issue an
6  order requiring the violator to file any report,
7  statement, or other information as required by the
8  code; subsection (c), they can in writing publicly
9  reprimand the violator for potential violations of
10 the law and provide a copy of the reprimand to the
11 presiding officer of the house in which the alleged
12 violator serves; subsection (d), in writing
13 recommend to the house in which the violator serves
14 that the violator be sanctioned as recommended by
15 the commission, which may include a recommendation
16 for a censure or expulsion; or subsection (e) issue
17 an order requiring the violator to pay a civil
18 penalty of not more than $2,000; or subsection (f),
19 revoke the registration of any legislative agent or
20 employer for a period not to exceed five years.
21   Q    Okay. And then we've got paragraph 6 --
22 well, let me just back up a little bit. Are these
23 mutually exclusive or can you do more than one of
24 these in any given case?
25   A    I think they could do more than one. I'm

51d14619-9481-44e8-adb5-d49d86433c88

Page 26

1    not sure that they have in the past done more than
2    one, but I think they could issue a public reprimand
3    and levy a civil penalty, for example.
4         Q    And then in paragraph 6 there is the
5    option of referral to the Attorney General, correct?
6         A    That's correct.
7         Q    Are you aware, has the Attorney General
8    ever prosecuted anybody for violations of the
9    Legislative Ethics Commission?
10        A    No.
11        Q    You're not aware of any anyways?
12        A    No.
13        Q    And then there's the right of appeal that
14   they have to go up to the Franklin Circuit Court,
15   correct?
16        A    If they're found to have committed a
17   violation.
18        Q    Have you ever had that happen?
19        A    Yes.
20        Q    So you actually do enforce the provisions
21   of the Legislative Ethics Code; is that fair?
22        A    The Legislative Ethics Commission
23   enforces the code.
24        Q    Sir, when I say you today, I don't mean
25   John Schaaf personally.  You're here as a 30(b)(6)

Page 27

1    witness on behalf of the commission, and so when I
2    say you, I actually mean the Legislative Ethics
3    Commission.
4         A    It has a generic application, I'll accept
5    that, sure.
6         Q    I'm going to be saying you a lot, you
7    enforce, you do this, and when I say you, I don't
8    mean Mr. Schaaf personally, I mean the Legislative
9    Ethics Commission.  I just want to be clear for the
10   record.
11        A    Thank you.
12        Q    One of the things that we talked before
13   about was the annual reports, and I'm sure that you
14   are familiar with those annual reports, are you not?
15        A    Yes.
16              (Exhibits 13, 14, and 15 were
17              marked for identification.)
18        Q    I'm going to hand you three exhibits that
19   I've marked 13, 14, and 15.  Do you recognize these?
20        A    Yes.
21        Q    And what are they?
22        A    They're the annual reports submitted by
23   the commission each year to the Legislative Research
24   Commission.
25        Q    On the first one, and we're eventually,

Page 28

1    we're going to be coming back to these a fair amount
2    today, I was mainly saying that for the benefit of
3    counsel, you may want to keep these separate as we
4    go because we're going to be coming back to them.
5         MR. JAMES:  Okay.
6         Q    Sir, I'd like you to turn if you can --
7         MR. JAMES:  This is the 2012-2013 one?
8         MR. WIEST:  Really we're going to be
9         coming back to all three of them today.  I'm
10        generally moving on with all these exhibits,
11        but we're going to be coming back to these
12        reports today.
13        Q    There's a page, sir, it's about five
14   pages back, and it's got a complaints and
15   administrative actions section on it.
16        A    Yes.
17        Q    Do you see that?  What is, and by the
18   way, I guess I forgot to ask, these reports, these
19   annual reports, are they available on the KLEC's
20   website?
21        A    Yes.
22        Q    And why do you make them available on
23   your website?
24        A    So anyone who has a question about what
25   the Legislative Ethics Commission does, the actions

Page 29

1    they've taken, the jurisdiction, they can get the
2    answer that way.
3         Q    When we go back to this page I'm looking
4    at, it starts on the left with complaints and
5    administrative actions; do you see that?
6         A    I do.
7         Q    What is that summarizing?
8         A    It appears to give an overview of the
9    complaints and administrative actions for the fiscal
10   year July 1, 2012 to June 30th, 2013.  Indicates
11   that there were no formal complaints filed during
12   the fiscal year, and then it details the totals of
13   the fines collected by the commission as levied
14   against legislative agents and employers of
15   legislative agents, and as it points out, the fines
16   were assessed due to failure to file updated
17   registration statements by the filing deadlines.
18   And levying of the fines tends to reduce the amount
19   of late filings that we get overall.
20        Q    You want to, and the reason you're
21   letting everybody know in your annual report, you
22   want the legislative agents to know that you're
23   going to impose a fine if they don't do what they
24   need to do and you want to encourage them to comply;
25   is that fair?

51d14619-9481-44e8-adb5-d49d86433c88

Page 30

1      A    Well, that's not necessarily why we
2  publish it on the website, but certainly they're
3  aware that if they file late, they can get fined and
4  if they file late on multiple occasions, the fine
5  can increase.  So, yes, they're generally aware of
6  the fines.
7      Q    All right.  Sir, you're aware that we've
8  raised a certain number of challenges of the
9  Kentucky Legislative Ethics Code in this lawsuit?
10     A    Yes.
11     Q    And you would agree with me that the
12 Kentucky Legislative Ethics Code in its provisions
13 regulates and in some cases prohibits certain
14 interactions between legislators and candidates on
15 the one hand and lobbyists and employers and PACs on
16 the other; is that fair?
17     A    Yes.
18     Q    You also understand that these provisions
19 have some impact on the First Amendment rights to
20 petition, freedom of speech, and freedom of
21 association; is that fair?
22         MR. JAMES:  Objection, calls for a legal
23 conclusion.
24     Q    You can answer.
25         MR. JAMES:  Yes, you can answer.

Page 31

1      A    You know, possibly, I don't know.  I
2  don't know.
3      Q    Do you agree with me that whether or not
4  the challenge provisions are constitutional depends
5  on whether or not they're closely drawn to meet a
6  compelling governmental interest?
7          MR. JAMES:  Objection, legal conclusion.
8      Q    If you know, you can answer.
9      A    I'm sorry, what?
10         MR. JAMES:  I'm going to make my
11 objections, but you can just go ahead and
12 answer after.
13     A    You know, it depends on the case law.
14     Q    You don't know one way or the other what
15 the case law says?
16     A    Not at any particular time.  Like today,
17 for example, I am vaguely aware of the case law, but
18 I don't know whether that would apply in any
19 particular case at this point.
20     Q    Okay.  So you've not researched whether
21 or not the provisions are constitutional or not; is
22 that fair?
23     A    No, I wouldn't say that.  You know, we're
24 fully confident that they are constitutional.
25     Q    Okay.  So --

Page 32

1      A    I'm just not going to reach a conclusion
2  about what the case law calls for at this point.
3      Q    Well, and I'm just asking for your
4  understanding.  Ultimately Judge Bertelsman and
5  possibly the Sixth Circuit is going to make some
6  decisions about the challenges.  But your
7  understanding, that's what I'm after today, and the
8  Legislative Ethics Commission's understanding, do
9  you agree that whether or not it's constitutional
10 depends on whether or not it's closely drawn to a
11 compelling governmental interest?
12         MR. JAMES:  Objection, legal conclusion.
13     A    It depends on which provision you're
14 talking about, you know, what's the impact of any
15 particular provision.
16     Q    And I agree with you.
17     A    What you're saying I'm sure is generally,
18 applies in some cases and it might not apply in
19 other cases.
20     Q    What cases would it not apply in?
21     A    Where there's no First Amendment
22 question.  For example, in the case of a penalty
23 that we might levy in the commission, I don't think
24 there's a First Amendment question called about a
25 penalty, for example.

Page 33

1      Q    You mean the amount of a penalty?
2      A    That's right.  So in some provisions the
3  First Amendment might apply in the ethics code and
4  some it may not.
5      Q    What about the ban on lobbyists donating
6  to a campaign, do you think there's a First
7  Amendment issue there?
8          MR. JAMES:  Objection, legal conclusion.
9      A    I have not kept up with the case law in
10 the last few months, so I don't know what might be
11 the situation now.
12     Q    Prior to a few months ago, just
13 generally, and I understand you may not understand
14 developing case law and we all are aware of the U.S.
15 Supreme Court case that was recently argued
16 probably, but putting all that aside, generally do
17 you think that there's a First Amendment implication
18 there, and I understand it may be constitutional
19 still, but do you think that there's a First
20 Amendment implication?
21         MR. JAMES:  Objection, legal conclusion.
22     A    I don't know.
23     Q    Sir, do you understand that there's got
24 to be, where the First Amendment is implicated, some
25 tailoring to either preventing corruption or its

51d14619-9481-44e8-adb5-d49d86433c88

Page 34

1    appearance?
2         MR. JAMES:  Objection, legal conclusion.
3         A    I don't know.
4         Q    And I just want to be clear, it is the
5    position of the Kentucky Legislative Ethics
6    Commission that it does not know what is required
7    constitutionally of these provisions; is that what
8    you're telling me?
9         MR. JAMES:  Objection to
10   characterization.
11        A    No, that's not correct.
12        Q    Then what is the position of the Kentucky
13   Legislative Ethics Commission?
14        A    The position of the Commission was to
15   make certain recommendations to the General
16   Assembly.  It then becomes the province of the
17   General Assembly to decide how those -- if those
18   recommendations, one or more of them, might be
19   drafted into bill form and presented to one chamber
20   of the General Assembly or the other.  At that point
21   it's in the province of the members of the General
22   Assembly to determine how to draft those in a
23   constitutional format and to pass a bill that they
24   believe meets constitutional muster.
25        Q    In formulating your recommendations, do

Page 35

1    you make any determinations when you formulate those
2    as to whether or not your recommendations are
3    constitutional?
4         A    Yes.  We believed at the time that they
5    were.
6         Q    And at the time that you made those
7    recommendations, did you understand that whether or
8    not they were constitutional depended on whether or
9    not they were closely drawn to meet a compelling
10   governmental interest?
11        A    Yes.
12        Q    We're going to talk about the pure speech
13   issue, there's this pure speech issue in terms of
14   what lobbyists can solicit, but we'll talk about
15   that later.
16        A    And I'm only asking you with regards to
17   your general question.  I'm not answering
18   specifically on any particular statute.
19        Q    And we're going to get into specifics
20   later, but I'm just asking generally.
21        We are going to come back to this report,
22   sir, but if you could just set this one aside,
23   Number 13, and I just want to look briefly at
24   Number 14.  Is Number 14 the annual report for '13
25   and '14?

Page 36

1         A    Yes.
2         Q    I want to turn back to the complaints and
3    administrative actions section.  It's the ninth page
4    back.  I could be wrong.  Do you see that?
5         A    I do.
6         Q    It looks like there were seven formal
7    complaints against legislators filed, correct?
8         A    Yeah, that's what the report says.  I
9    don't remember all seven of them.
10        Q    And four were dismissed, right?
11        A    Yes, four were dismissed and three
12   resulted in a public reprimand, along with a $1,000
13   fine in each case.
14        Q    So we talked before about whether or not
15   you could do multiple options in any given
16   enforcement case, and it looks like you in fact have
17   done that?
18        A    Right, yes.
19        Q    Did those result in formal adjudications
20   or were those settlements, do you remember?
21        A    I think those were all settlements, but
22   one of them could have been formally adjudicated.  I
23   can't remember the date.
24        Q    And it looks like again we've had some
25   administrative fines with the legislative agents and

Page 37

1    their employers, correct?
2         A    Yes, that's right.
3         Q    Why do you include this section in your
4    annual report, this complaints and administrative
5    actions?
6         A    Because it's significant action taken by
7    the Commission during that fiscal year, and it's
8    reasonable to include it in there to notify the
9    public that actions have been taken, notify the
10   members of the General Assembly.
11        Q    Would you say that you want to let people
12   know that they need to comply with the law?
13        A    Well, that's the basis of everything we
14   do, is to help people comply with the law.
15        Q    And you want to let people know there's
16   consequences if they don't?
17        A    Well, that's part of our charge.
18        Q    And that's part of why we've got this in
19   the annual report, right, the complaints and
20   administrative actions section?
21        A    I would say that it's just a report, you
22   know, it's not meant to convey consequences.  It's
23   meant to convey what the Commission did during that
24   fiscal year.
25        Q    The reason you take enforcement action is

51d14619-9481-44e8-adb5-d49d86433c88

Page 38

1   to coerce compliance, is it not?
2       A    I'm sure that's one of the results of
3   enforcement action, but certainly, I mean, if
4   there's a law and there's an enforcement mechanism,
5   the Commission is charged to follow the law and to
6   enforce the law, and if that sends a message to
7   other people, that might be part of the result.  The
8   main thing is to address the situation that's before
9   the Commission at the time.
10      Q    Do you agree with me that enforcement
11  actions result in general deterence?  In other
12  words, when you take an enforcement action -- you
13  indicated previously, sir, that by levying the
14  fines, you get more compliance from the legislative
15  agents and the employers, right?
16      A    That's correct, certainly.
17      Q    And part of that is because of general
18  deterence, right, people know that if they don't
19  file on time, you're going to fine them?
20      A    Certainly.
21      Q    Which is a purpose, not the sole purpose,
22  but a purpose of levying these fines?
23      A    Yes.
24      Q    And the same is true with the formal
25  actions against the legislators as well; is that

Page 39

1   fair?
2       A    Yes, yes.
3       Q    Let's look at Exhibit 15.  And, again, I
4   want to go back to, it looks like the fifth page.
5   Do you see that?  And again we don't have any formal
6   complaints against legislators, lobbyists, or
7   employers in this fiscal year, correct?
8       A    That's correct.
9       Q    But we do again have administrative fines
10  that are levied?
11      A    Yes.
12      Q    We'll set those aside.  We will be coming
13  back to these exhibits in a few moments.
14           MR. WIEST:  Do you need a break, by the
15  way?
16           THE WITNESS:  No, thanks.
17           (Exhibit 16 through 19 were
18                marked for identification.)
19      Q    I'm handing you what I've marked as
20  Exhibits 16 through 19.  Sir, Exhibit 16 is a copy
21  of KRS 6.761, which deals with conflict of interest
22  provisions.  Are you familiar with that?
23      A    Yes.
24      Q    And it prevents the use of public office
25  for private financial gain, among other things,

Page 40

1   right?
2       A    Correct.
3       Q    It's a serious provision in the sense
4   that if the legislator is using their public office
5   for private gain, that's a real problem; is that
6   fair?
7       A    Sure.
8       Q    And this provision was enacted, I
9   believe, in 1993 following what I'm going to call
10  the BOPTROT scandal.  Is that okay if I call it that
11  today?
12      A    That's what people call it, yes.
13      Q    And this provision has remained unchanged
14  since the BOPTROT scandal, correct?
15      A    That's correct.
16      Q    And in the BOPTROT scandal, in addition
17  to, I'm going to call it the federal charges, I
18  think there was some wire fraud, I think there was
19  some mail fraud, I think there was some bribery
20  charges that were brought, but at the heart it was
21  legislators using their public office for private
22  gain; is that fair?
23           MR. JAMES:  Objection to
24  characterization.
25      A    It was a multifaceted situation.  I don't

Page 41

1   recall, you know, you could characterize it as using
2   their office for private gain in every case, but I
3   don't remember every case.  There were almost 20
4   people convicted in that I think.
5       Q    Right.  And we're going to talk about
6   that some more and we've got some newspaper articles
7   that your counsel provided to us in discovery.  It
8   would be fair to say, though, that if you've got
9   bribery going on, you've got somebody using their
10  public office for private gain; would you agree with
11  me?
12      A    There were some charges I think of
13  bribery in there and there were other situations
14  too, but, yeah, I think that was it, the base of it,
15  yeah.
16      Q    The next exhibit, which is KRS 6.751 --
17  just to be clear, this provision has not changed,
18  this public office for private gain, hasn't changed
19  since 1993; would you agree with me?
20      A    That's correct.
21      Q    When we look at the next exhibit, the
22  prohibition against acceptance of additional
23  compensation or gifts for performance of legislative
24  duties, that's another provision that has not
25  changed since 1993?

51d14619-9481-44e8-adb5-d49d86433c88

Page 42

1      A    That's correct.
2      Q    What exactly is this provision
3  preventing, can you put it in layman's terms?
4      A    Well, an example would be if someone paid
5  a legislator to take a legislative action.
6      Q    Okay.
7      A    For example, could be their private
8  employer, if their private employer said, I'll give
9  you an extra $10,000 if you'll introduce this bill
10  that affects our industry.
11      Q    Would it include something that -- and
12  that's a very direct example.  Could it include a
13  more subtle example, in other words, the private
14  employer says, you know, this bill was affecting our
15  industry and just leaves it at that?
16      A    No.  I mean, that doesn't sound like
17  anybody is accepting compensation in that situation.
18      Q    In the private employer example, you
19  know, we've got -- if anybody is going to get a
20  bonus this year, we've got to make our numbers, and
21  this bill is what we need to make our numbers, does
22  that do it?
23          MR. JAMES:  Objection, speculation.
24      A    You know, that is so hypothetical and
25  speculative, every one of these situations is

Page 43

1  different, and if you present me with a hypothetical
2  like that, there's no way in the world I can make a
3  judgment on whether it would fall under a particular
4  statute.
5          MR. WIEST:  All right.  I'm going to
6      object for the record.  This is a 30(b)(6)
7      witness who has -- the topics include the
8      application of the law in particular
9      situations, and while I understand the
10      speculation objection, which would be
11      appropriate on a private deposition, it is not
12      acceptable for a 30(b)(6) deposition, and so
13      we've got our objection on the record, and
14      we'll deal with it, I suppose, with the Court.
15          MR. JAMES:  I would just like to say that
16      while hypotheticals may come into play for some
17      but not all of your challenges, I would like to
18      preserve speculation and legal conclusion
19      objections to the extent that they may be
20      applied to other challenges.
21      Q    All right.  Mr. Schaaf, are you aware of
22  any enforcement of this particular provision?
23      A    My recollection, it is not necessarily
24  enforcement, but I can remember that we've had
25  opinions, for example, I think we had an opinion

Page 44

1  stating that a legislator should not accept a free
2  parking pass from a local airport, which was
3  proposed to be given to him because he was a
4  legislator.  I think the Commission found that would
5  be outside compensation.  Similarly, membership in a
6  health club that was offered to the legislator
7  because he was a legislator.  The Commission found I
8  think in both of those cases that that was outside
9  compensation provided because they were legislators.
10      Q    Okay.
11      A    Not for any other reason.
12      Q    Okay.  Exhibit 18 is the definition
13  section, and I'm not going to go in and -- well, I
14  am going to go through some of these right now
15  because they've got other applications and other
16  provisions of the code, and you know that, right,
17  the definitions is an important section; would you
18  agree with me?
19      A    Yes.
20      Q    I want to look at the anything of value
21  definition, and I want to look at number 14 in
22  particular because I think I understand 1 through
23  13.  I understand pecuniary items and money, I
24  understand promissory notes.  But I'm looking at
25  number 14, and it says any other thing of value that

Page 45

1  is pecuniary or compensatory in value to a person or
2  the primary significance of which is economic gain.
3  Does that include food and beverages and
4  entertainment?
5      A    Well, it depends on the circumstances in
6  which the food and beverages and entertainment would
7  be given.  For example, you may not be able to give,
8  if you are a lobbyist or employer of a lobbyist, you
9  may not be able to give a legislator a country ham,
10  but if he's invited, he or she is invited to an
11  event that falls under one of these other
12  provisions, then you could serve country ham to the
13  legislators at the event.
14      Q    Let me restate it a different way if I
15  understand you.  There's a bunch of exceptions to
16  anything of value, and it's in subsection (b), and I
17  think what you're telling me is food and drink and
18  entertainment is anything of value unless it's
19  contained within an exception; is that fair?  And
20  there's a lot of exceptions, I understand that.
21          MR. JAMES:  Objection, legal conclusion.
22      A    Well, it depends I guess on whether the
23  food or drink or beverage was given in a situation
24  in which it was of pecuniary or compensatory value.
25  My example is one in which it would be, a country

12 (Pages 42 to 45)

Page 46

1   ham might be found to be of pecuniary value.
2       Q    What about a cup of coffee in the
3   cafeteria lobby, is that -- or, I'm sorry, in the
4   capitol cafeteria, is that a thing of value?
5       A    It depends on the situation.  You want to
6   ask me specifically if a legislator is given a cup
7   of coffee by a lobbyist?
8       Q    Sure.
9       A    That would probably be a thing of value
10  unless it took place in a situation --
11      Q    That's in one of these exceptions?
12      A    Yes.  Or if someone other than the
13  lobbyist paid for it.
14      Q    Okay.  Well, and that deals with the
15  later provisions that prohibit things of value from
16  lobbyists and in some cases their employers but
17  doesn't prohibit it necessarily from the general
18  public.  Are you with me?  Let me give you an
19  example.  There's nothing that prohibits John
20  Schickel, my client, from accepting a cup of coffee
21  from me, I'm not a lobbyist or an employer of a
22  lobbyist, right?
23      A    That's correct.
24      Q    But that doesn't change whether or not
25  it's a thing of value.  I'm not covered by the later

Page 47

1   sections of the code that we're going to talk about.
2   Are you with me?
3       A    The cup of coffee is not.
4       Q    The cup of coffee isn't, right.
5   Obviously cash gifts are something we can talk
6   about, but the cup of coffee from me, I'm not
7   covered by the code?
8       A    That's right.
9       Q    And I guess my question is back to this
10  thing of value, anything of value.  Anything of
11  value appears to include -- it would have to include
12  a cup of coffee, right?
13      A    Probably.  Again, depending on the
14  circumstances.
15      Q    Unless it's within an exception?
16      A    That's right.
17      Q    And what about a glass of water, is that
18  anything of value?
19      A    It depends on the circumstances.  Is it a
20  glass of tap water?  You know, if someone makes a
21  complaint that a legislator accepted a glass of tap
22  water, you know, is it given in a situation where
23  the glass of tap water cost the lobbyist $5,
24  50 cents, and then he gives it to the legislator,
25  the legislator would have had to pay $5 or 50 cents

Page 48

1   for it.  Maybe it's a thing of value, maybe not.
2       Q    The senator goes to the lobbyist's office
3   and he offers a glass of tap water.  The lobbyist
4   pays his water bill every month based on usage.  I
5   understand that may not be a lot.
6       A    The lobbyist pays the senator's water
7   bill?
8       Q    No, no.  He gives the senator a glass of
9   water, but he pays his own water bill.  Are you with
10  me?
11      A    No.
12      Q    The lobbyist is at his office.
13      A    At the lobbyist's office?
14      Q    At the lobbyist's office, and he gives
15  the senator a glass of tap water from his office.
16  He pays, the lobbyist pays the water bill every
17  month.  So there's something, maybe a couple cents,
18  may not be much, but there's something that's
19  associated with that glass of water the lobbyist has
20  paid for.  Is that anything of value?
21      A    Maybe, maybe not.  It's just hard to say.
22      Q    If it's not within an exception?
23      A    It depends on the circumstances really.
24  If the commission were to receive a complaint that a
25  legislator received a glass of water from a lobbyist

Page 49

1   at the lobbyist's office, then they would have to
2   determine is that a thing of value.
3           MR. JAMES:  Can we just go off the record
4   for a second.
5           MR. WIEST:  Sure.
6           (Off the record.)
7           MR. JAMES:  At this point I would just
8   like to enter into the record a standing
9   objection to speculation and legal conclusion
10  to the extent any questions involving
11  hypothetical situations are presented.
12          MR. WIEST:  And I'll put on my response
13  again.  This is a 30(b)(6) witness, he also
14  happens to be an attorney, he was the former
15  counsel for the Legislative Ethics Commission.
16  That I think deals with both the speculation
17  and the legal conclusion issue.  Furthermore,
18  this is a body that makes and renders opinions
19  based on facts and circumstances within their
20  statutory charge, but we recognize the standing
21  objection and we'll just have a standing
22  response and we'll move on.
23  BY MR. WIEST:
24      Q    We were talking before, Mr. Schaaf, about
25  the glass of water.  I see that you're drinking some

13 (Pages 46 to 49)

51d14619-9481-44e8-adb5-d49d86433c88

Page 50

1   bottled water today.  If that's given to the
2   legislator in the course and scope of a meeting at
3   the lobbyist's office by the lobbyist, is that a
4   thing of value?
5       A    It's possible.
6       Q    When you say it's possible, if that's not
7   within an exception, if it's not an event, for
8   instance, that all legislators are invited to or any
9   of the other anything of value exceptions in
10  paragraph 2(b), if it's not within the exception, is
11  it a thing of value?
12      A    It's possible.
13      Q    Okay.  When you say it's possible, how
14  does the legislator figure out whether or not it's
15  included or not?
16      A    He could ask first.  For example, when
17  the bottle of water is offered, he could call me and
18  ask me if he should accept it under the
19  circumstances, and we could discuss the
20  circumstances of the meeting.
21      Q    Okay.
22      A    We've never had anyone file a complaint
23  about a lobbyist offering or a legislator accepting
24  a glass or bottle of water.
25      Q    Okay.  So I guess I'm asking you right

Page 51

1   now, if I'm John Schickel and I call you up and I
2   say I'm at -- are you familiar with Mark Wilson,
3   he's one of the registered lobbyists?
4       A    Yes.
5       Q    I'm in Mark Wilson's office, he just
6   offered me a bottle of water, we're meeting to
7   discuss a bill, I don't know what it's worth, he's
8   not sure what it's worth, can I accept the bottle of
9   water?
10      A    Depending on the circumstances, I would
11  probably caution him not to; if he was concerned
12  enough to call and question it, obviously he has a
13  concern about it.
14      Q    Right.
15      A    So I would caution him not to do it.
16      Q    And he knows what we all know, that you
17  guys have a very, very broad reading in paragraph
18  14, right?
19          MR. JAMES:  Objection, characterization,
20  legal conclusion.
21      A    I don't know that that's broad or narrow.
22  It depends on the circumstances.
23      Q    Okay.  So meeting at Mark Wilson's
24  office, is that a circumstance if he's given a
25  bottle of water to discuss a bill?

Page 52

1       A    Like I said, it's possible.
2       Q    What's it depend on?
3       A    The surrounding circumstances, did Mark
4   Wilson offer the bottle of water, did someone who
5   just happened to be there bring a cooler full of
6   waters and offer them to everybody, this person
7   happens not to be a lobbyist.  That's possible.
8       Q    So assume it's Mr. Wilson's bottles of
9   water.
10      A    Again, if Senator Schickel had enough
11  concern to call me and ask about the situation, I'm
12  going to assume that he's got a concern about it.
13  Maybe he's concerned that somebody in the room might
14  file a complaint against him if he takes it.  Part
15  of what I want to do is preserve the appearance of
16  propriety and if Senator Schickel is concerned about
17  it, and he's obviously concerned that somebody might
18  file a complaint against him, and I would caution
19  him not to accept anything of value in that
20  situation.
21      Q    Including the bottle of water, right?
22      A    Including the glass of water possibly.
23  It depends on the circumstance.
24      Q    The anything of value exceptions that we
25  see there in subsection (b) includes campaign

Page 53

1   contributions, right, those are not things of value?
2       A    That's correct.
3       Q    And we understand those are regulated
4   separately by Ms. Dennis and her group, but at least
5   from your all's perspective, the campaign
6   contribution is not anything of value, although it
7   may be regulated in other sections of the
8   Legislative Ethics Code?
9       A    That's correct.
10      Q    Includes compensation, food, beverages,
11  entertainment, transportation, lodging extended to a
12  legislator by their private employer, right?
13      A    Correct.
14      Q    And the reason for that, as I understand
15  it, is that our legislature is not like some states,
16  we're not in session throughout the year, correct?
17      A    We have a part-time legislature.
18      Q    Right.  And so for the most part, not
19  everyone, but a lot of legislators have outside
20  employment, right?
21      A    Yes.
22      Q    There's some other exceptions there and
23  I'm not going to walk through all of them, but there
24  is an exception that allows, and we're going to be
25  talking about a fair amount today, the cost of

51d14619-9481-44e8-adb5-d49d86433c88

Page 54

1  attendance or participation and of food and
2  beverages consumed at events, and I assume
3  entertainment is probably included, you can tell me
4  if it's not, to which all members of the Kentucky
5  Senate or the Kentucky House or both are invited,
6  right?
7       A    That's correct.
8       Q    So if the lobbyist invites everyone in
9  the House or the Senate or both, it's okay?
10      A    What is?
11      Q    It's okay to accept food and beverages,
12  right?
13      A    Yes, at that event.
14      Q    At that event.  Does that include
15  entertainment at the event as well?
16      A    Yes, typically.
17      Q    And, again, to which all members of a
18 joint committee or task force of the Kentucky Senate
19 and the Kentucky House are invited, that's another
20 exception, right?
21      A    Yes.
22      Q    Or a caucus of legislators approved as a
23 caucus by the LRC, that's Legislative Research
24 Commission, that's an exception, right?
25      A    Yes.

Page 55

1       Q    And there's some other exceptions too,
2  you know, they can be invited and approved or get
3  prior approval from the LRC, right?
4       A    That's right.
5       Q    And then there's gifts from a person
6  related by blood or marriage, right?
7       A    Yes.
8       Q    We talked before about me giving, me
9  buying lunch for Senator Schickel and that being
10 okay, right, because I'm not a lobbyist or employer
11 or PAC, right?
12      A    That's correct.
13      Q    What about the CEO of Humana if he's not
14 employing the lobbyist, is that okay?
15      A    Well, Humana does employ a lobbyist.
16      Q    Okay.  What about the CEO of a local
17 manufacturing company, if he doesn't employ a
18 lobbyist, is that okay if he buys the senator lunch?
19      A    Yes.
20      Q    How about paid trips to Hawaii or
21 Jamaica, is that okay as long as he's not employing
22 the lobbyist?
23      A    It depends on the circumstances.
24 Possibly.  You know, it may be reportable but not
25 prohibited, depending on -- that would be the kind

Page 56

1  of thing that a legislator would call us about and
2  ask.  If there's a lobbying objective in there,
3  we're probably to going to caution them about doing
4  it, but as a straight-up proposition, it's not a
5  violation of the law for someone other than a
6  lobbyist or employer to pay for a trip, as long as
7  it has nothing to do with the legislator's
8  legislative responsibilities.
9       Q    Okay.  So he could pay for the trip today
10 to Hawaii or Jamaica?
11      A    As long as he's not being invited as a
12 legislator.  If his private employer is paying for
13 it, if somebody in the community who is a friend of
14 his, you know, if they're going to the friend's
15 condo.  If there's not a lobbying or legislative
16 involvement there, then it's probably all right.
17      Q    Let's assume that there's not, at least
18 initially, and then they come back from the trip and
19 that same guy calls up and says I need some help on
20 a bill?
21      A    Well, that's going to be up to Senator
22 Schickel what he does about that.
23      Q    Or Speaker Stumbo or whomever is in that
24 situation, right, whatever legislator is in that
25 situation?

Page 57

1       A    I don't know exactly what you're asking.
2       Q    Well, I'm just asking about paid trips
3  that then are followed up after the fact with an ask
4  on a particular bill?
5       A    I don't understand exactly what the --
6       Q    Well, here's my point.  I'm just trying
7  to cut to the chase.  We prohibit things that
8  lobbyists and their employers can do, right, in
9  terms of --
10      A    Yes.
11      Q    -- meals and dinners and trips and all of
12 that.  But we allow company executives, union
13 leaders, people like that, people of influence to do
14 these same things, right, as long as there's not a
15 lobbying objective; is that fair?
16           MR. JAMES:  Objection, legal conclusion.
17      A    No.  If they're lobbying as you
18 suggested, they need to be registered, and if this
19 individual you're talking about is asking Senator
20 Schickel or Representative Stumbo to take some
21 action and somebody is paying them to do that or
22 they're doing that as part of their job, they're
23 required to register as an employer and/or
24 legislative agent.  So this law is narrowly drawn to
25 impact the relationship between legislators and

51d14619-9481-44e8-adb5-d49d86433c88

Page 58

1    lobbyists and their employers.  It is not drawn so
2    broadly as to impact people who don't have a
3    legislative interest.
4        Q    Okay.  When we look at the exceptions to
5    lobbying and we see, for instance, certificates,
6    plaques, or commemorative tokens of less than $150
7    in value, do you see that, or promotional items of
8    less than $50?
9        A    Yes.
10       Q    Educational items and informational
11   items.  Is there any limit to the number of those
12   items that the legislator can get per year?
13       A    No.  But those all have to be reported by
14   the employer or lobbyist who is giving them.
15       Q    And do those reports include the
16   particular legislators that they were given to?
17       A    Usually they're given to all members of
18   the General Assembly, unless in the case of a plaque
19   it was given to a legislator who made an appearance
20   at a group's annual meeting or something like that,
21   and then they would probably report that they gave a
22   plaque to Senator Schickel.
23       Q    Okay.  And so if they're giving them to
24   everybody, do they need to report every legislator
25   or do they just say we offered it to all the

Page 59

1    legislators?
2        A    Yeah, and they report the total that they
3    spent on those items, what they were and what they
4    spent.
5        Q    Okay.  I'm going to talk to you about,
6    there's these group events that we just talked about
7    to which everybody is invited.  So the lobbyist can
8    invite all the members of the General Assembly or a
9    caucus to their UK basketball box for a game, and
10   that is not a thing of value, that can be accepted,
11   but it has to be reported, right?
12       A    There has to be an event in conjunction
13   with it.  They can't, for example, just give out
14   tickets to people.
15       Q    Right.
16       A    There has to be an event held in
17   conjunction with the game and they have to invite
18   everybody, and they have to report what they spent
19   and who they invited and what the event was.
20       Q    Okay.  But they don't have to identify
21   each particular legislator that attended, right, in
22   that instance?
23       A    That's correct.
24       Q    And I want to look at the, there's some
25   out-of-state conferences that the legislators go to

Page 60

1    I believe, NCSL seems to be one of them that I saw
2    in some of the reports; are you familiar with that?
3        A    Yes.
4        Q    And those are generally out of state,
5    correct?
6        A    Generally.
7        Q    Except, of course, when we're hosting
8    them here in Kentucky.
9        A    Right.
10       Q    And when they go to those, the lobbyists
11   are allowed to sponsor food and drinks and things
12   like that at these events and invite all of the
13   legislators?
14       A    That's correct.
15       Q    And so you could have -- Duke Energy, for
16   instance, could have a night at the UK basketball
17   game where they invite all members of the House and
18   Senate Interim Joint Committee on Licensing and
19   Occupations, for instance, right?
20       A    Yes.
21       Q    And that is perfectly acceptable, they
22   can do that, they report how much they spent, they
23   say we invited everybody on the committee and we
24   don't know which legislators attended or did not
25   attend that event, right?

Page 61

1        A    That's correct.
2        Q    I want you to -- the definitional
3    section, we're going to get back to it later, but I
4    want to hold it separately.
5            We're going to get into a couple other
6    things right now, including Exhibit 19, which is the
7    prohibition against honoraria, which is KRS 6.747;
8    do you see that?
9        A    Yes.
10       Q    And it looks like he can be reimbursed
11   for actual expenses or accept prepaid
12   transportation, food, and lodging if they get
13   approval from the majority of the LRC?
14       A    That's correct.
15       Q    But the legislative agent or employer
16   cannot actually pay for the transportation and
17   lodging to go to the out-of-state event now, that
18   was one of the changes?
19       A    That's correct.
20       Q    But once they're there, they can pay for
21   local transportation and food and things like that,
22   correct?
23       A    As long as they comply with the same law
24   that applies to in-state events.
25       Q    Okay.  Let me ask, your concern is with

16 (Pages 58 to 61)

Page 62

1   the appearance of impropriety, right?
2       A    That's one of my concerns.
3       Q    What are your other concerns?
4       A    Well, I'm always concerned with
5   compliance with the law.
6       Q    Okay.
7       A    And helping people comply with the law.
8       Q    Okay.
9       A    And avoid the appearance of impropriety.
10      Q    So complying with the law, but the
11  purpose behind these laws, as I understand them, the
12  compelling governmental interest is corruption or
13  its appearance; do you agree with that?
14           MR. JAMES:  Objection, legal conclusion.
15      A    I'm sure that was one of the purposes,
16  but it's not the only purpose.
17      Q    What are the other purposes?
18      A    I think the primary purpose is to assure
19  the public that the members of the General Assembly
20  are operating within a reasonable code of ethics
21  that provides some separation between the people who
22  are making policy and the people who want particular
23  policies made, to maintain a professional
24  relationship between the parties.
25      Q    And again I guess I'm back to the

Page 63

1   preventing the appearance of impropriety, doesn't
2   that really go to that same interest?
3       A    You know, they're probably on parallel
4   tracks.  I don't know that they're the same as
5   reassuring the public that the legislators are
6   acting within a reasonable code of ethics.  They're
7   not using their office for personal enrichment or
8   the enrichment of their business or their family
9   members and that they're maintaining a professional
10  relationship with people who are paid to influence
11  policy.
12      Q    Sir, I'm going to get to --
13           MS. DENNIS:  Do you mind if I go to use
14  the restroom?
15           MR. WIEST:  Yeah, we can take a break, we
16  can do a two-minute break or whatever.
17           (Brief recess.)
18           (Mr. John Steffen enters the room.)
19               (Exhibit 20 was marked for
20               identification.)
21  BY MR. WIEST:
22      Q    Mr. Schaaf, do you recognize what I've
23  marked as Exhibit 20?
24      A    Yes.
25      Q    And what is it?

