UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION (AT COVINGTON)

| | |
|---|---|
| JOHN SCHICKEL, et. al. | : Case No. 2:15-cv-00155-WOB-JGW |
| Plaintiffs, | : |
| v. | : Judge Bertelsman |
| | : Magistrate Judge Wehrman |
| CRAIG DILGER, et. al. | : |
| Defendants. | : |

**DECLARATION OF CLARK BENSEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR INJUNCTION/SUMMARY JUDGMENT**

Pursuant to 28 U.S.C. §1746, the undersigned, Clark Bensen, makes the following declaration, under penalty of perjury under the laws of the United States of America, that the facts contained herein are true and correct to the best of my knowledge and belief and that such facts are made based on my personal knowledge:

1. My name is Clark Bensen. I am currently the owner of a firm called Polidata that specializes in political and demographic data, development, analysis and, where appropriate, expert testimony.

2. I have rendered a full report in relation to the above captioned matter. A true and accurate copy of my report is attached hereto as Exhibit 1. I incorporate the totality of my report in the testimony I render in this declaration.

3. A true and accurate copy of my Curriculum Vitae is attached to my expert report as Exhibit A thereto. In the past four years, I have qualified as an expert and have testified in two separate cases related to campaign finance: *Lair v. Bullock*, D. Mont, 2012; and *Downing, et al. v. Dauphinais, et al.*, D. Alaska, 2016. I also testified, and was qualified

1

as an expert in the District Court case that led to the U.S. Supreme Court's decision in *Randall v. Sorrell.*

4. The opinions I have rendered in my report (and set forth in this declaration) were and are rendered to a reasonable degree of certainty, and are based on my review of relevant data, testimony taken, public sources of information, and certain accepted research publications, my own research, as well as my own education, training, and experience, in both this case and other cases I have been involved in.  As always, I reserve the right to modify, alter, or change the opinions I have rendered in the event new information, data, or evidence comes to light.

5. The $1,000 limit in KRS §121.150(6) is too low, because the limit leaves candidates and campaigns unable to amass sufficient resources needed for effective advocacy for the reasons set forth below and in my report.

    a. The $1,000 limit results in numerous campaigns having a substantial portion of all itemized donors, frequently from one third and close to one half, reaching the $1,000 limit; in addition, these funds by so called "maxed out" donors who reach the $1,000 limit provide a substantial portion of the campaign revenue.  This indicates that a number of donors desire to donate more, but are prevented from doing so due to the limit.

    b. Second, the $1,000 limit is low because it does not account for the effects of inflation and the increasing costs of operating an election campaign.

    c. Third, based on my analysis of over 200 competitive campaigns in Kentucky, the following funding patterns appear: **(i)** the amount of revenue raised has increased substantially over the past seven election cycles; **(ii)** there is a finite availability of

donors for campaigns; **(iii)** Democrats have raised more money than Republicans on average (and both parties have raised substantially more than third party or independent candidates on average, who typically pull from a substantially smaller pool of available donors); **(iv)** winners have raised more money than losers on average; **(v)** in general, as the degree of competition increases, the amount of revenue for the campaign increases (and the amount necessary to engage in effective advocacy increases); and **(vi)** when comparing revenue that goes to races decided by a margin under 20 percentage points versus those over 20 percentage points, the proportion of donations from candidates, parties, and individuals is much greater for those under 20 percentage points, while the proportion from Political Action Committees (PACs) and contributing organizations is fairly split between those under and over 20 percentage points; contributions from PACs are overwhelmingly in favor of candidates running as Republicans or Democrats, rather than independent or third party candidates.

d. Fourth, the increased presence of indirect Super PACs, especially in the arena of legislative or local elections, means that campaigns, already burdened by the low $1,000 limit, are now in even greater need to raise increased revenue to prepare for independent expenditures against their campaigns.

