# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:15-cv-155 (WOB-JGW)


SEN. JOHN SHICKEL, ET AL                              PLAINTIFFS


VS.                    **MEMORANDUM OPINION AND ORDER**


CRAIG C. DILGER, ET AL                                DEFENDANTS

This is a civil rights action in which Plaintiffs allege that Kentucky restrictions on campaign finance and lobbyists violate their First Amendment right to free speech and association, as well as their Fourteenth Amendment right to Equal Protection.

This matter is before the Court on separate motions for summary judgment on behalf of Defendant Kentucky Registry of Election Finance (Doc. 62) and Defendant Kentucky Legislative Ethics Commission (Doc. 64), and corresponding cross motions for a preliminary injunction, permanent injunction, and summary judgment by Plaintiffs (Docs. 63, 65).

Having reviewed this matter, and having previously heard oral argument from the parties, the Court now issues this Memorandum Opinion and Order.

1

*Factual and Procedural Background*

**A.    The Parties**

Plaintiff John Schickel ("Schickel") is the incumbent State Senator for the 11th Senatorial District in Kentucky. Plaintiff David Watson ("Watson") is a Libertarian candidate who ran, unsuccessfully, for the 6th House District in 2016.[1] Plaintiff Ken Moellman ("Moellman") is a candidate for the office of Pendleton County Judge/Executive in 2018.

Plaintiffs allege they desire to engage in activities that are currently prohibited by funding restrictions found in certain campaign finance statutes, as well as ethics statutes that apply to legislators, legislative candidates, their spouses, lobbyists, and the employers of lobbyists. (Doc. 65-1 at 1-3).

Defendants are members of the Kentucky Registry of Election Finance ("KREF") and the Kentucky Legislative Ethics Commission ("KLEC"). Plaintiffs allege that Defendants, who are sued in their official capacities, are responsible for the enforcement of the challenged statutes because they can bring civil or administrative enforcement actions, receive citizen complaints regarding alleged

---

[1] *See also Kentucky House of Representatives Elections*, *2016*, BALLOTPEDIA (last visited May 31, 2017), https://ballotpedia.org/Kentucky_House_of_Representatives_elec tions,_2016.

violations, and refer enforcement matters for criminal prosecution. (*Id.*).

**B.    The Statutes**

Plaintiffs challenge two categories of statutes: campaign finance restrictions and lobbying restrictions.

The campaign finance restrictions: (1) limit campaign contributions from individual donors to $1,000 per election; (2) limit campaign contributions from state executive committees or caucus campaign committees to $5,000 per election; (3) limit the amount a candidate may loan to his own campaign to $10,000 per election; (4) and prohibit campaign contributions from a permanent committee which, in the aggregate, exceed 50% of a candidate's total contributions, or $10,000, whichever is greater.

On March 27, 2017, new legislation that made substantial changes to the campaign finance restrictions at issue was signed into law by the Governor of Kentucky. The revisions to KRS § 121.150, found in 2017 Senate Bill 75, are taken into account in the Court's analysis.

The lobbying restrictions, which only Schickel and Watson challenge: (1) prohibit a legislator or his spouse from accepting "anything of value" from a legislative agent[2] or his employer; (2)

_____

2 "The definition of legislative agent under KRS 6.611(22)(a) . . . [is] individuals who are engaged for compensation to participate in lobbying activities on behalf of an organized association, coalition, or public interest entity formed for

3

prohibit a member of the General Assembly, a candidate for the General Assembly, or his campaign committee, from accepting a campaign contribution from a legislative agent at any time, or from a lobbyist's employer during a regular session of the General Assembly; (3) prohibit lobbyists and their employers from offering anything of value to legislators, candidates, or their spouse or child, or making campaign contributions to legislators, candidates, or campaign committees; and (4) prohibit lobbyists from soliciting contributions for candidates or legislators.

## C.    Procedural History

Plaintiffs filed their complaint on August 24, 2015, alleging the unconstitutionality of the challenged statutes, seeking either a temporary restraining order or preliminary injunction to enjoin enforcement of the statutes. (Doc. 1). Defendants moved to dismiss for lack of standing. (Doc. 17). This Court denied the motion to dismiss. (Doc. 25). Defendants now move for summary judgment. (Doc. 62, 64). Plaintiffs also move for summary judgment, in addition to seeking preliminary and permanent injunctions. (Doc 63, 65).

---

the purpose of promoting or otherwise influencing legislation, and the nature and identity of such entity, the subject matter of bill numbers of the legislation to be lobbied, and the source of the entity or association's funds and financial resources must be reported to the commission." Editor's Note to KRS § 6.807.

*Analysis*

**A.   Appropriate Levels of Scrutiny**

For claims relating to campaign finance restrictions, the Supreme Court applies strict scrutiny to limitations on candidate speech (i.e., campaign expenditures), and mid-level scrutiny for donor speech (i.e., campaign contributions), requiring that the limit be "closely drawn to avoid unnecessary abridgement of associational freedoms." *McCutcheon v. Fed. Election Comm'n*, ___ U.S. ___, 134 S. Ct. 1434, 1437 (2014).

