```
                                                                     1

 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                  NORTHERN DIVISION AT COVINGTON

 3
     JOHN SCHICKEL, in his            :  Docket No. CV 15-155
 4   official capacities, et al.,     :
                                      :
 5                    Plaintiffs,     :  Covington, Kentucky
                                      :  June 30, 2016
 6             versus                 :  1:00 p.m.
                                      :
 7   CRAIG C. DILGER, et al.,         :
                                      :
 8                    Defendants.     :

 9                            - - -

10              TRANSCRIPT OF ORAL ARGUMENT
              BEFORE WILLIAM O. BERTELSMAN,
11          UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:

13   For the Plaintiffs:           ROBERT A. WINTER, JR., ESQ.
                                   P.O. Box 175883
14                                 Ft. Mitchell, KY 41017-5883

15                                 CHRISTOPHER D. WIEST, ESQ.
                                   25 Town Center Boulevard, Ste. 104
16                                 Crestview Hills, KY 41017

17                                 THOMAS B. BRUNS, ESQ.
                                   Freund, Freeze & Arnold
18                                 2400 Chamber Center Dr., Ste. 200
                                   Ft. Mitchell, KY 41017
19
     For the Movant,               WILLIAM H. BRAMMELL, JR., ESQ.
20   House Democratic Campaign     KENT WICKER, ESQ.
     Caucus Committee:             Dressman, Benzinger & Lavelle, PSC
21                                 207 Thomas More Parkway
                                   Crestview Hills, KY 41017-2596
22
     Court Reporter:               JOAN LAMPKE AVERDICK, RMR-CRR
23                                 Official Court Reporter
                                   35 W. Fifth Street
24                                 Covington, KY 41011
                                   (859) 291-9666
25        Proceedings recorded by mechanical stenography,
     transcribed by computer.
```

1       (Proceedings commenced at 1:00 p.m.)

2              THE COURT: Okay. Let's get everybody's appearance,
3       starting with the plaintiffs.
4              MR. WINTER: Good afternoon, Your Honor. Robert A.
5       Winter, Junior for the plaintiffs.
6              THE COURT: Okay.
7              MR. WIEST: Chris Wiest, Your Honor, for the
8       plaintiffs.
9              MR. BRUNS: Tom Bruns for the plaintiffs.
10             THE COURT: Okay.
11             MR. BRAMMELL: Bill Brammell on behalf of the
12      nonparty Democratic House and Senate Caucus Committees.
13             MR. WICKER: And Kent Wicker also, Your Honor.
14             THE COURT: Pardon?
15             MR. WICKER: And Kent Wicker also, Judge.
16             THE COURT: Okay. So we're missing somebody, aren't
17      we?
18             MR. WINTER: The Kentucky Registry for Election
19      Finance will not be here, and we don't have a word from the
20      Attorney General, Judge.
21             THE COURT: Okay. Who's defending it in general,
22      aside from this subpoena?
23             MR. WINTER: You mean the House and Senate Democratic
24      party committees?
25             THE COURT: No, I don't mean -- that's not mainly

1    what your lawsuit's against, is it?
2             MR. BRUNS:  Oh, no.  No.
3             THE COURT:  Who's defending it, the attorney general?
4             MR. WIEST:  Well, Your Honor, the Registry of
5    Election Finance has their own lawyer, and the Attorney
6    General is representing the Kentucky Legislative Ethics
7    Commission.
8             THE COURT:  Okay.  But they're not interested in this
9    and they haven't appeared?
10            MR. WIEST:  I don't believe so.
11            THE COURT:  Did they file anything?
12            MR. WINTER:  No.
13            THE COURT:  Okay.  So here we have a third-party
14   subpoena.  These caucuses, or the one caucus, the Democratic
15   caucus, is requested to produce some documents, which they
16   have objected to, and the magistrate has sustained the
17   objection.  This is an appeal from the magistrate.
18        Tell me exactly what these documents are.
19            MR. BRAMMELL:  Yes, Your Honor.  The subpoenas that
20   were issued upon the caucuses, there were two separate
21   subpoenas.  There was a documentary subpoena and then also a
22   testimonial subpoena.
23            THE COURT:  Right.
24            MR. BRAMMELL:  I could go through point by point, but
25   generally speaking --