Page 64

1       A    It's one of the newsletters, in this case
2   it's the February 2009 newsletter published by the
3   Legislative Ethics Commission.
4       Q    And the caption of your newsletter is The
5   Ethics Reporter; is that right?
6       A    Yeah, that's the name of it, yeah.
7       Q    Who receives -- let me just back up.  The
8   newsletter is available on your website, right?
9       A    Yes.
10      Q    So it's available to the public?
11      A    That's right.
12      Q    Do you also deliver paper copies to
13  anybody?
14      A    No.
15      Q    Do you send out e-mail blasts with the
16  newsletter when one is available?
17      A    Yes.
18      Q    And who is on the e-mail list?
19      A    Well, the members of the General Assembly
20  each receive a copy, all registered legislative
21  agents, and all registered employers of legislative
22  agents, and that totals about 1300 people.  And a
23  newsletter mailing list that we've developed over
24  the years that primarily includes media around
25  Kentucky and then state and local officials over the

Page 65

1   years who have expressed interest in it or who I've
2   identified as having sort of related work, like
3   people at the Registry of Election Finance.
4       Q    Okay.  What about candidates for the
5   General Assembly, can they get on the list if they
6   want to be on the list?
7       A    Oh, anybody can get on the list who wants
8   to be on the list.  We don't routinely put the
9   candidates on there.  We have other communication
10  with them.
11      Q    Okay.  And when you send out the e-mail
12  blasts when one of these is available, do you
13  actually attach the newsletter itself or is it just
14  a link to your website?
15      A    No, the newsletter itself goes out in a
16  Word type document attached to every e-mail.
17      Q    I want to look at this February 2009
18  Reporter, and you talk about, the very first
19  paragraph talks about the prohibition of a
20  legislative agent, a lobbyist, from making a
21  campaign contribution, right?
22      A    Yes.
23      Q    By the way, sir, were you involved at all
24  with the drafting of this particular newsletter?
25      A    Yes.

51d14619-9481-44e8-adb5-d49d86433c88

Page 66

1    Q    And as the executive director, do you
2  review these newsletters before they go out the
3  door?
4    A    I generally write them.
5    Q    Okay.  The second paragraph indicates
6  that any lobbyist that violates the prohibition
7  against making a campaign contribution shall for the
8  first violation be guilty of ethical misconduct, and
9  for the second and any subsequent violation he shall
10  be guilty of a Class D felony; do you see that?
11    A    Yes, I do.
12    Q    You want the legislative agents to know
13  that this is some serious business, this
14  contribution, right?
15    A    It is serious, yes.
16    Q    And then you indicate that the
17  Legislative Ethics Commission recently reprimanded a
18  lobbyist for making a campaign contribution to a
19  legislative agent and levied a $500 fine against the
20  lobbyist, correct?
21    A    That's correct.
22    Q    Do you remember which lobbyist that was?
23    A    I do not remember his name.  He had been
24  a lobbyist for AT&T, but I don't remember his name.
25    Q    Do you remember which legislator he

Page 67

1  donated to?
2    A    No.  He went to a fund-raiser and wrote a
3  check to a legislative candidate I think.  There was
4  a fund-raiser for several candidates, as I remember,
5  and he wrote a check to one of them.
6    Q    And my understanding is that actual
7  violations -- the potential complaints -- not the
8  potential complaints, there were actual complaints
9  against the candidates that were filed but they were
10  dismissed, right?
11    A    I think that's correct.
12    Q    Because the lobbyist did not identify
13  himself and the candidates returned the
14  contributions once they learned that it was a
15  lobbyist that had written the check, right?
16    A    I think those points are both correct.
17    Q    And that's in paragraph four, the fourth
18  paragraph down.
19    A    Oh, okay.  Then it is correct.
20    Q    And then you've issued, it looks like,
21  some opinions also relating to soliciting campaign
22  contributions and things like that with lobbyists,
23  right?
24    A    Yes.  I think those are in one opinion,
25  those points.

Page 68

1    Q    Why can the lobbyist not make a campaign
2  contribution to the caucus campaign committees; do
3  you know why that is?
4    A    Well, what the Commission held in its
5  opinion on that particular point is that a caucus
6  campaign committee is a group of legislators, and if
7  the law prohibits a lobbyist from contributing to an
8  individual legislator, then it is a reasonable
9  interpretation to say if two or three or four or 20
10  legislators get together in a group, a lobbyist
11  can't contribute to that group either.
12    Q    And your understanding is that there is
13  four caucus campaign committees, right?
14    A    There are four.
15    Q    There's a Democrat and a Republican
16  caucus campaign committee in both the House and the
17  Senate, right?
18    A    That's correct.
19    Q    Is it your understanding that those are
20  actually controlled by the legislators themselves?
21    A    They are.
22    Q    Who's responsible for controlling those?
23    A    Well, I don't know, other than the fact
24  that, you know, just generally speaking I think the
25  legislators and leaders make the decisions about how

Page 69

1  the money is spent.  They have treasurers who are
2  not legislators I believe listed in the campaign
3  finance reports.
4    Q    Right.
5    A    But as far as deciding who gets how much
6  money, I think that's legislative leaders.
7    Q    They're controlled directly or indirectly
8  by the leadership in the House and the Senate?
9    A    I don't know how they decide who gets
10  what amounts, but it may be a group decision, I
11  don't know.
12    Q    But your understanding is that they're
13  controlled by the incumbent legislators?
14    A    By the legislators, yes.
15    Q    You also held that the legislator may not
16  solicit a campaign contribution from a lobbyist for
17  the caucus campaign committees, right?  Do you see
18  that?  It's the one, two, three, four, it's the
19  fifth paragraph down.
20    A    Yes.
21    Q    And by solicit, does that mean ask their
22  neighbor to donate, they can't do that?
23    A    If the neighbor is a lobbyist.  A
24  legislator can ask their neighbor who is not a
25  lobbyist to solicit campaign contributions for them.

51d14619-9481-44e8-adb5-d49d86433c88

Page 70

1    Q    Okay.  And the ethics code also prohibits
2  a legislator from soliciting the help of a lobbyist
3  in raising campaign funds for the legislator himself
4  or another legislator, right?
5    A    Yes.
6    Q    There's some other provisions in OLEC
7  06-03 that the Commission also issued some opinions
8  on, right, including that a member of the General
9  Assembly may not ask or direct a lobbyist to solicit
10  campaign contributions for a political party, right?
11    A    Yes.
12    Q    So, for instance, we talked before about
13  Speaker Stumbo, he can't ask a lobbyist to donate to
14  the Kentucky Democratic party, right?
15    A    That's -- well, according to this
16  opinion, he can't ask or direct a lobbyist to
17  solicit contributions, to go out and raise money.
18    Q    Okay.  Number 4 is interesting to me on
19  the second page.  Lobbyists can contribute or cohost
20  with legislators in an event to raise contributions
21  for a political party if the money is deposited in
22  the party's general fund and are not earmarked for a
23  specific legislative race, provided the lobbyist is
24  not requested by the legislator to do so, correct?
25    A    That's correct.

Page 71

1    Q    And so we talked before about Mark
2  Wilson.  I know Mr. Wilson because he lives up in
3  Northern Kentucky, so he's going to be the target
4  today for a fair amount of time, and I'm sure his
5  ears are burning.  He can go and show up with
6  Senator Schickel at an event for the Republican
7  party of Kentucky, and that's okay, right?
8    A    He can show up anywhere.
9    Q    Right.  And he can even write a check to
10  RPK at that event?
11    A    Yes.
12    Q    Unless it's known or understood that
13  there's something that's earmarked for a particular
14  legislative race, right?
15    A    That's correct.
16    Q    I'm going to look at this February 2009
17  report and where you talk about lobbyists and
18  employers registered and the amounts reported.  Do
19  you see that?  That's about middle way through the
20  second page there.
21    A    Yes.
22    Q    And we see between January 1st, 2008 to
23  December 31st, 2008 employers of lobbyists spent
24  more than $15.7 million on lobbying activities,
25  correct?

Page 72

1    A    Yes.
2    Q    And of that total, 14.8 million was spent
3  on actually compensating the lobbyists for their
4  work, right?
5    A    That's correct.
6    Q    Then there was $692,000 that was spent by
7  their employers on expenses associated with
8  lobbying, like office expenses, lodging and
9  transportation expenses for the lobbyists, right?
10    A    Right.
11    Q    And we see another $248,000 spent on
12  receptions, meals, and events which were conducted
13  primarily for groups of legislators, right?
14    A    Right.
15    Q    And we talked before, Mr. Schaaf, about
16  the exceptions where an entire House or the entire
17  Senate or the entire caucus is invited.  Is that
18  what this is primarily referring to?
19    A    Yes.
20    Q    I've not done all of the math on that,
21  but it seems to me that there's about 138
22  legislators in the Kentucky General Assembly.
23    A    There are exactly 138.
24    Q    Okay.  And if I did the math on that, I
25  would venture to guess that it's over a thousand

Page 73

1  dollars per legislator that's being spent in group
2  settings on receptions, meals, and events at least
3  in 2008, right?
4    A    A thousand dollars a year or a thousand
5  dollars an event?
6    Q    A thousand dollars a year.  At least, I
7  mean, it's actually more than that.
8    A    Well, I mean, if you want to average it
9  out that way, what, 248,000 total, 138 legislators,
10  you could say that it was over a thousand dollars,
11  it was close to $1800 per legislator --
12    Q    Right.
13    A    -- per year.
14    Q    Right.  And we don't know exactly how
15  many legislators went to these events because we
16  don't keep any track and there's no requirement for
17  any reporting of that, right?
18    A    No.  They only report the group they
19  invited.  They're not required to determine
20  specifically which of the 138 actually attend.
21    Q    Okay.  And then we see $434 in food and
22  beverage expenses to individual legislators or their
23  immediate family members in 2008, correct?
24    A    Correct.
25    Q    That's not a lot of money, is it?

51d14619-9481-44e8-adb5-d49d86433c88

Page 74

1     A    It depends on who's looking at it.
2     Q    Okay.  Comparatively, though, it's a
3  very, very small fraction compared to what was spent
4  on the group events?
5     A    It's a small fraction of 248,000, I'll
6  agree with that.
7            (Exhibit 21 was marked for
8            identification.)
9     Q    If you can look at Number 21, sir, with
10  me, and this is a little bit thicker because what I
11  did was I put a bunch of these reports together.  I
12  think it covers March through, I think it's through
13  October of 2009.  But turning to March, we see at
14  the beginning of this Reporter that there were fines
15  that were lobbied against some lobbyists, right?
16     A    They were levied.
17     Q    They were levied.  Were they paid by the
18  lobbyists?
19     A    Yes.  Well, it depends, fines against the
20  employer are --
21     Q    Paid by the employer?
22     A    Right, and sometimes an employer might
23  pay a lobbyist.  Doubtful, but it could happen.
24     Q    And, again, this goes out to every, you
25  indicated every legislative agent, every employer,

Page 75

1  and all the members of the General Assembly see this
2  report, right?
3     A    That's correct.
4     Q    At the bottom of that first page, through
5  the end of February, and this is the 2009 General
6  Assembly since January 1st, lobbyists or actually
7  their employers paid $63,590 for receptions, meals,
8  and events to which groups of legislators were
9  invited, right?
10     A    That's correct.
11     Q    And it looks like there was a whopping
12  $33.60 spent on individual legislator food and
13  beverages; is that fair?
14     A    That's correct.
15     Q    I want to go and look, sir, at the
16  May 2009 report.  There was a Chamber Day event that
17  is, oh, about the third paragraph from the end of
18  that page; do you see that?
19     A    Yes.
20     Q    And they spent 3,511 on that Chamber Day
21  event, right?
22     A    That's correct.
23     Q    And they invited all legislators?
24     A    That's correct.
25     Q    And we don't know how many attended that

Page 76

1  event?
2     A    We do not.
3     Q    Or even who, right, we don't know who
4  attended that event?
5     A    No, we don't.
6     Q    We've also got -- If you turn back to the
7  third page of that, on the very bottom right, I know
8  it's marked KREF360 on the bottom, on the bates
9  stamp; do you see that?
10     A    Yes.
11     Q    It looks like Commerce Lexington spent
12  $6,600 in February for An Evening in the Bluegrass
13  reception at Frankfort's Buffalo Trace Distillery.
14  Do you see that?
15     A    Yes.
16     Q    And, again, we don't know how many
17  legislators attended, right?
18     A    No.
19     Q    Do we know who was invited to that?
20     A    Well, no, not specifically, but I will
21  say -- I mean, we could look.  If it occurred during
22  a session or really pretty much anytime, an event
23  like that, they're going to invite all members of
24  the General Assembly.
25     Q    Okay.  And I want you to turn to page 4.

Page 77

1  The Northern Kentucky Chamber of Commerce it looks
2  like spent $24,500 on an event called a Night in
3  Frankfort in February 2008; do you see that?
4     A    Yes.
5     Q    And do you think all members of the
6  legislature were invited to that event?
7     A    Yes.
8     Q    One of the things that you said you were
9  concerned with was the appearance of impropriety.
10  Do you think that these group events where almost
11  $25,000 is being spent on a particular event raises
12  some questions about the appearance of impropriety?
13     A    No, not necessarily.  I think the way
14  they structured the law in 1993 provided that the
15  exceptions were for events to which members of both
16  chambers and members of both parties were invited,
17  rather than allowing unlimited spending on a couple
18  of legislators, for example, who might be taken on a
19  trip to Las Vegas, as was one of the issues in
20  BOPTROT.  This assured that if these events were
21  conducted, that significant groups of legislators
22  would be invited representing both chambers and both
23  parties.  So there would be less opportunity for the
24  type of corrupt activity that took place in BOPTROT.
25     Q    You agree with me that BOPTROT involved

20  (Pages 74 to 77)

Page 78

1   both Republican, although mostly Democrat,
2   legislators, correct?
3       A   I don't recall the breakdown by party,
4   but there were members of both parties and members
5   of both chambers who were ultimately convicted, yes.
6       Q   Now, following that, the law until 2014,
7   and we're going to talk more about that, was that an
8   individual legislator had a hundred dollars per year
9   limit, right?
10      A   An individual legislator could receive up
11  to a hundred dollars a year from each lobbyist and
12  employer, so there are over 650 lobbyists, so they
13  could have received up to a hundred dollars from 650
14  people.
15      Q   Right.  But there was a hundred dollar
16  limit on each of them, right?
17      A   On the amount that a particular lobbyist
18  could spend on a particular legislator.  Could take
19  place over the course of a whole year.  It could be
20  a series of $20 dinners or it could be one $99
21  dinner.
22      Q   Or it could be 30 cups of coffee at three
23  bucks a pop, right?
24      A   Yes.
25      Q   But there's no limit on these group

Page 79

1   events, correct, on what could be spent?
2       A   Right, there's no spending limit on an
3   event to which all members are invited.
4       Q   What about these group events is
5   different than the individual spending in terms of
6   the corruption or its appearance in your view?
7       A   I think there's a difference in terms of
8   assuring that there will be members of both parties
9   and both chambers, a cross section of legislators
10  will be there, and they'll all be treated in the
11  same fashion, which is different from a situation in
12  which a lobbyist can take an individual legislator
13  out for a meal and have that one-on-one time with no
14  one else around.  I think that was the problem in
15  BOPTROT, was there were no rules at the time, and so
16  there was a culture that developed, which I don't
17  think is present when you have a broad cross section
18  of legislators in attendance.
19      Q   Okay.  So you're saying that when you
20  have these group events, there's no one-on-one
21  interaction between a legislator and a lobbyist?
22      A   No, I'm not saying that.  Of course,
23  there's going to be one-on-one conversations, but
24  it's going to be in the context of a large event to
25  which 138 legislators and family members are invited

Page 80

1   and at which everybody is treated in the same
2   fashion.
3       Q   Okay.  There's nothing that keeps a
4   lobbyist from grabbing a legislator and talking
5   about something privately out in the hall, for
6   instance, at these events?
7       A   No.
8       Q   Let me ask, if the lobbyist is buying a
9   cup of coffee for the individual legislator, and I'm
10  talking about pre-2014, that interaction, that cup
11  of coffee has to be reported, right?
12      A   If the lobbyist bought the coffee for the
13  legislator, one-on-one situation, it was reportable.
14      Q   Okay.  And in that instance we would know
15  who the lobbyist was and we would know what they did
16  and what they bought, right?
17      A   If they reported it.
18      Q   If they reported it, if they complied
19  with the law at the time?
20      A   That's right.
21      Q   In the group setting we talked about we
22  don't know which legislators are there, we don't
23  know what necessarily conversations occur, all we
24  know to your point is there's a group, there's a
25  group setting, right?

Page 81

1       A   That's all we've ever known about the
2   group events.
3       Q   Now, one of the things that are allowed
4   is to invite a joint interim committee to these
5   group events, right?
6       A   That's correct.
7       Q   Do you know what the:  B-O-P in BOPTROT
8   stands for?
9       A   Business Organizations and Professions.
10      Q   Which was a joint committee at the time,
11  right, in the legislature?
12      A   Well, there was a House BOP committee and
13  a Senate BOP committee, and during the interim
14  between sessions, they met together and created the
15  interim joint committee on business organizations
16  and professions.
17      Q   And today the lobbyists can hold an
18  event -- by the way, do you know what the BOP
19  committees, what that evolved into today?
20      A   It's called Licensing and Occupations.
21      Q   And it's perfectly acceptable for the
22  lobbyists today to offer this large group event,
23  25,000, $50,000 if that's the cost for that interim
24  joint committee, right?
25      A   If they invite all members.

51d14619-9481-44e8-adb5-d49d86433c88

Page 82

1    Q    I am looking at -- I want to go ahead and
2  turn back to the June 2009 event, The Ethics
3  Reporter that's part of this particular exhibit.
4  What I want to point your attention to is you talk
5  about food and beverages and other items that are
6  part of the official program at events can be paid
7  for by employers and lobbyists, right?
8    A    Yes, if they're part of the official
9  program.
10    Q    Right.  And if they're not, then they had
11  to be reported outside of the -- well, it either had
12  to be reported or it had to be a group event that
13  was hosted in conjunction with the program, right?
14    A    I think so, yes, sounds right.
15    Q    I want to turn back one page to page 2
16  where you talk about campaign contributions during
17  legislative sessions.  And you note that a
18  legislator may properly solicit and accept campaign
19  contributions at any time, right?
20    A    Where is that?
21    Q    I'm sorry, it's the third sentence down
22  under the campaign contributions during legislative
23  sessions article.
24    A    Yes.
25    Q    And you indicate that there's nothing

Page 83

1  unethical or improper about a legislator engaging in
2  these seldom unnecessary political activities, nor
3  should these activities be viewed as somehow suspect
4  in themselves, right?
5    A    That's what the opinion said, yes.
6    Q    And the opinion is the opinion of the
7  Legislative Ethics Commission, right?
8    A    Yes.
9    Q    It's the official position of the
10  Commission; is that fair?
11    A    Yes.
12    Q    And so the Commission recognizes that
13  campaign contributions and their solicitation is
14  seldom unnecessary, right?
15    A    That's right.
16    Q    And then you indicate in that same
17  opinion that where you have some facts and
18  circumstances that give rise to an appearance of
19  improper influence, that is what raises the ethical
20  concern, right?
21    A    That's correct.
22    Q    And then again we get into these issues
23  about what General Assembly members can and can't do
24  in terms of lobbyists at these events, right?  And
25  I'm not going to get into each, I think we've

Page 84

1  already been through this opinion, including the
2  cohosting issue, right?
3    A    Yes.
4    Q    I want to turn -- we've got a July 2009
5  is on, I think it starts at KREF480 on the bottom
6  right; do you see that?
7    A    Yes.
8    Q    And this indicates that there was a, I
9  don't know if you see this, but this is at the -- if
10  we go, if you look, sir, at the bottom of the second
11  page, Legislative Agent Spending; do you see that?
12    A    Yes.
13    Q    In the first four months of 2009 there
14  was zero dollars reported spending on food and
15  beverages provided to individual legislators, right?
16    A    Correct.
17    Q    In 2008 it ended up being $81.83 a year,
18  correct?
19    A    That's correct.
20    Q    But when we look just a couple paragraphs
21  up, receptions, meals and events to which groups of
22  legislators were invited, $281,936; do you see that?
23    A    Yes.
24    Q    And I just want to understand, the
25  position of the KLEC is that the $81.83 is a problem

Page 85

1  but the 281,936 is not; is that fair?
2    A    No.
3    Q    Tell me why not.
4    A    Because the $81.83, not that the amount
5  itself is a problem or is not a problem, but the
6  conditions under which it was given can give rise to
7  a public perception that legislators are being
8  approached by lobbyists in situations and being
9  given gifts essentially by lobbyists on an
10  individual basis.  The same concern does not arise
11  apparently in the General Assembly for events to
12  which all members of the General Assembly are
13  invited.
14    Q    So if I'm a lobbyist and I invite
15  everybody to an expensive event at Buffalo Trace,
16  wine and dine everybody there, get everybody
17  liquored up there, show everybody a good time there,
18  spend hundreds of dollars on each legislator that
19  shows up there, that doesn't give rise to appearance
20  of an issue but a $3 cup of Coke does?
21    A    Well, again, it depends on who is looking
22  at the issue.  A legislator's opponent, for example,
23  in the next election could certainly look at that
24  and ask the legislator if he or she attended that
25  event, and if they did, that may become an issue

Page 86

1    with the constituents of the legislator.
2        Q    But the constituents don't know, couldn't
3    do an open records request and figure out whether or
4    not that legislator attended that group event,
5    right?
6        A    That's correct.
7        Q    But would know if that legislator
8    accepted the $3 cup of coffee from the lobbyist on
9    the individual spend; is that fair?
10       A    Under the old law if it was reported,
11   they would know, yes.
12       Q    I want to look at, sir, there's an
13   October 2009, and it looks like, and I just want to
14   point out a couple of figures that are there.  It
15   looks like in 2008 a total of $44,465 was spent on
16   food, beverages, and other expenses for events for
17   Kentucky legislators at the annual meetings of the
18   National Conference of State Legislatures; do you
19   see that?
20       A    In the next to last paragraph?
21       Q    Yes, sir.
22       A    Yes.
23       Q    And you agree with those figures, right,
24   what you put in these reports is accurate; is that
25   fair?

Page 87

1        A    That's correct.
2        Q    And I take it you, the Legislative Ethics
3    Commission, gets the data in the reports that are
4    reported to it, and then puts it into these
5    Reporters; is that fair?
6        A    That's correct.
7        Q    This year, this year being 2009, the
8    total spent on Kentucky Night events at the three
9    conferences was $33,893, right?
10       A    Yes, sir.
11       Q    And it looks like -- I want to go up to
12   the third to last paragraph, additionally employers
13   and lobbyists have spent just $34 on meals and
14   beverages for individual legislators in 2009
15   compared to $516 in 2008; do you see that?
16       A    Yes.
17            (Exhibits 22 and 23 were
18            marked for identification.)
19       Q    That covers this particular exhibit.  The
20   next one I want to talk about, and I'm sure that you
21   are familiar with this, is Exhibit 22.  There was an
22   October 18, 2009 article by the Lexington
23   Herald-Leader that says "Ethics complaints rarely
24   end in discipline."  Are you familiar with this
25   article?

Page 88

1        A    I haven't seen it for a long time.  I
2    remember it.  I don't remember the details.
3        Q    I was going to say probably one of the
4    reasons you remember it is that it prompted a
5    response by the Legislative Ethics Commission,
6    including a full article response in the 2009,
7    November 2009 Ethics Reporter, right, do you
8    remember that?  It's on Exhibit 23, the start of
9    Exhibit 23.
10       A    Yes.
11       Q    The things I just want to briefly talk
12   about in the article, and I don't want to get into a
13   lot of detail, if you go to the bottom of the third
14   page, at least the Herald-Leader says that "The
15   legislature established the Ethics Commission in
16   1993 in response to the Operation BOPTROT scandal
17   that exposed 15 current or former lawmakers selling
18   their votes."  Do you agree with that
19   characterization?
20       A    Well, I question -- well, I don't
21   question the number, but I think there were more
22   than 15 people.  Now the rest of them may have been
23   lobbyists or executive branch officials but, yes,
24   there's no question that the legislature established
25   the Ethics Commission in response to the BOPTROT

Page 89

1    scandal, part of the response.
2        Q    One of the charges or the complaints or
3    I'm going to call it the issues that the
4    Herald-Leader raises is the 1996 changes to the
5    Legislative Ethics Commission and the fact that
6    there was no more outside nominations, now House and
7    Senate leaders name whom they want to the
8    commission.  How do you respond to that charge?  And
9    I know how Mr. Troutman responds to that charge, but
10   what is your response to that particular charge?
11       A    I'm sorry, tell me the charge again.
12       Q    The Herald-Leader takes issue with the
13   fact that basically the House and Senate leaders
14   nominate and name who they want to the Ethics
15   Commission.
16       A    And where is this?
17       Q    It's on the bottom, I'm sorry, it is the
18   second to last paragraph on the bottom of the fourth
19   page.
20       A    Okay, right.
21       Q    What do you think about the fact that the
22   nominations process changed?
23       A    Well, as I recall, there were, there was
24   a constitutional question that was kind of the basis
25   for that.  When the original legislation passed in

23 (Pages 86 to 89)

Page 90

1    1993, it provided for significant involvement by
2    executive branch agencies in the appointment of
3    officials to the Legislative Ethics Commission. I
4    think the original intent was to, you know, involve
5    other agencies and provide a certain amount of
6    independence for the members. The problem was that
7    it raised a significant separation of powers
8    question of whether the executive branch should be
9    involved in appointing these people who oversee the
10   legislative code of ethics. So that was part of the
11   thinking in '96, was that if this thing was going to
12   be in the legislative branch and specifically
13   responsible for legislative ethics, that it should
14   not involve the board of elections, the attorney
15   general, the auditor of public accounts, and the
16   judicial retirement system. So they brought it
17   completely within the legislative branch.
18       Q    Okay. The other complaint that the
19   Herald-Leader makes is that the requirement to have
20   to file a signed notarized complaint and the warning
21   that filing a knowingly false complaint is a crime
22   leads to less complaints and less enforcement. Do
23   you agree with that charge or do you think that's
24   inaccurate?
25       A    I think that's inaccurate.

Page 91

1        Q    So you don't believe that there's been
2    any decrease in the number of complaints that have
3    been filed?
4        A    You know, I can't say that. I know that
5    what the General Assembly was concerned about was
6    the Ethics Commission investigating anonymous
7    complaints, complaints that maybe were based on
8    newspaper stories, that kind of thing. I think the
9    General Assembly, by changing its statute, intended
10   for people to have to put their name on a complaint.
11       Q    Okay.
12       A    I'm not sure about the numbers, I don't
13   know whether it's caused it or whether, if there has
14   been a decrease in the number, I'm not sure that
15   that is the reason.
16       Q    Okay.
17       A    It could be one reason.
18       Q    I want to look, sir, I marked it as
19   Exhibit 23, and I think that it's -- it starts with
20   the November 2009 Ethics Reporter; do you see that?
21       A    Yes.
22       Q    And this appears to be the Commission's
23   response to the Herald-Leader article. Would you
24   agree with that, at least the November 2009 Ethics
25   Reporter?

Page 92

1        A    I think it was the staff response. I
2    don't remember if the Commission --
3        Q    Okay.
4        A    -- approved it or not.
5        Q    Okay. One of the things that it
6    indicates, and I want to -- and one of your responses at
7    least to that article was that the Commission issued
8    172 published opinions, right; do you see that?
9    It's on the very first page, second paragraph.
10       A    Yes.
11       Q    Why is that an important fact?
12       A    Well, the opinions are part of the effort
13   to guide the people who are affected by this law.
14   So our charge under the law to issue opinions upon
15   request and the issuance of those opinions helps
16   people avoid problematic situations.
17       Q    Okay. Turn to the second page if you
18   can. It looks like the other response that you have
19   is that citizens file as many or more complaints
20   against legislators as before. Is that accurate?
21       A    Yes.
22       Q    And the Commission's enforcement counsel
23   files complaints based on tips if there is evidence
24   of wrongdoing. Do you agree with that?
25       A    Yes.

Page 93

1        Q    By the way, who is the complainant in
2    that instance, so if you get an anonymous tip, you
3    check it out, you find out that it's true, who is
4    the complainant?
5        A    The enforcement counsel.
6        Q    So he'll sign his own complaint then?
7        A    Yes.
8        Q    The other point that you make is that the
9    standards have been faithfully applied across the
10   board in the Commission's public opinions,
11   enforcement actions, and in thousands of
12   conversations and informal opinions designed to
13   assist people in complying with the law. Do you
14   agree with that?
15       A    Yes.
16       Q    And this is a big issue, at least a big
17   response point I think for the Commission, is that
18   the Herald-Leader's story did not include a quote
19   correctly pointing out that Kentucky has avoided --
20   or did include a quote that Kentucky has avoided any
21   recurrence of the early 1990's BOPTROT scandal that
22   shook the confidence in the legislature, right, do
23   you agree with that, at least as of 2009?
24       A    Yes.
25       Q    And in the 14 years since BOPTROT, and

51d14619-9481-44e8-adb5-d49d86433c88

Page 94

1    again this was accurate as of 2009, no Kentucky
2    legislator has been indicted in a state or federal
3    court for any sort of abuse of his or her
4    legislative office, right?
5        A    That is correct.
6        Q    And then you go through and you point out
7    a number of issues in a number of states, and I'm
8    not going to go through all of them, there's a lot
9    of them and it will be part of the record.  You
10   agree, right, that these issues in other states is a
11   problem and we've not had it because we've had
12   strong ethics laws I think is the point that's being
13   made; do you agree with that?
14       A    Yeah, that's what I said before, yeah.
15       Q    And you indicate that ethics laws are a
16   road map for behavior, but more important, they are
17   a deterrent.  And that's on, if you go to KREF768,
18   it's the second paragraph down.  Do you agree with
19   that?
20       A    Yes.
21       Q    How are they a deterrent?
22       A    If a legislator's lobbyists and employers
23   of lobbyists follow the Code of Legislative Ethics,
24   they will be deterred from the more serious conduct
25   that gives rise to FBI investigations and

Page 95

1    indictments in federal court.
2        Q    Like bribery, right?
3        A    That's one of the crimes for which you
4    could be indicted in federal court.
5        Q    Right.  And I want to go to just the
6    second last paragraph, fortunately, in Kentucky
7    there is a strong ethics education and enforcement
8    process in place at the Legislative Ethics
9    Commission; that was the statement, right?
10       A    That is correct.
11       Q    And you still agree with that, correct?
12       A    Yes, yes.
13       Q    At least for the past 14 years, the
14   comprehensive legislative ethics law, the
15   independent citizens' commission, and the
16   legislators' awareness of the ethics guidelines have
17   helped Kentucky legislators avoid the fate of many
18   legislators across the nation.  You agree with that
19   too, right?
20       A    That's right.
21       Q    Let's look at, if you go one page back,
22   we could have done it as a separate exhibit but I
23   didn't, I just kept going because it's all these
24   Reporters.  It's the December 2009, and there are, I
25   want to turn to some recommendations on page 3.  Do

Page 96

1    you see that?
2        A    Yes.
3        Q    One of the recommendations you make or
4    the Commission makes is to repeal the provision
5    allowing each lobbyist and employer to spend up to
6    $100 annually on food and beverages for each
7    legislator and his or her immediate family.  That
8    was a recommendation that came from the Legislative
9    Ethics Commission, correct?
10       A    Correct.  For several years in a row.
11       Q    Right.  Why was that?
12       A    I think the Commission thought that that
13   would improve the bright line which the law tries to
14   draw between the people who make the policy and the
15   people who want certain policies made.  That if the
16   legislature adopted that, that there would be no
17   question that they were taking inappropriate gifts
18   from lobbyists.  And there was an awareness of the
19   type of activity that had gone on in other states,
20   which we always look to for examples, as you can
21   tell by the newsletters, for example.  In states
22   that have no gift law or no prohibition on this type
23   of activity, there are abuses and problems can
24   arise.  So this again was like the rest of the law,
25   was a twofold approach to creating a culture in the

Page 97

1    legislature where legislators don't take anything
2    from lobbyists and employers of lobbyists, except
3    under certain well-defined situations where there
4    are many other legislators present.
5        Q    Okay.
6        A    And by taking seriously the example that
7    we saw in other states.
8        Q    Mr. Schaaf, I have been through all of
9    your newsletters, I spent a great deal of time
10   reading the newsletters and the articles in there.
11   I did not find a single example where the hundred
12   dollars or less annually ever led to a problem.  Are
13   you with me, where any other state had a scandal
14   over a limit and somebody doing these de minimis $5
15   cups of coffee leading to some kind of scandal.
16   Didn't see a single article on it.  Are you aware of
17   any examples specifically where that led to a
18   problem?
19       A    Yes.  It's more a creation of the
20   culture.  For example, two years ago I testified to
21   a Senate committee in Pennsylvania.  Pennsylvania
22   has no gift law at all.  Lobbyists can give whatever
23   to legislators, as long as it's not given under a
24   situation where it's in exchange for a vote or an
25   official action.  So that led to a situation in

51d14619-9481-44e8-adb5-d49d86433c88

Page 98

1  Pennsylvania where legislators were given cash
2  gifts, jewelry, these kind of things. So the no cup
3  of coffee rule is part of creating a culture in
4  which legislators don't take anything of value from
5  lobbyists, and it helps to develop this kind of
6  culture. Now, yes, you might be hard-pressed to
7  find a story that said, oh, for a $33 dinner I got
8  an official legislative action, nobody is going to
9  say that. And no legislator is going to say I did
10 something because somebody gave me a $33 dinner.
11     Q    Right.
12     A    But what you're doing when you pass a law
13 like this is helping to create a culture.
14 Legislators are already reimbursed by the public for
15 all of their food and lodging and beverages and
16 travel, and I think that there was a recognition on
17 the part of the General Assembly in 2014 that, hey,
18 we're already getting $154 a day from the public,
19 from the taxpayers to cover our food and other
20 incidentals, why do we need to take any more from
21 lobbyists.
22     Q    Sure. And I guess I'm back to, let's
23 talk about Pennsylvania. My understanding, and I've
24 read some articles on Pennsylvania, was there were
25 some major trips going on, major meals, I mean,

Page 99

1  we're talking thousands and thousands of dollars in
2  Pennsylvania; would you agree with me?
3      A    I don't know the details. I know what I
4  was there to testify about was Kentucky's new no cup
5  of coffee rule and the prohibition on lobbyists and
6  employers paying for out-of-state travel for
7  legislators. I think you have to view both of those
8  as a package to further draw a bright line between
9  the policy makers and the people who want particular
10 policy.
11     Q    Right. So back to the original question,
12 as you sit here today, you can't think of anything
13 where a scandal or a particular article, an FBI
14 indictment or anything like that arose out of a $3
15 cup of coffee or a 15, $20, even $30 meal, right?
16     A    Wrong. I can tell you that in states
17 that don't have the culture that Kentucky has, the
18 no cup of coffee rule is an integral part of that
19 culture. In states like Pennsylvania and Missouri,
20 you do have a different culture where lobbyists are
21 able to give gifts of all sizes to legislators, in
22 many instances without reporting them. So, no, I
23 would disagree with you that there have been no
24 problems that have occurred. Look at what happened
25 in Alabama, it's well-documented in these

Page 100

1  newsletters, they didn't have a gift law either, and
2  they had a series of legislators were indicted, and
3  much of that was based on gifts they received
4  because there was no limit.
5      Q    Right. There was no limit at all and
6  there was major, when I say major, I mean thousands
7  of dollars in trips and meals and expenses going on,
8  right, down in Alabama, right?
9      A    As far as I know, just like Pennsylvania,
10 just like Missouri. So this is part of creating a
11 culture in which legislators know, no, I'm not
12 taking that, I'm paying for that myself because the
13 taxpayers are giving me the money to pay for that.
14     Q    If they're in session, right?
15     A    Anytime we're on legislative business.
16     Q    So I guess I'm back to the original
17 question. I understand that there's been a number
18 of instances where in other states there's been, I'm
19 going to call them scandals, newspaper articles,
20 things like that that have arisen where legislators
21 have taken big trips, big dinners, big booze and
22 spending, big entertainment.
23     A    Just like they did in Kentucky.
24     Q    Just like they did in Kentucky prior to
25 BOPTROT, right?