e. Fifth, the special carve out for the Caucus Campaign Committees for the Democratic and Republican parties create an arbitrary impediment that is likely to become a substantial impediment for any candidate not running under one of those party labels or is not supported by partisan leadership, provided the candidate is running in a competitive race or district.

f. Sixth, with respect to PACs, the aggregate 50% limit arbitrarily restricts the ability of the PAC and their own contributors to support the candidates they wish to advance in the political process, especially in campaigns that are largely self-funded or have very few resources. Minor party candidates and independent candidates would typically fit into one or both of these categories.

g. Seventh, while lost revenue affects multiple candidates of all types (incumbents vs. challengers, winners vs. losers), the patterns established by the funding scheme and a decade of campaigns adapting to different sources indicate that incumbents, who already enjoy substantial advantages in name recognition, reputation, access, and campaign infrastructure, are further insulated from electoral responsiveness and the shifting will of the voters because of systemic advantages, especially those available to Caucus Campaign Committees. These advantages impose an additional hurdle to candidates not running as a Republican or a Democrat.

h. Eighth, the degree of the limit's overbreadth (i.e., the fact that the limits are far lower than needed to fend off corruption or its appearance) as applied and the estimates of lost revenue under either of the hypotheticals in my report (i.e., an increase to $1,500 to account for inflation since the limits were first enacted, or to $2,000 to account for inflation as well as increasing costs of campaigning), has generally increased over recent election cycles, particularly in elections to the Kentucky House of Representatives.

i. Ninth, the combination of these limits as applied to the current funding scheme for legislative and statewide offices means there is an imbalance between the

      limits and preventing corruption or its appearance. This imbalance means the limits are too low because too many donors are limited by the current limits and lost revenue to numerous campaigns is substantial.

   j. Tenth, numerous campaigns, including those of the Plaintiffs, are, would be, and have been hindered in finding the resources they believe they need to run an effective and competitive campaign. This is especially so when the degree of revenue lost in comparison to higher limits is based upon the revenue generated only from sources subject to the limit or based upon new donors needed to offset the lost revenue.

6. The $2,500 limit in KRS §121.150(11) to Caucus Campaign Committees, which are available only to Republicans and Democrats in the Kentucky House and Senate, and not to other parties, is a significant factor in increased funding for legislative elections selected by legislative leaders, and severely inhibits third party and independent candidates from being able to amass the resources necessary to engage in effective advocacy, as set forth in more detail in my report.

7. The aggregate limit in KRS §121.150(23)(a),(b), and (c) applicable to contributions from permanent committees, political parties, and campaign caucus committees, further serves to inhibit candidates generally, and is specifically problematic for the effective advocacy of PACs, as well the effective advocacy of minor party and independent candidates, since the established political parties can effectively double dip: raise and contribute money from both the party, and the Caucus Campaign Committee. These provisions severely inhibit third party and independent candidates, as well as PACs from being able to amass

the resources necessary to engage in effective advocacy, as set forth in more detail in my report.

8. The impact and inability to raise funds necessary for effective advocacy under the Kentucky campaign finance scheme is exacerbated due to the impact of newly founded SuperPACs that can raise and spend without limitation, as set forth in more detail in my report.

9. Finally, the combined effect of the Kentucky campaign finance regime, and specifically the $1,000 limit in KRS §121.150(6), the extra $2,500 limit in KRS §121.150(11) for Caucus Campaign Committees, and the aggregate caps of KRS §121.150(23)(a),(b), and (c) make it extremely difficult for a minor party or independent candidate to raise enough funds to engage in effective advocacy in a meaningful manner.

10. A limit of $2,000 (and then indexing it to inflation), along with permitting third parties to participate and have a Caucus Campaign Committee, would largely eliminate the concerns regarding being able to amass the resources needed for effective advocacy.

Pursuant to 28 U.S.C. §1746, I declare under penalties of perjury under the laws of the United States of America that the foregoing Declaration is true and correct to the best of my knowledge and belief and that such facts are made based on my personal knowledge.

Executed on 12 July 2016.

Clark Bensen