For claims relating to lobbying restrictions, laws which may curtail the freedom of association are subject to strict scrutiny. *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 461 (1958); *Fed. Election Comm'n v. Nat'l Right to Work Comm*., 459 U.S. 197, 206 (1982).

Further, the Sixth Circuit applies strict scrutiny to burdens on "core political speech," requiring that a burdensome provision be narrowly tailored to serve the overriding state interest. *Gables v. Patton*, 142 F.3d 940, 945 (6th Cir. 1998).

**B.   Campaign Finance Restrictions**

**1.   $1,000 per donor contribution limit – KRS § 121.150(6)**

Previously, KRS § 121.150(6) stated:

> No candidate, slate of candidates, campaign committee, political issues committee, nor anyone acting on their behalf, shall accept a contribution of more than one thousand dollars ($1,000) from any person, permanent committee, or contributing organization in any one (1)

election. No person, permanent committee, or contributing organization shall contribute more than one thousand dollars ($1,000) to any one (1) candidate, campaign committee, political issues committee, nor anyone acting on their behalf, in any one (1) election.

Prior to the revisions enacted by Senate Bill 75, KRS § 121.150(6) prevented a candidate from receiving a contribution greater than $1,000 from any single person, permanent committee, or organization within an election cycle.

Plaintiffs argued that the $1,000 limitation to each candidate per donor placed an undue burden on candidates for office because the buying power of $1,000 is not the same today as it was in 1996 when the limit was first introduced. Plaintiffs asserted that the limit was not closely drawn to avoid abridgment of First Amendment rights because the amount was so low that it prevented candidates "from mounting effective campaigns."

Senate Bill 75 has raised the $1,000 limit to $2,000, and it requires that the limit be indexed for inflation on a bi-annual basis. This revision thus directly addresses Plaintiffs' concern of the limit's insufficiency and its potential restraint on speech.

Therefore, the Court will deny as moot all motions for summary judgment with respect to KRS § 121.150(6).

## 2. $5,000 caucus campaign committee contribution limit – KRS 121.150(11) & 121.015(3)(b)

Currently, KRS § 121.150(11) states:

(a) No person shall contribute more than five thousand dollars ($5,000) to the state executive

6

committee of a political party in any one (1) year. The contribution limit in this paragraph shall not apply to a contribution designated exclusively for a state executive committee's building fund account established under Section 4 of this Act.

(b) No person shall contribute more than five thousand dollars ($5,000) to a subdivision or affiliate of a state political party in any one (1) calendar year.

(c) No person shall contribute more than five thousand dollars ($5,000) to a caucus campaign committee in any one (1) year.

KRS § 121.150(11) allows individual donors to give up to $5,000 per year to either a state political party's executive committee or a caucus campaign committee.

Plaintiffs assert that this provision constitutes viewpoint discrimination in violation of the Equal Protection Clause by allowing individuals to give larger contributions to the Republican and Democratic parties, the only political parties in Kentucky that maintain such committees. Plaintiffs believe this creates a grave disadvantage for third party candidates such as Watson.

The government commits viewpoint discrimination when it gives preference to certain speakers over others. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 312 (2010). Here, KRS § 121.150(11) allows two specific political parties to receive the highest contributions: executive committees of political parties and campaign caucus committees. Subsection 121.015(3)(b) defines

"caucus campaign committee" narrowly to include only four specific

groups:

> "Caucus campaign committee," which means members of
> one (1) of the following caucus groups who receive
> contributions and make expenditures to support or
> oppose one (1) or more specific candidates or slates
> of candidates for nomination or election, or a
> committee:
> 1. House Democratic caucus campaign committee;
> 2. House Republican caucus campaign committee;
> 3. Senate Democratic caucus campaign committee; and
> 4. Senate Republican caucus campaign committee.

KRS § 121.015(3)(b).

The statute thus does not allow for the same contributions to

other party caucus campaign committees that may be created in the

future.[3] A newly created Senate Libertarian caucus campaign

committee, for example, would not be eligible for the $5,000

contribution caps, and instead could only receive up to $2,000

from each donor if it were to qualify as a permanent committee.

*See* KRS § 121.150(10).

Equal protection challenges to election finance restrictions

under the Fourteenth Amendment must survive "exacting scrutiny."

*Buckley v. Valeo*, 424 U.S. 1, 44-45 (1976). "The restriction can

be sustained only if it furthers a vital governmental interest

that is achieved by a means that does not unfairly or unnecessarily

---

3  KRS § 121.150(11) taken alone on its face is constitutional
   because the subsection does not preclude the creation of a minor
   party caucus campaign committee.

burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity." *Id.* at 94 (internal quotations and citations omitted).

Defendants argue that the purpose of caucus campaign committees is to "separate the legislative caucus from control by a political party's executive committee." (Doc. 67-1 at 21). While this argument may explain the purpose of caucus campaign committees, it does not explain the exclusionary definition found in subsection (3)(b). The legislature could have defined "caucus campaign committees" in a broader way that would allow its application to committees affiliated with political groups other than the Republicans or Democrats.

Defendants further argue that nothing prevents either of the major party caucus campaign committees from contributing to minor party candidates. Though true, it remains that subsection (3)(b) on its face treats members of major and minor parties differently. Defendants have not demonstrated that this differential treatment is supported by a vital government interest.