1     THE COURT:  Well, just tell me generally what they
2  are.
3     MR. BRAMMELL:  They request information about the
4  caucuses', we would say political strategies, their
5  fundraising, how they solicit donations.  The original
6  subpoenas also requested information about the opinions that
7  the legislators had on pending legislation.
8      Overall, it seeks financial information and political
9  strategy information about how the caucuses spend the money
10 that they collect on the campaigns that they support.
11    THE COURT:  Okay.  Don't people have to file reports
12 on how this stuff is spent?
13    MR. BRAMMELL:  Yes, Your Honor.  There are very
14 burdensome reporting requirements, and the caucuses have
15 complied with all those requirements.
16    THE COURT:  Are those public once they're filed?
17    MR. BRAMMELL:  Yes, Your Honor, they are, with the
18 Registry of Election Finance.
19    THE COURT:  All right.  Frankly, I don't see why you
20 need this.  The cases are saying that the limits for the
21 contributions are too low.  And you could prove that case by
22 calling your clients, who would be experts, to say what it
23 costs to run a campaign, especially here in Northern Kentucky
24 where you've got to buy TV in the Cincinnati market.
25     I don't see why you need this stuff from the caucus

1    committee.  Maybe you can change my mind.

2           MR. WINTER:  I'll do my very best, Judge.  Thank you

3    for your time.  There's a campaign limit at 121.150 of $1,000

4    per person.

5           THE COURT:  Right.

6           MR. WINTER:  And then later on in the statute,

7    there's $2,500 through the campaign contribution committee.

8           THE COURT:  I understand.

9           MR. WINTER:  The House Democrat Caucus Committee took

10   in, in 2014, $1.1 million.  And of that amount, three hundred

11   and some odd thousand are direct contributions that are

12   reportable.  The other 800,000 are not.  And so we don't know

13   where that money was placed.  So if someone, a Libertarian

14   candidate, is run -- well, let me back up one.

15      I don't anticipate that the evidence will show, should we

16   get the evidence, that every House Democrat who's up for

17   reelection will get a fractional proportional amount of the

18   800,000.  They're placed in the races that are hotly

19   contested.  And I would expect that they would be.

20          THE COURT:  Okay.

21          MR. WINTER:  However, you know, my client's stuck

22   with 1,000 per head and has to make up that funding shortfall

23   that is applied in that race by the House Democratic Caucus

24   Committee.  That could be a tremendous advantage to the

25   incumbents.

1                    THE COURT: Can't the Republican Caucus Committee do
2     the same thing?
3                    MR. WINTER: They have indicated that they have done
4     so. And we have asked for a declaration from the Republicans.
5     And after negotiating what we need for our experts to opine,
6     they have signed a declaration. The Democrat --
7                    THE COURT: Don't the candidates -- not having to get
8     elected myself, I'm not familiar with all this. I'll become
9     familiar with it by the time I have to decide the case, of
10    course. But don't the candidates have to file reports of
11    where all their contributions come from and what they spend?
12                   MR. WINTER: The candidates, right. I ran for
13    office, too. I had to file mine, too.
14                   THE COURT: Why can't you look at those reports?
15                   MR. WINTER: Because the money comes in from the
16    caucus committee.
17                   THE COURT: Yeah.
18                   MR. WINTER: And so far as I know --
19                   THE COURT: Doesn't the report show I got X number of
20    dollars from the caucus committee?
21                   MR. WINTER: They'll give you gross numbers. For
22    example, as we indicated in our brief, in 2014, there was a
23    gross expenditure from the Democratic House Caucus Committee
24    of 1.1 million. But it doesn't state --
25                   THE COURT: Can't you look at the candidates'

1 reports?

2 MR. WINTER: No.

3 THE COURT: Okay. Is that right? My understanding
4 of what a candidate had to file a report. And say that maybe
5 there's a monetary limit if you go over 50 bucks or something,
6 but they would have to file a report saying I received X
7 number of dollars from Bob Winter and X number of dollars from
8 John Jones and X number of dollars from the caucus committee,
9 or whoever contributed to that.

10 MR. BRAMMELL: Yes, Your Honor, you're correct. All
11 that information is available publicly.

12 The caucus committee has different types of donations it
13 will make. It will make direct contributions to candidates.
14 And all that information is available, and you can look at
15 that information and you can tell where the caucuses have
16 decided to put their resources.

17 There are additional expenditures that the caucus
18 committee can make that are not necessarily tied to a
19 particular candidate. It will be independent expenditures,
20 and they're not coordinated with the campaign committee.

21 And so those independent expenditures, it could be that
22 the Democratic Caucus Committee has paid a vendor to send out
23 $10,000 worth of mailers. And they would report that they had
24 paid the vendor $10,000, and that information would be
25 reported to the Registry of Election Finance.