Page 101

1      A    Right.
2      Q    And my question is, again I'm back to any
3  instance, and I'm not talking about generally big
4  trips and things like that, any instance you can
5  think of where there's been a hundred dollar limit
6  or less per year and there's been some scandal
7  that's arisen.
8      A    Well, again we're going to have to agree
9  to disagree. You're trying to compartmentalize
10 this. I'm saying it's part of a larger culture
11 that's created when you have strict laws like this
12 that draw a bright line between legislators and
13 lobbyists and they're narrowly tailored to draw that
14 line, it does not apply to the legislator's friend
15 and next-door neighbor, it doesn't apply to their
16 supporters out there in the political world. It
17 applies to the relationship between legislators and
18 lobbyists, and the no cup of coffee rule is part of
19 creating a culture in which legislators don't take
20 anything of value, even a cup of coffee that's
21 bought by a lobbyist.
22     Q    And I understand that that's your
23 position, Mr. Schaaf, and I understand all of that.
24 As you sit here today, I'm just asking yes or no,
25 are you aware of any newspaper articles, scandal, or

51d14619-9481-44e8-adb5-d49d86433c88

Page 102

1    anything like that that has arisen by somebody
2    accepting something of a hundred dollars or less per
3    year?
4        A    Well, again, that's part of the problem
5    is that if they accept something, that's not going
6    to be where the scandal arises, it's going to be the
7    creation of the culture in which they think they can
8    accept things.  So they're developing this situation
9    where they have a meal with somebody, okay, then
10   it's okay to have the lobbyist take them someplace
11   on a trip or have some other exchange of gifts that
12   grows out of that culture.
13       Q    That's less than a hundred dollars per
14   year, right?
15       A    I don't know.
16       Q    That was the limit.
17       A    It could grow out of that.  So what I'm
18   saying is in answer to your question is, no, I don't
19   know of any particular situation in a vacuum that
20   grew out of a cup of coffee, but the no cup of
21   coffee rule is part of the culture that helps us
22   avoid situations like what they have in
23   Pennsylvania, what they've had in Tennessee, what
24   they've had in Alabama, what they had in North
25   Carolina.  You're talking about scandals -- what

Page 103

1    they've had in New York -- where the line between
2    legislators and lobbyists is blurred and people
3    question, well, can I take this or take that.  It
4    must be okay, I can do this.  And so the no cup of
5    coffee rule is a bright line rule that applies to
6    that particular relationship between the people who
7    make the policy and the people who want the policy
8    made.
9        Q    Well, but it's really not no cup of
10   coffee, period, right, it's no cup of coffee in an
11   individual setting, and it's $24,000, $24,500 events
12   for groups of legislators, correct, or more?
13       A    In its wisdom the General Assembly has
14   identified certain situations in which they think
15   the opportunity for corruption is less because of
16   the large number of members in attendance, the
17   members of both parties and both chambers in
18   attendance.
19       Q    Well, but, sir, you would agree with me
20   we don't know how many members are in attendance at
21   these events, right?
22       A    Well, we know who's invited.
23       Q    Right, all we know is who has been
24   invited, we don't know who actually attends, right?
25       A    That's correct.

Page 104

1        Q    Let me ask, this was your recommendation
2    in December of 2009, we're going to ban the hundred
3    dollar limit, but I don't see any mention of banning
4    these group events or even putting a limit on these
5    group events, correct?
6        A    That's correct.
7        Q    Or in the words of Justice Brandeis,
8    shining sunshine on these group events and
9    indicating to us who's attending, right?
10       A    Well, the General Assembly apparently has
11   determined that the reporting requirement is an
12   appropriate amount of sunshine.  So as you've seen
13   reported in these newsletters, we have the details
14   about who paid for the event, who was invited, where
15   the event was, how much was spent and what group
16   was invited.  So that apparently to the General
17   Assembly is a sufficient amount of sunshine.
18       Q    Well, but it's not in your
19   recommendations to change that and shine more
20   sunshine on it, right?
21       A    Well, that's because we're not aware of
22   any opportunity for corruption that has arisen out
23   of that.  If you're aware of something, I would like
24   to hear about it, corruption that has arisen out of
25   these group events.

Page 105

1        Q    Well, Mr. Schaaf, I'm not aware of any
2    corruption that has arisen out of the hundred dollar
3    limit that was previously enforced, and you've not
4    identified any for me.
5        A    Well, apparently the General Assembly
6    determined that it was a worthwhile addition to
7    creating a culture in which they would not accept
8    anything from lobbyists.
9        Q    But they do in group events, right?
10       A    They've decided that they will allow
11   those events as long as they're fully reported.
12       Q    Well, they're not fully reported.  We
13   don't know who attends and we don't know how much is
14   spent per legislator, right?
15       A    Well, that's your opinion that they're
16   not fully reported.  Yes, you're correct, we don't
17   know specifically which individuals attended, but
18   the General Assembly apparently views that as full
19   reporting.
20       Q    And you've not, you being the Legislative
21   Ethics Commission, has not offered to make that a
22   change or not recommended that change in the law?
23       A    No, because we haven't seen any
24   misconduct arising out of those events.
25       Q    But don't you need to keep a bright line

27 (Pages 102 to 105)

Page 106

1   between legislators and lobbyists, and wouldn't
2   these group events blur that line?
3       A   The General Assembly has determined how
4   bright that line is going to be, and this is what
5   they've decided.
6       Q   But you've not recommended that change?
7       A   No, because we don't see that as being a
8   problem.
9       Q   Okay.  I want to turn to, if you can turn
10  back to The Ethics Reporter, February 2010.
11      A   What page is that?
12      Q   It's KREF130.
13      A   Okay, I've got it.
14      Q   I'm sorry, Mr. Schaaf, I am going to hand
15  out -- we're going to go back.
16              (Exhibit 24 was marked for
17              identification.)
18      Q   This should have gotten bundled in with
19  everything else, but it didn't.  This is the January
20  2010 Ethics Reporter, right?
21      A   Yes.
22      Q   I want to turn, sir, to the second page
23  of that.  The Keeneland Association spent $145,000
24  on racing and gambling issues, correct?
25      A   That is correct.

Page 107

1       Q   And following BOPTROT, and BOPTROT, by
2   the way, that arose out of the horse racing industry
3   as I understand it, right?
4       A   Harness racing.
5       Q   Harness racing industry.  There was no
6   ban on or restrictions on that particular industry
7   following the BOPTROT scandal, is that fair, in
8   terms of they were continued to allow to lobby, the
9   harness racing industry, following the BOPTROT
10  scandal?
11      A   Yes.  In fact -- well, there were no
12  limitations placed on anybody lobbying, but there
13  was a new requirement adopted that required
14  everybody who lobbied to register and make reports.
15      Q   Right.  There was no prohibition, for
16  instance, on the harness racing or any other racing
17  interests donating to legislative campaigns,
18  correct?
19      A   The campaign finance -- no, there were no
20  restrictions on any particular industry making a
21  campaign donation.
22      Q   It was on lobbyists at the time, that was
23  what followed BOPTROT in the '93 code?
24      A   Yes.
25      Q   Okay.  I think that's it on this

Page 108

1   particular exhibit.  Turning back to the
2   February 2010, there was almost $2 million spent in
3   January 2010 on lobbying, correct?
4       A   Yes, that's correct.
5       Q   And I just want to look at a couple of
6   these events, the Kentucky Distillers Association;
7   do you see that?
8       A   No.
9       Q   It's about seven down?
10      A   Oh, yes.
11      Q   There's no appearance issues at all in
12  your view with them spending $11,802 on an event at
13  the Woodford Reserve Distillery near Frankfort,
14  correct?
15      A   Well, the law provides several
16  requirements for them.  Obviously prior to the
17  enactment of the law, they wouldn't have had to
18  report this at all, they wouldn't have been
19  registered, we wouldn't have known.
20      Q   You mean before the 1993 enactment?
21      A   Yes.  So I think the legislature
22  determined the new requirements in 1993, and so you
23  now have a report that they spent $21,833 lobbying,
24  including what they spent on their lobbyists and
25  what they spent on their events.

Page 109

1       Q   Okay.
2       A   And you could compare that to what they
3   spent in the previous year.  Whether I think that
4   it's a good appearance or a bad appearance or no
5   appearance at all is really not, you know.
6       Q   What do you think the public thinks?
7       A   You know, I don't know.  If you can take
8   what the General Assembly does as a reflection of
9   what the public thinks, which that's about as close
10  as we can get --
11      Q   Unless we did some kind of public opinion
12  poll or something like that, right?
13      A   Well, even then I don't think you get as
14  good of an indication of the public perception as
15  the actions of the members of the General Assembly
16  who are elected and who talk to their constituents
17  every day.  And so I think the General Assembly has
18  a pretty good idea of what the public thinks, and I
19  think they try to legislate accordingly.
20      Q   And the public doesn't need to know who
21  goes to these events, right?
22      A   Well, if the General Assembly believes
23  that the public would benefit from knowing that,
24  they can certainly put that in the statute.
25      Q   Sure.  At these group events, is food

51d14619-9481-44e8-adb5-d49d86433c88

Page 110

1  offered, do you know?
2      A    I think -- you know, I have not attended
3  one.  I think that sometimes they have food and
4  sometimes they have beverages and sometimes they
5  have food and beverages.
6      Q    And entertainment?
7      A    Some might have entertainment, I don't
8  know.
9      Q    Are they required to report the
10 breakdown?
11     A    They're required to report everything
12 they spend on legislators.  So they could factor in
13 the cost of renting the venue, for example, they can
14 report the total that they spent or they can break
15 it down.  If it's a smaller event and there were
16 only 20 legislators there, for example, and their
17 guests, they can break it down and report what their
18 total spent on legislators and guests was.
19     Q    You would agree with me, Mr. Schaaf, and
20 maybe you know this and maybe you don't, if you
21 don't, that's fine, that not all legislators attend
22 these events?
23     A    Oh, I agree with you totally.  There are
24 many who don't attend any.
25     Q    Right.  Some of them have an issue with

Page 111

1  the appearance; you would agree with that, right?
2      A    You know the reasons that some might
3  attend and some might not are as varied as each
4  legislator.  There's 138 different reasons for doing
5  what they do.
6      Q    Right.  You're at least aware that some
7  may have an issue with the appearance of going to
8  these events?
9      A    Some may have an appearance issue,
10 probably.
11     Q    I want to look at, I mean, there's some
12 other events there, it looks like CSX Corporation
13 did a $3,241 event on some rail cars parked on
14 Broadway in Frankfort; do you see that?
15     A    Oh, yeah.
16     Q    That's a recurring event, isn't it?
17     A    It has happened several years in a row.
18     Q    Right.  And when we look, and I'm just
19 going to try to speed this along so we can get to
20 lunch here and at least I'm past the half-way point
21 so we can get out of here.
22     A    I'd prefer to go straight through if
23 that's all right with you.
24     Q    We'll ask the group and see if anybody
25 wants to grab something to eat.  We can keep going,

Page 112

1  I'm okay to continue to go.
2          We'll look at March 2010.  I want you to
3  look down at the Coal, Oil and Gas Association, Coal
4  Operators and Associates, and Western Kentucky Coal
5  Association.  It looks like they spent $19,032 on a
6  reception at Buffalo Trace; do you see that?
7      A    Yes.
8      Q    That's also a recurring event, that seems
9  to be year after year?
10     A    I think that's happened several years in
11 a row, yeah.
12     Q    And there's some other group events as
13 well.  It looks like Commerce Lexington spent $4,700
14 at Buffalo Trace Clubhouse; do you see that?
15     A    What page is that?
16     Q    That is on the same page, it's the next
17 paragraph down.  On February 16.
18     A    Yes, yes.
19     Q    And it looks like the Kentucky
20 Association of Realtors spent $5,750 on a reception
21 at Capital Plaza, right?
22     A    Yes.
23     Q    And the Kentucky Power Cooperative,
24 $4,569 in a reception at the Capital Plaza; do you
25 see that?

Page 113

1      A    Yes.
2      Q    There's another event that we looked at,
3  and I think, there it is, the CSX, Norfolk Southern
4  Corp, and Paducah & Louisville Railway, it looks
5  like they spent considerably less in February after
6  they co-sponsored a $15,213 event in January; do you
7  see that?
8      A    Uh-huh, yes.
9      Q    And, again, these group events, not a
10 problem, not an appearance issue at all; is that the
11 position of the Legislative Ethics Commission?
12     A    We have not heard of any problems arising
13 from any of this.  Nor have we heard from any
14 legislators or from any citizen that there's an
15 appearance problem with that.
16     Q    So if you were to see a public opinion
17 poll that has a problem with that, that would change
18 your view?
19     A    It depends on the poll, what the question
20 was, who was polled.
21     Q    Sure.  Random sampling, Kentucky
22 residents, Kentucky voters?
23     A    That's why we put the information out
24 there every month.  We push this information out to
25 the public.

51d14619-9481-44e8-adb5-d49d86433c88

Page 114

1    Q    Right.
2    A    And so the public knows, because
3  otherwise you would have to come to our office and
4  go through files of records to find out who is
5  spending what on lobbying.  So we push this
6  information out there so that the public has some
7  awareness of how lobbying is done, who is spending
8  what to influence their elected officials.
9    Q    But they don't know whether or not their
10 elected officials are going to these events, right?
11   A    Well, if they want to know, for example,
12 they can ask.
13   Q    And then they have to rely on the honesty
14 of the politician, right?
15   A    Well, don't we always.
16   Q    Okay.  You would agree that there are
17 occasions when politicians may not be completely
18 honest with their --
19   A    No, I don't agree with that
20 characterization.
21   Q    That some politicians may not be honest
22 with their constituents?
23   A    Okay, you ask a question would I agree
24 that some people attend these events or some people
25 have a perception problem.  Some people might have a

Page 115

1  perception problem going to the Kentucky Grocers
2  Association event but they have no problem with the
3  Kentucky Coal Association event.  So each legislator
4  obviously has an individual set of ethics, thinking,
5  public contact with their constituents.  They're
6  going to make decisions like this, they're going to
7  make decisions about their honesty based on their
8  own set of variables.
9    Q    Okay.  I'm going to try to get us through
10 2010 at least.  I'm looking at April '10.  If you go
11 down to KREF00301, I am looking at, it looks like
12 there was a fine -- no, I'm sorry, there was not a
13 fine.  You all indicate in your newsletter here that
14 employers and lobbyists who fail to file reports by
15 the monthly deadline may be fined by the Commission
16 in an amount not to exceed $100 per day, up to
17 $1,000, without the necessity of a complaint being
18 filed; is that correct?
19   A    That's correct.
20   Q    That's also true with the reports that
21 legislators have to file too, don't they have to
22 file an annual disclosure statement with you folks?
23   A    They do.
24   Q    And if they're late, they can be fined as
25 well?

Page 116

1    A    They can be.
2    Q    I want to look at the May 2010, it's the
3  next one back.  And you talk about Kentucky lobbying
4  in May 2010, and you talk about the fact that
5  $1.2 million was spent on employer and lobbyist
6  expenses, do you see that, in the 2010 session?
7    A    Yes, yes.
8    Q    And $148,000 was spent during the session
9  on receptions, meals, and events to which groups of
10 legislators were invited, right?
11   A    Correct.
12   Q    If it's not a problem, if it's not an
13 appearance issue, why do you report that amount in
14 your newsletter?
15   A    Well, first of all, let me say it's not
16 an appearance issue according to the members of the
17 General Assembly at least.  If it was, they would do
18 something about it I think.  But --
19   Q    At least the majority, it's not a problem
20 with the majority of the members?
21   A    Apparently.  Now, the reason we report it
22 is because it is an aspect of lobbying, it's part of
23 the lobbying process in some cases, and so in those
24 cases where an employer of a lobbyist has reported
25 this, and obviously the General Assembly when they

Page 117

1  enacted this law in 1993 thought it was an important
2  part of the process because they wanted it reported.
3    Q    Right.
4    A    So under that requirement, when this is
5  reported to us, we view it as an important aspect of
6  lobbying.  It's not the major aspect of lobbying.
7  Obviously the compensation paid to lobbyists is by
8  far the largest aspect of lobbying spending.  But
9  the conduct of these events is, in total is probably
10 the second largest expenditure in lobbying.  So we
11 feel like that gives the public, pursuant to these
12 reports required by the General Assembly, this gives
13 the public a view of the different aspects of
14 lobbying.  Lobbying is not only paying someone to
15 lobby, it's also conducting these events at which
16 relationships are built as part of lobbying.
17   Q    And communication occurs on bills and
18 things like that at these events too I'm sure,
19 right?
20   A    I have no idea to tell you the truth.
21   Q    Okay.  Lobbying fundamentally is about an
22 interaction between a lobbyist and a legislator
23 where the lobbyist is advocating on behalf of
24 something or other, you'd agree with that, right?
25   A    A person who is paid to advocate, yes.

51d14619-9481-44e8-adb5-d49d86433c88

Page 118

1    Q    Right.  And with that in mind, there is
2  this interaction, there's got to be an interaction
3  between a lobbyist and a legislator for that to
4  occur, correct?
5    A    Yes.
6    Q    And the reason these events are important
7  and the reporting of them you think is important is
8  because the public needs to know about these events,
9  right?
10   A    The public needs to know what the General
11 Assembly has required to be reported.  Certainly the
12 General Assembly thought this was important to
13 require this type of reporting, and so I have to
14 think that they put that in the statute because they
15 wanted the public to be aware of what organizations
16 and businesses and individuals are spending on
17 lobbying.  So this newsletter that condenses all
18 that information into this format is an effort to
19 further that public awareness of who's spending what
20 kind of money on lobbying and how is it being spent.
21   Q    And the thought process, I suppose, at
22 the heart of some of this is that sunlight is a good
23 disinfectant.  Do you agree with that statement?
24   A    Yes.
25   Q    Let's go ahead and turn to, I want to

Page 119

1  look briefly, sir, at the June 2010 Reporter that
2  follows.
3    A    Yes.
4    Q    And again we're talking about some
5  prepaid travel and these conferences where lobbyist
6  spending is occurring on legislators and legislator
7  entertainment in connection with the event, right?
8    A    Right.
9    Q    There's always, it continues to this day,
10 some fairly significant spending on these sorts of
11 things; do you agree with that?
12   A    Spending by employers of lobbyists?
13   Q    Correct.
14   A    They typically, a large number of them
15 will cooperate on conducting an event at each of
16 these conferences.
17   Q    Okay.  Just briefly, we'll get into the
18 exact amount here in a minute that they spent in
19 2010, but if you can look briefly at August 2010,
20 just a couple more pages back, it's 567, again at
21 the top you're indicating the fines that you've
22 completed from lobbyists and employers; do you see
23 that?
24   A    Yes.
25   Q    And, again, you put this newsletter out

Page 120

1  to the lobbyists and the employers and the General
2  Assembly, right?
3    A    Primarily, but also to the media and the
4  public.
5    Q    Right.  And you want the lobbyists and
6  their employers to know that if you file late
7  reports, we're going to issue fines; is that fair?
8    A    I think they know that, but this gives
9  them a little summation, this gives everybody a
10 summation of what has gone on.
11   Q    Okay.  I want to go back, we're going to
12 end this exhibit on September 2010.  And you have a
13 summary there that indicates the top spenders on
14 lobbying in the summer months; do you see that?
15   A    Yes.
16   Q    And when we turn the page, we've got
17 conference spending by employers and lobbyists, do
18 you see that on KREF620?
19   A    Yes.
20   Q    And you indicate that there was a $2,400
21 happy hour event that was hosted in connection with
22 NCSL.  Do you see that?
23   A    Yes.
24   Q    And it looks like there's a Kentucky
25 Night at NCSL where 110 employers and 24 lobbyists

Page 121

1  joined together to spend about $19,000 on an event
2  at The Henry Clay; do you see that?
3    A    No.
4    Q    Look at the second paragraph.
5    A    Yes.
6    Q    And again we don't know how many
7  legislators attended that event, correct?
8    A    No, no.  There could have been hundreds
9  of legislators from other states there as well.
10   Q    Would that have been included in this
11 number, on the Kentucky Night number?
12   A    Included in which number?
13   Q    In the $19,000 number.
14   A    Well, they probably reported the total
15 that they spent on the event, but, like I said, it
16 was in conjunction with the National Conference of
17 State Legislatures.  There were legislators there
18 from all 50 states.  So, yes, we don't know how many
19 states were represented or how many Kentucky
20 legislators were there.
21   Q    Okay, that's fair.
22      MR. WIEST:  Do you guys want to take a
23 little break?
24      MR. JAMES:  Yes, please.
25         (Brief lunch recess.)

51d14619-9481-44e8-adb5-d49d86433c88

Page 122

1     (Exhibits 25 through 33 were
2 marked for identification.)
3 BY MR. WIEST:
4     Q    Mr. Schaaf, I put in front of you a
5 stack of documents, you would agree with me that
6 they're copies of the Ethics Reporters for calendar
7 year 2011, right?  It's Exhibit 25, I've marked it
8 as Exhibit 25.
9     A    Yes.
10     Q    I want to start with, when you go back,
11 page 57, and you put out or reiterate, I guess, a
12 couple of OLEC opinions regarding legislators that
13 are on the statewide ballot.  And it is the
14 Commission's opinion that lobbyists or legislative
15 agents are not permitted to donate -- for instance,
16 I know that Representative Overly ran for lieutenant
17 governor this last election cycle.  It would be
18 impermissible for a legislative agent to donate to
19 that slate of candidates, correct?
20     A    That's correct.
21     Q    But they would be free to donate to the,
22 for instance, the Bevin/Hampton ticket, right?
23     A    That's correct.
24     Q    I want to get into some articles that
25 you've got attached there, and the one on KREF61

Page 123

1 deals with a so-called $17,000 economic development
2 mission paid for by lobbyists to the Georgia House
3 Speaker.  Do you see that?
4     A    Yes.
5     Q    And, again, I've been through all of
6 these articles, I found not one that even mentions a
7 $2 cup of coffee.  Are you familiar with a single
8 article that mentions a $2 cup of coffee or a
9 scandal that arose from a $2 cup of coffee?
10     A    Well, scandals don't arise from $2 cups
11 of coffee.  They arise from a culture in which
12 legislators feel that they can accept gifts of
13 various kinds from lobbyists, that's one way they
14 arise.  The other way that might be in here is where
15 they might use their office to get some benefit for
16 themselves or somebody else who might compensate
17 them with gifts.  So, no, a scandal, you'd be
18 hard-pressed to find a story that says there was a
19 scandal over a $2 cup of coffee.  What you will find
20 is scandals that arise in situations where there is
21 no bright line between lobbyists and legislators.
22     Q    Okay.  When we look back on March 2011,
23 that's the next one back, I just want to go through
24 a couple of these group receptions or events, if you
25 will, that are identified in this particular

Page 124

1 March 2011 Ethics Reporter.  I saw a $17,208
2 reception or event that was hosted by, I'm going to
3 call them some railroad interests, you know, it was
4 the CSX, Norfolk Southern Corp, and Paducah &
5 Louisville Railway; do you see that?
6     MR. JAMES:  Are you on page 2?
7     Q    Yes, I'm sorry, page 2, KREF 227 is the
8 bates number on that.
9     A    Let me see, wait a minute.  Yes, okay.
10     Q    And again you note that they spent, it
11 looks like $15,000 on a similar railroad reception
12 during the 2010 session, right; do you see that?
13     A    Yes.
14     Q    The next night it looks like there was an
15 energy reception, and you put that in quotes, and,
16 by the way, why did you put that in quotations?
17     A    That was quoting the language that was on
18 the report.  All of this information is taken
19 directly from the reports that are made by the
20 businesses and organizations that report to the
21 Ethics Commission.  So they called it an energy
22 reception, so since I was quoting from their report,
23 I put that term in quotes.
24     Q    Okay.  And it looks like there was
25 $17,450 that was sponsored at the Buffalo Trace

Page 125

1 Distillery; is that correct?
2     A    Yes.
3     Q    Do you know whether or not alcohol was
4 served?
5     A    No, I don't.
6     Q    Would you guess based on the location --
7 well, if you don't know, you don't know.  I'm not
8 going to ask that.  That was at a distillery,
9 correct?
10     A    Yeah, they have a facility at that
11 distillery where they have receptions, parties, and
12 things, weddings.
13     Q    Okay.  And do you serve the Buffalo
14 Trace bourbon there too, I take it, at the facility?
15     A    You can get that if you take their tour.
16 Now, whether they serve it exclusively in their
17 facility there, I don't know.
18     Q    I see a $5,801 reception also at the
19 Buffalo Trace Distillery that was by Commerce
20 Lexington; do you see that?
21     A    Yes.
22     Q    And it looks like $4,967 at the Capital
23 Plaza Hotel; do you see that?
24     A    Yes.
25     Q    And $9,600 Frankfort Day reception as

51d14619-9481-44e8-adb5-d49d86433c88

Page 126

1    well; do you see that?
2        A    I'm looking for that.  What paragraph?
3        Q    If you look at -- I'm sorry, it was
4    Louisville Day.
5        A    Louisville Day, yes, I see that.
6        Q    And it looks like Sullivan University
7    System spent $2,188 on food and beverages as well at
8    the Capitol Annex, right?
9        A    Yes.
10       Q    I want to turn, sir, if you keep going
11   back to April 2011, and turn back to, there's some
12   informal opinions there that KLEC has rendered on
13   bates KREF 311; do you see that?
14       A    Yes.
15       Q    And you indicate again that, at least in
16   the first bullet point, we've been talking about
17   this for some time today, and again we're in 2011,
18   so this is prior to 2014 House Bill 28 obviously,
19   but if an organization that employs lobbyists can
20   provide part or all of the funding for events to
21   which legislators are invited, right, and you
22   indicate that if all members of the General Assembly
23   are invited or all members of a recognized caucus or
24   all members of an interim joint committee, you just
25   have to list the name of the group invited and the

Page 127

1    total spent, correct?
2        A    That's correct.
3        Q    And then if you've got an individual
4    legislator that's being invited somewhere, you've
5    got to list the individual legislator who attends
6    and the amount spent on each legislator, correct?
7        A    That was correct.
8        Q    It was correct in 2011, right?
9        A    Right.
10       Q    And then we've got this issue of tickets,
11   and I take it that this comes up probably with event
12   tickets, sporting event tickets, things like that.
13   This is in the third paragraph, right, and no matter
14   what the legislator -- I'm sorry, no matter what the
15   lobbyist actually pays for the tickets, as long as
16   the legislator pays face value, that's full value
17   and that's good enough, correct?
18       A    That's correct.
19       Q    I want to ask you a question and this
20   gets back to your hypothetical.  So I'm sure you've
21   seen in some of our pleadings, Senator Schickel and
22   the holiday parties that he's taken an issue with.
23   So he gets invited to Mark Wilson's annual holiday
24   party at the Oriental Wok in Northern Kentucky.  I'm
25   not sure if you're familiar with that or not, it's a

Page 128

1    Chinese restaurant, very nice Chinese restaurant.
2    And he gets invited to it, and he shows up under the
3    current code, and he decides that he wants to pay
4    his own way, right, and he can do that, that's an
5    exception, if you say, Mark, I'm going to pay my own
6    way, he can go and provide Wilson the cost and
7    that's acceptable, right?
8        A    Yes.
9        Q    So he looks at it and he says, I'm going
10   to get a cup of Coke and a couple of cocktail
11   shrimp, and I think that's a couple bucks.  It's a
12   big party, lots of people there.  He gives Mark a
13   couple dollars to kind of cover his way, and it
14   turns out that he's wrong, that it's not a couple
15   dollars, the Coke may be 50 cents, but the cocktail
16   shrimp, turns out they're expensive Oriental
17   cocktail shrimp and they're $3 a pop, and in fact
18   he's paid $2 and it turns out to be 6 or 7 or 8.  Is
19   that a violation?
20       A    Well, it would depend, first of all, on
21   what -- if Mark Wilson reports it and it's got
22   Senator Schickel's name on it, on his report, which
23   he would be required to do if he spends money on
24   Senator Schickel invited as an individual to Mark
25   Wilson's party and Senator Schickel gives him $2 but

Page 129

1    he takes $10 worth of food and beverages, then Mark
2    Wilson ostensibly would know about that, he's paying
3    the bills.  So Mark Wilson would file a report with
4    his regular report, he'd file a report and say I
5    provided $8 worth of food and beverages to Senator
6    John Schickel on December 20, 2011, and before he
7    files that, ten days prior to filing it, he has to
8    send a copy of that to Senator Schickel.  And at
9    that point Senator Schickel goes either way, he can
10   say, well, I wanted to cover the entire cost of
11   that, so I'm sending Mark Wilson $8 so that he won't
12   have to report my name as having received anything.
13   Or Senator Schickel could say, I don't care if
14   anybody knows that I took $8 worth of food and
15   beverages from Mark Wilson, go ahead and report it.
16       Q    And today, 2016, post-2014 House Bill 28,
17   the current legislative scheme, same party, Schickel
18   thinks it's worth a couple bucks and ends up that
19   it's worth more than that and nobody is really
20   paying attention, including Wilson, because it's a
21   big event.
22       A    Well, Mark Wilson has a need to pay
23   attention because the law applies to legislators and
24   lobbyists, so even though Senator Schickel might be
25   a close personal friend of Mark's, they have a

51d14619-9481-44e8-adb5-d49d86433c88

Page 130

1    legislator/lobbyist relationship that is reportable
2    if Mark is spending money on Senator Schickel.  So
3    if Senator Schickel says I want to pay for
4    everything myself and he gives Mark $2 and Mark
5    says, well, what you're getting here is actually
6    worth $20 and so you're getting something of value
7    here and it's a violation of the ethics law, I can't
8    give it to you and you can't accept it.  So you can
9    give me another $18 or you can, conceptually you
10   could be in violation of the law.
11       Q    And that would require, I guess,
12   throughout the evening Mr. Wilson to watch and audit
13   exactly what Senator Schickel is eating and
14   drinking?
15       A    No, no.  If Senator Schickel has given
16   him $2 and Mark knows that what he's getting is
17   worth more than $2, he needs to report it or report
18   it as a violation probably.
19       Q    And if he's not paying attention to
20   exactly what Schickel is consuming?
21       A    Again, they have a peculiar, legally
22   obligated relationship.  Mark is a lobbyist, Senator
23   Schickel is a legislator.  Mark needs to pay
24   attention if this is the way this is -- if he's
25   going to invite an individual legislator to an

Page 131

1    event, then he needs to know what he's providing, if
2    anything, to that legislator.  And if the legislator
3    wants to avoid a potential violation, the legislator
4    can simply pay the value of what he accepts.
5        Q    If he knows what that value is?
6        A    If he's accepting a gift from a lobbyist
7    and he wants to comply with the law, he should find
8    out what the value is.  That's peculiar
9    relationship.  It's different than anything else
10   probably in the law.  Once you register as a
11   lobbyist and you say I am paid to represent a
12   private interest and Senator Schickel is a
13   legislator, then you need to be aware of the various
14   interactions and whether they are governed by this
15   law that applies to both of you.
16       Q    Does Schickel have to advance it at the
17   beginning of the night or can he advance it at the
18   end of the night when he knows how many cocktail --
19       A    He can do it two weeks later probably,
20   again if he finds out that he's accepted something
21   of value from Mark.  Now, it's possible entirely
22   that Mark has a reception, but it's paid for by
23   Mark's wife.  I don't know, maybe that's not the
24   same thing.
25       Q    Is that the same thing?