Therefore, KRS § 121.015(3)(b) is unconstitutional on its face.[4]

---

4 Senate Bill 75 recently increased the limit in KRS § 121.150(11) from the previous cap of $2,500 to the current limit of $5,000. The increase in the fundraising limit from $2,500 to $5,000 thus creates an even larger benefit for the two majority parties.

Therefore, regarding KRS § 121.150(11) and KRS § 121.015(3)(b), the Court will grant in part and deny in part both Defendants' and Plaintiffs' motions for summary judgment in line with the analysis above.

### 3.    $10,000 limit on self-funding campaign loans – KRS § 121.150(13)

Previously, KRS § 121.150(13) stated:

> No candidates running as a slate for the offices of Governor and Lieutenant Governor shall make combined total personal loans to their committee in excess of fifty thousand dollars ($50,000) in any one (1) election. No candidate for any other statewide elected state office shall lend to his committee any amount in excess of twenty-five thousand dollars ($25,000) in any one (1) election. In campaigning for all other offices, no candidate shall lend to his committee more than ten thousand dollars ($10,000) in any one (1) election.

KRS § 121.150(13) imposed limitations on the amount of money a candidate could loan their own campaign committee, capped at various amounts depending on the office. *Id*. Both parties recognize that in 2004 the Sixth Circuit found this section of the statute to be wholly unconstitutional, *Anderson v. Spear*, 356 F.3d 651, 673 (6th Cir. 2004), although Plaintiffs expressed concern that Defendant KREF may arbitrarily enforce the statute regardless.

Senate Bill 75 has eliminated KRS § 121.150(13). Therefore, the Court will deny as moot all motions for summary judgment with respect to that provision.

**4.  $10,000 or 50% limit on permanent/executive/caucus campaign committee receipts – KRS 121.150(23)**

Previously, KRS § 121.150(23)(a)-(c) stated:

(a) A candidate or a slate of candidates for elective public office shall not accept contributions from permanent committees which, in the aggregate, exceed fifty percent (50%) of the total contributions accepted by the candidate or a slate of candidates in any one (1) election or ten thousand dollars ($10,000) in any one (1) election, whichever is the greater amount. The percentage of the total contributions or dollar amounts of contributions accepted by a candidate or a slate of candidates in an election that is accepted from permanent committees shall be calculated as of the day of each election. Funds in a candidate's or a slate of candidates' campaign account which are carried forward from one (1) election to another shall not be considered in calculating the acceptable percentage or dollar amount of contributions which may be accepted from permanent committees for the election for which the funds are carried forward. A candidate or a slate of candidates may, without penalty, contribute funds to his campaign account not later than sixty (60) days following the election so as not to exceed the permitted percentage or dollar amount of contributions which may be accepted from permanent committees or the candidate or a slate of candidates may, not later than sixty (60) days after the end of the election, refund any excess permanent committee contributions on a pro rata basis to the permanent committees whose contributions are accepted after the aggregate limit has been reached.

(b) The provisions of paragraph (a) of this subsection regarding the receipt of aggregate contributions from permanent committees in any one (1) election shall also apply separately to the receipt of aggregate contributions from executive committees of any county, district, state, or federal political party in any one (1) election.

(c) The provisions of paragraph (a) of this subsection regarding the receipt of aggregate contributions from permanent committees in any one (1) election shall also apply separately to the receipt of aggregate contributions from caucus campaign committees.

KRS § 121.150(23) prevented candidates from accepting more than $10,000 or 50% of their aggregate campaign funds (whichever is greater) from (a) permanent committees (more commonly known as political action committees or "PACs"), (b) executive committees (such as the Democratic/Libertarian/Republican Party of Kentucky), or (c) caucus campaign committees.

This provision thus allowed these partisan committees to inject a large sum of cash into a candidate's campaign, but prevented the groups from contributing a literal majority of the candidate's total funds, capping the maximum at half of the aggregate total of the candidate's war chests.

Senate Bill 75 has completely eliminated KRS § 121.150(23), including subsections (a) through (c). Therefore, the Court will deny as moot all motions for summary judgment with respect to KRS § 121.150(23).

## C. Restrictions on Lobbyists

### 1. Statutory ban on a legislator's receipt of "anything of value" – KRS § 6.751(2) & KRS § 6.811(4)

KRS § 6.751(2) states:

> A legislator or his spouse shall not solicit, accept, or agree to accept anything of value from a legislative agent or an employer. Violation of this subsection is a Class B misdemeanor.

KRS § 6.811(4) states:

A legislative agent or employer shall not knowingly offer, give, or agree to give anything of value to a legislator, a candidate, or the spouse or child of a legislator or candidate.

Plaintiffs allege that these provisions, referred to by both parties as the "gift ban," are constitutionally infirm in many respects.

First, Plaintiffs argue a prohibition on the receipt of "anything of value" by a legislator from a lobbyist or his employer is unconstitutionally vague and overbroad, which creates a chilling effect on the right to lobby. Further, they allege the ban violates the Fourteenth Amendment's guarantee of equal protection because it (i) treats lobbyists differently and (ii) creates a content-based restriction by targeting the speaker's identity.