1  THE COURT: Okay. And would it be reported who the
2  mailers were for?
3  MR. BRAMMELL: The way that the mailers would be
4  distributed, they'd be specifically sent to different
5  districts. That information you're not probably going to get
6  from a public report that's available at the Registry of
7  Election Finance.
8  But the way that they're focusing their money on
9  particular races is evident because you can see, and I believe
10 we demonstrated in our briefing, that the Democrats, if they
11 sent $25,000 to this particular Senate race and only 10,000 to
12 another, then you know that the $25,000 race is the more
13 competitive race. And it's fair to believe that the
14 additional independent expenditures would be revealed in the
15 same way.
16 I will point out, too, in the briefing, or it's been
17 suggested that $800,000 is missing. I believe that the
18 plaintiffs went and looked at some of the paper receipts that
19 were actually at the Registry of Election Finance and
20 identified about $400,000 there, exactly where it went. And
21 that was included in the briefing. So I think we're talking
22 about a much smaller amount of money.
23 And my secondary point would just be that the
24 Republicans' declaration that was submitted doesn't account
25 for where these independent expenditures went. There's a

1   large percentage of money that's just not addressed in the
2   Republican declaration.  And the Democrats are concerned about
3   the double standard in requiring more from us about that
4   expenditure.
5               THE COURT:  Well, as the --
6               MR. WINTER:  Judge, if I could respond.
7               THE COURT:  Yes.
8               MR. WINTER:  We originally reposited the same sets of
9   declarations on the two parties; and the Republicans were
10  readily responsive, but they had concerns.  And then we
11  negotiated with them to get the declarations that we felt was
12  needed and our experts felt that was needed in order to supply
13  the most comprehensive report they could.  There was no --
14  nothing from the Democrats at all.  So for them to say that
15  there's a dual standard when they don't even negotiate or
16  express their concerns --
17              THE COURT:  Well, each one's up to each one.  Have
18  you got any Democrats among your plaintiffs?
19              MR. WINTER:  No.
20              THE COURT:  I didn't think so.
21              MR. WIEST:  Your Honor, we have a Republican and two
22  Libertarians.  And the Libertarians don't get the Republican
23  caucus money.  They don't get the Democratic caucus money.
24              THE COURT:  But they can consult the public records.
25              MR. WIEST:  They cannot, Your Honor, because the

1 public records -- and I think the issue is the direct
2 contributions that they've been talking about, we can get
3 that, and we have gotten that, from the public records. That
4 accounts for about 400,000 of 1.2 million total in 2014.
5     There's another $800,000. We were able to go in and look
6 at the hard paper copies to account for another three to four
7 hundred of that, but there's still $400,000 missing. That's a
8 huge amount of money in a race. And we can't get that except
9 through these folks. And that's the problem.
10     THE COURT: Where do you need it?
11     MR. WIEST: Your Honor, we've got two experts, one of
12 whom --
13     THE COURT: Are all your people from Northern
14 Kentucky?
15     MR. WIEST: No, Your Honor. Two are from Northern
16 Kentucky. One is from Western Kentucky.
17     THE COURT: Okay. How far away?
18     MR. WIEST: He's way down in Paducah. He's way out
19 there. He's down in the House that's far south. But the
20 problem is that that these caucus campaign committees go out
21 and spend money, independent of candidates; and they spend it,
22 from what we can tell, in competitive races. And when they go
23 in and they do that, our experts, to figure out what our folks
24 need to raise to be competitive, which is what the U.S.
25 Supreme Court says we need to look at in *Randall v. Sorrell* --

1          THE COURT: Right.

2          MR. WIEST: -- says you've got to look at what

3 they're competing against. Well, we can't figure that out

4 because these guys won't give us the information. And that's

5 the whole problem.

6          By the way, Judge, one of our experts, who is the expert

7 that the U.S. Supreme Court quoted at length in *Randall* -- he

8 was the expert in *Randall* -- he says he needs this information

9 from these guys to do this analysis. That's the problem.

10         THE COURT: Well, I would say that you could prove

11 your case with your own witnesses; that you could make an

12 estimate of what it takes and what everybody's getting. And

13 if they want to rebut it, they can rebut it.

14         MR. BRUNS: They won't be here to rebut it since

15 they're a third party. The folks who are going to rebut it

16 aren't here. And if they would agree with you that our own

17 clients could meet the standard, then we'd be happy to walk

18 away from this. But they're not going to agree to that.

19 They're going to attack our expert's opinion and the basis of

20 the opinion being flawed because it's missing that

21 information.

22         MR. BRAMMELL: Your Honor, if I could respond.

23         THE COURT: Yeah. Well, I might not allow it if they

24 refuse to produce it.