Page 132

1        A    Maybe not, if Mark can show that he
2    didn't pay for it, Mark's wife paid for it.
3        Q    And if it's coming out of a joint
4    checking account that she's writing the check on?
5    You tell me, you're the authority here.
6        A    If a complaint is filed, let's say
7    Senator Schickel received something of value and an
8    investigation is conducted and they can show that
9    Mark Wilson, the lobbyist, didn't pay for it.  Just
10   like Mark's wife can give a campaign contribution to
11   Senator Schickel, and she can give it out of a joint
12   checking account as long as she specifies it's from
13   her, it's not from him.
14       Q    Okay.  Or I guess Senator Schickel could
15   just avoid trying to find out exactly what it's
16   worth because he may not be able to and just avoid
17   the reception, right, that's the other option, and
18   avoid the interaction?
19       A    Well, he can be there, he certainly can
20   attend anything he wants.  The question is whether
21   he accepts something of value from a lobbyist.
22       Q    What about the entertainment that may be
23   there, they got a band that's playing, does he need
24   to pay for that?
25       A    Probably not.  That's not necessarily

Page 133

1    quantifiable, you know.  Is the band playing for
2    free?
3        Q    No, let's assume they're not, let's
4    assume Wilson paid for the band.
5        A    He's probably not there because of the
6    entertainment, you know, but if he actively partakes
7    of the food and beverages and the entertainment is
8    going on, Mark Wilson might report the full cost of
9    the event, he might say, look, I don't want to break
10   it down, there were, I don't know how many
11   legislators were there, I didn't count them, I'm
12   just going to report that the event cost $5,000.
13       Q    Okay.  And he can't do it at all today
14   and invite just individual legislators, he's got to
15   invite a group if he wants to hold a group event?
16       A    No, he can invite anybody he wants.  He
17   can invite individual legislators.  It's just a
18   question of whether they want to pay for what they
19   receive in terms of food and beverages.  They can
20   attend anything.  This law does not implicate any
21   attendance at an event.  They can go anywhere.  It's
22   just a question of whether they accept something
23   that's paid for by a lobbyist.  It's a very narrowly
24   drawn statute.
25       Q    So like a glass of water, not okay, just

51d14619-9481-44e8-adb5-d49d86433c88

Page 134

1    being there is okay?
2         A    Being there is okay.
3         Q    All right.  When we go back to the
4    May 2011, I just want to look very, very briefly at
5    that Reporter.  That's at KREF373, and I just want
6    to look at KREF374; do you see that?  And towards
7    the bottom of it, third paragraph up, there appears
8    to be some horse racing and gambling interests; do
9    you see that?  And it looks like $213,000 was spent
10   in May 2011 on those gambling interests, right?
11        A    Yes.
12        Q    And we do not prohibit that sort of
13   lobbying today even after BOPTROT, right?
14        A    No, that would -- no, we don't -- in the
15   law individual industries are not singled out.  This
16   applies to everybody who pays somebody to lobby.
17        Q    Okay.  I want to take you back to the
18   next one, it starts at KREF627 there, is the bates
19   number, and it's August/September 2011 Ethics
20   Reporter, and again we've got some recommendations
21   to change the law; do you see that?
22        A    Yes.
23        Q    And you've got again the hundred dollar
24   exception, but there's no explanation from KREF --
25   I'm sorry, from the KLEC as to why they want to

Page 135

1    repeal that hundred dollar exception, right?
2         A    I think we typically just send over
3    recommendations.  I don't believe that we included a
4    lot of supporting data with that.  It is pointed out
5    here that Kentucky would join other states and there
6    are a number of other states that have adopted this
7    before Kentucky did.
8         Q    Let me ask, Mr. Schaaf, are there other
9    states that prohibit the group events?
10        A    Not that I'm aware of, no.  That's a
11   pretty typical process in most states.
12        Q    So even in states that have the so-called
13   no cup of coffee rule, the group events are okay?
14        A    As far as I know, but I don't know the
15   specifics.  I've never --
16        Q    You've never like done a state-by-state
17   survey or anything like that?
18        A    Not on that particular question.  I know
19   that there are other states that have no cup of
20   coffee laws that adopted them long before we did,
21   but I don't know whether they also allow other types
22   of events or whether all events are prohibited.
23        Q    Okay.  The other thing, the other change
24   that is interesting to me, and this is the first
25   time I saw it at least, so it seems to be a 2011

Page 136

1    recommendation that came up first in 2011, is the
2    recommendation that the ethics law prohibit
3    employers of lobbyists and political action
4    committees from making campaign contributions to a
5    legislative candidate or a legislator during a
6    regular session.  Do you see that?
7         A    Yes.
8         Q    Why was that recommendation made?
9         A    Well, there are typically situations --
10   even-year sessions fall in the years of legislative
11   elections.  So legislators and candidates for the
12   General Assembly are going to have fund-raisers --
13        Q    Right.
14        A    -- during the run-up to the May primary,
15   which coincides with the 60-day session of the
16   General Assembly.  So the problem is -- the vast
17   majority of the state registered PACs are affiliated
18   with businesses and organizations which employ
19   lobbyists.  So the Commission determined that a
20   logical extension of the ban on lobbyist
21   contributions would be an in-session ban on
22   contributions from the people who hire the
23   lobbyists.  It's not a year-round ban.  It's a very,
24   obviously a very finite period of time, and it
25   coincides with the time in which legislators are

Page 137

1    introducing and sponsoring and voting on
2    legislation.  So it essentially -- and legislators
3    can still have fund-raisers during sessions.  They
4    just can't accept at those fund-raisers a check from
5    a state PAC or a business or organization that
6    employs a lobbyist.
7              So that avoids a situation, for example,
8    in which a legislator votes on a bill on Friday and
9    then goes home and on Saturday night they have a
10   fund-raiser, and one of the checks they receive is
11   from a PAC that is affiliated with an employer that
12   directly benefits from the legislation they passed
13   the day before that they had voted on.  And so that
14   raises a situation or vice versa, say they have a
15   fund-raiser on Saturday and they come back on Monday
16   and vote on a bill in which one of their donors has
17   an interest.  That could raise the perception that
18   they were voting or acting in the legislative sphere
19   on the basis of this contribution that they just
20   received or that they were going to receive the next
21   night.
22        Q    Let me ask, I've actually got three or
23   four follow-ups to what you just laid out for me.
24   Is there anything different about a donation that's
25   made, a maxed-out donation that's made by these

51d14619-9481-44e8-adb5-d49d86433c88

Page 138

1    folks the day before the session begins, which is
2    fully permitted?
3        A    The difference is it comes before the
4    session begins and before the legislator is
5    sponsoring and voting on legislation.
6        Q    But that legislator, if you think that
7    the campaign contribution is going to influence
8    their activities beforehand, it doesn't make any
9    difference, does it?
10       A    It may not make any difference to you,
11   but there's a difference in the law.  And many
12   states employ a similar technique where they ban
13   lobbyists from giving only during a legislative
14   session because that's when legislators are voting
15   on bills, but they allow contributions immediately
16   before and immediately after adjournment.
17       Q    Is there anything that keeps the employer
18   from saying to the legislator, hey, look, if you
19   vote on this for me, we'll max you out right
20   after the session is over in your campaign?
21       A    Say that again, I'm sorry.
22       Q    Yeah.  Is there anything that keeps the
23   employer or the PAC from saying to the legislator,
24   hey, if you vote on this bill, you know, we need
25   some help, and we know as soon as the session is

Page 139

1    over you need some help in your fund-raising, so,
2    you know --
3        A    Well, if the FBI overhears that
4    conversation, there could be a problem.
5        Q    Right.  But what's to keep that employer
6    from making the same donation right after the
7    session?
8        A    Nothing.
9        Q    And you don't think the same issues
10   arise?
11       A    Well, the General Assembly didn't think
12   the issues were as serious when they're not in
13   session.  So they only blocked off that finite
14   period of time, and they said during that period of
15   time, contributions cannot be accepted from these
16   specific individuals or organizations, not from the
17   whole world.  They can still fund-raise during a
18   session.
19       Q    That's an interesting question.  Why
20   can't the lobbyists donate then when they're not in
21   session, why isn't that okay?
22       A    Well, because in 1993 the legislature
23   said we're going to put a bright line between
24   lobbyists and legislators because in fact they're
25   lobbying all year long.  They are having

Page 140

1    relationships in terms of attending meetings,
2    talking to legislators all year long.  So that
3    person who has the direct connection to the member
4    of the General Assembly, the lobbyist, they put
5    fund-raising off limits for that person all year
6    long, but the employers and the PACs, they've drawn
7    a very bright line around the regular session.  It
8    doesn't apply during special sessions and it doesn't
9    apply to special elections.  So if you have a
10   vacancy, as we did during this just concluded
11   session, we had four vacancies in the House of
12   Representatives.  There were four special elections,
13   and none of those people was serving in the General
14   Assembly at the time but they were running in
15   special elections.  So PACs were allowed to
16   contribute to those individuals.  But not lobbyists
17   because that applies year round, and there's no
18   exception.
19       Q    The PACs that are not employing
20   lobbyists, and there's several state PACs that do
21   not employ any lobbyists at all?
22       A    Well, PACs don't employ lobbyists, but
23   PACs are frequently affiliated with organizations
24   that employ lobbyists.  Like Altria has a PAC, most
25   unions have PACs.  Some of them employ lobbyists but

Page 141

1    the PACs do not, but they're affiliated.
2        Q    Sure, and for the PACs that have no such
3    affiliation, right?
4        A    Right.
5        Q    And there's several of them that have no
6    affiliation at all.  There's the Good Government
7    PAC, for instance, that are out there that have
8    nothing to do with organizations that employ
9    lobbyists.  What's the justification for banning
10   contributions from those PACs?
11       A    Well, they're not banned completely.
12   They can participate immediately after the session,
13   immediately before the session.  So it's only during
14   a session that they can't, and that shouldn't be a
15   cause for concern for them.  If they have no
16   legislative issues, they probably are not
17   contributing to legislators anyway.  And they can
18   contribute immediately upon adjournment on
19   April 15th.  So they still have ample opportunity to
20   contribute.  They just can't contribute during a
21   session.
22       Q    Let's explore that a little bit.  So they
23   cannot contribute -- they're unaffiliated with an
24   employer of a lobbyist, and we know that the primary
25   season really starts in January and it ends in May;

51d14619-9481-44e8-adb5-d49d86433c88

Page 142

1    are you with me?
2        A    Well, actually you can file for office as
3    early as the day after the previous November general
4    election I believe.
5        Q    That's right.
6        A    So it starts then.
7        Q    But the deadline for filing is in
8    January, right?
9        A    Yes.
10       Q    And most legislators are conducting their
11   campaign fund-raising for the primary cycle
12   generally when the legislature is in session; you'd
13   agree with me there, would you not?
14       A    I don't know.
15       Q    I guess I'm back to this PAC that's
16   unaffiliated with an employer of a lobbyist, what's
17   the justification for shutting them out during the
18   session in terms of donations?
19       A    Yes, they're not shut out, they can
20   give, but if they give to a legislative candidate,
21   that candidate has to send it back and ask them to
22   send it after the session.
23       Q    So really they can't give in the sense
24   that it won't be accepted, right?
25       A    Well, it shouldn't be for that group.

Page 143

1        Q    And I've not heard any justification for
2    that particular --
3        A    No, the justification applies to state
4    PACs generally.  It also applies to businesses and
5    organizations that employ lobbyists.
6        Q    That's right.
7        A    But they could employ a lobbyist but they
8    may not have any issues during a session and they
9    may not do any active lobbying, but it still applies
10   to them.
11       Q    Right.
12       A    A state-registered PAC may not have an
13   immediate connection with an employer of a lobbyist,
14   but they may be doing work on behalf of them, they
15   may be contributing to people who support issues
16   that are individual to a particular employer.  So
17   they can still have an effect on -- they can still
18   contribute to legislative elections in theory and
19   have an influence on legislation.  So even if they
20   don't -- even if they're not affiliated with an
21   employer of a lobbyist.  So that's why that very
22   specific and very temporary ban is in place, just to
23   take state-registered PACs out of the equation for
24   60 days.
25       Q    Okay.  And just to be clear, Joe Schmo

Page 144

1    citizen who lives in Frankfort, Kentucky, doesn't
2    like a particular bill that's going through the
3    legislature.  He's not being paid to lobby or
4    anything like that, but he just doesn't like a
5    particular bill, he thinks it's bad for government.
6    He gets to donate, does he not, at any time to the
7    legislature or the legislative candidate?
8        A    Yeah, the Code of Legislative Ethics is
9    drawn specifically to the lobbyists and the
10   employers of lobbyists.
11       Q    And PACs, state PACs?
12       A    Well, no, it really is on the legislator.
13   The state PACs are not really addressed in terms of
14   regulating them in any sense, but the legislator,
15   who is regulated by the ethics law, is not allowed
16   to accept a state PAC contribution during a
17   legislative session.
18       Q    But he can from Joe Schmo citizen, right?
19       A    Yes, he can continue to fund-raise.
20       Q    So Joe Schmo citizen can make his voice
21   known on a particular piece of legislation, not
22   being paid for it and donate, but the PAC is not
23   allowed, the state PAC is not allowed to do the same
24   thing?
25       A    Not for that 60 days, but anytime

Page 145

1    thereafter or prior to.
2        Q    Okay.  Let me ask, and I know we're going
3    to get into BOPTROT and look at some articles here
4    in a couple of minutes, but did that occur during
5    the session or outside of the session?
6        A    BOPTROT?
7        Q    Right.
8        A    Well, it started during the 1990 session,
9    I think, or '92 I guess, the very end of the '92
10   session, but it had been, as an undercover
11   investigation, the FBI had been working on it for
12   over a year prior to that.  That's when it became
13   public.
14       Q    Okay.  I want you just to take a quick
15   look, and I'm not going to spend a lot of time on
16   it, October 2011, and I just want to look at, if I
17   can, the fact that employers and lobbyists joined to
18   spend over $26,000 on Kentucky Night receptions and
19   dinners at the three summer events; is that
20   accurate?
21       A    Yes.
22       Q    And that was in 2011, right?
23       A    Yes.
24       Q    And then I just want you to confirm for
25   me the November '11, that's your newsletter for

51d14619-9481-44e8-adb5-d49d86433c88

Page 146

1    November '11 and the same with December '11, right?
2        A    I'm sorry, what's the question?
3        Q    Those are your newsletters, right?
4        A    Those are portions of them.  They have
5    more pages.
6        Q    I know, yeah, your newsletters include
7    also newspaper articles as well as excerpts of them
8    that I did not necessarily include.
9        A    Problems that legislators have in other
10   states that we don't want them to have here.
11       Q    Right.  Let's look at December '11 if you
12   don't mind.  I just want to take a look at, there is
13   some informal opinions that I want to discuss with
14   you.  It talks about the Code of -- do you see the
15   second one right there, the Code of Legislative
16   Ethics prohibits, do you see that paragraph?
17       A    Yes.
18       Q    There's nothing that keeps the
19   legislative agent from discussing the particular
20   legislators with the PAC, with the PACs, right?
21       A    Yes, that's right.
22       Q    And if that leads to a campaign donation,
23   then great, right?
24       A    Well, the lobbyist can, yes, they can
25   discuss -- it may lead to not giving a campaign

Page 147

1    donation also.  The lobbyist just explains what they
2    know about the individual legislator or candidate,
3    and then the PAC makes a determination.
4        Q    Okay.  I want to look at Exhibit 26.
5    This is the 2012, I'm going to call it the Ethics
6    Reporters or at least the portions of them that do
7    not include the news articles, right?
8        A    Yes.
9        Q    There's a little bit of news articles in
10   there but not a lot.  I want to start with the
11   February 2012.  Again, I'm looking at the railroad
12   reception there, reception event is on page 2.
13   10,161 on a reception on rail cars in 2012, right?
14       A    10,161, yes.
15       Q    And, again, they did it also in 2011 and
16   2010, correct?
17       A    Correct.
18       Q    Do you know whether or not food or
19   alcohol or entertainment was provided in connection
20   with that?
21       A    No, I do not.
22       Q    And we still don't know in 2012 which
23   legislators were involved or actually went to the
24   particular events, right?
25       A    Well, the law doesn't require the

Page 148

1    employer if they invite a whole group of
2    legislators, it only requires them to list who was
3    invited.
4        Q    Right.
5        A    And so there's no obligation for them to
6    report who actually was there.
7        Q    And as a consequence, we don't know who
8    was actually there, right?
9        A    Well, before this law was adopted, we
10   didn't even know they had a reception like this.
11       Q    I understand.
12       A    We didn't know how much they spent, we
13   didn't know where it was, we didn't know what group
14   of legislators they invited.  So now we know all
15   those things, and the public can see that and they
16   can ask questions appropriately.  They can ask their
17   legislator if their legislator attended.  If that's
18   a problem, if they don't like railroads, they can
19   vote against their legislator for attending that
20   reception.
21       Q    If they know that the legislator
22   attended?
23       A    That's what I said, they have to ask.
24       Q    And the legislator has to tell them,
25   right, which may not happen?

Page 149

1        A    Depends on the legislator, depends on the
2    relationship they have with their constituents.  If
3    you want to be a legislator who gets a reputation
4    for not being forthright with your constituents, you
5    can do that at your peril.
6        Q    Sure.  Certainly there's nothing in the
7    state's reports that these legislators filed that
8    indicates who in terms of particular legislators
9    attends, right?
10       A    There's nothing in the reports filed by
11   the lobbyist.  I think you said legislators, but the
12   legislators don't have to report these events.
13       Q    Right.  I want to look, sir, at
14   March 2012, and what I want to look at there is the
15   fact that it looks like Kentucky lobbying law gets
16   high praise, and it looks like folks are, there's
17   some organization, the State Integrity Investigation
18   that rates Kentucky's Legislative Ethics Code as
19   being very high.  Would you agree with that?
20       A    I haven't looked at that story for a
21   while, but, yeah, generally it got pretty good
22   ratings.
23       Q    Okay.  And then at the bottom, again it
24   looks like we've got some receptions, meals, and
25   events.  $67,000 spent in February 2012, the most

51d14619-9481-44e8-adb5-d49d86433c88

Page 150

1    expensive of which was a $18,150 energy reception at
2    the Buffalo Trace Clubhouse in Frankfort; is that
3    correct?
4        A    That's correct.
5        Q    Let's go back to April 2012.  I want to
6    go back again to the receptions on page 3 of that.
7    It looks like there's a number of receptions hosted
8    by a bunch of different organizations, is that
9    correct, or are those figures correct?
10       A    Well, the figures came from the reports
11   filed by employers of lobbyists, so they're as
12   correct as we can determine.
13       Q    Okay.  And then again we're back to, I
14   want you to turn to June 2012, we're back to the
15   recommendations that are coming out of the
16   Legislative Ethics Commission for the changes in the
17   law, right?
18       A    Those are recommendations, yeah.
19       Q    Right.  And you explain why there's
20   recommendations, why you're making certain
21   recommendations, including the hundred dollar limit
22   and the removal of that limit in the creation of the
23   no cup of coffee rule; do you see that on page 2?
24       A    Yes.
25       Q    And the explanation that you give for

Page 151

1    this is that, and this is I guess what you're
2    telling the General Assembly, is that lobbyists and
3    employers of lobbyists could continue to sponsor
4    events to which groups of legislators are invited,
5    but could not purchase meals or beverages for
6    individual legislators or members of a legislator's
7    immediate family.  Also, under current law, with the
8    approval of the Senate President or House Speaker, a
9    legislator may accept transportation, food,
10   beverages and lodging for an out-of-state event, and
11   those expenses may be paid for by lobbyists or
12   employer of lobbyists.  I guess I'm confused, are
13   you telling the legislature that, look, we just want
14   to end the hundred dollar limit, we don't want to
15   end the group events, is that what you're
16   communicating to the legislature?
17       A    No.  What's being communicated there is
18   that this is a package of proposals.  These two in
19   particular are part and parcel of the same approach,
20   which is to create a bright line between legislators
21   and the lobbying community which wants legislative
22   action.  So on the one hand you've got the
23   recommendation for the so-called no cup of coffee
24   law, that is to repeal the hundred dollar limit that
25   the 650 lobbyists and employers were able to each

Page 152

1    give to each legislator every year, to repeal that,
2    and also to say that lobbyists and their employers
3    are no longer going to be able to pay for a
4    legislator's out-of-town trip, which they could do
5    as explained in the italicized paragraph, under the
6    current law if the legislator got approval from the
7    Senate president, for example, Senator Schickel, if
8    Altria or let's say Brown-Forman wanted to fly
9    Senator Schickel to their shareholders' meeting in
10   New York so that Senator Schickel could give the
11   shareholders of Brown-Forman an update on
12   legislation relating to the distilling industry in
13   Kentucky, under the former law they could do that.
14   Under this change, the bright line again is extended
15   to out-of-state trips.  They could have done that
16   before if Senator Schickel had asked for approval of
17   that trip from the Senate president.  If the Senate
18   president approved, the legislator could go and
19   anybody could pay for it.  This change simply
20   narrows that a little bit and says if a legislator
21   is going out of town, out of state on a trip related
22   to the legislator's legislative responsibilities,
23   then it can't be paid for by an employer of a
24   lobbyist.
25       Q    I understand that.  By the way, are you

Page 153

1    aware of any of these out-of-state trips that
2    Senator Schickel took?
3        A    No.  There were others who took
4    out-of-state trips.
5        Q    Oh, I know that, right.
6        A    At the expense of employers of lobbyists.
7    They take out-of-state trips, but usually those are
8    paid for by the legislature.  If they're taking a
9    trip that's related to their legislative
10   responsibilities, like they're going to NCSL to be
11   on a panel or to participate in discussions of
12   legislative issues, the legislature will pay for
13   that.
14       Q    Right.
15       A    Likewise, if they're on legislative
16   business, the legislature will pay for their food
17   and beverages, the taxpayers will do that.  And so
18   this really isn't a great burden on the legislators.
19   When you think about how often or how little it was
20   done before, obviously there weren't very many
21   legislators taking advantage of the situation.
22   There were some.
23       Q    Right.
24       A    But there weren't many, and by enacting
25   this statute, they could draw a bright line and they

51d14619-9481-44e8-adb5-d49d86433c88

Page 154

1    could tell the public the legislators are not taking
2    anything from lobbyists.
3        Q    Except, of course, at the group events,
4    right?
5        A    Group events if they attend those.
6        Q    If they attend.  And to be clear, my
7    understanding is where the rubber really met the
8    road on this de minimis hundred dollar exemption, I
9    call it the de minimis exemption because it was a
10   hundred dollars or less a year, so I just wanted to
11   use that term, most of it that went on was a
12   lobbyist catching a legislator in the capitol
13   cafeteria and saying can you give me a couple
14   minutes on a bill, here's a cup of coffee, and that
15   was completely exempted, right?  It had to be
16   reported, but that was where this kind of -- if it
17   was going to be used at all, that was where it kind
18   of came up?
19       A    No, no, not necessarily.  Where it came
20   up more often than that would be legislators
21   attending an event and then finding out later when
22   they received in the mail a copy of the report that
23   a lobbyist was about to file and being surprised
24   that they were going to have their name reported as
25   attending an event because they were either under

Page 155

1    the perception that someone else was paying for it,
2    not the lobbyist, or that it was an event to which
3    everybody had been invited, so individual
4    legislators would not be reported as having
5    attended.  But when they would receive in the mail,
6    as the law requires, ten days before the report is
7    filed the lobbyist or employer would send them a
8    copy of the report, and it says Senator John
9    Schickel received a $12 meal when he attended our
10   meeting, and the legislator would call the
11   Commission and say, why are they reporting this, and
12   we would say, well, you'll have to ask them.  It
13   depends on who they invited to the event and who
14   paid for it.  So apparently if they're reporting it,
15   they paid for it and they only invited you or they
16   only invited you and a couple of other members, so
17   they're required to let you know that your name is
18   going into the record.
19            And so it was this, I think this -- it
20   was somewhat troublesome I think to some members to
21   find out that all of a sudden when they thought they
22   were attending an event that everybody else was
23   invited to, that they were going to be reported as
24   being the only one there.
25       Q    Or that they thought their name wasn't

Page 156

1    going to be reported, for instance, because it was a
2    group event, and then find out that, oh, my gosh,
3    I'm being reported as going to this lobbyist?
4        A    Right.  So it was a combination of
5    factors.  I would say I don't remember anybody
6    talking about cups of coffee in the annex cafeteria.
7    That wasn't exactly what the basis for this was.
8        Q    Well, because there was an exemption for
9    food and drink that was consumed on-site, right,
10   there was an exemption from, I think it was even
11   maybe from reporting?
12       A    No, a cup of coffee was still reportable.
13   I'm just guessing that most legislators bought their
14   own coffee or got it up in their office.
15       Q    Yeah, I think they would, if they had
16   time, but if they were in the cafeteria and the
17   lobbyist was way up ahead in line, then maybe, you
18   know --
19       A    Well, keep in mind this law doesn't
20   prevent them from meeting with lobbyists.  They can
21   sit down in the annex cafeteria, in the lobbyist's
22   office, in the legislator's office, anywhere they
23   want.  It just says the cup of coffee is not going
24   to be part of that, or if it is, you're going to pay
25   for it yourself with this money that the taxpayers

Page 157

1    give you, $154 a day when you're in the annex
2    cafeteria.
3        Q    The next thing that's on here is there is
4    some fines for failure to disclose.  It looks like
5    you folks lobbied or levied some fines on three
6    legislative candidates who did not file disclosure
7    statements.
8        A    What page is that, I'm sorry?
9        Q    That is on page 2.
10       A    I have it.
11       Q    And you also listed who they are.  Do you
12   see that?
13       A    Yes.
14       Q    Why would you list who they are but we
15   don't see the names of the lobbyists that you levy
16   fines against?
17       A    Well, I think this obligation, if you're
18   running for public office, I think there's an
19   obligation to comply with the ethics law, well, I
20   know there is, and these three people willfully
21   failed to comply and they were candidates, and so I
22   reported who they were.  Now, the typical lobbyist
23   fine is levied on somebody who inadvertently failed
24   to file on time, and typically it has to be the
25   second or third time that they failed to file in a

51d14619-9481-44e8-adb5-d49d86433c88

Page 158

1    two-year period.
2        I don't view that personally, and I'm the
3    one who puts this together, I don't view that as
4    purposefully as I do a candidate ignoring the
5    requirement after repeated contacts.  Most of the
6    lobbyists, in fact all of them, after they're
7    contacted once, they'll file the report because
8    their failure to file on the deadline was probably
9    inadvertent or they thought they filed and they
10   didn't through our online system.  But these three
11   candidates willfully ignored the law, and I thought
12   that the public has a right to know that they were
13   running for office and they had, before they even
14   had taken office, they had willfully ignored the
15   ethics law applying to legislators and candidates.
16       Q    So to be clear, they were warned, didn't
17   fix it, and that's what --
18       A    They were warned repeatedly.
19       Q    Okay.  And then it looks like there was
20   also, I think that's it on this.
21           July 2012, just again briefly at these
22   group events, there's no limit on what a lobbyist
23   can spend on these group events; is that right?
24       A    Well, typically they're not paid for by
25   lobbyists, they're paid for by the businesses and

Page 159

1    organizations that employ the lobbyists.
2        Q    The employers.
3        A    The lobbyists have very little
4    expenditure in that regard.  But there is no limit.
5    There's no limit to how many people they can invite.
6    They just have to report the legislators who were
7    invited.
8        Q    Okay.  And then I see also, just back to
9    August 2012, KREF 576, it looks like in August of
10   '12 there was a finding of ethical misconduct and a
11   $500 penalty and a public reprimand for a lobbyist
12   that violated KRS 6.811, subsection (6).  Do you see
13   that?
14       A    Let me read that.
15       Q    Sure.
16       A    Okay, thank you.
17       Q    Do you know what provision that is, by
18   the way?  I'm sure we can look it up here in a
19   minute, but do you know what provision that is?
20       A    That's the, I believe that's prohibition
21   on lobbyists giving a campaign contribution.
22       Q    I think you're right.  I just wanted to
23   ask just briefly in terms of the enforcement
24   process, it looks like this particular lobbyist
25   said, hey, look, I violated, I'm not going to go

Page 160

1    through this adjudicatory process, I just want to
2    resolve this, and you guys said that that's fine.
3    Is that correct?
4        A    That's correct.
5        Q    And then just briefly September 2012,
6    looks like there was a Kentucky Night that some
7    lobbyists and some employers spent about $15,000 to
8    entertain Kentucky legislators at the Skydeck in
9    Chicago; is that accurate?
10       A    That's accurate.  That's taken either
11   from the report or from the NCSL -- it's probably
12   from the report, the employer reported that.
13       Q    Okay.  And then you explained what the
14   Skydeck, that it's the 99th floor of the Willis
15   Tower in downtown Chicago, right?
16       A    That's correct.
17       Q    Mr. Schaaf, I want to look at Exhibit 27,
18   this is probably something that you're familiar
19   with.  It looks like it's got a very nice picture of
20   you right up front.
21       A    A much younger me.
22       Q    This is an article, sir, that you
23   authored, right?
24       A    Yes.
25       Q    Back when you were counsel to the KLEC;

Page 161

1    is that accurate?
2        A    Yes, that's accurate.
3        Q    And you indicate that it's always a good
4    time to let Kentuckians know that our state's
5    legislative ethics law is working, and Kentucky is
6    avoiding the kinds of investigations and scandals
7    that occur regularly in other states, right?
8        A    Right.
9        Q    You also indicated that, let me go back
10   here, I'm looking at page, the third one back, you
11   indicate that Kentucky's Code of Legislative Ethics
12   is one of the most comprehensive ethics laws in the
13   nation, and it clearly regulates legislators'
14   interaction with state agencies while recognizing
15   that a key part of every legislator's job is working
16   for constituents who need a response or assistance
17   from state government.  Do you agree with that?
18       A    Yes.
19       Q    I want to turn to the last page of this
20   particular exhibit.  You indicate that, and you're
21   talking about the term these, you're talking about
22   Kentucky's strict provisions and the entire
23   legislative ethics law help Kentucky's General
24   Assembly stay free of indictments and convictions
25   since 1993, when the ethics law was enacted.

51d14619-9481-44e8-adb5-d49d86433c88

Page 162

1      A    That's correct.
2      Q    And you say that the best way to answer
3   that mischaracterization, you're talking about a
4   mischaracterization I think in a prior article, is
5   for Kentucky's citizen legislators to represent
6   their constituents effectively and stay within the
7   guidelines of the nation's strongest ethics law,
8   right?  Very last paragraph.
9      A    Well, that comes after the paragraph in
10  which I address the fact that some people wrongly
11  believe that all legislators and other public
12  officials are dishonest, and, yes, so I said the
13  best way to answer that mischaracterization is to
14  represent constituents effectively and stay within
15  the guidelines and stay away from criminal penalties
16  and things like that that give the public a bad
17  impression of the General Assembly.
18     Q    All right.  I want to look at, Exhibit 28
19  is the 2013 Ethics Reporter or at least the
20  nonarticle portions of them.  Do you agree with me?
21     A    I'll take your word for it.  Have you got
22  the whole year in here?
23     Q    I believe so.
24     A    It looks like it's through September.
25     Q    Through September anyway.  I just want to

Page 163

1   look briefly, January you indicate that there was a,
2   and let's go back to the third page, actually it was
3   the Courier-Journal that reported the lobbying
4   spending set a record in Kentucky in 2012.  Do you
5   agree with that?
6      A    Do I agree with --
7      Q    That it was a record at the time.
8      A    Yes.
9      Q    Then I want to look at March 2013 just
10  briefly.  And again there's certainly, when we go
11  back to some receptions that are there, there's a
12  $14,748 energy reception and there's a $10,755
13  Kentucky Railroad Association reception, correct?
14     A    I think -- I didn't catch all your
15  numbers, but, yeah, whatever it says on that page is
16  correct.
17     Q    All right.  I want to just briefly look
18  back at April 2013.  And you start to talk about in
19  this particular article a number of, I'm going to
20  call them related PAC donations, in other words,
21  where you've got a lobbyist or an employer in a
22  related PAC, you're identifying what those PACs are
23  spending, I suppose on incumbent legislators; is
24  that fair?
25     A    It could have included candidates as

Page 164

1   well, not just incumbents.  I'm not sure.
2      Q    You don't know one way or the other?
3      A    Well, I'd have to read it.  It looks like
4   their total spending on legislative campaigns, which
5   would be both incumbent legislators and possibly on
6   legislative candidates as well.
7      Q    Okay.  And then again we're back to
8   the -- when you go back to the next one that follows
9   there's a July '13, and we've got the changes that
10  we've already outlined with the explanations that
11  were previously given in terms of those changes,
12  right?
13     A    I'm sorry, did you go to another month?
14     Q    I did, I went to July '13.  I'm not
15  spending a lot of time on these big packets because
16  I'm trying to move through them.
17     A    Right.  And we have the recommendations
18  for changes.
19     Q    Right, that's what I'm after.  And again
20  there's no recommendation about discontinuing group
21  events, correct?
22     A    No.  That's never come up as a problem.
23     Q    Or even reporting which legislators
24  attend those events?
25     A    Nobody has ever asked about that.

Page 165

1      Q    Let me ask, Mr. Schaaf, do you think that
2   if you reported which individual legislators
3   attended these events that the attendance would go
4   down?
5      A    I don't know.  You know, the idea of
6   getting -- most of these events, to my knowledge,
7   involve hundreds of people.  Some are legislators,
8   some are legislators' spouses, some are legislative
9   staff people, some are executive branch officials,
10  and I don't know that anybody is going to give you,
11  be able to give you an accurate assessment of who
12  was there.  And you wouldn't want a report that's
13  inherently unreliable.  If I say these 27
14  legislators were there, but there were actually 10
15  others who were there and you didn't see them or you
16  didn't count them, you didn't know them, then you've
17  got an inaccurate report.
18     Q    Or you could require the people as they
19  check into the event to identify themselves?
20     A    Well, you could.  I don't think the
21  General Assembly has seen fit to go that far and put
22  that kind of extra administrative responsibility on
23  anybody.
24     Q    Or that transparency in terms of who's
25  attending these big group events, right?

51d14619-9481-44e8-adb5-d49d86433c88

Page 166

1     A    Well, as I said, when the General
2  Assembly identified in 1993 these particular types
3  of groups, I think they focused on events to which
4  bipartisan, bicameral groups of legislators were
5  invited, and I think their theory probably was
6  that's an open event, people can walk in off the
7  street, legislators can attend or not, but that's
8  much less problematic than a one-on-one dinner at a
9  restaurant in Louisville where a lobbyist pays all
10  the tab and gets that kind of one-on-one time with a
11  legislator because the lobbyist is buying the
12  dinner, not because there's an event to which
13  everybody is invited.  So I think they made a
14  determination that these types of events are less
15  problematic, and there's no real need to record
16  every single individual who's there.  Putting aside
17  the administrative nightmare that would be involved
18  there at some of these receptions.
19     Q    How much of a nightmare would it be if
20  the legislators had to self-identify if they
21  attended one of these events?
22     A    Well, you'll have to ask the legislators.
23  If they want to change the law to require that,
24  that's certainly something that, you know, could fit
25  in the law.  But I think that anytime that they make

Page 167

1  a determination about how extensive a law's
2  application is going to be, they have to make
3  decisions.  The crime of abusing a child is
4  different than abusing an adult.  There are stiffer
5  penalties for that.  So they make distinctions when
6  they write these statutes and they try to address
7  the situations that are presented to them.  And,
8  again, in all candor, that's never been an issue.
9  You know, and, again, this is much more extensive
10  reporting in terms of these events than I think
11  you'll find in most states and much more than the
12  nonexistent reporting that went on prior to 1993.
13  So I think at this point they believe they've
14  addressed that issue reasonably.
15     Q    Okay.
16     A    And made a distinction certainly between
17  the one-on-one type of events and the event to which
18  large bipartisan groups of senators and
19  representatives are invited.
20     Q    So let's look at the example of the
21  Capitol cafeteria.  Everybody sees that Schickel is
22  sitting down with Wilson having a cup of coffee.
23  That's just as transparent as these group events,
24  isn't it?  Everybody sees it.
25     A    Who is everybody?

Page 168

1     Q    Everybody walking through the Capitol
2  cafeteria.
3     A    Is that the general public or is that
4  just a finite group of people who happen to be in
5  the annex cafeteria?
6     Q    Well, let's talk about the general
7  public, Mr. Schaaf.  The general public knows
8  because there's a report that's filed about that cup
9  of coffee in the Capitol cafeteria, right?
10     A    If a lobbyist paid for it, yes.
11     Q    And if a lobbyist isn't paying for it,
12  that's allowed today, correct?
13     A    Yes.
14        MS. DENNIS:  Mr. Wiest, I'm going to need
15  to leave.  I'm going to leave my exhibits with
16  Katie if that's okay, and if any more come
17  through, just --
18        MR. WIEST:  More is coming through.
19        MS. DENNIS:  Yeah, I know.  I'm sorry I'm
20  going to have to leave.  This has just come up
21  today.
22        MR. WIEST:  That's okay.  Let me just ask
23  for the record, Ms. Dennis, do you have any
24  questions of this witness?
25        MS. DENNIS:  No.  My only objection is

Page 169

1  that these are bates stamped KREF.
2        MR. WIEST:  Let me just indicate for the
3  record that I have labeled everything that
4  comes from any defendant in this case as a KREF
5  label generally because, unfortunately, we put
6  you all in the Complaint first.
7        MS. DENNIS:  I was only kidding anyway.
8  So thank you so much.
9        MR. JAMES:  This is all your fault.
10        MS. DENNIS:  I figured as much.
11        MR. STEFFEN:  I've got to leave soon, and
12  I'm going to slip out now rather than interrupt
13  you twice.
14  (Ms. Dennis and Mr. Steffen leave the room.)
15  BY MR. WIEST:
16     Q    Mr. Schaaf, I want to continue through
17  2013 and I want to go through 2014 pretty quickly.
18  Looking at August of '13, you briefly are talking
19  about the in-session changes that you want to make
20  in terms of employers and PACs; do you see that on
21  August '13?
22     A    Yes.
23     Q    I need to ask the question, was there
24  anything in Kentucky, any abuses or scandals or
25  issues raised in Kentucky that led to these

Page 170

1    recommendations?  And I'm not talking about other
2    states, we'll talk about that in a minute, but
3    anything in Kentucky?
4        A    There were questions raised about that
5    scenario that we discussed earlier regarding
6    legislators and candidates having fund-raisers in
7    close proximity to the time that bills were being
8    considered.  And so from time to time there were
9    questions asked of us by legislators and by others,
10   can we raise money during sessions, can we accept
11   contributions from groups that have an interest in
12   legislation, such as the Jefferson County Teachers
13   Association, the largest PAC, or the carpenters or
14   the healthcare facilities.
15        That was a question that continued to
16   confuse legislators because, again, you've got 138
17   of them, and at any particular time a lot of them
18   are going to have questions about things like
19   fund-raising during session, close proximity to
20   voting on legislation.  And we saw what was going on
21   in other states where there were allegations made
22   and stories written about legislators collecting
23   large amounts of campaign contributions while they
24   were in session and voting on bills of interest to
25   the people who were giving them contributions.  So

Page 171

1    based on those kinds of situations in other states
2    and on the number of questions we got about
3    in-session contributions, who could they come from,
4    you know, what kind of situation does that put me in
5    if I vote on a bill two days after I've gotten $2500
6    from somebody who's going to benefit from that bill,
7    how can I avoid the appearance of impropriety there.
8        Q    Are those questions all resolved today or
9    do you still get those questions today?
10        A    Those questions are resolved to the
11   extent that they involve people who have an interest
12   in legislation, a registered interest.  They have
13   employer -- they have lobbyists or they're
14   affiliated with employers of lobbyists.  They cannot
15   give a contribution during a session.  So a
16   legislator now knows that they can fund-raise from
17   the rest of the community.
18        Q    Sure.
19        A    Anybody else they want to get
20   contributions from in the middle of a session, in
21   the middle of voting, they can accept contributions
22   from anybody other than a lobbyist, a PAC, or an
23   employer of a lobbyist.  And this is, in many
24   respects is a logical extension of the ban on
25   lobbyist contributions.  If you're going to say that

Page 172

1    a lobbyist can't contribute anytime because they are
2    lobbying the legislator, then it makes a lot of
3    sense to say, well, their employer can't contribute
4    either.  And keep in mind this doesn't apply to the
5    vice president for sales of Toyota, you know.
6    Toyota employs a lobbyist and Toyota has an
7    affiliated PAC.  So Toyota as an entity, a corporate
8    entity cannot give a contribution to a legislator or
9    a candidate during a session.  Toyota's PAC can't
10   give a contribution during a session to a legislator
11   or a candidate.  But my friend, the vice president
12   for human resources, can give a personal
13   contribution to a legislator or a candidate.
14        So the whole universe of potential
15   contributors is still open to the legislator except
16   for the very narrow people who the legislature has
17   identified as having potential interest in front of
18   the General Assembly while they're in session.
19        Q    But it's not just anybody who has an
20   interest, it's particular lobbying interests, right,
21   because a company's CEO may have an interest on a
22   bill, right, and be able to donate?
23        A    Well, he's got his own interest, but
24   that's -- the corporation has an interest.  The
25   corporation who employs the lobbyist is prohibited

Page 173

1    from giving.  As an individual, he's not prohibited
2    from giving, whatever his interest is.
3        Q    Right.  And if he's the sole CEO of a
4    business that he's the sole owner, for instance, he
5    can make the donation, right, as long as he's not
6    employing a lobbyist?
7        A    That's right, if he doesn't employ a
8    lobbyist.
9        Q    And he can have an interest in the bill
10   and he can donate?
11        A    Well, if he's got an interest in a bill
12   and he wants to express that to legislators, he
13   should be registered.  He can have an interest in a
14   bill and not express it to a legislator.  That's not
15   a problem.  But once he moves into the lobbying
16   world and he's paid by his company to lobby, then he
17   has to register.
18        Q    Maybe he's not drawing a salary at all
19   from his company, maybe he gets a draw every year
20   and he's not being paid for it, is there anything
21   that keeps him then from going down and saying, hey,
22   here's my campaign donation and, by the way, you've
23   got this bill in front of you, I'd like some action
24   on it?
25        A    Well, that's going to depend on the

51d14619-9481-44e8-adb5-d49d86433c88

Page 174

1    specific facts of the situation.  Is the company
2    paying him to lobby?  Maybe, maybe not, I don't
3    know, if he takes a draw and not a salary, I don't
4    know.  So that's a fact specific situation.
5         But the fact is if you employ a lobbyist
6    as a corporate entity or as a union or whatever your
7    organization is, profit or nonprofit, if you employ
8    a lobbyist, that essentially means you have the
9    legislative interest which you are willing to pay
10   people to promote, and if you move to that level,
11   then you come under the auspices of this code.  You
12   can avoid that by not lobbying if you don't want to
13   lobby.
14       Q    Right.  And you can make your donations
15   then as an individual and you can call as an
16   individual and say, jeez, I don't like this bill,
17   right?
18       A    If you're not being paid by the company
19   to lobby.
20       Q    Right.
21       A    Now, if the company says we want
22   everybody here to take a day, we're going to pay
23   you, but you go over to Frankfort and lobby your
24   legislators, well, that might be lobbying and that
25   might require registration.  If you're registered,

Page 175

1    you can't give a campaign contribution.
2         Q    Okay.  I want to look briefly August '13,
3    second page, it looks like there's a lot of sponsors
4    of these national conferences; do you see that?
5         A    Yes.
6         Q    What's the purpose of putting all these
7    sponsors into the bulletin, into the Ethics
8    Reporter?
9         A    They -- all of those employ lobbyists in
10   Kentucky.  So that is an effort to inform the public
11   of what the businesses and unions and other
12   organizations that lobby in Kentucky -- one of the
13   aspects of their lobbying obviously is support for
14   these national legislative organizations, which
15   convene meetings periodically throughout the year.
16   Legislators participate in that, and this is another
17   aspect of lobbying.
18        Q    Okay.
19        A    Wal-Mart doesn't give money to NCSL
20   because they think NCSL is going to make great
21   policy.  They give it so that they can send people
22   to NCSL events and participate in those events with
23   legislators from the states where they do business.
24        Q    Sure.
25        A    So it's an aspect of lobbying.