KRS § 6.611(2)(a) defines "anything of value" broadly to include:

1. A pecuniary item, including money, or a bank bill or note;
2. A promissory note, bill of exchange, order, draft, warrant, check, or bond given for the payment of money;
3. A contract, agreement, promise, or other obligation for an advance, conveyance, forgiveness of indebtedness, deposit, distribution, loan, payment, gift, pledge, or transfer of money;
4. A stock, bond, note, or other investment interest in an entity;
5. A receipt given for the payment of money or other property;
6. A right in action;

7. A gift, tangible good, chattel, or an interest in a gift, tangible good, or chattel;
8. A loan or forgiveness of indebtedness;
9. A work of art, antique, or collectible;
10. An automobile or other means of personal transportation;
11. Real property or an interest in real property, including title to realty; a fee simple or partial interest, present or future, contingent or vested, within realty; a leasehold interest; or other beneficial interest in realty;
12. A rebate or discount in the price of anything of value unless the rebate or discount is made in the ordinary course of business to a member of the public without regard to that person's status as a legislator;
13. A promise or offer of employment; or
14. Any other thing of value that is pecuniary or compensatory in value to a person, or the primary significance of which is economic gain.

An additional subsection of this definition states that "compensation, food, beverages, entertainment, transportation, lodging, or other goods" are also prohibited if, and only if, they are from a lobbyist or a lobbyist's employer. KRS § 6.611(2)(b)(2). Violation of KRS § 6.751(2) by either a legislator or legislative candidate, or his/her spouse, is a Class B criminal misdemeanor.

KRS § 6.611(2)(b)(8) carves out an exception under which an active legislator may accept "the cost of attendance or participation, and of food and beverages consumed at events" to which either the entirety of the body of the legislature, a joint committee task force, or an approved caucus of legislators is invited.

Simply put, it is a criminal act for a legislator to attend an event hosted by a company which lobbies the state government, but it is not a criminal act if the company has extended the invitation to everyone in the legislature. There is no requirement for the lobbyist to report which legislators attended the event, if any, regardless of the cost, location, or purpose of the event. Qualifying events may be held outside of the state of Kentucky, and could even include an all-expense paid vacation to a foreign destination or luxury resort, as long as the invitation is a blanket one to a qualifying group of legislators.

In 2014, KRS § 6.611 was amended to remove a *de minimis* exception on incidental costs incurred by lobbyists when hosting an individual legislator. That now-defunct exception allowed for expenditures up to $100 per year for each legislator, and all expenditures had to be reported by the lobbyist to the Ethics Commission. Alternatively, the $100 limit could also count towards non-promotional, non-cash items given to a legislator on behalf of a lobbyist or his employer.

The crux of Plaintiffs' challenge to the "gift ban" is whether the removal of the *de minimis* exception in 2014 was intended to combat actual *quid pro quo* corruption, in a way that does not impose an unnecessary burden on speech. This issue, as well as the other constitutional issues raised by Plaintiffs, are examined below.

### a. Vagueness

A statute which proscribes criminal punishment violates the Fifth Amendment's guarantee of due process when it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, ___ U.S. ___, 135 S. Ct. 2551, 2556 (2015).

An illustration of how arbitrarily this "gift ban" is applied can be found in the testimony of the Executive Director of the Ethics Commission. In his deposition, the Executive Director admitted that a bottle of water consumed by a legislator during the course of a meeting at a lobbyist's office to discuss a pending bill would be a "possible" thing of value that would violate the ban, and suggested that the legislator should literally call him on the telephone to "ask [] if he should accept it under the circumstance." (Schaaf Depo., Doc. 47-1 at 49-50). This testimony alone indicates that the law is unconstitutionally vague because it does not give a person of ordinary intelligence the ability to know what conduct is prohibited. *Johnson*, 135 S. Ct. at 2556.

Plaintiffs argue that, given the elimination of the *de minimis* exception, this ban does not pass closely drawn scrutiny, let alone strict scrutiny, because the ban is not related to the deterrence of *quid pro quo* corruption. They point to further testimony from the Executive Director of the Ethics Commission, who admitted that

the ban was actually enacted due to complaints by some of the legislators who "were surprised by the fact that their names were being reported for some event that they didn't think was going to be reported that they attended or didn't attend in some cases." (Schaaf Depo., Doc. 47-1 at 189-191).

In addition to creating an as-applied vagueness problem, this testimony is a clear admission that the reason for removing the *de minimis* exception was not problems with *quid pro quo* corruption or its appearance. Moreover, removing the requirement for disclosure of a lobbyist's expenditures on individual legislators eliminated a mechanism of accountability and transparency, simply because the legislators objected to their names showing up on the reports.

Another vagueness problem arises with the exception for events to which the entire legislature is invited. What if an event hosted by a large company who employs lobbyists is open to the general public and no specific invitation is required? Is it necessary that the entire legislature needs to be put on notice if Senator Schickel wishes to attend the event? What if the Senator is under the impression that the entire legislature was invited, but later learns that was not the case? KRS § 6.751(2) is too vague to answer these questions. It is thus unconstitutional because it does not provide fair notice of what conduct might violate it, creating opportunities for arbitrary enforcement of criminal law.