25         MR. BRAMMELL: The plaintiffs have attached pages of

1   the expert's reports to the most recent filing, but have
2   produced the full report. And in both reports, the expert was
3   able to produce the conclusion, and they were reasonably
4   supported, and they were confident -- I can't remember the
5   exact language, but confident in their conclusion. And in
6   both circumstances, they found that there was a disparity
7   between the ability of the independent candidates,
8   Libertarians, to raise money, when compared to the caucus
9   campaign committees.
10        And we know from looking at the information, if the
11  Democrats can raise 1.1 million through their caucus
12  committees in the House in 2014 and the Libertarian party
13  doesn't even have a caucus committee to be able to raise any
14  money, we can see the disparity. And going in to ask the
15  additional information from the Democrats isn't going to
16  provide any additional light on the disparity that exists.
17            THE COURT: I don't think you need this. I would
18  agree with the magistrate's report as not clearly erroneous,
19  and an additional factor, have you heard yet of our new
20  concept of proportionality that we have in the federal courts?
21            MR. WINTER: Yes.
22            THE COURT: Okay. Well, I don't think this is
23  proportional, what you're asking is proportional, to what
24  you've got to put in. You'll have to prove your case. It's
25  excessive and would cause a lot of expense to somebody that's

1 not even a party.

2 I think your own experts could reconstruct pretty well
3 what's going on, and if they wanted to rebut it, they could
4 testify for the other side or whatever.

5 MR. WINTER: Judge, the only thing we would say, if I
6 may --

7 THE COURT: Go ahead. I've already ruled, but I'm
8 always interested to hear what you have to say.

9 MR. WINTER: Thank you, sir. It's just a matter of
10 statistics. If you have facts and they're really not that
11 hard to get, in lieu of assumptions and pre-assumptions, which
12 is what our two experts have now, it's always better -- you're
13 always better off to provide the most comprehensive picture to
14 the Court.

15 THE COURT: Well, I think your experts could testify
16 from what they see is being spent -- what was spent on this
17 campaign or that campaign or the other campaign. Your own
18 people can testify to what their sources are and can make a
19 projection of why they need these limits raised. And I don't
20 think you need to go to a nonparty and get what could be their
21 confidential political information. I'm not saying it's
22 privileged, but that's a factor that enters into it.

23 Anyway, I don't think the magistrate's report -- he
24 discusses all this except he didn't call it proportionality, I
25 guess. So I'm going to overrule the objections to the

1   magistrate's decision.

2   And now let's set some kind of a schedule to bring this
3   interesting case to a conclusion.  How old is it?  It was
4   filed, let's see, in '15, around the middle of '15 someplace.
5   So are we going to be able to do this by summary judgment, or
6   are you going to need a trial?

7   MR. WIEST:  Judge, we're going to try it by summary
8   judgment, and if you think there's an issue of fact, then
9   we're happy to have a bench trial on that.  But I think you've
10  established a briefing schedule that's coming up, and there's
11  an agreed order on that, when we'll have it all briefed by.

12  THE COURT:  Have I already signed that?

13  MR. WIEST:  Yes.  Or Judge Wehrman did.  One of you
14  did.

15  THE COURT:  Okay.  So you think it would all be
16  resolved on summary judgment?

17  MR. WIEST:  Unless you disagree, Your Honor, and then
18  we'll have a bench trial.

19  THE COURT:  Okay.  Well, it will all depend on how --
20  you come up and say what you think the facts are.  Who's
21  moving first?

22  MR. WIEST:  Your Honor, I think we anticipated
23  cross-motions to be filed by a date certain, I think in a
24  couple weeks, and then there's a briefing schedule.

25  THE COURT:  Simultaneously?

1  MR. WIEST: Yes, Your Honor.
2  THE COURT: When you say the briefing schedule, who
3  files the first brief?
4  MR. WIEST: I think both sides do simultaneously.
5  THE COURT: Okay. Well, I hope you argue the same
6  issues. Okay. Let's try to do it that way. I might have to
7  have some testimony because I'm not up on this stuff, but
8  we'll work it out. When will that briefing be completed?
9  MR. WIEST: I think by early August, Your Honor.
10 THE COURT: Okay. Well, we'll try to get you a
11 decision. I'm pretty well caught up so it shouldn't be very
12 long.
13 MR. WIEST: And, Your Honor, if you need a hearing or
14 you want any witnesses --
15 THE COURT: I'm sure I'll probably need a hearing
16 just to be sure I understand everything. So what do you have,
17 affidavits of the experts or depositions or what?
18 MR. WIEST: There's expert reports, and we'll be
19 doing declarations in support of that as well. And then if
20 the Court wants to hear from either of them, we're happy to
21 bring them up.
22 THE COURT: Okay. Well, that sounds like a good way
23 to do it. Okay.
24 MR. WIEST: Thank you, Your Honor.
25 MR. WICKER: Thank you, Judge.

1      (Proceedings concluded at 1:19 p.m.)

2                       - - -

3                  C E R T I F I C A T E

4      I, JOAN LAMPKE AVERDICK, RMR-CRR, certify that
the foregoing is a correct transcript from the record of
5      proceedings in the above-entitled case.

6      \s\ Joan Lampke Averdick              July 7, 2017
JOAN LAMPKE AVERDICK, RMR-CRR          Date of Certification
7      Official Court Reporter