Page 176

1         Q    Right.
2         A    And that's why they're in this
3    newsletter.
4         Q    Okay.  I want to turn briefly to
5    September 2013, and then we'll wrap up 2013.  You
6    have a bulletin there, it looks like spending on
7    events in 2013 exceeded $126,000.  Do you see that?
8         A    Yes.
9         Q    And included, and I'm just going to give
10   a highlight here, it looks like $13,314 at NCSL with
11   a rooftop event space overlooking downtown Atlanta,
12   right?
13        A    Correct.
14        Q    Again, we don't know which of our
15   Kentucky legislators participated in any of these
16   events, right?
17        A    No.  You can find out by asking the
18   Legislative Research Commission what Kentucky
19   legislators attended that event.
20        Q    Which will narrow it down, but it still
21   won't tell you whether or not they went to this
22   particular rooftop event in Atlanta, right?
23        A    Correct.  That's not in the public
24   record.
25        Q    All right.  Do you have Exhibit 29 in

Page 177

1    front of you, 2014?
2         A    Yes.
3         Q    I'm not going to spend a lot of time on
4    2014 except that this was a fairly big year.  I'm
5    looking at January, and it looks like the January
6    '13 indicated that 2013 was another record year in
7    lobbying.  It looks like it was 16.4 million that
8    was spent totally on lobbying in 2013?
9         A    That's correct.
10        Q    And then when we turn back to
11   February 2014, it looks like again $32,000 was spent
12   in January on receptions and group events, right;
13   you agree with that, correct?
14        A    Where is that number?
15        Q    It is the fourth paragraph down, first
16   month lobbying spending in excess of $2 million,
17   fourth paragraph down.
18        A    Oh, yeah, lobbyists and their employers
19   spent about 32,000 in January, yes.
20        Q    Right.  And then I want to turn back to
21   April 2014, and this is, I'm going to call it KLEC's
22   summary of House Bill 28.
23        A    Yeah.
24        Q    It indicated, first of all, that by
25   following the guidelines set forth in the Code of

Page 178

1    Legislative Ethics in '93, Kentucky legislators and
2    lobbyists have for over 20 years avoided law
3    enforcement investigations, indictments, trials, and
4    prison terms, right?
5         A    That's right.
6         Q    And then it outlines the changes.
7    Year-round ban -- well, it talks about, not all
8    these are changes, some of them are just provisions
9    of the code.  For instance, it was a year-round ban
10   before these changes on lobbyist donations to
11   campaigns, it was a ban --
12        A    Right, this summarizes all the, a lot of
13   the important components of the law.
14        Q    Let me ask, Mr. Schaaf, about that
15   year-round ban on lobbyist campaign contributions.
16   Those are publicly reported in KREF's database,
17   aren't they, when somebody makes those
18   contributions?
19        A    Contributions are reported, sure, all
20   contributions as far as I know over a hundred
21   dollars.
22        Q    Over a hundred dollars.
23             MR. JAMES:  Do you mean KREF or KLEC?
24             MR. WIEST:  I meant KREF, the Registry of
25   Election Finance.

Page 179

1         Q    So what would be the problem with a
2    publicly reported campaign contribution by lobbyists
3    outside of the session?
4         A    Well, it would be against the law.
5         Q    I understand.  Let's assume it wasn't,
6    what from policy reasons or otherwise would dictate
7    that not being a good idea?
8         A    Well, the lobbyist/legislator
9    relationship is very -- is unique.
10        Q    Sure.
11        A    You have on the one hand a person who has
12   responsibility for making policy for the public
13   elected to the state legislature.  You have on the
14   other hand someone who's paid to persuade person one
15   to take certain actions.
16             So the legislature in its wisdom in 1993
17   determined that that very close relationship should
18   be divorced from the political process.  The public
19   policy making on one hand in the General Assembly
20   should be separate from the fund-raising which is
21   essential to the policymakers' campaigns.  So by
22   having, implementing a year-round ban, they have put
23   a bright line between the person who makes the
24   policy and the person who is paid to influence the
25   policymaker by putting campaign contributions off

Page 180

1    limits.  And I can only surmise that that came from
2    problems that those legislators saw in 1993 that had
3    developed in which campaign contributions played a
4    role in this relationship between legislators and
5    lobbyists becoming one that led to violations of the
6    federal law.  So to separate the parties essentially
7    and to make the relationship professional, they not
8    only banned contributions, but they said legislators
9    can't take anything of value from lobbyists, not
10   including campaign contributions, but in terms of
11   gifts of any kind.
12        Q    Subject to the hundred dollar limit.
13        A    Subject to the hundred dollar limit, food
14   and beverages, trips to anywhere unless the
15   legislator had specific approval from a body of
16   legislators.  So they drew a bright line in 1993,
17   and part of that line ran right through the
18   political relationship between legislators and
19   lobbyists, and they separated the lobbyists to some
20   extent from the political process, not to every --
21   lobbyists are still allowed to participate in a wide
22   array of campaign-related activities.
23        Q    Sure.
24        A    Lobbyists can stuff envelopes, they can
25   speak well of any member of the General Assembly or

Page 181

1    any candidate, they can put up yard signs, they can
2    do a whole range of activities on behalf of
3    legislators and legislative candidates.  But the
4    money is the heart of the matter, and so in that
5    regard the General Assembly separated the
6    legislators and the candidates for the legislature,
7    the policy makers from the policy influencers.
8         Q    Let me ask you, Mr. Schaaf, the
9    difference between all of those things you talked
10   about, yard signs, maybe knocking on doors, the
11   public never find out that the lobbyists is doing
12   those things on behalf of the candidate necessarily,
13   right, the public may never find out?
14        A    Well, I don't know about that.  It's done
15   in public, you put up a yard sign in your yard or
16   somebody else's, I mean --
17        Q    The general public may not find out?
18        A    If you're asking if public disclosure of
19   campaign contributions is enough to deter
20   corruption, my answer is the General Assembly
21   apparently didn't think so, so they implemented a
22   year-round ban.
23        Q    My suggestion to you, sir, is actually
24   that the public disclosure of lobbyists involved in
25   a particular campaign is a better remedy to prevent

51d14619-9481-44e8-adb5-d49d86433c88

Page 182

1  corruption than an outright ban where certain other
2  activities are permitted that the public never finds
3  out about necessarily.  That's my suggestion.
4        MR. JAMES:  Objection.
5     Q   I'm asking him to respond.
6     A   There may have been legislators who
7  agreed with that in 1993, but they were not in the
8  majority.
9     Q   And you agreed with the reporting and
10  other things that sunlight is the best disinfectant,
11  right?
12    A   But it's not the only remedy.  It's a
13  disinfectant, but you also have publicly reported --
14  Sheldon Silver got indicted in New York and
15  convicted, Speaker of the House up there --
16    Q   Right.
17    A   -- for information he was publicly
18  reporting.  So, you know, sunlight can be a
19  disinfectant, but it's not the only remedy to
20  address corruption.
21    Q   Sure, sure.  We've got this Op-Ed that
22  Mr. Troutman put together that starts on page 348;
23  do you see that?
24    A   Yes.
25    Q   And he says that it's important for the

Page 183

1  process to work without improper influence, okay.
2  Can you explain to me how a cup of coffee improperly
3  influences a legislator?
4     A   I don't see that quote in here, I'm sure
5  it's in here if you read it.  Well, I can only say
6  that the cup of coffee by itself may or may not
7  influence it.  It's the -- it's a product of the
8  culture, and so if you ban lobbyists from giving
9  legislators anything of value, including a
10  one-on-one cup of coffee, you help to create a
11  culture in which every legislator knows all the time
12  if a lobbyist is offering them something, they
13  probably shouldn't take it.  Maybe they better
14  check.  Maybe it's an improper gift, or maybe it's
15  given in the context in which it's not a problem,
16  like an event to which all legislators are invited.
17    Q   Sure.
18    A   So I would say to you that it's about the
19  culture that you create.  And Kentucky is following
20  in the footsteps of probably a dozen or more, two
21  dozen states that have no cup of coffee rules.  And
22  Kentucky has, as you've pointed out, broad
23  exceptions to those.  So it's not a question of a
24  cup of coffee causing corruption.  It's a question
25  of banning gifts from people with interests, paid

Page 184

1  interest in legislation and creating a culture in
2  which legislators don't accept things from
3  lobbyists.
4     Q   Well, and I'm still trying to get my head
5  around this, and I guess I'm just having difficulty
6  how a cup of coffee in a one-on-one setting
7  improperly influences but getting to attend an
8  $18,000 event with alcohol and entertainment and
9  food for the legislator and a spouse doesn't
10  improperly influence, and I'm just, I just can't
11  figure out that disconnect.  Maybe you can help me
12  with that.
13    A   There are 138 people who could probably
14  shed more light on that than I can, and those are
15  the members of the General Assembly who -- and maybe
16  to some of them or a majority of them a cup of
17  coffee could be a problem if it's accepted from a
18  lobbyist.  It may not be a problem for you as an
19  observer, it may not be a problem for anybody in
20  this room, but the legislators reflect the public
21  interest, and when they vote on a bill like this,
22  it's because they think there's a need to draw that
23  bright line and to help create that culture where
24  their constituents understand that they're not
25  taking -- you know, their constituents are paying

Page 185

1  them, in addition to a salary, their constituents,
2  the taxpayers are giving them $154 a day.
3     Q   Right.
4     A   The constituents might rightly ask, why
5  do you need a lobbyist, somebody who wants something
6  from you, to buy you a cup of coffee.
7     Q   Or maybe the constituent would ask why is
8  it okay if you're being paid $154 a day to go to a
9  group reception at Buffalo Trace, right?
10    A   Right, they might ask that, and if enough
11  of them ask, the legislators might suggest that the
12  law be changed to somehow regulate those entities
13  more than they are currently regulated.
14    Q   Okay.
15    A   Apparently they think the level of
16  regulation that's in place is sufficient, but if
17  problems arise out of that, they'll probably respond
18  just as they've done before.
19    Q   Or they may not be aware of the issue,
20  right, the public?
21    A   Well, legislators are the most accessible
22  public officials that we elect.  You can't see the
23  governor at Kroger on a typical Saturday afternoon,
24  but you might see your state representative or your
25  state senator, and believe me, they are approached

47 (Pages 182 to 185)

Page 186

1    constantly by people who have various complaints or
2    comments about what's going on in the General
3    Assembly, and if one legislator is having a problem,
4    every legislator is going to hear about it when they
5    go home.  And so they reflect the public interest
6    pretty effectively.
7        Q    Okay.  I just want to look just briefly,
8    I've got marked as Exhibit 30, 2015, sir.  You would
9    agree with me this is after the enactment of House
10   Bill, 2014 House Bill 28, right?
11       A    Yes.
12       Q    And in the first two months of 2015, if
13   you look, this is the March 2015, we get back to
14   lobbying events.  Lobbyists and their employers
15   spent $84,000 on receptions, meals, and events to
16   which members of the General Assembly were invited;
17   do you see that?
18       A    Yes, I do.
19       Q    And there's a couple big ones, and I'm
20   not going to spend a lot of time on all of them, but
21   it looks like there was an $11,675 that was spent at
22   a, I'm going to call it a railway event, it was the
23   February 10th railroad reception, right?
24       A    I'm sorry.
25       Q    It's in the first paragraph.

Page 187

1        A    Yes, yes.
2        Q    And, again, the changes that were enacted
3    in 2014, no requirement for anybody to report which
4    particular legislators are attending these lobbying
5    events, right?
6        A    That's correct.  Then you get into a
7    discussion too about what is attendance.  If I come
8    down there and see a couple people I know outside of
9    the train or outside of the reception hall and I
10   shake hands and I talk with them for 30 minutes but
11   they never see me inside, did I attend?  I don't
12   know.
13       Q    Or maybe you would write the same way you
14   did with --
15       A    What if they have a registration table
16   set up and I don't register.  Did I attend?  I don't
17   know.  What if I didn't know I had to register?  So
18   I think the legislature has decided that at least to
19   this point that that reporting requirement is
20   sufficient.  We know which interest groups spent how
21   much on what kind of an event, the public is now
22   aware of it.  If somebody wants to ask their
23   individual legislator did you attend that event, and
24   the legislator says no, but then they find somebody
25   else who says, yeah, I saw him there, well, then the

Page 188

1    legislator has got a problem, maybe he has to defend
2    himself, I don't know.  So I would just --
3        Q    I mean you could always require the
4    legislators themselves to report on their report
5    what events are you attending with lobbyists where
6    you're accepting food or drink at group events,
7    right?
8        A    You could.  Well, then do they report it
9    if they didn't have food or drink, if they just
10   walked in and spent an hour glad-handing with
11   people.
12       Q    Well, they don't have to report that now
13   individually, right, they could meet with people and
14   they don't have to report it?
15       A    They don't have to report that at all,
16   no.
17       Q    Right.  So if they're accepting
18   something, maybe they could report it, right, if
19   they're accepting food or drink?
20       A    If that is viewed as a problem, the
21   General Assembly would probably address that, I
22   don't know.  Right now you're the first person I've
23   heard who raised that as an issue.
24       Q    Why would the General Assembly want to
25   shed light on the fact that legislators are

Page 189

1    attending $11,675 railroad receptions, right?
2        A    Well, they don't complain about me
3    putting it in here, for example.  If you thought
4    that they wanted to keep that information somehow
5    secret, they wouldn't require even this level of
6    reporting.
7        Q    Why do they care unless their individual
8    names are on it, right?
9        A    Well, because you're saying that it's
10   somehow unethical for them to attend these
11   receptions, and I'm not disagreeing with you one way
12   or the other, I'm just saying they haven't seen fit
13   to require reporting.
14       Q    Mr. Schaaf, I'm not suggesting that at
15   all.  In fact, my contention is that I don't think
16   the hundred dollar exception gives rise to an
17   appearance of impropriety, but if that does, then
18   surely a $11,675 group event does.  That's my
19   contention.  I don't know if you have a response to
20   that.
21       A    If the public is concerned about it, you
22   know, as they are concerned generally about the
23   interaction between legislators and lobbyists, the
24   public might make an issue of that.
25       Q    Were there any complaints that the

51d14619-9481-44e8-adb5-d49d86433c88

Page 190

1    Legislative Ethics Commission received in terms of
2    the de minimis, the less than a hundred dollar a
3    year exemptions prior to 2014 House Bill 28?
4        A    Formal complaints, no.  Complaints we
5    heard by and large were from legislators, who, as I
6    suggested earlier, were surprised by the fact that
7    their names were being reported for some event that
8    they didn't think was going to be reported that they
9    attended or didn't attend in some cases.
10       Q    So their concern was, hey, my name is on
11   the report and I don't want it on the report?
12       A    Well, I wouldn't characterize those as
13   complaints.  Those were calls inquiring as to why
14   they received this report from an employer of a
15   lobbyist saying that the employer was about to
16   report that the legislator had attended an event to
17   which the legislator may not have even attended.
18   There may have been a mistake made, they may have
19   been invited, said they were going to come and at
20   the last minute they couldn't come.  They didn't
21   know why they were on these reports.
22       Q    And would they get that resolved
23   typically?
24       A    Yeah.  Typically you could either resolve
25   it by paying the cost of the event that was going to

Page 191

1    be reported or by contacting the people who were
2    going to report it and saying, look, I said I was
3    going to be there, at the last minute I couldn't be,
4    I wasn't there.
5        Q    Okay.  I'm looking at September 2015, and
6    again I just want to go back to, we've got these
7    lobbyists and employers spendings at these
8    conferences, and it looks like $19,695 was spent at
9    the SLC conference.  Do you see that?
10       A    That's correct.
11       Q    And it looks like, if you turn to the
12   next page 19,111 was spent at NCSL?
13       A    Yes.
14       Q    And then it looks like there was a big
15   Kentucky Derby event, if you scroll down to the
16   third paragraph there.
17       A    And 5,368 at ALEC, which is another
18   organization to which legislators belong.
19       Q    Okay.  And again it looks like we've got
20   another event, there's a big Kentucky Derby brunch
21   that was held for legislators, $15,656; do you see
22   that?
23       A    Yes, 28 employers together spent that,
24   yes.
25       Q    Right.  And, again, I'm just asking the

Page 192

1    position of the Kentucky Legislative Ethics
2    Commission here, which has the greater impact on the
3    public perception, a $15,656 Kentucky Derby event or
4    a $2 cup of Coke?
5        A    The one that is in compliance with the
6    law is of concern to us.
7        Q    Let's put the law aside.  I'm asking --
8        A    No, let's don't.  I'm talking about the
9    law and you're talking about what is of concern to
10   the Commission.
11       Q    Sure.
12       A    The Commission is concerned with people
13   complying with the law, and so the law now prohibits
14   a lobbyist from buying the $2 cup of coffee, so that
15   would be of concern if they did that.  If people are
16   reporting what they're supposed to report and
17   complying with the law in regards to these
18   receptions, that is not a concern to the Commission
19   at this point.  Now, if we begin to hear that there
20   are problems with these events or the public begins
21   to talk to legislators or contact the Commission and
22   say, what is all this you're reporting, we're
23   concerned about this, well, then it might become an
24   issue.
25       Q    Okay.

Page 193

1        A    But right now compliance with the law is
2    what's concerning to the Commission.
3        Q    Well, you folks, you being KLEC, makes
4    recommendations every year to the legislature,
5    right, about changes in the law?
6        A    We do.
7        Q    And I guess I'm just looking from a
8    policy perspective, from strictly a policy
9    perspective, not what's on the books or not on the
10   books but strictly from a policy perspective, which
11   do you, KLEC believes has a greater impact on the
12   public perception, a $15,656 group event at the
13   Kentucky Derby or a $2 cup of Coke in a one-on-one
14   with a legislator that's reported?
15       A    I'm not sure that either one of them has
16   a great deal of impact on the public perception.
17   What has an impact on the public perception is the
18   culture which you develop and adhere to around the
19   General Assembly, and if that culture is that you
20   cannot have a one-on-one meal paid for by a
21   lobbyist, then that I think is good in the public
22   perception.  Now, there may be others who say, well,
23   we don't like the fact that you can go to these
24   events, and the legislator can respond accordingly.
25   I go to these events because local officials from my

51d14619-9481-44e8-adb5-d49d86433c88

Page 194

1    area are usually there and I get a chance to see
2    them, I get a chance to mingle with people in a less
3    formal atmosphere, or I don't go to those events.
4    They can respond to that in any way they want. But
5    to this point I have not heard the public perception
6    that you've expressed that these type of events are
7    somehow giving people an idea that their legislators
8    are being corrupted.
9        Q    Okay.
10       A    As opposed to, for example, a one-on-one
11   dinner that you as a legislator choose to go to and
12   choose to receive from an individual lobbyist who
13   has a special interest in a particular bill and it's
14   then reported that I went out, you know, that's --
15   what we would rather have is a culture where a
16   legislator knows if I go to dinner with a lobbyist,
17   I'll pay for it myself because that's what the
18   taxpayers are giving me $154 a day to do, is to pay
19   for my own meals, not to accept them from people who
20   have a particular interest in legislation. So as
21   far as public perception, I'll come down on the side
22   of the no cup of coffee.
23       Q    Okay. I guess I'm left with the lobbyist
24   still has interest in bills when they invite an
25   entire committee, for instance, or an entire caucus

Page 195

1    to a group event, right?
2        A    Absolutely. That's why they have the
3    events, so they can bring legislators together.
4        Q    And they get the chance to interact with
5    them there?
6        A    They do.
7        Q    And they get the chance to pitch their
8    bills there?
9        A    They do, and they're reported.
10       Q    And in the environment where the
11   legislators know that they're being given these
12   things by the lobbyists they're sponsoring, right?
13       A    Well, oftentimes these things are the
14   product of a number of groups going together and
15   most frequently, I would guess, the legislators are
16   not lobbied at these events. But it is more of the
17   same relationship-building opportunity. But the
18   legislator has those same opportunities with
19   individual lobbyists, they just have to pay for it
20   themselves.
21       Q    Okay. But they can get the lobbyists or
22   the group of lobbyists to pay for it at the group
23   events, right?
24       A    Yes, because it's done and you have large
25   numbers of legislators invited and if there are

Page 196

1    legislators in attendance, it's going to be a
2    bipartisan, bicameral group, people who agree,
3    people who disagree with the issues presented by the
4    particular group at that particular time. So I
5    think the perception is there's less opportunity for
6    the type of corruption you want to prevent. The
7    type of corruption that was endemic at BOPTROT when
8    you have a lot of one-on-one dinners paid for by
9    lobbyists, you had lobbyists leaving their credit
10   cards at restaurants where legislators could put
11   their meals and beverages on a lobbyist's credit
12   card. That's what they were trying to get at, and
13   this no cup of coffee rule is just a logical
14   extension of the former law, which put a very strict
15   limit on what each lobbyist could give you, but it
16   added up to actually 650 times a hundred dollars
17   that you could accept from lobbyists in a particular
18   calendar year. So that is now stopped. You can no
19   longer accept that $60,000 or whatever it would be
20   of gifts.
21       Q    We're going to talk about how much there
22   was here in a minute that was actually going on.
23   You mentioned that the concern is alleviated when
24   there's a bipartisan group that attends.
25       A    Well, the legislator seemed to think so

Page 197

1    because each of those groups that they specified in
2    that statute are bipartisan and generally bicameral
3    groups of legislators.
4        Q    Well, then one of the things that is
5    exempted is groups in which an entire caucus is
6    invited, right?
7        A    That's right.
8        Q    And you're aware there are strictly
9    Republican caucuses and there's strictly Democratic
10   caucuses?
11       A    There are the caucus campaign committees.
12       Q    There's also the caucuses themselves that
13   have been approved; there's the Senate Democratic
14   caucus, for instance, there's the Senate Republican
15   caucus; those are not bipartisan, right?
16       A    No. But I don't get, I don't think I get
17   any questions about whether you can invite the
18   Senate Republican caucus. Typically what they
19   invite is all members of the Senate.
20       Q    Right.
21       A    So I don't know that we've had any
22   reports in which a single partisan caucus has been
23   invited to an event.
24       Q    But they're allowed to be, right?
25       A    They may be. I don't know if they're

51d14619-9481-44e8-adb5-d49d86433c88

Page 198

1   officially recognized under this law.
2       Q    By the LRC?
3       A    By the LRC.  Those are primarily, in
4   fact -- well, there have been a couple of different
5   ones created in recent years, but those are
6   primarily regional caucuses, the Mountain caucus,
7   the Northern Kentucky caucus, the Central Kentucky
8   caucus, the Jefferson County delegation, and those
9   are typically for events of particular interest to
10  the people in that area.
11      Q    Okay.
12      A    And those are senators and
13  representatives and Republicans and Democrats from
14  those areas, are all members of those caucuses.
15      Q    Let's look at Exhibit 31.  This is
16  February 2016.  This is the Ethics Reporter for this
17  year actually, February 2016.  And I just want to
18  look at, there's some opinions you're giving in your
19  outlining of legislative campaign finance, and it
20  looks like a lobbyist is able to attend a
21  fund-raiser, right, by a legislator?
22      A    Yes.
23      Q    And they can invite their friends, right?
24      A    Sure.
25      Q    And their family, right; the lobbyist can

Page 199

1   invite their family to go to the fund-raiser?
2       A    I don't know, it depends on who's having
3   the fund-raiser.
4       Q    The legislator is having the fund-raiser.
5   Can the lobbyist invite his wife to go with him?
6       A    I don't know, I guess you'd have to ask
7   the legislator who is having the fund-raiser.
8       Q    Sure.  There's nothing --
9       A    I don't know if I want to trail in there
10  bringing six people with me who weren't invited, but
11  I don't know.  That's my answer.
12      Q    But there's nothing in the law that keeps
13  them from doing that, right?
14      A    Right.
15      Q    They just can't tell the people you need
16  to donate, the lobbyist?
17      A    Right, they can't solicit a contribution.
18      Q    The lobbyist can't suggest to a spouse,
19  hey, I need you to donate to Representative Stumbo;
20  that's illegal, right, you can't solicit a donation?
21      A    Well, what the law says is that the
22  lobbyist can't solicit a campaign contribution for a
23  legislator or a legislative candidate.
24      Q    And that includes solicitation even of
25  the lobbyist's own spouse, right?

Page 200

1       A    I don't know, the question has never come
2   up.  It would depend on the circumstances I guess.
3       Q    I'm asking you, the lobbyist looks at his
4   spouse and says, hey, I need you to go and donate a
5   thousand dollars to Representative Stumbo's
6   reelection campaign.  Is that allowed?
7       A    We would have to look at all the facts
8   around that.  First of all, there would have to be a
9   complaint filed probably.
10      Q    Sure.
11      A    Unless the lobbyist asked me.
12      Q    Okay.  The lobbyist asks you --
13      A    If the lobbyist asks me ahead of time,
14  can I ask my wife to give a campaign contribution to
15  a legislator, I would say probably not.
16      Q    All right.
17      A    But it depends on what the ask is, too.
18  If you just say, you know --
19      Q    Right, right?
20      A    It depends on the circumstances.
21      Q    Let's look at March just briefly.  I'm
22  looking at March 2016, I marked that as Exhibit 32.
23  I just want to turn to the second page.  This is
24  again after the House Bill, 2014 House Bill 28 was
25  passed.  We still have these energy receptions, for

Page 201

1   instance, at Buffalo Trace Distillery, six groups
2   spent 13,967, right?
3       A    That's right.
4       Q    And we still don't know which particular
5   legislators attended, right?
6       A    As we've discussed previously, we still
7   don't know.
8       Q    Okay.  And that is all I have on March.
9   Let's look at April, which I marked as Exhibit 33.
10  And again I'm looking at the recently reported
11  lobbying events.  I'm not going to go through all of
12  them, but it's about $22,000 that's been identified
13  in April 2016's newsletter; would you agree with me?
14  You can add it up if you want.
15      A    I'll agree with you, it's probably in
16  that neighborhood.
17      Q    Mr. Schaaf, I want to take you back, I
18  told you we were going to get back to this before,
19  to the annual reports, and specifically I want to
20  look at Exhibit 14 again that has been marked
21  previously.  I want to turn back to -- no, I'm
22  sorry, I'm on the wrong one I think.  I actually
23  want to go back to 2012 and '13.  And I want to go
24  back to, there's a chart in here, sir, that's got,
25  and it's on the same page as the complaints and

51d14619-9481-44e8-adb5-d49d86433c88

Page 202

1   administrative activities.  It looks like it's about
2   the fifth page back.  Tell me when you're there.
3       A    I have it.
4       Q    I went through this and I'm looking at
5   the money for food and beverage for legislators and
6   their families.  There's a column there that is,
7   it's under the chart money spent on legislative
8   activity since the enactment of the Legislative
9   Ethics Code.  Do you see that?
10      A    Yes.
11      Q    And generally, I mean, I'm not going to
12  get into a whole lot of specifics, but the most that
13  was ever spent on money for food and beverages for
14  legislators and their families was in 1994, which
15  was $1,202 in any particular year; do you agree with
16  that?
17      A    That's correct.
18      Q    And generally, you know, when we look at
19  more recent years, and I'm looking at '10, '11, '12,
20  '13, the most that I see anyway is 2010 where it was
21  $530 that was spent that year on money for food and
22  beverages for legislators and their immediate
23  families.
24      A    And 539 in 2012.
25      Q    You're right, 539 in 2012.  Now, just to

Page 203

1   be clear, that's all legislators, all 138
2   legislators in the whole General Assembly, right?
3       A    Yes.
4       Q    And we know that -- I know that you
5   mentioned the possibility of 60-some thousand
6   dollars that could be spent, but the fact of the
7   matter is when we actually look at what was spent, I
8   mean, at least in recent years it's less than $750,
9   right, total?
10      A    It's less than $550.
11      Q    Right.
12      A    In most cases.
13      Q    And, again, all of this individual
14  spending is reported and it's transparent?
15      A    It was.
16      Q    I've talked to my client and he has told
17  me that generally and as a general matter, other
18  than maybe grabbing something in the Capitol
19  cafeteria, that he didn't want his name on the
20  reports and neither did the other legislators as a
21  general matter.  Do you agree with that?
22      A    Well, again, you have 138 different
23  opinions about that, and those opinions could vary
24  depending on who was offering to pay for something.
25  I might accept something from Mark Wilson but I

Page 204

1   don't want to accept something from Bob Babbage.
2       Q    Right.
3       A    Yes, sometimes they did not want their
4   name on the reports and sometimes they didn't care.
5   So there was a variety of --
6       Q    Would you agree with the statement that
7   the reporting requirements, the fact that the names
8   were on the report, had an effect in terms of
9   diminishing the amount that was accepted by the
10  legislators as a general proposition?
11      A    Probably.  Probably.  Because, as I said
12  earlier, occasionally when they would get those
13  reports, they would question and you, know, a
14  general theme was, well, either, I don't mind or I
15  don't want my name on that report, how do I get them
16  to not report that.  And I'd say, well, you've got
17  to pay full value of what you received.
18      Q    Right.  Today if somebody wants to pay
19  full value to comply with the law, do they still
20  have that opportunity after the event to square up
21  with the lobbyist?
22      A    Yeah, I think so, yeah.
23      Q    And, again, I'm looking at the money for
24  food and beverages at recognized events, that has, I
25  think you'd agree with me, that's generally been,

Page 205

1   you know, at least $150,000 other than in '13 --
2   well, I'm sorry, in '9.  In any event, it's been
3   over $125,000 at least in recent years, right, on
4   these group events?
5       A    Oh, yeah.  It was over $200,000 in '04
6   and '05 and '06, '08.
7       Q    Let's keep this out and I want to get
8   into, and I didn't do a lot of these but I'm going
9   to go ahead and mark this.
10                  (Exhibits 34 and 35 were
11                  marked for identification.)
12          MR. WIEST:  I didn't mark all of these,
13  by the way, despite the fact that they were
14  produced.
15      Q    Sir, I'm going to hand you 34 and 35.
16  Sir, do you recognize what I've marked as
17  Exhibits 34 and 35?
18      A    Yes.
19      Q    Do you know, what are they?
20      A    Well, Number 34 is the changes
21  recommended by the Legislative Ethics Commission in
22  2007 to the Legislative Research Commission.  And 35
23  is those recommendations as they were reported or
24  presented to LRC in 2013.  The Commission has a
25  statutory obligation to make recommendations to the

Page 206

1    Legislative Research Commission at least every other
2    year, and in recent years they just sent those over
3    every year as a matter of routine.
4        Q    Is that something that's discussed and
5    voted on by the Commission as a whole, these
6    recommendations?
7        A    Yes, it is.
8        Q    I'm going to try to shortcut this a
9    little, both the 2007 and the 2013 proposed changes
10   both involve the repeal, if you will, or the
11   elimination of the hundred dollar exemption, right?
12       A    I think so, yeah.  That was in there for
13   quite a while.
14       Q    If you want to check, feel free.  I'm not
15   trying to trick you.
16       A    No.
17       Q    In neither case is there an explanation
18   for why that recommendation is made; is that fair?
19       A    Oh, yeah, that's fair.  The fact is, if I
20   might elaborate.
21       Q    Yeah.
22       A    In 1993 this was a heatedly debated topic
23   in the General Assembly as to whether they would
24   adopt the no cup of coffee rule that had been
25   recommended to them by the South Carolina

Page 207

1    legislature at the time or whether they would adopt
2    this slightly more flexible rule of a hundred
3    dollars for each lobbyist and employer to each
4    legislator.  So they eventually decided on the
5    reporting and the hundred dollar limitation.
6            And so beginning in the mid 2000s, maybe
7    2007, the Commission began, based on problems that
8    were arising in other states that had, you know, did
9    not have gift laws or strict gift laws, the
10   Commission began to recommend that they just repeal
11   this and go ahead and adopt the no cup of coffee
12   rule.
13       Q    Let me ask, these problems that were
14   going on in other states, in any instance did the
15   states have a scheme like Kentucky where there was
16   gift laws in place generally with the hundred dollar
17   exemption?
18       A    They may have, but what developed -- I
19   don't know.
20       Q    You're not aware of any as you sit here?
21       A    No.  What did happen is the gift giving,
22   typically if there's a loophole in the law, the
23   lobbyist will find the loophole and give to the
24   legislator whatever they legally can.  So to address
25   that, 15 or so other states have gone with the no

Page 208

1    cup of coffee, and I think Kentucky in their
2    experience decided that that was easier to
3    administer and that painted a brighter line for the
4    General Assembly and the public to know that
5    legislators are not taking anything of value.
6        Q    Okay.  At least not individually, right?
7        A    They're not taking anything of value as
8    it's defined in the statute.
9        Q    Okay.  And they weren't taking anything
10   of value as it was defined in the statute prior to
11   the House Bill changes that occurred, right, because
12   the hundred dollars was exempted?
13       A    Well, again, no cup of coffee was part of
14   a package together with a ban on lobbyist funded
15   travel.  So if you think about it, the legislature
16   addressed two areas in which lobbyists were still
17   able and employers were still able to give gifts to
18   legislators, and the General Assembly simply said,
19   we're just going to draw the line and say we're not
20   going to do that anymore.  People can argue, Senator
21   Schickel was the only person out of 138 who voted
22   against the law, and I guess he argued, I didn't
23   hear the arguments, but he probably argued that the
24   current law back then was working well enough.  But
25   137 of his colleagues disagreed.