### b. Content-Based Restriction on Speech

Plaintiffs also allege that the gift ban amounts to a content-based speech restriction because it targets the identity of the giver.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, ___ U.S. ___, 135 S. Ct. 2218, 2227 (2015). A law in which the restriction is speaker-based does not render it content neutral because "speech restrictions based on the identity of the speaker are all too often simply a means to control content." *Reed*, 135 S. Ct. at 2230 (internal quotations and citations omitted).

"Political speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

Here, lobbyists and their employers are the only persons banned from giving a legislator "anything of value." The purpose of a lobbyist is to influence government, which is the very heart of politics. Therefore, a speaker-based ban which suppresses political speech requires the government to show that the ban is

narrowly tailored to achieve the purpose of combatting *quid pro quo* corruption. *Citizens United*, 558 U.S. at 340.

As previously discussed, the statutes allow lobbyists and their employers to invite all legislators to events, with no requirement to report which legislators actually end up attending. This lack of accountability for "group events" does not render a complete ban on invitations to fewer than all legislators narrowly tailored to prevent *quid pro quo* corruption. At any event, large or small, a lobbyist may still corner a particular legislator in an effort to broker a *quid pro quo* deal. Further, the deletion of the $100 *de minimis* exception increases this risk because it eliminated the only reporting mechanism—meaning information about which legislators attended events hosted by lobbyists and their employers is no longer public record.

### c. Chilling Effect and Overbreadth

Plaintiffs next allege that the gift ban creates a chilling effect on speech and is overly broad, two issues that go hand in hand.

The act of lobbying is protected by the First Amendment right to petition the government. *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 297 (6th Cir. 1992). Lobbying is thus protected from overly broad restrictions that cause a chilling effect on the protected expression. *Broadrick v. Oklahoma*, 413 U.S. 601, 630 (1973). The Sixth Circuit has stated:

> A law is overbroad under the First Amendment if it reaches a substantial number of impermissible applications relative to the law's legitimate sweep. The overbreadth doctrine exists to prevent the chilling of future protected expression. Therefore, any law imposing restrictions so broad that it chills speech outside the purview of its legitimate regulatory purpose will be struck down.

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 274 F.3d 377, 387 (6th Cir. 2001)(internal quotations and citations omitted). A law's use of criminal sanctions, as found in KRS § 6.751(2), magnifies the chilling effect. *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 345 (6th Cir. 2009).

As discussed, the scope of the gift ban is so broad that even a glass of water may be considered a violation. Plaintiffs argue that if water is an item of value, then so might be the heating of a building on a cold winter day, or air-conditioned cooling in the middle of the summer. Not knowing what otherwise mundane amenities may constitute something of "value" would cause hesitation on the part of a legislator if invited to a lobbyist's office to discuss a matter of importance.

As Plaintiffs point out, lobbyists and their employers are often major players in whatever industry they participate, and they serve as "excellent sources of information, and are experts in certain industries and fields." (Doc. 65-1 at 4). "Influence and access, moreover, are not sinister in nature. Some influence,

such as wise counsel from a trusted advisor—even if that advisor is a lobbyist—can enhance the effectiveness of our representative government." *Green Party of Connecticut v. Garfield*, 616 F.3d 189, 206 (2d Cir. 2010).

If a legislator is hesitant to visit a factory or manufacturing facility operated by a company that actively lobbies the legislature for fear that the visit may constitute an economic benefit, the legislator misses out on the opportunity to learn more about that particular industry. If even the act of accepting a glass of water could amount to a criminal violation, a legislator would reasonably be hesitant to attend a meeting at a lobbyist's office to discuss a matter of potential public importance.

Therefore, the gift ban may include innocuous interactions between legislators and constituents that could cause a chilling effect on fundamental interactions in the furtherance of the democratic process.

In addition, the law impedes the legislator's right, as an individual, to associate with a member of the public, having a direct effect on personal relationships that may exist prior to and outside of the lobbyist's professional career. As Plaintiffs note, the ban prohibits a member of the Kentucky legislature from attending a social event held by his friend if that person happens to be a lobbyist. This ban extends even to the legislator's spouse, and it is written so broadly that it would include private events

hosted by a close friend, such as a family dinner or graduation party.

Defendants argue that legislators are free to attend such events within the confines of this ban as long as the legislator or his/her spouse reimburses the lobbyist for anything of value obtained. As KRS § 6.611 is currently written, that would include paying the host for any entertainment, food, or drink consumed by either the legislator or spouse at the event. This requirement is clearly an overreaching and unreasonable restraint on an individual's freedom of association with other members of the public.

The vagueness and overbreadth of this section may be illustrated by the following example: suppose someone is employed by the Northern Kentucky Chamber of Commerce, and part of his or her duty is to assist in lobbying. Suppose that person's father dies and he or she is paying for a funeral, at the conclusion of which refreshments are served. Suppose further that a state legislator who is a friend of the lobbyist's brother attends the funeral and partakes of the refreshments, but the legislator does not know that the host is a lobbyist.

Under the language of the statute, would an offense be committed by the legislator? The statute is vague on this point. It is also overbroad in that fear of its application would deter people from engaging in activities which are protected by freedom

of association and the liberty guaranteed by the Constitution of the United States.

### d. Equal Protection

Plaintiffs also allege that the gift ban treats lobbyists differently from other constituents, and is therefore in violation of their rights to equal protection.