Page 209

1        Q    I think that was one argument.  I think
2    the other argument was you were still allowing these
3    group events to go on while you were banning the
4    hundred dollar exemption.
5        A    I didn't hear that argument.  I didn't
6    hear the other argument to tell you the truth.  I'm
7    just guessing that one of Senator Schickel's
8    arguments was that it was working well enough.
9        Q    Was it?
10       A    Well, not according to the General
11   Assembly.
12       Q    Was it according to you?
13       A    Well, that could take us into a different
14   discussion.  So, yes, I think it was working well in
15   some respects, but in other respects there was not
16   the culture there that we really needed to have,
17   where legislators knew that they could not take
18   anything of value from lobbyists.  We did not have
19   that culture because there were exceptions.  Now, we
20   have much fewer in terms of exceptions.
21       Q    But you still have exceptions?
22       A    It's not a total ban, but the legislature
23   has made a determination about what's reasonable and
24   what is a reasonable place for this bright line to
25   be.  Now, you and others may argue, and you're

51d14619-9481-44e8-adb5-d49d86433c88

Page 210

1   perfectly, you know, able to go to the legislature
2   and make the argument, that they need to ban these
3   other events.  The legislature has not seen that as
4   a problem at this point.  Apparently they saw a need
5   to change the culture.  Maybe it was because of
6   problems they saw that weren't being reported, maybe
7   it was for other problems.
8              (Exhibit 36 was marked for
9          identification.)
10   Q   Okay.  I'm going to hand you, sir, what
11   I've marked as Exhibit 36.  This is probably a
12   document that you are intimately familiar with,
13   which is the official Lexis printout of 2014 House
14   Bill 28.  Have you seen this before?
15   A   Not in this format, no.
16   Q   How about the substance of it?
17   A   Oh, yeah, I'm familiar with it.
18   Q   We're going to go through this bit by
19   bit, and I just want to start with a, if you go to
20   page 2, one of the anything of value exceptions that
21   was removed was food and beverages consumed on the
22   premises, do you see that?  It's on (b)7 was an
23   exemption from anything of value.
24   A   Yeah.  This is the bill, okay, so you've
25   got --

Page 211

1   Q   This is the bill, this is the House Bill.
2   A   The language that would be deleted is --
3   Q   In the (b).
4   A   Okay.
5   Q   And the language that is added is in the
6   (a).
7   A   Right, okay.
8   Q   So one of the things that this bill
9   changed and removed was food and beverages consumed
10   on the premises, right?
11   A   It removed that from the exceptions, yes.
12   Q   Was the premises the actual -- What was
13   the premises that was part of that statute before
14   this change, was that food and beverages on the
15   Capitol, I mean, what was the premises?
16   A   No.  The premises was if you, again back
17   to the example of the country ham, if you were at an
18   event and you consumed food and beverages and then
19   left without any food and beverages, you had
20   consumed those on the premises of the event.  Or
21   under that law also it applied to food and beverages
22   consumed with a lobbyist, for example.  But that had
23   to be reported up to a hundred dollars.
24   Q   Right.
25   A   So if you ate a meal with a lobbyist and

Page 212

1   it wasn't necessarily a thing of value at that
2   point, as long as it was under a hundred dollars for
3   the year.
4   Q   Right, and at the place, right, you
5   didn't take anything home with you?
6   A   Right.  It doesn't apply to groceries.
7   Q   And I understand that there were some
8   other changes that were made as well with this House
9   Bill, including out-of-state travel.  I want to
10   turn, though, to the exception, if you look at
11   subparagraph (b)14, anything for which the recipient
12   pays or gives full value.  Are you with me?  And
13   that's still an exception today, right?
14   A   Right.
15   Q   And again I guess I'm back to the
16   question of the Coke and the two shrimp and the
17   entertainment at the party, how does Senator
18   Schickel determine with any level of certainty what
19   that value is without having to basically undergo a
20   fairly extensive accounting throughout the course of
21   an evening, is there any way that he can reasonably
22   do that?
23   A   Well, first of all, you're talking about
24   an event which is sponsored by a lobbyist or an
25   employer of a lobbyist, right?

Page 213

1   Q   Sure.
2   A   So if he's been invited to that event and
3   he's the only legislator there and he knows that
4   it's sponsored and paid for by a lobbyist or
5   employer, he can ask somebody, you know, here's what
6   I've had, or if it's a meal, that's easy enough to
7   figure out.
8   Q   Unless it's a buffet, who knows then,
9   right?
10   A   Well, he could ask and get a reasonable
11   accounting by asking.  If his accounting is off by a
12   significant amount, he could follow up later.  The
13   individual -- the lobbyist or the employer could
14   follow up with him and say, look, we were mistaken,
15   instead of being worth $12, it was worth $75, we
16   didn't know.
17   Q   Does he have to still do that if it's 12
18   versus $15, if he pays 12 and it turns out to be 15?
19   A   Well, it depends on how strictly he wants
20   to comply with the law.
21   Q   He wants to comply with it according to
22   what the Legislative Ethics Commission says he needs
23   to do.
24   A   He should pay full value.
25   Q   And that's the $15 example, right?

54 (Pages 210 to 213)

51d14619-9481-44e8-adb5-d49d86433c88

Page 214

1      A    Sounds like it.
2      Q    I want to look at, there's a definition
3  as well of candidate; do you see that?
4      A    Yes.
5      Q    And a candidate is somebody that seeks
6  nomination or election to the General Assembly.  An
7  individual is a candidate when the individual files
8  a notification and declaration for nomination for
9  office with the Secretary of State, or is nominated
10  for office by his or her party under, there's some
11  provisions of the Kentucky elections law Mr. James
12  and I are familiar with under Chapter 118.  Do you
13  see that?
14      A    Yes.
15      Q    My question is, and I'm going to go ahead
16  and mark a couple other exhibits right now.  It's as
17  good a time as any to go ahead and do it.  We're
18  going to keep this out, but we're going to look at a
19  couple other things while we're here.
20              (Exhibits 37 and 38 were
21              marked for identification.)
22      Q    Sir, I'm handing you what's been marked
23  as Exhibits 37 and 38, and I don't know if your
24  counsel shared this with you, but it's something
25  that we produced in discovery.  I know we've been

Page 215

1  talking for a fair amount of time about Senator
2  Schickel, and I don't know if you're aware of this
3  or not, but one of the other plaintiffs in this
4  matter is a gentleman by the name of David Watson.
5  Were you familiar with that?
6      A    Not particularly.  I mean, I recognize
7  his name, but I don't know his situation.
8      Q    Okay.  Exhibit 37, I'll represent to you
9  and certainly we can get an official copy probably
10  right down the hall here, is his statement of
11  candidacy that was filed with the State Board of
12  Elections.  He's a candidate for House District 6.
13  Does his filing of this statement of candidacy
14  subject him to the Legislative Ethics Code?
15      A    In some respects.  He will be notified
16  that he, let's see, the deadline is the second
17  Tuesday in August.  Probably in August, I have to
18  look at this, but at some point if it's determined
19  that he has become a candidate, either by nomination
20  or notification, they will send him a packet asking
21  him to fill out a statement of financial disclosure,
22  inform him that he cannot accept a campaign
23  contribution from a lobbyist.
24      Q    Does his filing of the Statement of
25  Candidacy, which is 118.365, does that trigger the

Page 216

1  filing or is it actually when he's nominated?
2      A    You know, I don't really know to tell you
3  the truth.  I'll have to look at what the statute
4  says and what the effect of this statement of
5  candidacy is.  If this makes him a candidate and
6  it's not just a statement of his intention to become
7  a candidate, then, yes, it would trigger the
8  Legislative Ethics Code application.  I just don't
9  know what a statement of candidacy is.
10      Q    How about, if you look at Exhibit 38,
11  this was the filing that he did with the Registry of
12  Election Finance, it's KREF-001.  Does that trigger
13  the applicability of the code to him, do you know?
14      A    Not necessarily.  You know, but I can't
15  tell you -- it says, the statute says when the
16  individual files a notification and declaration for
17  nomination for office with the Secretary of State.
18  That might be what this is, this statement of
19  candidacy, or is nominated by his or her party, and
20  I don't know if he's been nominated by the
21  Libertarian Party or whether he's running an
22  independent campaign.
23      Q    No, sir, he's running as a Libertarian
24  candidate.
25      A    Has the Libertarian Party nominated him?

Page 217

1      Q    They did in March, and let's assume that
2  that's the case, he was nominated at his district
3  nomination convention in March, does that subject
4  him to the code at that point in time?
5      A    You know, I'll have to look at the
6  statute.  I really am not familiar with these terms.
7  Typically obviously in 99.9 percent of the cases
8  you've got people who file with the Secretary of
9  State as a candidate for the primary election, and
10  at that point they become subject to the code.  I
11  just don't know if this statement of candidacy has
12  the same effect as filing to run for office.
13      Q    Sure.  And they'll gather signatures and
14  file the petition formally that will put him on the
15  ballot.
16      A    I will say that at some point if he
17  continues on, at least by August he will be an
18  official candidate it looks like, if he has to get
19  petitions or whatever.  At some point he will be a
20  candidate and he will be subject to this law.
21      Q    And you don't know whether this does it
22  or whether something else, his nomination may do it?
23      A    Right, I don't know.
24      Q    Or maybe actually when he puts the
25  signatures in down the hall may do it at the Board

51d14619-9481-44e8-adb5-d49d86433c88

Page 218

1    of Elections, you don't know which one triggers the
2    applicability of --
3        A    Not at this point, not for a Libertarian
4    Party.  I can't tell if he's mounting an independent
5    candidacy or a candidacy on behalf of the
6    Libertarian Party and whether he has to have
7    petitions.
8        Q    Sir, he'll be the Libertarian nominee,
9    and I think he will have to have signatures to
10   actually put himself on the ballot, but he will be
11   the official nominated candidate for the Libertarian
12   Party.
13       A    Well, at some point he will probably show
14   up on the Secretary of State's website as a
15   candidate.  I don't know if he's on there now.
16       Q    Yeah, I don't know for sure.
17       A    But when we see that he's an official
18   candidate, then we'll notify him.
19       Q    When he's on the Secretary of State's
20   website, is that the trigger?
21       A    That probably is when he becomes an
22   official candidate.
23       Q    Okay.
24       A    That means he's done everything necessary
25   to appear on the ballot, so I would think that's --

Page 219

1    I just don't know if he's reached that point yet.
2        Q    Okay.  So we don't know if he's subject
3    to the code right now, but once he gets himself on
4    the ballot, he will be, right?
5        A    Yes.  For example, this statement says "I
6    state my desire to become a candidate."  Well, I'm
7    aware that ballot access is obtained by filing a
8    petition of nomination, and those petitions are
9    accepted by the Secretary of State or the county
10   clerk.  Those appear to be required by the second
11   Tuesday in August.
12       Q    Sure.
13       A    So once he files whatever paperwork is
14   required, if he files it correctly, he will become a
15   candidate.
16       Q    Okay.
17       A    At this point it does not appear that he
18   is a candidate.
19       Q    Or at least not that we've got anything
20   in front of us that indicates that.  I'm not sure
21   how close he is on the signatures.
22            I want to go back to 2014 House Bill 28
23   that was in front of us.  We're done with those
24   exhibits, but I'm still looking at Exhibit 36, and I
25   want to turn to -- when you look at KRS 6.747, I'm

Page 220

1    going to give you the exact section, it's on page 8.
2        A    All right.
3        Q    This was the out-of-state transportation
4    issue that we've been speaking about that now cannot
5    be paid for by legislative agents or their
6    employers, correct?
7        A    That's correct.
8        Q    And you're aware that Senator Schickel
9    and even Mr. Watson, they're not challenging that
10   particular change, right?  Are you aware of that?
11       A    I'll accept your characterization of
12   their complaint.  I don't really recall.
13       Q    When we look at 6.767 that's right below,
14   this deals with the employers of legislative agents
15   or permanent committee contributions during the
16   session, which was a change that's now prohibited,
17   correct?
18       A    Yes, that's in that section.
19       Q    Was there, and again I understand there's
20   other states, I want to talk about other states in a
21   moment, I'm just splitting the question, was there
22   any instance of any abuse, complaint, enforcement
23   action, or scandal in Kentucky that would warrant
24   this particular provision?  And we'll talk about
25   other states in a moment, I'm just focusing in on

Page 221

1    Kentucky.
2        A    There were, and legislators were probably
3    aware of this much more than I was, but I know there
4    were questions on a regular basis about fund-raising
5    during a session, and legislators were frequently
6    asking could they raise money during a session, and,
7    if so, from whom.  So there were questions and there
8    were concerns about raising money in close proximity
9    to voting on bills that might be of interest to the
10   contributors.  So those were the types of problems
11   that we were encountering, was no one, at least in
12   recent memory, no one has been accused of doing
13   anything wrong, but a lot of legislators I think
14   felt like they were in problematic situations.  If
15   they were having a fund-raiser and there were people
16   there, maybe they didn't even know who was there, or
17   until later they didn't know who they had gotten a
18   check from.  But, nonetheless, they could be accused
19   in the media of having accepted a contribution, so
20   they were concerned about it.  They did not want to
21   appear as if they were taking money in exchange for
22   their legislative actions.
23       Q    Okay.
24       A    And again they'd be much more informed
25   about that.

51d14619-9481-44e8-adb5-d49d86433c88

Page 222

1    Q    Sure.  In other states were there
2  examples of legitimate and sort of reported campaign
3  contributions by PACs in particular or employers
4  that, you know, a newspaper article you can point us
5  to that indicated that this particular provision was
6  necessary; are you familiar with any in particular?
7    A    Well, there were pretty regularly
8  articles about contributions during legislative
9  sessions.  And the perception -- for example, here's
10 one from The Washington Post in March of 2014, in
11 Virginia a hundred thousand dollars will get you a
12 sit-down with policy experts governor's new PAC
13 says.  Well, that was the governor, he had a PAC,
14 and he was charging people -- well, he was accepting
15 donations ranging from 10,000 to $100,000, and that
16 would get you a roundtable discussion with the
17 governor and a sit-down every month with policy
18 experts.
19   Q    And that was a donation to the PAC
20 though, right, not from the PAC to a particular
21 campaign?
22   A    That's right.  It was a campaign
23 contribution question raised in the context of
24 policymaking.  As a PAC contribution in the middle
25 of a legislative session from the Jefferson County

Page 223

1  Teachers Association might raise an issue when the
2  legislator two days later is voting on a bill
3  affecting teachers.
4    Q    Are you familiar with that occurring in
5  Kentucky?
6    A    No, not specifically, but I'm sure it has
7  occurred.
8    Q    But you can't point to anything as you
9  sit here today?
10   A    I'm pointing to questions that I got on a
11 regular basis from legislators who were concerned
12 about whether they could take money in campaign
13 contributions while they were in legislative
14 session, and especially from people who had interest
15 in legislation.  That was a concern of many
16 legislators.
17   Q    And how would you answer those questions,
18 Mr. Schaaf, when they came to you prior to the
19 enactment of 2014 House Bill 28?
20   A    Well, I would point them to Commission
21 opinions that had cautioned that legislators use
22 great caution and scrutiny on contributions they
23 receive during a session because you don't want to
24 put yourself in a situation where it even appears as
25 if you've taken a campaign contribution in exchange

Page 224

1  for a legislative action.  So the passage of this
2  statute addressed that by freeing them of that
3  concern.  The PACs now know that if they want to
4  make a contribution to a particular candidate or a
5  legislator, they can do that prior to convening in
6  early January or after adjournment, but if they are
7  a state registered PAC, there is a brief window in
8  which they cannot make a contribution to somebody
9  who's acting on their legislation.
10   Q    Would you agree with me that a more
11 narrow provision would have simply prohibited the
12 donation while legislation that they were interested
13 in was pending?
14   A    Well, that would be very difficult to
15 enforce for one thing because legislation can come
16 on the same day.  You can introduce an amendment, in
17 fact this is done frequently toward the end of a
18 session, an amendment can be introduced in the House
19 that was a complete bill in the Senate that sat over
20 there for months and nobody acted on it.  So then
21 the House introduces the whole bill as an amendment.
22 So if I gave a contribution, all of a sudden I'm in
23 violation under your scenario.
24   Q    Well, that assumes that at the time you
25 gave the donation that you knew that there was

Page 225

1  legislation pending, right?
2    A    Here's another story from California.
3  California State Senator Ron Calderon indicted on
4  corruption charges.  Federal prosecutors announce
5  that a grand jury indicted this legislator on 24
6  criminal charges that allege he took nearly a
7  hundred thousand dollars in bribes in exchange for
8  efforts to influence legislation.
9         Well, if you're going to give somebody a
10 campaign contribution and you intend for it to be a
11 bribe, it's likely that that's going to happen
12 during a legislative session.  So if you put off
13 limits that brief period of time in which they're
14 actually writing and voting on legislation, you've
15 alleviated that concern both from the public
16 standpoint and from the standpoint of the FBI and
17 other law enforcement agencies.
18   Q    The California person that you just
19 mentioned, that was a flat-out bribe, right, that
20 wasn't a reported campaign contribution?
21   A    Well, we don't know.  A hundred thousand
22 dollars in bribes in exchange for efforts to
23 influence legislation.  Might have been straight out
24 bribes, might have been campaign contributions.  The
25 plea agreement says Calderon got a stream of

51d14619-9481-44e8-adb5-d49d86433c88

Page 226

1    financial benefits, free flights on a private plane,
2    outings at exclusive golf resorts, expensive
3    restaurant dinners. So all of that -- summer jobs
4    for his son. All of these things are kind of part
5    and parcel of the culture which you develop or which
6    you allow to develop.
7        Q    But again, back to that particular
8    individual, it sounds like -- I didn't hear the term
9    campaign contribution mentioned.
10       A    Here's another one if you want a campaign
11   contribution. From the New York Times in January of
12   2014, a loophole allows lawmakers to reel in trips
13   and donations. So on the other side of the Rocky
14   Mountains in Utah, Senator Kelly Ayotte of New
15   Hampshire kicked off the new year in an equally
16   upscale resort town of Park City by hitting the ski
17   slopes in the morning with her chief of staff. She
18   then joined a room full of corporate executives and
19   lobbyists at a mountaintop resort for lunch, her
20   face flush from the mountain sun. Well, that's some
21   good writing.
22       But, anyway, the point is members of
23   Congress can have these trips as long as they are
24   campaign fund-raising trips, and they're in session
25   all the time. So they're raising money from

Page 227

1    lobbyists, that's another thing that you can't do in
2    Kentucky, and they're doing it at times that they're
3    considering legislation.
4        And a couple of years ago we had a guest
5    speaker at one of our ethics sessions, Jack
6    Abramoff. You might know Jack Abramoff, convicted
7    lobbyist.
8        Q    Right.
9        A    And he explained an entire -- in fact I'd
10   encourage you to look at the videotape, it's on our
11   website -- an entire regimen of lobbying activities
12   that lobbyists in Washington do for members of
13   Congress, and campaign contributions are a major
14   part of your lobbying activity in Washington. And
15   what we see frequently is things happening in
16   Washington, we don't want them to happen in
17   Kentucky, and that's one of them. And that is one
18   of the reasons for the adoption of the ban on
19   solicitation of, by lobbyists of campaign
20   contributions, because in Washington the lobbyists
21   are fighting each other to bring hundreds of
22   thousands of dollars to members of Congress.
23       Q    Are you referring to the practice of
24   bundling, is that what you're --
25       A    Yeah, bundling.

Page 228

1        Q    My understanding is that's where somebody
2    goes out and gathers a bunch of donations from a
3    bunch of different donors and then delivers them to
4    the person in question, right?
5        A    That's correct, or a lobbyist does that.
6        Q    Well, it may not be a lobbyist.
7        A    It could be anybody.
8        Q    I'm aware of some politically active
9    people that go out and do that.
10       A    Sure. In Washington they present several
11   examples of things that we don't want to develop in
12   Kentucky, and so we look to them for enlightenment
13   in that regard.
14       Q    And to be clear, Mr. Schaaf, there's
15   nothing that keeps the political activist from going
16   out and doing that today, the bundling and the
17   influence, right?
18       A    If they're not lobbyists.
19       Q    If they're not lobbyists, right.
20   Correct?
21       A    Correct.
22       Q    I want to look at -- just looking at
23   6.811, that's the next change on page 9. It looks
24   like now we're adding a candidate to the prohibition
25   of things of value, right?

Page 229

1        A    Yes.
2        Q    So that was a change. The other change
3    in subsection 5, there was a prohibition previously
4    on being a campaign treasurer. Today you can't
5    solicit, control, or deliver a campaign
6    contribution, correct, that was a change?
7        A    That's correct.
8        Q    And that includes asking other people to
9    deliver campaign contributions or running a
10   contribution over from one person to another; we
11   talked about bundling, but it doesn't necessarily
12   have to be bundling, right, it's any ask, correct?
13       A    That sounds correct. I'm not following
14   exactly, but I think that sounds correct.
15       Q    Well, you don't necessarily need to
16   bundle to go and call up your friend and ask him to
17   donate to --
18       A    Right, right, it's not bundling
19   necessarily, although that's the example that
20   Washington presents most clearly to us is the
21   lobbyist collecting large amounts of campaign
22   contributions.
23       Q    Is there anything that keeps a lobbyist
24   from going out and raising money for a PAC?
25       A    No.

51d14619-9481-44e8-adb5-d49d86433c88

Page 230

1    Q    And there's nothing that keeps that PAC
2  from then engaging independent expenditures to help
3  out the legislature; are you familiar with the term
4  independent expenditure?
5    A    I've heard it, but I don't begin to
6  understand campaign finance statutes, so I don't
7  know which entities can spend what kind of money.
8    Q    An independent expenditure is where the
9  PAC goes out and spends money independent of any
10  candidate, they decide what they're going to spend
11  money on.  It can be for or against the candidate,
12  but it's independent, it's not coordinated with the
13  campaign, okay?  Are you with me on the definition?
14    A    Yes.
15    Q    So the lobbyist, let's use Mr. Wilson as
16  an example, he wants to see Senator Schickel, his
17  friend, reelected.  He can go out and raise a
18  hundred thousand dollars for a PAC from a bunch of
19  different donors.  There's nothing illegal about
20  that, right?
21    A    Yes, he can raise money for a PAC.
22    Q    That PAC can then spend that hundred
23  thousand dollars to ensure Senator Schickel is
24  reelected; are you with me?
25    A    The PAC can give money to Senator

Page 231

1  Schickel.
2    Q    I'm not talking about the direct
3  contribution, they can do that too; I'm talking
4  about they can go out and engage independent
5  expenditures and spend money on mailers to support
6  Senator Schickel.
7    A    I'll take your word for it, I don't know.
8    Q    And I guess my question to you is there's
9  nothing that keeps Mr. Wilson from saying after the
10  fact, hey, Senator Schickel, I went out and raised a
11  hundred thousand dollars for this PAC that helped
12  get you reelected, right?
13    A    Yeah, because when he was raising money
14  for the PAC, ostensibly he had no control over how
15  the PAC was going to spend their money.
16    Q    Let's say he did, let's say he was
17  behind -- let's say he was helping to control the
18  PAC.  Is that a problem?
19    A    Well, a lobbyist is really supposed to
20  have a certain distance from the decision-making.
21  The Commission has interpreted the statute that says
22  a lobbyist can't give a contribution to a legislator
23  or a legislative candidate as including giving a PAC
24  contribution to a legislator or candidate or giving
25  a contribution from somebody else.  I can't, as a

Page 232

1  lobbyist, I can't carry somebody else's contribution
2  to a legislator.
3    Q    Directly, right, but you could certainly
4  give it to the PAC to make independent expenditures?
5    A    Yes, yes.
6    Q    And I guess I'm looking at this and I'm a
7  little bit confused, the employers can do the same
8  thing, right, of the lobbyists, they can give to
9  these PACs during the session and the PACs can then
10  engage in independent expenditures, right?
11    A    If you say so.  I don't know what PACs
12  can engage in.  I know they can give direct
13  contributions to candidates and legislators but not
14  during a session.  I don't know what else they're
15  allowed to spend their money on.
16    Q    And the public knows, would know, for
17  instance, that the employer or the lobbyist gave
18  directly to the legislator, right, because that
19  would be reported on the KREF if it's over a hundred
20  dollars; are you with me?
21    A    The employer, yes, I guess if they
22  give -- but I don't know if they're even allowed to
23  give corporate contributions.
24    Q    They are today perhaps.  We can have a
25  discussion about that, that's another case, we

Page 233

1  didn't bring that case.
2    A    To the extent that they employ lobbyists,
3  they can't give a direct contribution to a
4  legislator or a candidate during a session, but
5  after the session, they can give those contributions
6  or they can give them to anybody else as far as I
7  know.
8    Q    And even the lobbyist can help out with
9  independent expenditure, right, as long as it's not
10  a direct donation to a candidate?
11    A    I don't know about that.
12    Q    There's nothing that keeps Mark Wilson
13  from going out and putting an ad in the paper, you
14  know, support Senator Schickel, is there?
15    A    I don't know.  I don't know.  Isn't that
16  considered an in-kind contribution of some kind,
17  wouldn't that be reportable?
18    Q    Not if it's an independent expenditure.
19  Not if it's not coordinated at all --
20    A    If it's an independent expenditure --
21  well, I don't know, I just don't know enough about
22  that to say he could do that or not.  I don't know.
23    Q    Which do you think has more -- let's
24  assume he can do it.  Which do you think has more
25  influence on the senator, going out and spending

51d14619-9481-44e8-adb5-d49d86433c88

Page 234

1  $10,000 to get him reelected with a newspaper ad or
2  a $500 donation to the senator?
3      A    It depends on the senator I guess.
4      Q    Sure.  Which do you think has more of an
5  impact on public perception, the reported
6  transparent donation or the independent expenditure
7  that may or may not be transparent?
8      A    I don't know.  Is it transparent or is it
9  not?
10     Q    It is unless it's a dark money super PAC,
11  and that's another discussion for another day.
12     A    You're already way ahead of where I am.
13  I don't understand that.
14     Q    All right.  The other thing that we did
15  that was a change was there was the removal, and
16  again I'm looking at 6.811, there was the hundred
17  dollar exemption, that's now been removed, right?
18  I'm looking at paragraph 7, if you look on page 9,
19  6.811, subsection 7.
20     A    Yes.
21     Q    And again, I know we've talked about this
22  a lot today, but there's not been any change in
23  terms of the group events, that's still perfectly
24  okay, right?
25     A    As long as they comply with the law, the

Page 235

1  reporting requirements.
2      Q    I'm looking at 6.821, and I know that
3  starts at the very, very bottom of page 9 and goes
4  to page 10.  There was a, previously there was a
5  requirement, and I'm looking at food or drink
6  consumed on the premises, that's now been deleted.
7  And we allow cost of admittance, lodging, and other
8  expenses relating to group events, but in terms of
9  individual events, food or drink consumed on the
10  premises is removed, right, as an exemption?
11     A    Yes, in terms of lobbyists or employers
12  paying for it, they can no longer do that.
13     Q    Okay.  I think that that is it with this
14  exhibit and I don't think we're going back to it.
15  Give me just a minute.  We can take a quick two
16  minutes while I mark the next set.  I'm getting
17  close.  Let's just take a couple minute break.
18              (Brief recess.)
19              (Exhibits 39 through 42 were
20              marked for identification.)
21  BY MR. WIEST:
22     Q    Sir, I've marked Exhibit 39, this is
23  KRS 6.731.  This is a statute that has been on the
24  books since 1993, correct?
25     A    Correct.

Page 236

1      Q    No changes?
2      A    Well, actually, it appears that some of
3  it was on the books in 1976, amended in 1988, then
4  taken in and made part of the Code of Legislative
5  Ethics, but which parts of it were in effect prior
6  to '93, I couldn't tell you.
7      Q    Well, my point is this version of it has
8  been in force since 1993?
9      A    Yes.
10     Q    And it talks about general standards of
11  conduct for legislators, right?
12     A    Yes.
13     Q    And it basically is a prohibition on
14  using his official position or office to obtain
15  financial gain for himself or his family or business
16  associate, right?
17     A    Correct.
18     Q    And there's some other provisions in it
19  as well, but that was the big, I think the big
20  sections.  Also using his official position to
21  secure or create privileges, exemptions, advantages,
22  or treatment for himself or others in direct
23  contravention of the public interest at large,
24  right, that's another provision?
25     A    Correct.

Page 237

1      Q    And these are pretty serious provisions
2  of the Legislative Ethics Code; you'd agree with me
3  on that, right?
4      A    Absolutely.
5      Q    I want to look at KRS 6.767.  This was a
6  change with the House Bill we just looked at.  Let
7  me ask, the legislator, he is not allowed -- I'm
8  sorry, the lobbyist is not allowed to make a
9  contribution during the session to -- scratch that.
10  I'm going to reask that question.
11          A member of the General Assembly or
12  candidate or his or her campaign committee is not
13  permitted to accept a contribution from an employer
14  of a lobbyist or a permanent committee during a
15  regular session of a General Assembly, right?
16     A    That's correct.
17     Q    And, again, there's an exemption for
18  special elections, right?
19     A    Yes.
20     Q    And there's also, I'm going to call it
21  the unknowing contribution exception that basically
22  if somebody doesn't know what they're getting from
23  somebody, if it's not identified, they figure it
24  out, they can fix it after the fact, and that's a
25  defense, right?

51d14619-9481-44e8-adb5-d49d86433c88

Page 238

1    A    That's correct.
2    Q    That's 40. Exhibit 41, the statement of
3  financial interest, there are statements of
4  financial interest and disclosure that are required
5  under the Legislative Ethics Code, correct?
6    A    That's correct.
7    Q    And this has been, this is a provision
8  that's been on the books since the 1993 changes,
9  correct?
10   A    That's correct.
11   Q    And in terms of what they disclose, that
12 is also contained on the very next page of this
13 exhibit, which is KRS 6.8, I'm sorry, 6.787; do you
14 see that?
15   A    Yes.
16   Q    And it talks about the things that need
17 to be disclosed, sources of income, property
18 interests, and relationships with certain
19 legislative agents in terms of the private employer
20 or their immediate family, right, that's all got to
21 be disclosed?
22   A    Right.
23   Q    When we turn to the next page, 6.791,
24 that indicates that these statements are public
25 record, right?

Page 239

1    A    That's correct.
2    Q    Anybody can get a copy of them?
3    A    Yes.
4    Q    In fact, you guys make them available on
5  your website, right?
6    A    We do.
7    Q    Or at least the last couple of years
8  worth of statements?
9    A    No. We maintain the statements for three
10 years, but we only keep the current statements on
11 the website.
12   Q    Right. And there's a requirement, the
13 last one is 6.793, there's a requirement in terms of
14 when people have to file these, right?
15   A    Right.
16   Q    I want you to turn to the next exhibit,
17 this is Exhibit 42. I guess I could have picked
18 Senator Stivers too, but this is Speaker Stumbo's
19 statement, correct?
20   A    Yes.
21   Q    And what we know from looking at this is
22 we know that he's, for instance, a director of the
23 First Guaranty Bank in Martin, Kentucky, right?
24   A    Yes.
25   Q    And he's the president of Braveheart

Page 240

1  Investments, correct?
2    A    Yes.
3    Q    And he's an attorney in private practice
4  in Prestonsburg and Lexington?
5    A    Yes.
6    Q    We don't know how much he's received from
7  these different interests, do we?
8    A    No.
9    Q    And we don't know anything about
10 Braveheart Investments or who's part of it or
11 anything like that, right?
12   A    No.
13   Q    He lists some real estate as well. There
14 is, when you look at, it looks like the second page,
15 there's a listing of some real estate, and, again,
16 we don't know the value of the real estate, who any
17 co-owners are, or anything like that, right?
18   A    Well, it's not reported on this form, but
19 the fact that it's reported gives the public the
20 opportunity to go find out. For example, what about
21 this address 2545 Pascoli Place in Lexington. Well,
22 I can look on the PVA website for Fayette County and
23 see that that is worth X number of dollars, and he
24 actually owns that in conjunction with three other
25 people. So this makes, seen with the information on

Page 241

1  the first page, it makes some basic information
2  available, and then if there's any question
3  regarding his assets, his income, his sources of
4  income, then people have someplace to start and they
5  can go from there.
6    Q    Okay. I want to look at the gifts of
7  money or property with a retail value of more than
8  $200. Do you see that?
9    A    Yes.
10   Q    Now, there's no disclosure requirement
11 for food, drink, or entertainment regardless of the
12 value, correct, on this form?
13   A    Well, if the food, beverages, or
14 entertainment was given in the form of a gift, let's
15 say a trip or the gift of a condo for two weeks in
16 Cancun that comes from somebody, well, that would
17 seem to me to be a gift that probably should be
18 reported. But, no, there's no requirement to report
19 food and beverages that you consume on a daily
20 basis.
21   Q    Sure. So if you get an expensive dinner
22 with somebody, there's no need to disclose that,
23 right?
24   A    Probably not, although, you know, some
25 might. If it's worth more than $200, it's possible

61 (Pages 238 to 241)

51d14619-9481-44e8-adb5-d49d86433c88

Page 242

1   that it should be reported, yeah.
2       Q   Why not disclose, you know, require the
3   disclosure of all of those things?
4       A   Well, the legislature has determined that
5   it's not necessary to report all of those things,
6   but if something is worth more than $200, it should
7   be reported.  They've established that as a, as what
8   they consider to be reasonable limit.
9       Q   And what about a series of $150 gifts,
10  that doesn't need to be disclosed, right?
11      A   Well, if it came from the same source and
12  it added up to more than $200, yeah, that's a
13  possibility that it should be.  If it was a box at
14  Churchill Downs, three Saturdays in a row, you know,
15  even if -- or a seat that may not be worth $200
16  once, but I give it to you for the whole run of the
17  racing meet, well, it's worth more than $200.  Maybe
18  that needs to be disclosed.
19      Q   Does it or doesn't it need to be
20  disclosed?
21      A   Well, it kind of depends on, you know, if
22  it comes from the same source and it adds up to more
23  than $200, the recipient would pose that question.
24      Q   How would you answer it?
25      A   Well, I would ask those kind of

Page 243

1   questions, did it come from the same source at the
2   same time, is it the same gift essentially, just add
3   it up, you know, sequentially.
4       Q   What if it's not the same source at the
5   same time, what if it's the same source over a
6   period of time?
7       A   Again, it would depend on the facts to
8   determine whether this was a gift with a retail
9   value of more than $200.  If it's various sources
10  and the gift is only 150, then it's probably not
11  reportable.  If it's the same person and it adds up
12  to $400, sure.
13              (Exhibit 43 was marked for
14              identification.)
15      Q   Maybe it is over a period of time, okay.
16  The next exhibit, sir, that I marked is Exhibit 43.
17  This is your, your being the Legislative Ethics
18  Commission defendants' responses to our discovery.
19  The first page I want you to go to, and I understand
20  I have a little stapling issue here, it's supposed
21  to be all one exhibit.  Our paralegal kind of messed
22  that up.  But on page 24, is this your signature on
23  page 24?
24      A   Yes, it is.
25      Q   And I want to look at request for

Page 244

1   admission number 1.  We've talked today -- are you
2   aware of whether or not the Registry Election
3   Finance requires campaign donations over a hundred
4   dollars to be reported and publicly disclosed?
5       A   That's my general understanding, but I
6   don't know their law.
7       Q   Have you ever searched the KREF database?
8       A   Yes.
9       Q   And you're aware that it is searchable,
10  the public can go on it and search and see who's
11  made what donations?
12      A   Yes.
13      Q   We talked before about request for
14  admission number 8.
15      A   What page is that?
16      Q   I'm sorry, that's on page 6.  And I'm
17  jumping around, I'm not going to hit all this.  I've
18  beat enough on Mr. Wilson today, so I'm going to
19  take one of my other favorite lobbyists, Patrick
20  Crawley.  Are you familiar with Mr. Crawley?
21      A   I know Patrick, yes.
22      Q   Mr. Crawley asks his wife, says to her,
23  hey, Mrs. Crawley, I want you to donate $300 to
24  Dennis Keene and his campaign.  Is that prohibited
25  under the code?

Page 245

1       A   It's possible.  It depends.  A lot of
2   things would depend on the context of the situation.
3   Again, you know, without knowing what kind of
4   language was used and that kind of thing, and it's
5   so hypothetical, and every one of these things, I
6   can't emphasize enough, every question I get is a
7   shade different than the last one, even if it's on
8   the same subject.  And certainly if someone were to
9   file a complaint and say that Patrick Crawley
10  solicited a campaign contribution for Senator
11  Schickel from his wife, we would have to look at the
12  whole context.  Interviews would be conducted by our
13  enforcement counsel.  And I don't know to tell you
14  the truth.  The Commission would have to make a
15  determination how that statute should be enforced in
16  that situation.
17      Q   Okay.  And I'm asking, I guess, you as
18  the representative of the Commission here today, if
19  the facts turn out that Mr. Crawley is sitting at
20  dinner with Mrs. Crawley, says, jeez, Representative
21  Keene is running for reelection, he's got a race
22  this year, he's been pretty good to me down in
23  Frankfort, can you write him a check for 300 bucks
24  for his reelection campaign, is that a violation of
25  the code?