Even though lobbyists and their employers are not part of a suspect class, a law that treats them differently from other citizens is subject to the highest level of scrutiny when it seeks to suppress their political expression. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 666 (1990)("Because the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest.")(citing *Police Department of Chicago v. Mosley*, 408 U.S. 92, 101 (1972), overruled on other grounds by *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)).

As discussed, influencing the government through the act of lobbying is at the heart of the political process. A law that specifically restricts what a lobbyist can and cannot do regarding a legislative member of government is a suppression on their freedom of association with those individuals. *Id*.

Therefore, the Court will deny Defendants' motion for summary judgment and grant Plaintiff's motion for summary judgment with respect to KRS § 6.751(2) and KRS § 6.811(4).

**2.    Statutory ban on campaign contributions from lobbyists at all times – KRS § 6.767(1) & KRS § 6.811(6)**

KRS § 6.767(1) states:

> A member of the General Assembly, candidate for the General Assembly, or his or her campaign committee shall not accept a campaign contribution from a legislative agent. Violation of this provision is ethical misconduct.

KRS § 6.811(6) states:

> A legislative agent shall not make a campaign contribution to a legislator, a candidate, or his or her campaign committee.

KRS § 6.767(1) and KRS § 6.811(6) together thus impose a complete ban on campaign contributions from lobbyists at all times.

Contributions to a candidate or incumbent legislator's campaign are protected by the First Amendment as both a means of political expression and political association. *McCutcheon v. Fed. Election Comm'n*, ___ U.S. ___, 134 S. Ct. 1434, 1448 (2014). Campaign contributions may only be limited to serve the legitimate government interest of preventing *quid pro quo* corruption or its appearance. *Id*. at 1450.

Any such restrictions must be "closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley v. Valeo*, 424 U.S. 1, 25 (1976). The Sixth Circuit applies strict

scrutiny to burdens on "core political speech," requiring that a burdensome provision be narrowly tailored to serve the overriding state interest. *Gables v. Patton*, 142 F.3d 940, 945 (6th Cir. 1998). The government has the burden of proving that a restriction on campaign contributions furthers the objective of preventing *quid pro quo* corruption or its appearance. *McCutcheon,* 134 S. Ct. at 1452.

Here, Defendants fail to show that a complete ban on campaign contributions from lobbyists is narrowly tailored to prevent *quid pro quo* corruption. Defendants point to *North Carolina Right to Life, Inc. v. Bartlett* as an example of restrictions on contributions from lobbyists that have been upheld as constitutional. 168 F.3d 705 (4th Cir. 1999). However, the Fourth Circuit found North Carolina's ban on contributions made by lobbyists to be constitutional because it was narrowly tailored to "last only during the legislative session." *Bartlett*, 168 F.3d at 716.

> North Carolina's restrictions do nothing more than place a temporary hold on appellees' ability to contribute during the General Assembly session, leaving them free to contribute during the rest of the calendar year and to engage in political speech for the entire year.

*Id*. at 715.

Defendants cite to a similar case in which the Supreme Court of Vermont also found a ban on contributions from lobbyists during a legislative session to be constitutional because "the limited

prohibition focuses on a narrow period during which legislators could be, or could appear to be, pressured, coerced, or tempted into voting on the basis of cash contributions rather than on consideration of the public weal." *Kimbell v. Hooper*, 665 A.2d 44, 51 (Vt. 1995).

Plaintiffs and Defendants both cite to *Green Party of Connecticut*, where the Second Circuit struck down a ban on contributions from lobbyists, although Defendants argue that the Court did so only "because the lobbyists had nothing to do with the scandal at issue." (Doc. 70 at 22).

In fact, *Garfield* echoes the same concerns about complete bans on contributions that underline Plaintiffs' claims:

> Indeed, a contribution ban cuts off even the symbolic expression of support evidenced by a small contribution. Thus, if the state's interests in this case can be achieved by means of a limit on lobbyist contributions, rather than a ban, the ban should be struck down for failing to avoid unnecessary abridgment of associational freedoms.

*Green Party of Connecticut v. Garfield*, 616 F.3d 189, 206 (2d Cir. 2010)(internal quotations and citations omitted).

Here, the Kentucky statutes at issue do not permit lobbyists to make contributions during any time of year. It is clear that the statute could be narrowed to prohibit lobbyists from contributing only during an active legislative session.

The Court concludes that Kentucky's complete ban on all campaign contributions from lobbyists is unconstitutional because

there are less restrictive means available that may achieve the same goal, such as setting an annual limit or limiting the ban to the active legislative session. Thus, the statutes are neither closely drawn nor narrowly tailored to achieve the compelling state interest of preventing *quid pro quo* corruption. *See Bartlett*, 168 F.3d at 715-16; *Garfield*, 616 F.3d at 206.

As with the previous example regarding the gift ban, this statute is also overbroad because the candidate might not know that the contribution comes from a "legislative agent." The donor might not even know he or she is considered a "legislative agent" if they are a clerical employee of an organization such as the Chamber of Commerce or the Kentucky Bar Association.

Therefore, the Court will deny Defendants' motion for summary judgment with respect to KRS § 6.757(1) and KRS § 6.811(6).