62 (Pages 242 to 245)

Page 246

1    A    It might be, but I'm not able to say.
2    Q    Can you say whether or not it probably is
3  or probably is not?
4    A    No.
5    Q    What does that depend on, what other
6  facts do you need to make that determination?
7    A    Well, I think again interviews would have
8  to be conducted to find out exactly what the context
9  was.
10   Q    The context was dinner conversation just
11 like I laid out.
12   A    Well, but how did she feel about it, how
13 did he intend it, was it a solicitation or was it
14 just a husband and wife talking.  Is either one of
15 them going to testify what the other one said.  We
16 don't know.  That could get so complicated that it
17 would be difficult to reach a resolution.  But, you
18 know, all of these things depend on very specific
19 facts and then the Commission's determination on how
20 to go forward on those facts.
21   Q    Okay.  And you're saying you don't know
22 sitting here today on that scenario?
23   A    No.
24   Q    How about Crawley asking his brother,
25 says to his brother, hey, can you donate to Dennis

Page 247

1  Keene for me?
2    A    Let me say Crawley asking you or anybody
3  else, it just depends on the facts of the situation.
4  And I'm really reluctant to answer a hypothetical
5  whether someone would be in violation of the law
6  just based on a scenario described generally like
7  that.  I don't know.
8    Q    Okay.  We talked about the statewide
9  office issue, so I'm going to skip request for
10 admission number 9 because you agree with me that
11 the legislators running for Governor, lobbyists
12 can't make a donation to the campaign, right?
13   A    That is correct, as long as they remain a
14 member of the General Assembly while they're
15 running, because they're still a legislator, even
16 though they're seeking another office.
17   Q    I asked a question in number 10, I said
18 please admit that KLEC enforces the provisions of
19 generally the Legislative Ethics Code, and I list
20 some statutes.  You say that we admit that we have
21 the authority to enforce.  The fact of the matter is
22 you actually enforce these statutes, correct?
23   A    Well, I think the point there was there's
24 nothing to enforce in a definition section.  Those
25 are just definitions.  We do enforce the Code of

Page 248

1  Legislative Ethics, of which the definitions are a
2  part.
3    Q    Sure.  We talked about accepting
4  complaints from the public, the Legislative Ethics
5  Commission does accept complaints from the public,
6  right?
7    A    Yes.
8    Q    Request for admission number 15, we asked
9  about scandals and corruption that led to the
10 passage of 2014 Kentucky House Bill 28.  Are you
11 aware of anything specific in that request that led
12 to that particular passage?  And I realize you may
13 be missing a page.
14   A    Am I aware of anything specific?
15   Q    That led to the passage of 2014 Kentucky
16 House Bill 28, was there any particular scandal that
17 led to that passage that you're aware of?
18   A    Well, there were three situations in
19 front of the General Assembly when they convened in
20 January of 2014.
21   Q    Okay.
22   A    Involving members of the House of
23 Representatives.  And they were front and center in
24 terms of being in the media and being in the
25 legislative arena.

Page 249

1    Q    What were those?
2    A    One was the ongoing problems of
3  Representative Keith Hall, who had a series of
4  situations involving the Ethics Commission with
5  failure to file complete financial disclosure
6  reports, a conflict of interest situation that
7  resulted in him essentially pleading to the
8  violation and taking a fine of $2,000, and then
9  culminating shortly before the January 14 session
10 convened I think with allegations that he had paid
11 bribes to a state mine inspector to not report
12 violations on some of the coal mines that
13 Representative Hall operated.
14   Q    What was the second one?
15   A    The second situation, in no particular
16 order, I don't know what might have occurred first,
17 but these were all pending when the 2014 session
18 convened.  The second situation was the situation
19 involving State Representative Ben Waide of
20 Madisonville and the accusation by some of his
21 corporate partners that he had essentially stolen
22 money from his corporation to fund his campaign for
23 state representative.  And so they had filed a
24 lawsuit and they had filed a complaint with the
25 Registry of Election Finance, and he was later

51d14619-9481-44e8-adb5-d49d86433c88

Page 250

1  prosecuted by the Attorney General and convicted of
2  campaign finance violations.  But that was in
3  January, in fact the very day that the 2014 session
4  convened, this story came out about this lawsuit
5  that was filed against him accusing him of misusing
6  his company's finances for financing his campaign
7  and for personal use.
8      Q   Sir, my understanding, and I'm just going
9  to walk you back over both of those just real quick,
10 Representative Hall, my understanding was the first
11 run-in that he had was a failure to disclose his
12 wife's state income and job back in 2009.  Do you
13 remember that?
14     A   It's hard for me -- I do remember that, I
15 don't remember if that was the first problem he had.
16     Q   That was a problem he had at least?
17     A   He had a problem at that point with that.
18 And then this, in mid-2013 the Herald-Leader
19 reported that he complained to the Energy and
20 Environment Cabinet that a certain inspector was
21 soliciting money.
22     Q   I want to back you up because I want to
23 hit all these real quick.  I'd like to do it in
24 order.  So that was '9.  I think it was October 12,
25 2011 was the thousand dollar fine and the reprimand

Page 251

1  where there was a conflict of interest issue where
2  he had one of --
3      A   $2,000 fine and a public reprimand.
4      Q   And he voted on a bill in which one of
5  his companies profited $171,000?
6      A   That's basically right.  I don't remember
7  the amount but, yeah, $171,000.
8      Q   And you all did not have the ability to
9  sort of unwind that transaction, that profit, right,
10 you being the Ethics Commission, you couldn't make
11 him give up those profits, correct?
12     A   No, no.
13     Q   And then we get into the mine safety
14 issue in '13, right, with Representative Hall?
15     A   Right.
16     Q   And my understanding is that was with a
17 gentleman by the name of Shortridge --
18     A   That's right.
19     Q   -- who was with the Environmental and
20 Energy Cabinet.  At least initially the Legislative
21 Ethics Commission did not charge Representative Hall
22 with any violations on that particular issue, right?
23     A   No.
24     Q   Instead, the feds came in and indicted
25 him on October 23, 2014, right?

Page 252

1      A   That's correct.
2      Q   And my understanding is that he had
3  already lost his race by that point in time; didn't
4  he lose a primary?
5      A   He lost in May of 2014 I believe.
6      Q   Right.  And so then he gets indicted and
7  ultimately he gets convicted in federal court?
8      A   That's right.
9      Q   Representative Walde -- if I get this
10 wrong, correct me.
11     A   Waide, W-A-I-D-E, Ben Waide of
12 Madisonville.
13     Q   He took about 200 -- he's alleged to
14 have, although I guess he actually did because he
15 pled guilty -- $200,000 in funds from his private
16 company and dumped it into his campaign, right, at
17 least that's the allegation?
18     A   I think that's right.
19     Q   And then he's charged criminally by the
20 Kentucky Attorney General's Office, correct?
21     A   That's correct.
22     Q   And he pleads guilty, at least that's my
23 understanding, correct?
24     A   I think that's correct.  Yeah, eventually
25 he did, yes.

Page 253

1      Q   All right.  So what was the third issue?
2      A   The third issue was the three complaints
3  that were filed by legislative staff people against
4  Representative John Arnold.  That was in the fall of
5  2013, just a couple of months before the session
6  convened.  And that was certainly an issue in the
7  General Assembly.  The Ethics Commission found that
8  the ethics law applied in that situation, and so
9  they proceeded -- the matter first came to light by
10 the three staff people filing their complaints with
11 the Ethics Commission, and shortly thereafter
12 Representative Arnold resigned and the Commission
13 proceeded with its investigation.  Eventually -- and
14 that was throughout the 2014 session, and eventually
15 we conducted a public hearing and he was found in
16 violation of the law.
17     Q   My understanding is the allegations with
18 Representative Arnold were for sexual assault and
19 harassment.  Is that your understanding?
20     A   For sexual assault and --
21     Q   Harassment were the nature of the
22 allegations.
23     A   Well, yeah, there were some factual
24 allegations in there like that.  I mean, the
25 allegation of the Ethics Commission was that he had

51d14619-9481-44e8-adb5-d49d86433c88

Page 254

1    violated one of the standards of conduct in the
2    Ethics Code by his actions toward the staff people,
3    yeah, and I think two of them did involve unwelcome
4    touching.
5        Q    So those were the three.  Anything else
6    other than those three?
7        A    Well, those three are --
8        Q    I don't mean to minimize them.
9        A    No, no.  Yeah, what I'm saying is if
10   you're a legislator and you're not involved in any
11   of that stuff, you're still hearing about that, and
12   it is part of the ethical culture of the General
13   Assembly.  And so that is what was going on at the
14   time that was most prevalent I think.
15       Q    Okay.  Going back to the discovery, and
16   I'm looking at request for admission number, I
17   believe it is 19 on page 10.  I guess this talks
18   about the cup of coffee in the cafeteria.  You say
19   it depends on who's paying for what, it depends who
20   attends, and I suppose that gets into the group
21   events that we talked about earlier that become
22   factors, right?
23       A    Well, there could be a situation where
24   Senator Schickel is sitting with his neighbor from
25   Union and a lobbyist walks up and says can I have a

Page 255

1    cup of coffee with you, and the neighbor says, I'll
2    go get the coffee.  So somebody else pays for it but
3    you're still sitting there, legislator and a
4    lobbyist are enjoying a cup of coffee, but the
5    lobbyist didn't pay for it.
6        Q    Which is okay, right?
7        A    That's right.
8        Q    Has KLEC commissioned or done any public
9    opinion polling to determine what the public views
10   as appropriate or the appearance of corruption?
11       A    No.
12       Q    You do agree that that's a good way to
13   figure out what the public thinks, right?
14       A    You know, it could be a way, it could be
15   a good way.  A good poll can give you some insights.
16       Q    Okay.  I'm looking at request for
17   admission number 29.  We talk about the receipt or
18   giving anything of value and de minimis items like
19   food and drink and prohibit what was otherwise
20   customary and usual interactions between folks.  Do
21   you agree that when you prohibit, for instance, a
22   cup of coffee or a bottle of water, that you can
23   inhibit interactions between folks?
24       A    No.  No, I don't agree with that.  And
25   the use of the term what was otherwise customary and

Page 256

1    usual, I'll tell you that before BOPTROT, it was
2    customary and usual for lobbyists to leave their
3    credit cards at Frankfort restaurants, that was
4    customary, nobody thought anything of it.  But it
5    led to a whole culture that lacked the type of
6    ethics and behavior that the public expects out of
7    their legislators relating to lobbyists and special
8    interest pleaders.  So what's customary can be
9    enshrined in law, and if the General Assembly thinks
10   that the custom ought to change, the General
11   Assembly can make that determination.
12       Q    As a general matter, let's put the law
13   aside, if somebody is buying a cup of coffee for
14   somebody else, it wouldn't be typical to split that,
15   right, somebody is probably going to go up to that
16   Starbucks counter and drop $5 if they're having
17   coffee with somebody for two coffees?
18       A    I'll tell you since the adoption of this
19   Code of Ethics in 1993, lobbying has not been
20   inhibited, and as far as I know, neither has the
21   relationship between legislators and lobbyists.
22   Lobbying, if anything, has skyrocketed.  There's
23   close to $20 million a year spent on lobbying.  So
24   the lobbyists are certainly not inhibited in their
25   ability to approach legislators and have frank

Page 257

1    conversations with them one-on-one or in groups.  I
2    think the public has determined through their
3    comments to legislators that the taxpayer funded per
4    diem that legislators receive is sufficient for them
5    to pay for their own coffee or at least not to
6    receive it from people who have special favors to
7    ask of them.  So the line has been drawn, and what's
8    customary now is that the legislators pay for their
9    own or at least they don't accept it from people who
10   have lobbying interests.
11       Q    And there's nothing that keeps the
12   constituent from sitting down with the legislator
13   and saying, here, let me get you a cup of coffee, I
14   want to have a conversation about this bill, right?
15       A    Nothing, as long as that constituent is
16   not a lobbyist.
17       Q    As long as they're not being paid
18   essentially to advance that?
19       A    Right.
20       Q    I'm going to introduce a couple more
21   exhibits.  We're on, let's see, Number 43.
22            (Exhibits 43 and 44 were
23             marked for identification.)
24       Q    I'm going to hand you what I'm marking as
25   43 and 44.  Sir, do you recognize 43 and 44?

51d14619-9481-44e8-adb5-d49d86433c88

Page 258

1    A    Yes.
2    Q    What are they?
3    A    Those are the minutes of two different
4  meetings of the Interim Joint Committee on State
5  Government.
6    Q    And is that the committee that's got
7  jurisdiction over the Kentucky Legislative Ethics
8  Code?
9    A    Generally, bills related to ethics are
10  referred to the State Government Committee, yes.
11    Q    Okay.  And in 2011 I believe Judge
12  Wilhoit testified, correct?
13    A    That's correct.
14    Q    And my understanding is, among other
15  things, he indicated that Kentucky has one of the
16  best ethics laws in the country, correct?
17    A    Yes.
18    Q    Do you agree with that?
19    A    I agree with that now, as I did then.
20    Q    Okay.  That it was a model for the House
21  Office of Congressional Ethics?
22    A    That is correct.
23    Q    And when we look at the hundred dollars,
24  the no cup of coffee rule, the exemption, Judge
25  Wilhoit's explanation is I think two or three-fold.

Page 259

1  He says first that in 17 years employers of
2  lobbyists have spent $5,327 for food and beverages
3  for individual legislators, right?
4    A    That's correct.
5    Q    And he also says the total spent by
6  lobbyists in 17 years is $1,518, correct?
7    A    That's correct.
8    Q    Is he saying that to point out that it's
9  not that much money?
10    A    Partly.  And he's saying it to show that
11  there's been good compliance with the law, that the
12  reporting has been complete, and that they had taken
13  great strides toward eliminating the kind of
14  activity that had contributed to BOPTROT.  Now, what
15  we didn't say was that the law couldn't be better,
16  and that's why we were making the recommendation.
17  The law is good.  The law is great today, especially
18  compared to other states.  But it can always be
19  better.
20    Q    Okay.  I want to look at the next
21  sentence.  He says, "This provision has caused
22  administrative problems because employer/lobbyists
23  often fail to provide legislators with the required
24  ten-day notice of spending."  That seems to be the
25  root of this issue; would you agree with that?

Page 260

1    A    I wouldn't say it was the root.  I'd say
2  it was a factor in the fact that legislators were
3  sometimes reported on these reports that then, of
4  course, become public and when they had not even
5  been at the event or they had been at the event or
6  hadn't eaten anything, no money had been spent on
7  them really, but they had just been reported because
8  they were there.  And so there were problems in that
9  sense with the administration of it.
10    Q    Okay.
11    A    Nobody wants to be reported as doing
12  something they didn't do.
13    Q    And that leads to his next sentence,
14  "Poor public perception is an issue to consider,"
15  right?
16    A    Well, and that also goes to the fact that
17  lobbyists are able to give legislators anything,
18  that there's a poor public perception if you are
19  able to give them food and beverages in these
20  conditions, the very conditions that were at issue
21  in BOPTROT, and yet you can continue to do it as
22  long as no lobbyist spends over a hundred dollars.
23  So if you just make sure that you have a round robin
24  of lobbyists, you can have a series of events.
25    Q    Or you could do a group event today,

Page 261

1  right, and continue --
2    A    You could do a group event to which you
3  invite more than two.  I'm talking about one-on-one.
4  Yeah, there were various factors that led the
5  Commission to recommend that they just do what they
6  almost did in 1993, which is adopt a no cup of
7  coffee law.
8    Q    Okay.  I want to look at recommendation
9  number 6, and there's a discussion, and it looks
10  like you have, about prohibiting lobbyists from
11  directly soliciting contributions for an election
12  campaign of a legislator or legislative candidate,
13  and there's a concern by Representative Wayne that
14  this recommendation doesn't apply to caucus PACs,
15  which are actually caucus campaign committees that
16  are created separately, and he notes and he's got a
17  concern that funding and influence of these groups
18  is growing.  Do you agree with that?
19    A    Now, are we talking about PACs or are we
20  talking about caucus campaign committees?
21    Q    I think he's talking about caucus
22  campaign committees, Representative Wayne, and you
23  indicate that it's worth looking into.  Do you see
24  that?
25    A    Yes.  But in answer to your question, I

51d14619-9481-44e8-adb5-d49d86433c88

Page 262

1    really don't know if caucus campaign committees have
2    more influence than they had when they were first
3    created or not.  What I do know is the Commission
4    took notice of the fact that a caucus campaign
5    committee consists solely of legislators, and in an
6    opinion in 2005 they told lobbyists that they were
7    not allowed to make campaign contributions to caucus
8    campaign committees because that's just a group of
9    legislators.
10       Q    All right.  So I think that covers '11.
11   I want to look at the 2012 minutes, the October 24,
12   2012, whenever you're ready.  That's the next
13   exhibit.  Sir, what I'm most interested, and I
14   believe again it was Judge Wilhoit and yourself that
15   were the testifying folks at this, correct?
16       A    That's correct.
17       Q    And I want to look at the hundred dollar
18   annual limit in recommendation number 1; do you see
19   that?
20       A    Yes.
21       Q    Judge Wilhoit said the amount that
22   lobbyists and their employers spent on food and
23   beverages for individual legislators does not appear
24   to be an ethical problem, correct?
25       A    That's correct.  It might be an

Page 263

1    administrative problem, it might be a public
2    perception problem, but so far it had not developed
3    into an ethics problem in the sense that any
4    lobbyist or employer had spent more than a hundred
5    dollars or any legislator had, you know, gone out
6    and dined with a series of lobbyists in order to
7    exceed the hundred dollars.  Now, it wasn't a
8    problem for us except in terms of, you know, the
9    legislators calling us with concerns about being
10   listed when they had not attended an event or had
11   not had anything to eat or drink.
12       Q    And when you say it hasn't been an
13   ethical problem, it also wasn't a problem in terms
14   of anybody being bought or any bribery going on with
15   that hundred dollar limit; is that fair?
16       A    Well, again, it was part of the culture
17   in which here was a loophole essentially in the
18   legislative ethics law.  A loophole which the law in
19   any other important aspect, whether it was campaign
20   contributions or gifts or trips, the law puts strict
21   limits on what a lobbyist could give a legislator,
22   but here was an opportunity for each lobbyist, each
23   of the 650 lobbyists to buy up to a hundred dollars
24   in meals and beverages for a legislator.  So I would
25   call that a loophole.  So what they did here was

Page 264

1    they said, look, this is not happening a great deal
2    anyway, let's just alleviate the administrative
3    problems that we're having, the incorrect reports
4    that include legislators who didn't even attend
5    events or didn't eat or drink at the events but
6    they're getting their name publicized, let's
7    eliminate that, let's create a bright line here that
8    says legislators won't take anything from lobbyists.
9        Q    And just to be clear, and I suppose it's
10   probably partially because it was publicly reported,
11   at least as of a couple of years, by 2012 it looked
12   to be only about $6900 total spent on individuals?
13       A    I don't know that number.  But if you're
14   reading that off of something, I'll take your word
15   for it.
16       Q    I'm doing rough math from what Judge
17   Wilhoit's testimony was.
18       A    Oh, okay.
19       Q    5327 plus 1518 between lobbyists and
20   their employers.  Like I said about $6900 roughly,
21   maybe a little less.
22       A    Well, that's in the paragraph where he
23   says, "As a matter of public perception, lobbyists
24   and their employers should be prohibited from paying
25   for out-of-state travel, food, or lodging"?

Page 265

1        Q    No, I'm sorry, I was back to 2012 just
2    briefly, but looking again -- or '11 just briefly,
3    but looking at this 2012 minutes, he indicates that
4    last year the total spent was only $300 and in some
5    years it's less than a hundred, right?
6        A    Right, that's correct.
7        Q    And, again, he is focused in on the fact
8    that it's become an administrative problem, correct?
9        A    That's one of his focuses.
10       Q    Okay.
11       A    Or foci in the Latin.
12       Q    And what administrative problems were
13   there for the Commission?  I understand this issue
14   for the legislators of being incorrectly included on
15   the reports or not wanting to be included on
16   reports, but for the Commission, what was the
17   concern with that?
18       A    Well, if we're receiving incorrect
19   reports, that's a problem.  If lobbyists and their
20   employers are filing reports that don't have a
21   legislator on there, and then they tell us later,
22   well, we didn't invite a group, we only invited
23   Senator Schickel and Representative Keene, and then
24   we have to say, well, that's not the Northern
25   Kentucky caucus, for example, that's just Senator

67 (Pages 262 to 265)

Page 266

1    Schickel and Representative Keene, you have to
2    report those expenditures.  So those are the type
3    of -- you know, it's a problem sometimes for
4    legislators and it was a problem sometimes for the
5    people filing the reports.
6        Q    And there's also some discussion in
7    recommendation number -- oh, just to be clear, Judge
8    Wilhoit was very clear because this was an
9    interesting question it looks like Representative
10   Riner raised, Judge Wilhoit said that this
11   recommendation would not affect the ability of
12   lobbyists and their employers to sponsor events for
13   groups of legislators, right?
14       A    That's correct.
15       Q    So obviously Representative Riner was
16   concerned about the group issue, would you agree
17   with me?
18       A    Well, he asked about it.  He did not, as
19   far as I know, put forth any kind of a position that
20   these events ought to be more tightly regulated or
21   prohibited, but he did ask about it.
22       Q    Which leads us to believe that he wanted
23   them to be able to continue, right?
24       A    Well, I don't know.  I can tell you from
25   my long-time knowledge of Representative Riner, he's

Page 267

1    probably never been to one of these.
2        Q    Okay.  So he might have had some concern
3    with them, but we all know how sausage is made in
4    Frankfort, you don't want to know what goes on?
5        A    Right.  He may have wanted reassurance
6    for his colleagues that these things would be
7    continuing or maybe he wanted to think about it.  He
8    has frequently proposed amendments to ethics bills,
9    maybe he wanted to introduce some himself, maybe he
10   wanted to ban them, but I never heard that from him.
11       Q    In looking at recommendation number 3,
12   this is our prohibits employers of lobbyists and
13   PACs from making the contribution we talked about.
14   You indicate that it would apply to caucus campaign
15   committees in the absence of statutory language to
16   exempt them.  Do you see that?
17       A    That's our position, yes.
18       Q    And so the employer of the lobbyist or
19   the PAC cannot donate to a caucus campaign committee
20   while the legislature is in session; is that
21   correct?
22       A    Yes.
23       Q    It looks like Representative Marzian
24   agreed with the interpretation because it would help
25   avoid the perception of potential conflict of

Page 268

1    interest during regular sessions.
2        A    That's correct.
3        Q    Do you agree with her on that?
4        A    Yeah, that was what I was saying.
5        Q    Because, again, these caucus campaign
6    committees are controlled by the legislators
7    themselves, and so we don't want that going on?
8        A    Well, you know, to that issue, and I
9    notice you commented about that to Ms. Dennis, I
10   don't know who controls the caucus campaign
11   committees.  I know that the legislators are the
12   only members of each caucus campaign committee, so I
13   have to presume from that that they control it, but
14   I don't know personally how that's done.
15       Q    Okay.
16       A    Maybe they take a vote amongst all their
17   members, maybe they bring candidates in and say,
18   what do you think, I don't know.
19       Q    But in some way, shape, or form the
20   legislators are driving the train?
21       A    The statute provides that the members of
22   the Senate majority caucus campaign committee shall
23   be all the members of the majority party in the
24   Senate, and that would be whether they're
25   Republicans or Democrats, minority likewise, same in

Page 269

1    the House.  So they don't have outside members.
2    There's no county judges who belong to the caucus
3    campaign committee.  So I have to presume that the
4    legislators control the output.
5        Q    Put another way, you know that the
6    legislators are driving the train, you just don't
7    know the specifics of how; is that fair?
8        A    I just know that legislators are the only
9    members by statute of a caucus campaign committee.
10       Q    Okay.
11       A    They can hire outside people to be their
12   treasurer, you know, and watch the money and that
13   kind of stuff.
14       Q    Sure.  I think that's it in terms of this
15   particular or these particular exhibits.  I do want
16   to go back to --
17       THE WITNESS:  I've got two that are
18   numbered 43.
19       MR. WIEST:  That's not surprising.
20       MR. JAMES:  Yeah, I think we're up to at
21   least 45.
22       MR. WIEST:  I've got 43 and 44.  I
23   apologize for that if I mismarked them.
24       THE WITNESS:  Our defendants' responses
25   to plaintiffs' interrogatories, that says 43 on

51d14619-9481-44e8-adb5-d49d86433c88

Page 270

1    it.
2        MR. WIEST:  Then we'll mark the 2011
3    minutes 44 and we'll mark the 2012 minutes 45
4    if that's okay for everyone and for the court
5    reporter.
6            (Exhibit 44 and 45 were
7            remarked for identification.)
8            (Exhibits 46 through 49 were
9            marked for identification.)
10   BY MR. WIEST:
11       Q   I'm going to give you a stack here, it
12   will be 46, 47, 48, 49.
13       Mr. Schaaf, do you recognize Exhibit 46?
14       A   Yes.
15       Q   That's the legislative findings and
16   declarations regarding legislative lobbying,
17   correct?
18       A   Yes.
19       Q   And we recognize that there's a couple
20   different interests that come into play with regard
21   to the regulation of lobbyists; would you agree with
22   that?
23       A   Yes.
24       Q   On the one hand there's the fullest
25   opportunity for folks to petition the legislature

Page 271

1    and the government for redress of grievances and to
2    freely express their opinions on executive and
3    legislative action, and on the other hand there's,
4    it's important to identify expenditures of certain
5    persons who attempt to influence executive and
6    legislative actions and the need to regulate some of
7    that as well, right?
8        A   Yes.
9        Q   And the purpose is to maintain the
10   integrity of government; do you agree with that?
11       A   That's correct.
12       Q   When we look at KRS, the next one, 6.807,
13   which is Exhibit 47, these are the registration
14   statements that are required for the legislative
15   agents, at least the statute dealing with them,
16   right?
17       A   Yes.
18       Q   And you folks do require those to be
19   filed in what intervals?
20       A   Well, the initial registration statement
21   is filed within seven days of the engagement of a
22   legislative agent, that is agreement between an
23   employer and a lobbyist that the lobbyist will work
24   for the employer while lobbying.  And then after
25   that the updated registration statements are due

Page 272

1    monthly during a session of the General Assembly.
2    They're due by the 15th of each month for the
3    preceding calendar month, and then after the session
4    adjourns, there is a statement due in mid-September
5    that encompasses the summer months, and then the
6    next statement is due January 15th that encompasses
7    September through December.  So it's six statements
8    a year.
9        Q   And if we look at Exhibits 48 and 49,
10   Exhibit 48, is that the, I'm going to call it the
11   blank legislative agent statement for the agents
12   themselves that you all have?
13       A   Yes, that's correct.
14       Q   And that's on your website, correct?
15       A   Yes.
16       Q   And 49 is the one for the employers,
17   correct?
18       A   Right.
19       Q   And the idea is we want these legislative
20   agents and their employers to disclose to the public
21   where they're spending money and on what particular
22   issues they're advocating, correct?
23       A   That's correct.
24            (Exhibits 50 through 58 were
25            marked for identification.)

Page 273

1        Q   I hand you what I've marked, sir, as 50
2    through 58.  Exhibit 50, this is KRS 6.811, and this
3    is the, I'm going to call it the standards of
4    conduct for legislative agents and their employers;
5    is that fair?
6        A   That's fair.
7        Q   Again, they're not allowed to offer
8    anything of value to a legislator and they can't
9    give or agree to give anything of value to a
10   legislator or a candidate or the spouse or child of
11   a legislator or candidate, correct?
12       A   That's correct.
13       Q   And the definition of anything of value
14   changed obviously, which we've talked about with the
15   recent House Bill.  But, again, group events are
16   exempt, correct, from that?
17       A   The group events we've previously
18   discussed to which large numbers of people are
19   invited, yes.
20       Q   Sure.  They're also not allowed to serve
21   as a campaign treasurer, correct?
22       A   That's right.
23       Q   Why is that?
24       A   Well, again, it was to separate, to the
25   extent possible, the lobbyist from the financing of

Page 274

1    legislative campaigns, because obviously raising and
2    spending money is a key aspect of getting elected to
3    the legislature.  And by and large a legislator or a
4    candidate can raise and spend money in any legal way
5    from any person legally authorized to give.
6    However, there is a narrow exception to that that's
7    set forth in this ethics law that says that
8    relationship between a legislator and a lobbyist is
9    such that it's in the public interest to keep the
10   lobbyist separate from the financing of the
11   legislator's campaign.  So not only can the lobbyist
12   not contribute to the campaign, but he can't serve
13   as a treasurer, which is inherently, you know,
14   that's the person who brings in the money, reports
15   the financing, so separate that person from that
16   particular position.  A lobbyist can still have a
17   role in a campaign in other respects.  They could be
18   the chair of the campaign probably if that's an
19   unpaid position and they don't make a
20   contribution --
21       Q    Okay.
22       A    -- for which they'd otherwise be
23   compensated.
24       Q    We've got this money thing going on
25   you're concerned about, Mr. Schaaf, but we've also

Page 275

1    got a prohibition on soliciting, they cannot solicit
2    a campaign contribution; do you see that?
3        A    Yes.
4        Q    That means they can't ask somebody else
5    to donate, correct?
6        A    Generally, yeah.
7        Q    In what instances, you say generally, in
8    what instances would they be allowed to ask someone
9    else to donate to a legislator?
10       A    Well, I don't know, see, that's the
11   problem with a large general statement.  Generally
12   they can't solicit contributions for legislative
13   candidates.  Now, can they solicit a contribution
14   for a candidate for county judge?  Yes.  They can be
15   active in other campaigns.  It's just in this one
16   arena where they have taken on responsibilities and
17   they're paid to persuade these legislators to a
18   particular point of view, so they're separated from
19   several different aspects of the financing of
20   legislative campaigns, and soliciting contributions
21   for legislative candidates and legislators is one of
22   them.
23       Q    And is there any instance where they're
24   allowed to do that, to solicit contributions for
25   legislators or candidates?

Page 276

1        A    Well, probably not.  I can't encompass
2    all the things that that term might take in, but as
3    a general rule, no, a lobbyist cannot ask someone to
4    contribute to a legislator's campaign or the
5    campaign of a candidate for the legislature.
6        Q    I'm looking at paragraph 7, we've talked
7    about that as well, it's employers and legislative
8    agents not making, at least during the session, it's
9    employers of legislative agents not making a
10   campaign contribution to a legislator, candidate, or
11   campaign committee or caucus campaign committee,
12   correct?
13       A    That's correct.
14       Q    And the reason that we wanted to ban the
15   caucus campaign committee is because they're
16   comprised of legislators, right?
17       A    The legislators are the only members of a
18   caucus campaign committee.  So if you can't give to
19   one, you can't give to 21.
20       Q    Sure.  I want to look at KRS 6.281.  This
21   is the statements of expenditures and the penalties
22   that are made.  And, again, we do require statements
23   of expenditure and there is some penalties set forth
24   within the statute, including some fines, that are
25   able to be levied for violations, right?

Page 277

1        A    Yes.
2        Q    And if you file an intentionally false
3    report, that can be a Class D felony, right?
4        A    That's correct.
5        Q    Looking at 52, this is another
6    disclosure, this is statements of financial
7    transactions, and this is another statute where we
8    require certain statements to be filed and
9    disclosures by legislative agents, right?
10       A    That's correct.
11       Q    Sir, I'm going to turn to, I know we've
12   been hinting around and we've been talking about it
13   some today, but I'm going to turn to Exhibit 53.
14   Your counsel referred to and I'm almost hesitant to
15   use Wikipedia as a source, but you guys disclosed it
16   in discovery, so we're going to talk about it as a
17   summary of BOPTROT.  We talked about this before,
18   but it was the Business, Organization, and
19   Professions Committee of the Kentucky House of
20   Representatives and the Kentucky Senate, right?
21       A    That's correct.
22       Q    And it was to support horse racing
23   legislation in Kentucky, right, or harness racing?
24       A    Yes, and -- that's right.  I don't think
25   the legislation was ever actually introduced, but --

51d14619-9481-44e8-adb5-d49d86433c88

Page 278

1  so it was basically to support a cause that was set
2  forth by some harness racing tracks I think.
3      Q    Okay.  And there's a list of legislators
4  that were convicted, right?
5      A    Yes.
6      Q    And it looks like there was a lobbyist,
7  John Spurrier, that was convicted?
8      A    He was a lobbyist for the harness racing
9  industry.
10     Q    It looks like there was an aide to the
11 House Speaker that got convicted, Mr. Guy?
12     A    That's right.
13     Q    And then Mr. Wilkerson, the nephew of the
14 Governor, who was --
15     A    That's right.
16     Q    -- convicted involving an arbitration
17 award, right, that they were trying to mess with?
18     A    Right.
19     Q    There's a much better summary in
20 Wikipedia actually, I don't know if you've ever seen
21 this before, I hope that you have, it's an article
22 entitled "Lies, bribes and videotape" that I
23 attached as Exhibit 54.  Have you ever seen that
24 before?
25     A    Sure, I've read that.  Tom Loftus and Al

Page 279

1  Cross, or was that the New York Times article?
2      Q    This was Loftus and Cross.
3      A    Yeah.
4      Q    I went through this and I saw a lot of,
5  through this article, I saw the gambling interests
6  that were mentioned, of course, right, the gambling
7  bill interests, the harness racing industry?
8      A    Yes.
9      Q    They're still allowed to donate as much
10 as they want and take people out to dinner and all
11 those kinds of things, right?
12     A    They are allowed to do what any other
13 industry does, yeah.  It was not, you know, as in
14 any situation like that, it wasn't the entire racing
15 industry that was implicated.
16     Q    It wasn't every lobbyist either though,
17 right?
18     A    No, no.
19     Q    It was a handful of lobbyists?
20     A    That's right.  But prior to that, they
21 didn't even have to register.  They may have been a
22 lobbyist, maybe not.  But, yeah, harness racing was
23 at the root of it, but as you can see if you read
24 through both of these, there were other aspects to
25 it too.  Senator Rogers was convicted on a variety

Page 280

1  of charges that had nothing to do with gambling.  He
2  was moving a banking bill through the Senate while
3  receiving money from banking interests.
4      Q    He was receiving flat-out bribes,
5  correct?
6      A    As far as I know, I don't remember.
7  Senator Landon Sexton took an illegal cash campaign
8  contribution, $5,000.
9          So there were ample aspects of this that
10 didn't involve the matter that first gave rise to
11 the FBI investigation.  In the course of their
12 investigation, they uncovered a wide array of
13 wrongdoing because there were no rules back then
14 except the federal rules relating to bribery and
15 corruption.
16     Q    On the surfaces fraud, all that stuff?
17     A    Right.
18     Q    The question that I've got, I went
19 through this article and I went through the
20 Wikipedia and I actually went through a couple other
21 sources, you guys also mention it in Exhibit 55,
22 which is a seminar that it looks like LEC put on, it
23 looks like a portion of the agenda anyways that
24 talks about BOPTROT and its legacy.
25     A    Yeah, we present that every year in a

Page 281

1  variety of fashions, but some of this, the first
2  several pages of it remain pretty much the same.
3      Q    In none of these articles did I see
4  anything about hundred dollars or less gifts being
5  implicated.  Would you agree with that?
6      A    Well, what you will see implicated is the
7  fact that the Kentucky General Assembly was beset by
8  a culture of corruption, and the response to that
9  corruption was a rather sweeping piece of
10 legislation that was borrowed in some respects from
11 other states that had had similar problems just
12 before BOPTROT.  For example, South Carolina had an
13 FBI sting called Operation Lost Trust, and in the
14 course of drafting this legislation, the task force
15 on governmental ethics, which was charged with
16 drafting that and was made up of legislators from
17 both chambers, both parties, and several executive
18 branch officials working on this, they called in
19 people from Wisconsin, South Carolina, New York,
20 places that had had recent experiences with corruption,
21 indictments, investigations, and convictions, and we
22 took from those people recommendations for what
23 should be included in an ethics law that would
24 change the culture around the General Assembly
25 because prior to that, as I said, there were no

51d14619-9481-44e8-adb5-d49d86433c88

Page 282

1    rules governing the interaction between lobbyists
2    and legislators.
3           So as a result, and as a matter of fact,
4    one of the bills that passed, I can't remember if it
5    was the House bill or the Senate bill, included the
6    no cup of coffee provision in 1993. And it was only
7    when they went to conference committee, in the free
8    conference committee, which is made up of members of
9    the Senate, members of the House, where they
10   negotiate the final version of the bill that they
11   can both agree on, was the no cup of coffee rule
12   taken out and the hundred dollar limit put in.
13       Q    Did this bill have the result of changing
14   the culture?
15       A    Yes.
16       Q    And it included the hundred dollar
17   exemption, right?
18       A    Yes, it did. Which was a huge change
19   from what had been the previous no limits.
20       Q    Right, which is still the case on the
21   group events, right, no limits?
22       A    No limits, but there's no indication that
23   any particular legislator is there.
24       Q    That's part of the problem.
25       A    It's an invitation and you can go or not