**3. Ban on campaign contributions from employers of lobbyists during an active legislative session – KRS § 6.767(2) & KRS § 6.811(7)**

KRS § 6.767(2) states:

> A member of the General Assembly, candidate for the General Assembly, or his or her campaign committee shall not, during a regular session of the General Assembly, accept a campaign contribution from an employer of a legislative agent, or from a permanent committee as defined in KRS 121.015. This subsection shall not apply to candidates for the General Assembly in a special election held during a regular session of the General Assembly. Violation of this provision is ethical misconduct.

KRS § 6.811(7) states:

> During a regular session of the General Assembly, an employer of a legislative agent shall not make a campaign contribution to a legislator, candidate, campaign committee for a legislator or candidate, or caucus campaign committee. This subsection shall not apply to candidates for the General Assembly in a special election held during a regular session of the General Assembly.

KRS 6.767(2) prohibits legislators and candidates from accepting campaign contributions from an employer of a lobbyist during regular sessions of the General Assembly, and KRS 6.811(7) reciprocally prohibits employers of lobbyists from making campaign contributions during regular sessions of the General Assembly.

Plaintiffs allege that a complete ban on contributions at any time is a drastic limitation on First Amendment rights, even during the General Assembly session, and requires actual evidence of a recent scandal to demonstrate that a ban is the only possible method of curtailing corruption. The Sixth Circuit has held that less restrictive bans are favorable to an outright ban on contributions because the latter is a drastic restriction and requires the government to assert something greater than its own discretion to "demonstrate *how* its contribution ban furthers a sufficiently important interest." *Lavin v. Husted*, 689 F.3d 543, 547 (6th Cir. 2012).

Here, KRS 6.767(2) and KRS 6.811(7) only impose a ban during active legislative sessions. This time-specific prohibition is less restrictive than a complete ban, and is closely drawn to the

goal of deterring corruption or its appearance by preventing money from exchanging hands between legislators and lobbyists during legislative sessions when *quid pro quo* corruption would be a greater danger. *Id.; see also Kimbell*, 665 A.2d at 51 (holding a contribution ban during active legislative sessions constitutional because it focused on a narrow period of time when legislators could be, or appear to be, pressured to act).

Therefore, the Court will grant Defendants' motion for summary judgment and deny Plaintiffs' motion for summary judgment with respect to KRS § 6.767(2) and KRS § 6.811(7).

### 4. Prohibition on lobbyists serving as campaign treasurers, and on soliciting, controlling, or delivering a campaign contribution. – KRS § 6.811(5)

KRS § 6.811(5) states:

> A legislative agent shall not serve as a campaign treasurer, and shall not directly solicit, control, or deliver a campaign contribution, for a candidate or legislator.

Plaintiffs allege that preventing a lobbyist from soliciting on behalf of a candidate is an unreasonable restriction on speech that does not serve the purpose of combatting *quid pro quo* corruption, and it is not the least restrictive means to achieve that goal.

An individual's ability to solicit contributions, rather than directly make a contribution, lies close to the core of protected political speech. *Garfield*, 616 F.3d at 207–08; *see also Fed.*

*Election Comm'n v. Beaumont*, 539 U.S. 146, 163 (2003)(holding a ban on direct contributions from corporations to be constitutional because it did not interfere with the corporation's right to advocate for candidates through other avenues of solicitation). As the Second Circuit stated:

> Unlike laws limiting contributions, which present marginal speech restrictions that lie closer to the edges than to the core of political expression, a limit on the solicitation of otherwise permissible contributions prohibits exactly the kind of expressive activity that lies at the First Amendment's core. That is because the solicitation of contributions involves speech—to solicit contributions on behalf of a candidate is to make a statement: "You should support this candidate, not only at the polls but with a financial contribution." Whatever may be said about whether money is speech, speech is speech, even if it is speech about money.

*Garfield*, 616 F.3d at 207–08 (internal quotations and citations omitted).

Here, KRS § 6.811(5) prohibits a lobbyist from advocating his or her support for a candidate through solicitation of any kind. This restriction impedes an individual's associational freedom by stifling a lobbyist's ability to express his or her opinion of a candidate's worthiness of support, even to a member of his or her own family. *Garfield*, 616 F.3d at 203–04.

Defendants counter that this solicitation ban is constitutional because other jurisdictions have upheld similar bans. However, Defendants have shown no evidence of recent corruption in Kentucky that would show that the ban is narrowly

tailored to address an important government interest. Defendants'
reliance on other states' court findings of constitutionality on
different statutes is thus unavailing.

Therefore, the Court will deny Defendants' motion for summary
judgment and grant Plaintiff's motion for summary judgment with
respect to KRS § 6.811(5).

**D. Plaintiff Ken Moellman, Jr.'s standing**

"To establish Article III standing, an injury must be
concrete, particularized, and actual or imminent; fairly traceable
to the challenged action; and redressable by a favorable ruling."
*Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2015)
(quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 133 S.Ct.
1138, 1147 (2013)).