Page 283

1    go, but if you're there, I mean, I think the General
2    Assembly has recognized if you're there, you're in a
3    large group of people, and this is different than a
4    lobbyist getting you in a one-on-one situation where
5    they can wine and dine you up to a hundred dollars,
6    and then another lobbyist coming in the next night,
7    and the same two lobbyists take you out, another
8    hundred dollars can be spent on you. So this is a
9    large event in which you may or may not even talk to
10   the sponsor, you may or may not even attend.
11       Q    The lobbyists can catch you one-on-one at
12   these events, right?
13       A    They can, or they might not.
14       Q    They can be out in the hall?
15       A    If a lobbyist has to have an event in
16   order to talk to a legislator, then they're probably
17   not doing their job. Because there are many
18   opportunities to talk to legislators, in their
19   offices, after committee meetings. So I want to
20   distinguish, as the law does, between these large
21   group events, which people may or may not attend,
22   and these one-on-one sessions with lobbyists that
23   give certain lobbyists the ability to develop
24   relationships with certain legislators, which is to
25   me and apparently to the legislature, it's a

Page 284

1    completely different issue than what happens at
2    these large events which more than half the
3    legislators probably don't even attend. I mean,
4    they put these on in the hopes that some people will
5    come, but they don't have any guarantee that anybody
6    is going to be there.
7        Q    Well, if they invite an individual
8    legislator, except for a cup of coffee or a dinner
9    in an individual setting, that legislator is not
10   going to go there either, right?
11       A    You know, it just depends on the
12   situation. Somebody might be comfortable with one
13   situation and not another. It depends on the
14   lobbyist, it depends on the legislator.
15       Q    Okay. I'm going to talk about a couple
16   more recent scandals in Kentucky, and I'm sure you
17   may be aware of it. Exhibits 56 and 57 deal with,
18   and we'll get to 58 as well, the Tim Longmeyer
19   situation. Are you familiar with Mr. Longmeyer?
20       A    I've read about it in the papers.
21       Q    Okay. And I don't know if you're aware
22   of this, he actually pled guilty on April 19, 2016
23   in federal court.
24       A    I read that in the paper as well.
25       Q    And we've got his plea agreement and

Page 285

1    we've got the newspaper, and not to pick on the
2    Attorney General's office, but I think they're in a
3    bit of damage control right now on this and I think
4    they're looking to pursue Mr. Longmeyer themselves.
5    My understanding is Mr. Longmeyer was accepting
6    bribes, among other things. Would you agree with
7    that?
8        A    I'm going to plead a complete lack of
9    knowledge about that case.
10       Q    You have no knowledge at all?
11       A    I have no knowledge of what happened in
12   that case.
13       Q    Okay. We'll sit on that. I want you to
14   look, sir, and I think that you've seen this article
15   before because I think it was referenced in one of
16   your newsletters, Exhibit 58. Have you read the AP
17   article, "Statehouse sex scandals carry public costs
18   and consequences"?
19       A    I don't know if I've read this particular
20   article, but I have read many articles about
21   Missouri and Michigan and --
22       Q    Actually, it talks about Kentucky too.
23       A    -- other states. And Kentucky, I'm well
24   aware of that situation.
25       Q    And I know that we had talked before

Page 286

1    about Hall, Waide, and John Arnold, and this does
2    talk about John Arnold and this was an article that
3    was carried widely on the AP.  Again, have you seen
4    this before, this article?
5        A    I don't think so, no.
6        Q    If I represent to you that this article
7    was carried in your newsletter --
8        A    Oh, if it was -- I have seen many
9    articles about this same issue.  I just don't know
10   if I've seen this particular one, but if this was in
11   my newsletter, yes, I've seen it.
12       Q    Let me ask, is there anything in Kentucky
13   law currently that keeps a legislator from having
14   sexual relations with a lobbyist, female lobbyist or
15   maybe vice versa?
16       A    No.
17       Q    And that's an acceptable one-on-one
18   situation?
19       A    Well, you know, when you say is that
20   acceptable, I mean, there is no law at this point
21   that governs that.  Now, if we were to receive a
22   complaint that a lobbyist sold his or her sexual
23   services to a legislator, essentially in exchange
24   for action on a bill, now that would be a problem.
25   But if a legislator and a lobbyist have a personal

Page 287

1    relationship with each other, you know, no, there's
2    no law that addresses that.
3        Q    So they have this personal relationship
4    that may be going on and then the lobbyist goes in
5    and asks for help on a bill, anything illegal with
6    that?
7        A    You know, again, it depends upon the
8    circumstances.  I don't know.  That issue has never
9    come up, so, you know, in terms of a potential
10   violation -- I'm not saying that legislators and
11   lobbyists have not had relationships, they probably
12   have.  They do in every other state.
13       Q    Right.  When you say it hasn't come up,
14   it hasn't come up in Kentucky?
15       A    It hasn't come up in my knowledge.
16       Q    But it has come up in other states,
17   right?
18       A    Sure, sure.  And I assume that's why
19   you're asking the question.  I don't know if it
20   would be a violation.  It depends on the
21   circumstances.
22       Q    Do you agree there's a gentleman by the
23   name of Chamberlin from the University of Michigan,
24   and he indicates, I'm looking at page 3, "When
25   lawmakers and lobbyists hook up, there's certainly a

Page 288

1    conflict of interest there.  It's implausible to
2    believe that might not have an effect on their
3    legislative behavior."  Do you agree with that?
4        A    You know, it's hard to say.  It really
5    is.  It depends on the legislator, it depends on the
6    lobbyist.
7        Q    Which do you think is more likely to
8    influence a legislator, a $2 cup of coffee or
9    repeated sexual favors?
10       A    It depends on the legislator and the
11   lobbyist.
12       Q    Okay.  And, again, there's nothing
13   explicit at least, there's nothing in Kentucky law
14   at all that addresses this particular situation with
15   the lobbyist and the legislator and sex, correct?
16       A    No, there was nothing in the law that
17   specifically addressed an allegation of sexual
18   harassment.
19       Q    Sure.
20       A    But the Ethics Commission found that it
21   fit under KRS 6.731, subsection 3.
22       Q    Which prohibits what?
23       A    Where the legislator was taking advantage
24   of his position as a legislator to have access to
25   these staff people, and it was in that context that

Page 289

1    he carried out his objectionable actions.  So
2    depending on the circumstances, you know, in your
3    scenario, there could be a violation or there might
4    not be, it just depends.
5        Q    I know, sir, that there's a requirement
6    to disclose if a legislative agent is married or
7    becomes a family member of a legislator, correct;
8    there's a requirement of disclosure or maybe there's
9    a flat-out prohibition?
10       A    No, I don't think so.
11       Q    Can a legislator's wife be a lobbyist?
12       A    I think so.  I think they can still do
13   that.  There was some -- that was again in 1993,
14   there was a prohibition in there originally against
15   a legislator's spouse being a lobbyist, but they
16   didn't put that in the final version of the bill.
17       Q    Is there a requirement to even disclose
18   that, a family member that's a lobbyist?
19       A    I believe there is, but I'm not sure if
20   it's on the legislator's report or the lobbyist's
21   report.
22       Q    Is there any requirement to disclose a
23   sexual relationship between a lobbyist and a
24   legislator under Kentucky law?
25       A    No, there's not a requirement for Senator

73 (Pages 286 to 289)

Page 290

1    Schickel to report to me that he's a friend of Mark
2    Wilson.
3        Q    Sure.  Should there be?
4        A    I don't know.  How do you characterize --
5    I mean, at what point do you require reporting in a
6    personal friendship?  If Senator Schickel and Mark
7    Wilson go to a Reds game, is that the same as having
8    a sexual encounter?
9        Q    I wouldn't say so, but are you saying
10   that?
11       A    The legislature has not said that.  So
12   it's not in the law.
13       MR. JAMES:  It hasn't been a very good
14   one lately.
15       Q    All right.  And back to Mr. Arnold.  The
16   view of the Commission at least was that he had
17   access to the staff people and that's what, that was
18   the abuse of the office, correct?
19       A    Right.
20       MR. WIEST:  I think that is all I have
21   for you, sir.  Unless your counsel has got some
22   questions.
23       MR. JAMES:  I would just like to take a
24   ten-minute break and confer with Ms. Daniel and
25   we'll be back.

Page 291

1        MR. WIEST:  Okay, sure.
2            (Brief recess.)
3            EXAMINATION
4    BY MR. JAMES:
5        Q    Let's go back to Exhibit 18, which is
6    KRS 6.611.
7        A    All right.
8        Q    Turn to page 5 of that, particularly
9    subsection (b).  We've kind of already gone over
10   these, but I want to kind of run down the line
11   through them real quickly.  So subsection (b) on
12   page 5 says anything of value does not include, and
13   subsection 2 says compensation, food, beverages,
14   entertainment, transportation, lodging or other
15   goods or services extended to a legislator by the
16   legislator's private employer or by a person other
17   than a legislative agent or employer.  What do you
18   understand that section to mean?
19       A    Well, primarily that a legislator's
20   private employer can, for example, buy meals for the
21   legislator, send the legislator on trips, give the
22   legislator anything else in the scope of their
23   employment without being in violation of this law
24   and, number two, that as long as a person is not a
25   lobbyist or employer, they can also give a

Page 292

1    legislator those type of items.
2        Q    Okay.  Subsection 5 says promotional
3    items of less than $50.  Does that mean that a
4    lobbyist or legislator may give or receive
5    promotional items of less than $50?
6        A    It means that a lobbyist may give a
7    legislator a promotional item, calendar, pen, those
8    type of items that are valued at less than $50.
9        Q    Okay.  Subsection 8 says the cost of
10   attendance or participation and of food and
11   beverages consumed at events, and subsection A below
12   that says, to which all members of the Kentucky
13   Senate or the Kentucky House of Representatives or
14   both are invited.  Does that mean that a lobbyist or
15   a legislator may accept cost of attendance, food and
16   beverages at an event where the entire Senate or
17   House or both are invited?
18       A    Yes.
19       Q    Subsection C says to which a caucus of
20   legislators approved as a caucus by the Legislative
21   Research Commission is invited.  What do you
22   understand that subsection to mean?
23       A    Well, over the years the Legislative
24   Research Commission has approved the existence and
25   the membership of primarily regional caucuses, the

Page 293

1    Mountain caucus, the Western Kentucky caucus,
2    Northern Kentucky caucus.  But they've also approved
3    in more recent years the creation of an automotive
4    caucus, for example, which includes legislators,
5    senators, representatives, Republicans and Democrats
6    from the regions affected by automotive
7    manufacturing, Jefferson County, for example, Scott
8    County, and typically that includes legislators from
9    the entire region, not just a specific county in
10   which the -- and Warren County where the Corvette
11   plant is.  So there's an automotive caucus now.  So
12   those caucuses have been recognized by the LRC and
13   their membership is recognized in terms of the
14   legislators from the house districts in Warren
15   County and the Senate district.  So districts are
16   recognized as members of those caucuses.
17       Q    Can a lobbyist or legislator accept cost
18   of attendance and food and beverages at an event
19   hosted by one of these recognized caucuses?
20       A    Well, the event is to which the caucus is
21   invited.  It wouldn't necessarily be hosted by them,
22   although I guess it could be.  If the caucus is
23   invited, then that's how the event is reported, it's
24   reported as all members of the Northern Kentucky
25   caucus were invited.

51d14619-9481-44e8-adb5-d49d86433c88

Page 294

1    Q    But they could accept cost of attendance
2  and food and beverages at this event they were
3  invited?
4    A    Yes.
5    Q    Subsection D says, sponsored or
6  coordinated by a state or local government entity,
7  including a state institution of higher education,
8  provided that the cost thereof is covered by the
9  state or local government entity or state
10  institution of higher education.  So may a lobbyist
11  or legislator accept cost of attendance and food and
12  beverages at any event sponsored or coordinated by a
13  state or local government entity?
14         MR. WIEST:  Objection to form.
15    Q    Go ahead.
16    A    Yes.
17    Q    May they do so at any event sponsored or
18  coordinated by a state institution of higher
19  education?
20    A    Yes.
21    Q    Subsection 8e says, to which an
22  individual legislator is invited that are held
23  in-state and for which the legislator receives prior
24  approval from a majority of the Legislative Research
25  Commission.  What do you understand that provision

Page 295

1  to mean?
2    A    Well, that would come into play if a
3  legislator, say, or two legislators, let's say the
4  Senate and House Chair of the Appropriations and
5  Revenue Committee are invited to address the
6  Kentucky Chamber of Commerce's annual meeting in
7  Paducah, for example, and since they are not a
8  recognized group or a bipartisan or bicameral group
9  that's identified in the statute, they would get the
10  approval of their leaders to attend by submitting a
11  request that says I've been invited to this event
12  hosted by this group, paid for by this group, can I
13  attend.  With that approval, they can attend.
14    Q    So if the Legislative Research Commission
15  approves of an event, can a lobbyist or legislator
16  accept cost of attendance or food and beverage at
17  that event?
18         MR. WIEST:  Objection to form.
19    A    A legislator could.  I don't know about
20  the lobbyist.
21    Q    But a legislator could?
22    A    A legislator with approval could attend
23  that event.
24    Q    Turn to the next page, page 6 and
25  subsection 12.  It says the cost of attendance or

Page 296

1  participation provided by the sponsoring entity, of
2  lodging, and of food and beverages consumed, at
3  in-state events sponsored by or in conjunction with
4  a civic, charitable, governmental, trade
5  association, or community organization.  Can a
6  lobbyist or legislator accept cost of attendance
7  and/or food and beverages at an event sponsored by a
8  charitable organization?
9         MR. WIEST:  Objection to form.
10    A    A legislator can.  Again, the General
11  Assembly has designated these certain types of
12  organizations as being able to sponsor these types
13  of events, civic, and they set them forth there in
14  that subsection, civic, charitable, governmental.
15  It covers a lot of organizations.
16    Q    So they could accept, a legislator could
17  accept cost of attendance, food and beverages at an
18  event hosted by a governmental organization?
19         MR. WIEST:  Objection to form.
20    A    Yes.  They could accept from a civic,
21  charitable, governmental, trade association or a
22  community organization.
23    Q    Subsection 14, this has kind of already
24  been discussed, it says anything for which the
25  recipient pays or gives full value.  What do you

Page 297

1  understand that subsection to mean?
2    A    That even if a legislator by him or
3  herself is dining with a lobbyist, which if the
4  lobbyist paid for it, it would be a violation if
5  none of these other circumstances were met, but in
6  this case if the legislator pays his own way, he can
7  go out with anybody he wants, he or she wants.
8    Q    Can a legislator accept anything for
9  which they pay full value?
10    A    Yes.
11         (Exhibit 59 was marked for
12         identification.)
13    Q    That will do it for Exhibit 18.  I'd like
14  to turn to what I'm going to mark as hopefully
15  Exhibit 59, it's Ethics Reporter, February 2013.  I
16  kind of lost track, I assume some part of it has
17  shown up already, but do you recognize it?
18    A    February 2013?
19    Q    Yes.  And this is an LEC newsletter,
20  Ethics Reporter?
21    A    Yes.
22    Q    Please turn to page 3 and just take,
23  sorry to do this, but just take a moment and read
24  the entire page.  The title says, "Lobbyists Asked
25  to Sponsor Georgia Senate Lunches."  If you wouldn't

51d14619-9481-44e8-adb5-d49d86433c88

Page 298

1   mind, just take a minute and read over it and
2   familiarize yourself with that and just let us know
3   when you're done.
4       A   Okay, I've read that.
5       Q   Do you remember the article?
6       A   Yes.
7       Q   Could you summarize your understanding of
8   it.
9       A   Well, my take is that Georgia had
10  implemented, in the wake of some problems because
11  they didn't have any limits on legislators receiving
12  food and beverages from lobbyists, they implemented
13  a scenario like Kentucky's where the legislator
14  could accept up to a hundred dollars of food and
15  beverages.  But in this case they had kind of,
16  between the legislators and the lobbyists, they had
17  kind of developed a workaround where, you know,
18  instead of inviting an individual, you invite an
19  entire group of individuals, not even a recognized
20  committee, but just a bunch of chairmen and I guess
21  call them a group and allowing the lobbyists to buy
22  the lunches in spite of the fact that legislators
23  were receiving, similar to Kentucky, $173 a day to
24  help with expenses.  So some legislators are
25  expressing concern that that didn't look good.

Page 299

1       Q   Okay.  So just to go through this piece
2   by piece.  So Georgia in this situation had enacted
3   a hundred dollar cap on lobbyists' gifts that was
4   similar to Kentucky prior to 2014 HB 28?
5       A   Right.
6       Q   And after that was passed, Georgia had a
7   problem where lobbyists would pay for groups of
8   individual senators' lunches?
9           MR. WIEST:  Objection to form.
10      Q   Is that correct?
11          MR. WIEST:  Objection to form.
12      A   Well, it looks like there was a concern
13  that, yes, that they had various lobbying entities
14  such as the Georgia Association of Realtors paying
15  $430 for this lunch for this group of individual
16  legislators.
17      Q   And there's a sentence that's about
18  two-thirds of the way down the page, it just says,
19  "Some senators said continuing the lunches may not
20  send the best message."  Would you agree that such
21  lunches may not send the best message in situations
22  like this?
23      A   Yes, I think that's well-recognized.
24      Q   Are you aware of other instances similar
25  to this that may have come up in the LEC

Page 300

1   newsletters?
2       A   Yes, there have been stories from other
3   states which involve food and beverages, hospitality
4   extended to legislators by lobbyists, and it
5   consistently creates a perception that legislators
6   are receiving some benefits which are not
7   appropriate.
8       Q   And some of those instances could be
9   found in the Ethics Reporter newsletter?
10      A   Yes.
11      Q   And just to confirm, these Ethics
12  Reporters are e-mailed to all lobbyists and
13  legislators?
14      A   They are received every month by over,
15  almost 700 lobbyists and an equal number of
16  employers of lobbyists, all members of the General
17  Assembly, and media throughout Kentucky, and
18  citizens.
19      Q   Were instances like this and the other
20  instances that are maybe found throughout the Ethics
21  Reporters, were they part of the motivation for
22  House Bill 28?
23          MR. WIEST:  Objection to form.
24      A   I think that what happens in other states
25  is always important to legislators.  In the process

Page 301

1   of enacting any statute, a standard research method
2   is to look at how the law is structured in other
3   states and to see what is working and what is not.
4   And I think in this case they certainly had
5   knowledge of what this was -- what was going on in
6   these other states that did not have strict gift
7   laws versus what was going on in the states that did
8   have those laws, and I think they made a
9   determination to go with the state that had -- the
10  states that had the no cup of coffee law, which
11  number somewhere between 15 and 20 I think.
12      Q   Okay.  I think I'm done with 59.  Let's
13  move on to Exhibit 60, please.
14          (Exhibit 60 was marked for
15           identification.)
16      Q   Do you recognize this article?
17      A   Yes.
18      Q   What kind of article is it?
19      A   This is an article that discusses the
20  Ethics Commission recommendation which I think they
21  made beginning in 2012 and then made it subsequently
22  in 2013.  The recommendation was that employers of
23  lobbyists, these businesses and organizations that
24  are lobbying, be required to report the amounts
25  spent on advertising that was run during the

51d14619-9481-44e8-adb5-d49d86433c88

Page 302

1    sessions and supported or opposed legislation.  So
2    it was part of their lobbying effort, which was not
3    previously required to be reported.  And we saw a
4    growing use of this type of grass roots or
5    third-party type lobbying, where they were going
6    beyond the employment of individual lobbyists to
7    make their case to members of the General Assembly,
8    and they were supplementing that with radio,
9    television, Internet, billboard, advertising in
10   support or opposition to their lobbying efforts.
11         So the Commission determined that while
12   that might not fit specifically under the definition
13   of lobbying, that if it was paid for by an employer
14   of lobbyists, then it could be reported or should be
15   reported.  So that was the recommendation they made,
16   and a version of that was adopted by the General
17   Assembly as part of this package of reforms in 2014.
18       Q    The fourth paragraph, it's the one
19   sentence in the middle that says, "John Schaaf,
20   general counsel for the Legislative Ethics
21   Commission, said the Commission is trying to keep up
22   with the changing landscape of lobbying."  Is that a
23   correct statement?
24       A    That's correct.
25       Q    And you said that this was part of the

Page 303

1    package that eventually became HB 28?
2        A    Yes.
3        Q    Was part of the motivation for HB 28 to
4    try to keep up with the changing landscape of
5    lobbying?
6             MR. WIEST:  Objection to form.
7        A    Yes.
8                 (Exhibit 61 was marked for
9                  identification.)
10       Q    That's it for 60.  Turn to the next one,
11   it's "Ethics In State Government," this one should
12   be 61.  Do you recognize this article?
13       A    Yes, I do.
14       Q    Do you remember what it's about?
15       A    I think it was about our recommendations
16   which at that point had been, some of them anyway, I
17   think had been adopted into bill form by Bowling
18   Green representatives.  So this was a story by the
19   paper in Bowling Green discussing the bill, House
20   Bill 3.
21       Q    Paragraph six on the page, about
22   60 percent of the way down says, "The bill would
23   also prohibit campaign contributions from employers
24   of lobbyists during regular sessions, which was also
25   recommended by the Ethics Commission.  If such

Page 304

1    contributions are made during the session, and
2    legislators vote on a bill that impacts the lobbyist
3    employer, it can create the impression that votes
4    can be bought, Schaaf said."  Is that a correct
5    reflection of your statement?
6        A    That is correct.
7        Q    Would the -- Does the perception that
8    votes can be bought lead to corruption or the
9    appearance of corruption?
10       A    Oh, yes, I think certainly the perception
11   leads to the appearance of corruption in many cases.
12   Because it could be a perception not just in the
13   public but amongst legislators themselves that
14   everybody else is doing something, I can do it too.
15                 (Exhibit 62 was marked for
16                  identification.)
17       Q    That's it for 61.  Turning to Exhibit 62,
18   which would be an LA Times article entitled
19   "Kentuckians Amazed That $400 Can Buy a Lawmaker."
20   Do you remember this article?
21       A    I do remember the substance of the
22   article, yeah.
23       Q    Okay.  The third paragraph and the third
24   sentence on the page says, "So far, BOPTROT has led
25   to the indictments of seven legislators or former

Page 305

1    legislators, one lobbyist, and two state officials
2    for, among other things, accepting bribes as low as
3    $400 in exchange for influencing legislation."  Did
4    BOPTROT involve bribes as small as $400?
5        A    Yes.
6        Q    And I think you mentioned earlier that
7    BOPTROT, that lobbyists had a habit of leaving
8    credit cards at restaurants.  Does that mean the
9    lobbyists were leaving their credit cards at
10   restaurants to pay for legislators' meals?
11       A    Yes.
12       Q    So paying for legislators' meals was part
13   of the corruption that was involved in BOPTROT?
14            MR. WIEST:  Objection to form.
15       A    Yes.  I think it was a contributing
16   factor to the culture that existed at that time that
17   led to even more serious problems.
18       Q    Did BOPTROT involve corruption between
19   lobbyists and legislators?
20            MR. WIEST:  Objection to form.
21       A    Yes.
22       Q    You also said that BOPTROT also involved
23   individual one-on-one or I guess small group
24   meetings between lobbyists and legislators earlier;
25   is that correct?

51d14619-9481-44e8-adb5-d49d86433c88

Page 306

1          MR. WIEST:  Objection to form.
2      A    Yes, that's correct.
3      Q    And the Legislative Ethics Code was
4   designed to remedy the corruption of BOPTROT; is
5   that correct?
6          MR. WIEST:  Objection to form.
7      A    It was designed to address the
8   corruption, yes, and to create a different culture
9   going forward in which there would be guidelines and
10  enforcement where none had existed before.
11     Q    So prior to the enactment of the
12  Legislative Ethics Code, there were no requirements
13  to report any lobbying activities?
14         MR. WIEST:  Objection to form.
15     A    That's correct as to the activity.  There
16  was a voluntary book maintained in the Attorney
17  General's office where a lobbyist, if they thought
18  of themselves as a lobbyist, they could go down and
19  sign in as a lobbyist.  That was the extent of the
20  registration requirement.
21     Q    Did that environment prior to the
22  Legislative Ethics Code create corruption or the
23  appearance of corruption?
24         MR. WIEST:  Objection to form.
25     A    I think the -- yes.  I think the lobbying

Page 307

1   as a part of the legislative process was actually a
2   rather new concept in the 1980s.  Lobbyists had
3   typically gone to the Governor to get things done.
4   And so in the 1980s when the legislature became more
5   independent and a stronger branch of state
6   government, the lobbyists gravitated to the third
7   floor of the Capitol and they began lobbying
8   legislators, and there were no laws in place on the
9   state level to really govern that kind of
10  interaction.  So I think the adoption of the ethics
11  code provided guidelines and I like to think of it
12  as guardrails.  If legislators and lobbyists can
13  stay between the guardrails, they will not run off
14  the road into greater problems.  These are
15  administrative statutes that set forth a
16  comprehensive ethics code, and if those are
17  followed, the legislators and lobbyists will stay
18  out of the focus of the FBI or law enforcement
19  agencies.
20     Q    After the enactment of the Legislative
21  Ethics Code, we talked about it most of the day,
22  group events to which the entire legislature or
23  bipartisan groups of legislators are invited now
24  have to be reported and the amount that is spent at
25  these events disclosed; is that correct?

Page 308

1      A    That's correct.
2      Q    Has that reporting requirement reduced
3   corruption?
4          MR. WIEST:  Objection to form.
5      A    Well, I believe that and the other
6   provisions of the law and the fact that legislators
7   now have a place where they can, and lobbyists,
8   where they can seek advice about these issues.  I
9   think the whole package working together has helped
10  to create a culture of compliance as opposed to a
11  culture of corruption.  I think people are now,
12  since the adoption of the code in '93, and our
13  annual training sessions for legislators, I think
14  all of these things are part of bringing about
15  compliance and avoiding the perception or the
16  reality of corruption.
17     Q    You also talked about the bans by, the
18  addition to ban PACs and some other entities from
19  fund-raising during the session.  I believe you said
20  roughly that the motivation for that provision was
21  that you didn't want it to appear as if the
22  legislators were taking money for their legislative
23  actions; was that correct?
24         MR. WIEST:  Objection to form.
25     A    Well, the prohibition, just to be clear,

Page 309

1   is not on PAC fund-raising.  It's on legislators
2   accepting PAC contributions.  PACs can still raise
3   as much money as the law allows anytime.  But during
4   a session of the legislature, yes, a legislator is
5   now prohibited from accepting a PAC check while the
6   General Assembly is in regular session and, yes,
7   that does address the perception and the concern of
8   many legislators that they would unknowingly be
9   placed in a difficult situation by accepting a
10  contribution from an interest group, a PAC, with a
11  clearly identifiable legislative interest in close
12  proximity to the time in which they took a
13  particular action on a piece of legislation that the
14  PAC or the affiliated employer was interested in.
15  So, yes, it does address that and resolve that so
16  that legislators and candidates don't have to be
17  concerned about that for that narrow window of time
18  when the General Assembly is in regular session.
19     Q    Does this ban on accepting contributions
20  from -- on legislators accepting contributions from
21  PACs during the session, does that reduce the
22  appearance of corruption?
23         MR. WIEST:  Objection to form.
24     A    Yes.
25         MR. JAMES:  All right.  I think we're

51d14619-9481-44e8-adb5-d49d86433c88

Page 310

1    done unless you have any follow-ups.
2         MR. WIEST: Unfortunately, I do. When
3    you open doors, I got to go through them.
4         FURTHER CROSS-EXAMINATION
5    BY MR. WIEST:
6    Q   Let me ask, sir, just briefly, the issues
7    with Representative Arnold, Hall, and Waide, none of
8    those involved food or drink under a hundred
9    dollars, right?
10   A   None of the issues that they were in
11   trouble for.  Now, I don't know about other issues
12   that legislators may have had knowledge of that may
13   have involved contributions or food or --
14   Q   And none of those involved employer or
15   PAC donations during the session, right?
16   A   Not that I know of.
17   Q   I want to go back to Exhibit 59 that your
18   counsel pointed out about these Georgia luncheons,
19   on page 3 of that exhibit.  It is a fact, is it not,
20   that these luncheons were for the Chairmen's
21   Committee, which was actually a legal loophole in
22   the law, they were considered a group, correct?  If
23   you look at the second to last paragraph on page 3.
24   A   Yeah, I don't know really what the
25   situation was there.  They say it is technically

Page 311

1    known as the Chairmen's Committee.  So probably that
2    is, if that's a recognized group and if their
3    statute allows the provision by a lobbyist/employer
4    of food and beverages to a recognized group, then
5    that's what they're talking about as the loophole.
6    Q   And so that was perfectly legal, it
7    wasn't -- the whole idea wasn't even subject to the
8    hundred dollar cap, it was the group function that
9    is today perfectly legal in Kentucky, correct?
10   A   Well, we don't have a similar group to
11   that in Kentucky.  We don't have a Chairmen's
12   Committee.  There's no recognized -- as I said, most
13   of the recognized groups are bicameral and
14   bipartisan.  So I think the point of the story is to
15   make an issue out of somebody who has an interest in
16   legislation being able to confer food and beverages
17   on this group of particularly powerful individuals,
18   who are only technically known as a committee.
19   They're not really a committee at all apparently.
20   Q   And in Kentucky you can confer a benefit,
21   you can invite, for instance, the Interim Committee
22   on Licensing and Occupations, which is a powerful
23   group, to an event, correct?
24   A   You can invite a group to an event.  In
25   that case, though, it would be a bipartisan group of

Page 312

1    legislators and not just a group of chairmen.
2    Chairmen are particularly influential in any state's
3    legislative process.  So if you're able to get a
4    group of them together, which you can't do in
5    Kentucky in the same fashion, and confer benefits on
6    them, then that's where the businesses and
7    organizations would focus all of their resources
8    probably because they control the flow of
9    legislation.
10   Q   Sure.
11   A   But when you can invite all the members
12   of a committee, you're not having the same kind of
13   influence over that group because they're not
14   chairmen.  Only one is a chairman.  The rest are
15   just members.  It's a little bit different in that
16   regard.
17   Q   Okay.  But it still is an article that
18   deals with a concern about groups of legislators
19   getting meals and benefits and things like that,
20   correct?
21   A   It deals with a concern about legislators
22   getting food and beverages paid for by somebody
23   who's got specific legislative interests, in this
24   case the Realtors Association.
25   Q   Sure.  And, again, in Kentucky the

Page 313

1    Realtors Association can host a $25,000 legislative
2    event, correct?
3    A   They could host an event of pretty much
4    any cost as long as they invited a recognized group.
5    Q   Okay.  I want to look, sir, at
6    Exhibit 62.  This looks like another BOPTROT article
7    that your counsel pointed out.  I'm sorry, I
8    actually want to go back to Exhibit 61, I just have
9    one question on Exhibit 61.  This is the article
10   about ethics in state government.  You indicate, and
11   I think this is you, yeah, John Schaaf, counsel for
12   the Legislative Ethics Commission, that the Ethics
13   Commission is reflecting what members believe the
14   public would want, correct?
15   A   The members of the Ethics Commission,
16   yes.
17   Q   Is recommending what the members of the
18   Ethics Commission believes the public would want in
19   their law, right?
20   A   Yes.  We have a citizen commission with
21   no currently serving legislators, and I think part
22   of the genius behind designing a commission that
23   way, Kentucky is maybe still the only state in the
24   nation that has a citizen-run Legislative Ethics
25   Commission.  Most states resolve ethics issues with

51d14619-9481-44e8-adb5-d49d86433c88

Page 314

1    committees of sitting legislators who have to sit in
2    judgment of their colleagues, and that becomes very
3    difficult.  So in 1993 when they adopted this law,
4    they created an ethics commission that was made up
5    of nine citizens.  Now, they can be former
6    legislators, and a couple of them are, but the vast
7    majority of them have always been citizens, just
8    people, who don't have any particular interest in
9    what the legislature is doing on any bills of
10   substance.  So what they are designed to do is
11   reflect the public will in terms of ethics.  And
12   that's why the statute also calls for them to make
13   recommendations to the General Assembly of what they
14   see as important in moving the culture toward one of
15   compliance rather than corruption.
16       Q    And, again, all of them are appointed by
17   the sitting legislature and in particular the
18   leaders, right?
19       A    Four are appointed by the Speaker, four
20   are appointed by the President of the Senate, and
21   one is a cooperative appointment.  The two leaders
22   have to agree.
23       Q    Okay.  I'm looking at Exhibit 62.  The
24   $400, that was a flat-out bribe, correct, that
25   they're referring to?

Page 315

1        A    You know, you'd have to go back and watch
2    the videotape.  What the speaker said when he
3    accepted that cash, Don Blandford --
4        Q    It was "Bless your heart," right?
5        A    He said, "Bless your heart," but he told
6    the jury at his trial that he thought he was being
7    repaid for some food and beverages that he had
8    bought at a function, which the lobbyist had really
9    sort of organized, and the lobbyist, he said the
10   lobbyist was attempting to repay him for that
11   expense.
12       Q    And the jury rejected that?
13       A    They did, because they had a videotape
14   that showed him accepting cash, and the prosecutors
15   made an ample case that it was done in exchange for
16   a legislative act.
17       Q    And that was cash, cash was being moved
18   between people, not just a meal, right?
19       A    Well, it was repayment for food and
20   beverages.
21       Q    Allegedly it was repayment according to
22   Blandford.
23       A    That's what he said.
24       Q    But the jury confirmed that wasn't true,
25   right?

Page 316

1        A    Well, you know, I don't know if that was
2    true.  I mean, it could be true, but the lobbyists
3    or the jury may still have found that it was a
4    bribe.  You know, as far as I know, Blandford never,
5    but I don't remember that Blandford could show that
6    he actually spent $400.  But that's an example of
7    how food and beverages and the payment for the same
8    can be tied up in corruption because, you know, who
9    knows what Blandford really thought.
10       Q    And that was $400, which was
11   substantially more than the hundred dollar exemption
12   that was put in place following this incident,
13   right?
14       A    That's right.
15       Q    The other thing that's in this article
16   that I thought was interesting, and I realize that I
17   guess it's kind of cut off, but it says, and I'm
18   looking at the third to last paragraph, "Although
19   the FBI has insisted there was no heavy sex, rumors
20   persist that call girls were brought in for
21   additional attitude," it looks likes "adjustment."
22   Do you see that?
23       A    I see that.
24       Q    Again, we have nothing in the Legislative
25   Ethics Code that deals with the sex issue, correct?

Page 317

1        A    Not specifically, but, again, we had
2    nothing in there that said the words sexual
3    harassment.  Yet a legislator was found in violation
4    of the ethics law for three allegations, incidents
5    of what the Commission found to be sexual
6    harassment.  So, again, if a lobbyist is exchanging
7    sexual favors for legislative action, that may very
8    well be covered by the code.
9        Q    Okay.  And finally, I just want to be
10   clear, was actually buying meals on the part of, and
11   I understand your argument about slippery slope, but
12   just putting that aside, was anybody indicted for
13   accepting food and drink as part of BOPTROT?
14       A    There were some meals and trips involved,
15   but I don't know if the charges -- usually there was
16   also cash involved along with the meals and the
17   trips.  I don't have that article anymore, it's in
18   here.  It gives a whole litany of the various
19   convictions.
20       Q    Sure.
21       A    I don't think that meals and beverages
22   alone were found to be bribes, but I think they were
23   part and parcel of several of the indictments and
24   convictions.
25       Q    And that's why we needed the 1993

51d14619-9481-44e8-adb5-d49d86433c88

Page 318

```
 1    Legislative Ethics Code to be enacted to cause a
 2  culture change, right?
 3       A    Right, on a wide array of fronts.  I
 4  mean, the Ethics Code addresses the revolving door
 5  problem, which was also at issue in BOPTROT, there
 6  were several lobbyists who had been legislators,
 7  including Bill McBee from Burlington, who you may
 8  know or have been familiar with.  So they enacted a
 9  two-year ban on legislators becoming lobbyists.
10       Q    Right.
11       A    So, yes, it changed the culture and
12  addressed a whole array of issues.
13          MR. WIEST:  That's it.
14          MR. JAMES:  I don't have any further
15  questions.
16             (Witness excused.)
17        (Deposition concluded at 6:09 p.m.)
18
19  (Signature Waived.)
20
21  H. JOHN SCHAAF              DATE
22
23
24
25
```

Page 319

```
 1              )
 2  COMMONWEALTH OF KENTUCKY  )
 3              )
 4       I, Lois A. Roell, RMR and Notary Public
 5  in and for the Commonwealth of Kentucky, do hereby
 6  certify:
 7       That the witness named in the deposition,
 8  prior to being examined, was by me duly sworn;
 9       That said deposition was taken before me
10  at the time and place therein set forth and was
11  taken down by me in shorthand and thereafter
12  transcribed into typewriting under my direction and
13  supervision;
14       That said deposition is a true record of
15  the testimony given by the witness and of all
16  objections made at the time of the examination.
17       I further certify that I am neither
18  counsel for nor related to any party to said action,
19  nor in any way interested in the outcome thereof.
20       IN WITNESS WHEREOF I have subscribed my
21  name and affixed my seal this 19th day of May, 2016.
22
23
24       LOIS A. ROELL, RMR
         Notary Public
25       My Commission expires: 09/07/19
```

81 (Pages 318 to 319)