To demonstrate standing, Plaintiffs need only plead that they
reasonably fear actions that might be taken by Defendants that
would cause them an injury in fact. *Id.* "Where plaintiffs allege
an intention to engage in a course of conduct arguably affected
with a constitutional interest which is clearly proscribed by
statute, courts have found standing to challenge the statute, even
absent a specific threat of enforcement." *United Food & Commercial
Workers Int'l Union, AFL-CIO, CLC v. IBP, Inc.*, 857 F.2d 422, 428
(8th Cir. 1988).

Moellman alleges his intent to run for County Judge/Executive
of Pendelton County in the 2018 election. Defendants assert that

Moellman lacks standing because he has yet to register to run for said office. This argument is not well taken. According to the Kentucky Secretary of State's website, the earliest filing date for the seat in question would be November 8, 2017, and therefore Moellman is unable to officially register until that date.[5] Though it is possible for a potential candidate to file a "Letter of Intent" with KREF prior to the open ballot registration, it is not required.[6] Therefore, Moellman's expressed intent to run for election is sufficient to confer standing.

Therefore, the Court will deny Defendants' motion for summary judgment and grant Plaintiffs' motion for summary judgment with respect to Ken Moellman Jr.'s standing in the instant case.

Therefore, having heard the parties, and the Court being sufficiently advised,

**IT IS ORDERED** that:

---

5 *County Judge/Executive Republican and Democrat Party Candidates Primary Election*, COMMONWEALTH OF KENTUCKY, OFFICE OF THE SECRETARY OF STATE, http://apps.sos.ky.gov/CandidateFilingDocuments/CountyJudgeExecutive_RepublicanDemocraticPrimary.pdf (last visited May 31, 2017).

6 *Guide to Campaign Finance*, KREF, http://kref.ky.gov/SiteAssets/Pages/Online-Training/Candidate%20Guide%20to%20Campaign%20Finance.pdf (last visited May 31, 2017).

(1) Defendants' motion for summary judgment (Doc. 62) and Plaintiffs' motion for summary judgment and injunction (Doc. 63) with respect to KRS § 121.150(6) be, and are hereby, **DENIED as moot**;

(2) Defendants' motion for summary judgment (Doc. 62) and Plaintiffs' motion for summary judgment and injunction (Doc. 63) with respect to KRS § 121.150(11) and KRS § 121.015(3)(b) be, and are hereby **GRANTED** in part and **DENIED** in part, in line with the analysis above;

(3) Defendants' motion for summary judgment (Doc. 62) and Plaintiffs' motion for summary judgment and injunction (Doc. 63) with respect to KRS § 121.150(13) (Doc. 62) be, and are hereby, **DENIED as moot**;

(4) Defendants' motion for summary judgment (Doc. 62) and Plaintiffs' motion for summary judgment and injunction (Doc. 63) with respect to KRS § 121.150(23) (Doc. 62) be, and are hereby, **DENIED as moot**;

(5) Defendants' motion for summary judgment (Doc. 64) with respect to KRS § 6.751(2) be, and is hereby, **DENIED**;

(6) Plaintiffs' motion for summary judgment and injunction (Doc. 65) with respect to KRS § 121.751(2) be, and is hereby, **GRANTED**;

(7) Defendants' motion for summary judgment (Doc. 64) with respect to KRS § 6.811(4) be, and is hereby, **DENIED**;

(8)  Plaintiffs' motion for summary judgment and injunction
     (Doc. 65) with respect to KRS § 6.811(4) be, and is
     hereby, **GRANTED;**

(9)  Defendants' motion for summary judgment (Doc. 64) with
     respect to KRS § 6.767(1) be, and is hereby, **DENIED;**

(10) Plaintiffs' motion for summary judgment and injunction
     (Doc. 65) with respect to KRS § 6.767(1) be, and is
     hereby, **GRANTED;**

(11) Defendants' motion for summary judgment (Doc. 64) with
     respect to KRS § 6.811(6) be, and is hereby, **DENIED;**

(12) Plaintiffs' motion for summary judgment and injunction
     (Doc. 65) with respect to KRS § 6.811(6) be, and is
     hereby, **GRANTED;**

(13) Defendants' motion for summary judgment (Doc. 64) with
     respect to KRS § 6.767(2) be, and is hereby, **GRANTED;**

(14) Plaintiffs' motion for summary judgment and injunction
     (Doc. 65) with respect to KRS § 6.767(2) be, and is
     hereby, **DENIED;**

(15) Defendants' motion for summary judgment (Doc. 64) with
     respect to KRS § 6.811(7) be, and is hereby, **GRANTED;**

(16) Plaintiffs' motion for summary judgment and injunction
     (Doc. 65) with respect to KRS § 6.811(7) be, and is
     hereby, **DENIED;**

(17) Defendants' motion for summary judgment (Doc. 64) with respect to KRS § 6.811(5) be, and is hereby, **DENIED**;

(18) Plaintiffs' motion for summary judgment and injunction (Doc. 65) with respect to KRS § 6.811(5) be, and is hereby, **GRANTED**; and

(19) The parties shall confer and draft a permanent injunction that comports with this Opinion and Fed. R. Civ. P. 65, and they shall file the proposed injunction **within twenty (20) days of entry of this Order.** This shall not constitute a waiver of any party's right to contest or appeal the rulings adverse to them.

This 6th day of June, 2017.



Signed By:

*William O. Bertelsman* WOB

**United States District Judge**